No. 15-1265

# In the United States Court of Appeals for the Federal Circuit

**PFIZER INC., A DELAWARE CORPORATION, AND WYETH HOLDINGS CORPORATION, A MAINE CORPORATION,**

*Plaintiffs/Appellants*

v.

**MICHELLE K. LEE, DIRECTOR, U.S. PATENT AND TRADEMARK OFFICE, UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE,**

*Defendant/Appellee*

Appeal from the United States District Court for the Eastern District of Virginia in Case No. 1:12-CV-01131-GBL-TRJ, Judge Gerald Bruce Lee

## CORRECTED OPENING BRIEF FOR PLAINTIFFS/APPELLANTS PFIZER INC. AND WYETH HOLDINGS CORPORATION

Patricia A. Carson
Daniel Forchheimer
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Simeon G. Papacostas
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

*Counsel for Plaintiffs/Appellants Pfizer Inc. and Wyeth Holdings Corporation*

March 25, 2015

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 26.1, 28(a)(1) and 47.4, counsel for Plaintiffs/Appellants Pfizer Inc. and Wyeth Holdings Corporation certifies the following:

**1.     The full name of every party represented by me is:**

Pfizer Inc. and Wyeth Holdings Corporation.

**2.     The name of the real party of interest (if neither party named in the caption is a real party in interest) represented by me is:**

N/A.

**3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

No publicly held company owns 10% or more of the stock of Pfizer Inc. Wyeth Holdings Corporation is a wholly-owned, indirect subsidiary of Pfizer Inc.

**4.     The names of all law firms and the partners and associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:**

Kirkland & Ellis LLP:  Patricia A. Carson; Daniel Forchheimer; Simeon G. Papacostas

Blankingship & Keith PC:  William B. Porter

*/s/ Daniel Forchheimer*
Daniel Forchheimer

March 25, 2015

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................. i

STATEMENT OF RELATED CASES.....................................1

STATEMENT OF JURISDICTION ....................................2

STATEMENT OF THE ISSUES.....................................3

STATEMENT OF THE CASE.....................................4

STATEMENT OF THE FACTS ................................................7

    I.    THE '768 PATENT.................................................7

        A.    Background ...................................7

        B.    Prosecution History of the '768 Patent.........................8

        C.    District Court Proceedings...........................................12

SUMMARY OF THE ARGUMENT ....................................13

ARGUMENT ................................................................17

    I.    STANDARD OF REVIEW ...................................17

    II.    THE DISTRICT COURT ERRONEOUSLY
        INTERPRETED AND APPLIED SECTION 154(b)
        AND DID NOT CONSIDER THE ENTIRETY OF THE
        STATUTORY FRAMEWORK................................17

        A.    Section 154(b) Unambiguously Specifies That The
            "A Delay" Clock Stops Upon Provision Of "One Of
            The Notifications Under Section 132" .........................20

        B.    Section 132(a) Requires That A Restriction
            Requirement Include "The Reasons For Such …
            Requirement, Together With Such Information
            And References As May Be Useful In Judging Of
            The Propriety of Continuing The Prosecution Of
            His Application" .........................................................23

III.  THE STATUTORY FRAMEWORK GOVERNING
RESTRICTION PRACTICE FURTHER CONFIRMS
THE INSUFFICIENCY OF THE AUGUST 2005
RESTRICTION REQUIREMENT ........................................27

IV.  PRIOR PATENT OFFICE PRACTICES ARE
CONSISTENT WITH PFIZER'S REQUESTED
RELIEF .................................................................................31

  A.  *UMass* Did Not Address Whether A Restriction
Requirement Met The Requirements of Section
132 ...............................................................................31

  B.  The PTO In *UMass* Never Admitted That The
Restriction Requirement Was Defective Such
That It Needed To Be "Redone and Resent"................34

  C.  The PTO Has A Record Of Treating Defective
Office Actions As A Nullity For The Purpose Of
Calculating A Delay ....................................................38

V.  POLICY CONCERNS SUPPORT THE REQUESTED
RELIEF .................................................................................43

**CONCLUSION**......................................................................................**47**

# TABLE OF AUTHORITIES

## Cases

*BedRoc, Ltd. v. United States*,
541 U.S. 176 (2004)............................................................20

*Chester v. Miller*,
906 F.2d 1574 (Fed. Cir. 1990) .........................................25

*Davis v. Michigan Dep't of Treasury*,
489 U.S. 803 (1989)............................................................21

*Exelixis, Inc. v. Lee*,
Nos. 2013-1175 ....................................................................5

*Florida Power & Light Co. v. Lorion*,
470 U.S. 729 (1985)............................................................47

*Geneva Pharm., Inc. v. GlaxoSmithKline PLC*,
349 F.3d 1373 (Fed. Cir. 2003) .........................................29

*Gerber Garment Tech., Inc. v. Lectra Sys.*,
916 F.2d 683 (Fed. Cir. 1990) ...........................................28

*Hassett v. Welch*,
303 U.S. 303 (1938)............................................................20

*Janssen Pharmaceutica, N.V. v. Rea*,
928 F. Supp. 2d 102 (D.D.C. 2013) ...................................40

*Kelly v. United States*,
826 F.2d 1049 (Fed. Cir. 1987) .........................................21

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001)..............................................................24

*United States v. Menasche*,
348 U.S. 528 (1955)............................................................21

*United States v. Myers*,
553 F.3d 328 (4th Cir. 2009)..............................................20

*University of Massachusetts v. Kappos ("UMass")*,
903 F. Supp. 2d 77 (2012)............................................ passim

## Statutes

28 U.S.C. § 1295(a)(4)(C) ........................................................2

28 U.S.C. § 1331 ......................................................................2

28 U.S.C. § 1338(a) .................................................................2

28 U.S.C. § 1361 ......................................................................2

28 U.S.C. § 2201 ......................................................................2

28 U.S.C. § 2202 ......................................................................2

35 U.S.C. § 121 ..................................................... 27, 28, 29, 30

35 U.S.C. § 132 ............................................................... passim

35 U.S.C. § 132(a) .......................................................... passim

35 U.S.C. § 151 ..................................................................8, 19

35 U.S.C. § 154(b) .......................................................... passim

35 U.S.C. § 154(b)(1) .............................................................18

35 U.S.C. § 154(b)(1)(A) ....................................................4, 12

35 U.S.C. § 154(b)(1)(A)(i) ....................................................11

35 U.S.C. § 154(b)(1)(A)(ii) .............................................11, 38

35 U.S.C. § 154(b)(1)(B) ..........................................................4

35 U.S.C. § 154(b)(2)(c)(ii) ....................................................26

5 U.S.C. § 701 ..........................................................................2

5 U.S.C. § 702 ..........................................................................2

5 U.S.C. § 703 ..........................................................................2

5 U.S.C. § 704 ..........................................................................2

5 U.S.C. § 705 ..........................................................................2

5 U.S.C. § 706 ....................................................................2, 46

## Other Authorities

*In re: Patent No. 7,741,356,* Breslin et al.,
   Decision Upon Remand and Reconsideration of
   Patent Term Adjustment and Notice of Intent
   to Issue Certificate of Correction ............................................ 15, 41, 42

*In re: Patent No. 7,803,385*, Matthew C. Coffey,
   Decision on Application For Patent Term Adjustment ..... 15, 38, 40, 42

*Manual of Patent Examining Procedure* ch. 710.06 (8th ed., Rev. 9) .... 43

*Manual of Patent Examining Procedure* ch. 814 (8th ed., Rev. 9) ......... 29

*Manual of Patent Examining Procedure* ch. 815 (8th ed., Rev. 9) ......... 29

*Manual of Patent Examining Procedure* ch. 817 (8th ed., Rev. 9) ......... 30

Patent Act of 1870, ch. 230, § 41, 16
   Stat. 198-217 (1870) ................................................................................ 25

S. Rep. No. 1979 (1952) .......................................................................... 25

## Rules

Fed. R. App. P. 28(f) ................................................................................. 18

Fed. R. Civ. P. 25(d) .................................................................................... 5

## Regulations

37 C.F.R. § 1.135(c) ................................................................................ 44

37 C.F.R. § 1.136(a) .................................................................................. 9

37 C.F.R. § 1.136(a)(3) .............................................................................. 9

37 C.F.R. § 1.181(a)(3) ............................................................................ 39

37 C.F.R. § 1.702(a)(1) ............................................................................ 8, 9

37 C.F.R. § 1.702(a)(2) ............................................................................ 39

37 C.F.R. § 1.703 .................................................................................... 44

37 C.F.R. § 1.704(c)(7) ............................................................................ 44

## STATEMENT OF RELATED CASES

There has been no other appeal in or from the same proceeding in the lower court that gives rise to this appeal.  Furthermore, counsel for Plaintiffs/Appellants is aware of no other case in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction to hear this action and was authorized to issue an order pursuant to 28 U.S.C. §§ 1331, 1338(a), 1361, 2201 & 2202; 35 U.S.C. § 154(b); and 5 U.S.C. §§ 701-706.  The District Court entered final judgment in favor of Defendant/Appellee on November 12, 2014.  (JA0001).[1]  Plaintiffs/Appellants timely filed a Notice of Appeal on December 5, 2014.  This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(C).

---

[1]  "JA" refers to documents provided in the Joint Appendix.

## STATEMENT OF THE ISSUES

1.     Did the District Court err in denying Pfizer's motion for summary judgment seeking patent term adjustment under 35 U.S.C. § 154(b), where the Patent Examiner issued an admittedly defective -- and subsequently corrected -- Restriction Requirement during prosecution of the underlying patent application?

2.     Does an admittedly defective Restriction Requirement issued during prosecution of a patent application constitute a "notice" within the meaning of 35 U.S.C. § 132, such that it tolls the accrual of "A Delay" for purposes of calculating the proper patent term adjustment?

## STATEMENT OF THE CASE

On April 12, 2012, U.S. Patent 8,153,768 ("the '768 Patent") issued from underlying application 10/428,894 ("the '894 application"), filed on May 2, 2003.  (JA2320-2401).  In connection with the issuance, the PTO extended the term of the '768 patent by 1291 days in accordance with 35 U.S.C. § 154(b).  (JA2320; JA2085-87).

On October 5, 2012, Plaintiffs/Appellants (hereinafter "Pfizer") filed this case against the Honorable David J. Kappos, as Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.  (JA0025-237).  In the Complaint, Pfizer sought, *inter alia*, a correction of the PTO's calculation of "A Delay" in accordance with 35 U.S.C. § 154(b)(1)(A), to add an additional 197 days of patent term based on the time elapsed between the PTO Examiner's issuance of an admittedly-defective Restriction Requirement on August 10, 2005, and the subsequent issuance of a corrected Restriction Requirement on February 23, 2006. (*Id*.).  The Complaint also sought a recalculation of "B Delay" in accordance with 35 U.S.C. § 154(b)(1)(B).  (*Id*.).  The parties agreed that the issues surrounding the proper calculation of "B Delay" would be

4

disposed of by this Court's then-pending decision on appeal in *Exelixis, Inc. v. Lee*, Nos. 2013-1175, -1198, and the District Court therefore stayed these proceedings pending resolution of the *Exelixis* matter. (JA0242).   On January 15, 2014, this Court issued its decision in *Exelixis*, clarifying the proper calculation of "B Delay."   To promote judicial efficiency, the parties agreed that although "B Delay" for the '768 patent was ripe for recalculation in view of *Exelixis*, the remaining issue of "A Delay" remained pending, was appropriate for resolution on summary judgment, and should be resolved prior to remanding the matter to the PTO, so that all issues could be dealt with on remand at once.   (JA0243-48; JA0249-50).

On April 14, 2014, the parties informed the District Court that Deputy Director Michelle K. Lee had assumed the duties and functions of the Under Secretary of Commerce for Intellectual Property and Director of the USPTO, a position that had been vacated.   Ms. Lee was therefore substituted as Defendant for David J. Kappos in accordance with Fed. R. Civ. P. 25(d).   (JA-0243).

Following summary judgment briefing and argument, the District Court, on November 6, 2014, denied Pfizer's motion for summary

judgment to correct the calculation of "A Delay" and concomitantly granted Lee's (hereinafter "Appellee" or "the PTO") motion for summary judgment to affirm the PTO's calculation of "A Delay."[2]  (JA0002-17). Final judgment was entered on November 12, 2014.  (JA0001).

Pfizer filed this appeal on December 5, 2014, which this Court docketed on January 14, 2015.  (Dkt No. 1).

---

[2]  Also at issue in the Complaint and on summary judgment was the question of whether the '894 application was properly deemed "abandoned" during the course of the prosecution.  This issue was resolved during the course of summary judgment briefing, with the PTO agreeing to withdraw its earlier finding that the application was abandoned.  (*E.g.* JA2272).  Thus, Pfizer's motion for summary judgment on the abandonment issue was appropriately denied as moot, and is not made part of this appeal.  (JA0013-14).

## STATEMENT OF THE FACTS

I.    **THE '768 PATENT**

    A.    **Background**

The '768 Patent, directed to "Calicheamicin Derivative-Carrier Conjugates," discloses and claims antibody drug conjugates ("conjugates") that can bind to malignant cancer cells to release a cytotoxic agent and destroy those cells. (JA2320-2401). One of the claimed conjugates, inotuzumab ozogamicin, is being studied in clinical trials for the treatment of acute lymphoblastic leukemia ("ALL") -- one of four main types of leukemia -- which is a blood cancer that starts in bone marrow cells. (*E.g.* JA2081-83). ALL is a common form of cancer in children, accounting for approximately 75-80% of childhood leukemias. (JA1998; JA2024-25). In the absence of treatment, most patients with ALL will succumb to their disease in a matter of months. (JA1995-96). Pfizer[3] scientists continue to explore the utility of the

---

[3] The research underlying the invention of the '768 Patent was performed by scientists at Wyeth, which was acquired by Pfizer in 2009.

claimed compounds in clinical trials, including with ongoing clinical trials for utility in ALL.[4] (JA2081-83).

The '768 Patent names twelve (12) co-inventors and issued on April 10, 2012, after approximately nine (9) years of prosecution before the United States Patent and Trademark Office ("PTO"). The '768 Patent is assigned to Wyeth Holdings Corporation, a wholly-owned subsidiary of Pfizer Inc. (JA2320).

## B.    Prosecution History of the '768 Patent

The '768 Patent issued from U.S. Patent Appl. No. 10/428,894 ("the '894 application"), which was filed on May 2, 2003. (JA2320). To avoid the accrual of any additional patent term in accordance with 35 U.S.C. § 154(b), the PTO Examiner had a duty to act on the application -- either by issuing a notification under 35 U.S.C. § 132 or a notice of allowance under 35 U.S.C. § 151 -- within fourteen months from the filing date, *i.e.* by July 2, 2004. 37 C.F.R. § 1.702(a)(1).

Having received no notice from the PTO by August 2005, the applicants mailed a letter to the PTO on August 2, 2005 -- 13 months

---

[4]   Pfizer also studied the utility of inotuzumab ozogamicin for Non-Hodgkins Lymphoma ("NHL") in a Phase III clinical trial, which was discontinued in May 2013.

after the PTO deadline to act -- requesting that the PTO "[p]lease advise us of the status of the above-mentioned application, and when a first Office Action on the merits can be expected." (JA0458). Days later, on August 10, 2005, the PTO mailed a Restriction Requirement, 404 days after the July 2, 2004 deadline for doing so in accordance with 37 C.F.R. § 1.702(a)(1). (JA0459-70). The Examiner set a one-month shortened statutory period for reply, extendible up to six months in accordance with 37 C.F.R. § 1.136(a). (JA0460). As is common in patent prosecution and permitted in accordance with 37 C.F.R. § 1.136(a)(3), applicants earlier authorized the PTO to "treat any reply requiring a petition for extension of time for its timely submission as containing a request therefor for the appropriate length of time" during the pendency of the '894 application, and further authorizing the PTO to charge all required extension fees. (JA0267). Thus, with respect to the August 10, 2005 Restriction Requirement, applicants' response deadline was September 10, 2005, *automatically extendible* (and impliedly extended) to February 10, 2005.

The Patent Office admitted that this first Restriction Requirement was defective. The application, as filed, contained 144 claims (JA0355-

9

75), and the Office Action summary indicated that all claims (claims 1-144) were "subject to restriction and/or election requirement." (JA0460).  Further, the Detailed Action provided 21 different claim groups in total, but omitted *any* reference to claims 75, 76 and 103-106; therefore applicants were unable to respond and make a provisional claim group election and/or traverse as to those claims.  (JA0461-65).

Thus, on February 6, 2006, applicants informed the Examiner, via telephone interview, that the Restriction Requirement was defective in view of its omission of six claims, and the Examiner *agreed*, indicating that the "Restriction Requirement will be redone and resent including claims 75-76 and 103-106," as memorialized in an Interview Summary attached to a revised Restriction Requirement signed by the Supervisory Patent Examiner, on February 7, 2006.  (JA0579; JA0567-78).  The revised Restriction Requirement, properly including all pending claims, was mailed on February 23, 2006.  (JA0567-78).  The remainder of prosecution continued uninterrupted until, on October 11, 2011, a Notice of Allowance was issued.  (JA1692-93).  The Issue Notification for the '894 application was mailed on March 21, 2012, which included a Determination of Patent Term Adjustment under 35

10

U.S.C. § 154(b), indicating a PTA of 1291 days, 684 of which accrued as "A Delay." [5] (JA1773; JA2085-87). The '768 Patent issued on April 10, 2012, reflecting that same PTA of 1291 days. (JA2320). The PTO's calculation of 684 days of "A Delay" was derived as follows:

- **404 Days**: In accordance with 35 U.S.C. § 154(b)(1)(A)(i), the PTO was required to provide a notification under Section 132 within fourteen (14) months of the date on which the application was filed. Here, the application was filed on May 2, 2003, meaning the PTO was required to act by July 2, 2004 to avoid the accrual of "A Delay." No action was taken until August 10, 2005 -- the date of mailing of the first Restriction Requirement -- amounting to 404 days of "A Delay."[6] (*See* JA2087).

- **280 Days**: Later in prosecution, applicants submitted a Request for Continued Examination (RCE), on March 16, 2010, in response to a final rejection. In accordance with 35 U.S.C. § 154(b)(1)(A)(ii), the PTO was required to provide a response within four (4) months -- i.e. by July 16, 2010 -- to avoid the accrual of additional "A Delay." The PTO did not mail a response until April 22, 2011, amounting to 280 days of additional "A Delay." (*See* JA2085-86).

---

[5] When the PTO fails to meet the statutory deadlines depicted in Section 154(b), that delay is commonly referred to as "A Delay," because of its presence in sub-section "(A)" of Section 154(b)(1).

[6] Of course, central to this dispute is whether the August 10, 2005 mailing was a proper notification under Section 132 so as to stop the accrual of "A Delay." Pfizer disagrees that it satisfied the requirements of Section 132, but merely provides these facts for an understanding of how the PTO -- albeit erroneously -- arrived at its calculation.

11

## C.    District Court Proceedings

Pfizer filed the instant suit to obtain, *inter alia*, 197 days of additional PTA in the form of "A Delay" that should have been awarded from the time between August 10, 2005 (the date the first Restriction Requirement was mailed) and February 23, 2006 (the date the second, corrected Restriction Requirement was mailed). (JA0025-237). Following a brief stay period, the parties agreed the issues were amenable to summary judgment, and that they would file cross motions for summary judgment on, *inter alia*, the propriety of the PTO's determination of "A Delay" for purposes of calculating the overall PTA. (JA0243-48; JA0249-50).

On November 6, 2014, the District Court granted the PTO's motion for summary judgment, concluding that the language of 35 U.S.C. § 154(b)(1)(A) "is unambiguous on its face" and "requires only that the PTO 'provide at least one of the notifications under section 132,' in order to stop the clock" on "A Delay" accrual. (JA0014-15). In siding with the PTO, the District Court found that the issuance of a Restriction Requirement -- regardless of its ultimate accuracy or

sufficiency -- stops the clock.  (JA0014-17).  This decision forms the basis of appeal.

## SUMMARY OF THE ARGUMENT

Pfizer's appeal presents a straightforward question of proper statutory interpretation and application, which the District Court failed to properly undertake, resulting in the improper affirmance of the PTO's withholding from Pfizer of 197 days of patent term adjustment.

The statutory provisions at issue here are clear.  Pursuant to Section 154(b) of Title 35, when the PTO fails to issue a "notification under section 132" within fourteen months of the patent filing date, the patentee is entitled to additional patent term for each day that the PTO delays -- called "A Delay" -- until the PTO issues that notification or a notice of issuance.  In the case at bar, the PTO -- as affirmed by the District Court -- stopped the clock on "A Delay" as soon as the PTO issued a restriction requirement in August 2005, notwithstanding that the restriction requirement failed to account for all pending claims and because of this, the Examiner admitted that it was so deficient that it needed to be "redone and resent."

In so deciding, the PTO and the District Court failed to acknowledge that this defective Restriction Requirement did not meet the standards for a "notification under section 132," and therefore did not stop the clock on "A Delay." Indeed, Section 154(b) does not merely require the PTO to *act* to stop the clock; it must act in accordance with the statute and meet the threshold requirements of Section 132, which requires that the notification be provided "with such information and references as may be useful in judging of the propriety of continuing the prosecution of his application." Absent full compliance with Section 132, there is no statutory basis for "stopping the clock." The District Court decision stopped short of addressing whether or not the requirements of Section 132 were met by the PTO when it issued a deficient Restriction Requirement in August 2005. The record is clear that the Section 132 requirements were not satisfied. These facts alone dictate reversal of the District Court judgment.

In rendering its decision, the District Court improperly relied on the *UMass v. Kappos* decision from the District of Columbia where additional "A Delay" was denied when a restriction requirement was issued and responded to, but which the PTO later revised. That case is

inapposite, as it does not address a situation where a restriction requirement is facially deficient, unanswerable (and unanswered) and later withdrawn, as is the case here. *UMass* merely stands for the proposition that where a restriction requirement is modified as part of the "give and take" between the applicant and the PTO, "A Delay" does not continue accruing. Such is not the case here, where there was no "give and take." And additional case examples with facts analogous to this case support extending the period of "A Delay" where a restriction requirement is withdrawn and replaced outside the context of the normal back-and-forth of patent prosecution. *See In re: Patent No. 7,741,356,* Breslin et al., Decision Upon Remand and Reconsideration of Patent Term Adjustment and Notice of Intent to Issue Certificate of Correction ("*Janssen*") (JA2402-08); *In re: Patent No. 7,803,385*, Matthew C. Coffey, Decision on Application For Patent Term Adjustment ("*Oncolytics*") (JA2151-55).

Pfizer's requested relief is also consistent with the statutory framework governing restriction practice, which requires patentees to maintain "consonance" in divisional applications filed after a restriction requirement. A facially -- and admittedly -- deficient restriction

requirement that does not account for all pending subject matter provides insufficient information to maintain consonance going forward, and thus cannot possibly be a satisfactory notification in accordance with Section 132.

In short, as explained herein, the plain wording of the statutory provisions at issue here mandate reversing the District Court's judgment and finding that Pfizer is entitled to additional patent term adjustment. Such a ruling is entirely consistent with past PTO practices in cases analogous to the one at hand, and promotes the policy directives of the PTO to ensure expedient and complete patent prosecution and compensate for delays outside the control of the patent applicant.

# ARGUMENT

## I.   STANDARD OF REVIEW

The District Court's denial of summary judgment is reviewed *de novo*.  This appeal presents a pure question of statutory interpretation; no facts are in dispute.  As the District Court recognized, *Chevron* deference is unavailable because the statutory text is clear, and Congress did not delegate to the USPTO rulemaking power that gives the agency's construction of the "A Delay" provision the force and effect of law.  The District Court further recognized that the statute at issue (35 U.S.C. § 154(b)) is unambiguous on its face, and accordingly the PTO's -- and the District Court's -- interpretation of that statute is entitled to no deference.

## II.   THE DISTRICT COURT ERRONEOUSLY INTERPRETED AND APPLIED SECTION 154(b) AND DID NOT CONSIDER THE ENTIRETY OF THE STATUTORY FRAMEWORK

At issue in this appeal is the proper interpretation and application of Section 154(b) of Title 35, which guarantees prompt responses by the PTO and provides for an extension of patent term by one day for each day after the period specified in the statute until the PTO takes the required action.  The District Court, in granting summary judgment in

favor of the PTO, found this statute to be unambiguous, yet ignored

critical text regarding the PTO's statutory obligations.

The full text of 35 U.S.C. § 154 is in the addendum to this brief.[7]

Specifically, Section 154(b) states, in relevant part:

> **(A) Guarantee of prompt patent and trademark office responses.—** Subject to the limitations under paragraph (2), if the issue of an original patent is delayed due to the failure of the Patent and Trademark Office to—
>
>> **(i)** *provide at least one of the notifications under section 132* or a notice of allowance under section 151 not later than 14 months after—
>>
>>> **(I)** the date on which an application was filed under section 111 (a);
>>
>>> \*   \*   \*
>>
>> the term of the patent shall be extended 1 day for each day after the end of the period specified in clause (i), (ii), (iii), or (iv), as the case may be, until the action described in such clause is taken.

35 U.S.C. § 154(b)(1) (italics added).

As made plain by the statutory framework, if after fourteen

months from filing the PTO has failed to provide a notification under

---

[7]   In accordance with Federal Rule of Appellate Procedure 28(f), the addendum accompanying this brief contains full versions of certain statutes, rules, regulations, and other authorities discussed herein.

Section 132 or a notice of allowance under Section 151, each day that transpires from that day onward is added to the overall patent term of the issued patent.

Key to resolving the dispute here -- but overlooked by the District Court -- is an understanding of what constitutes a "notification[] under Section 132" sufficient to satisfy the PTO's obligation to act within 14 months from the application filing date and, by consequence, toll the accrual of any additional "A Delay" for purposes of calculating overall patent term adjustment. Section 132(a) of Title 35 not only defines what constitutes a response, but what such a response must contain in order to qualify under the statute:

> Whenever, on examination, any claim for a patent is rejected, or any objection or requirement made, *the Director shall notify the applicant thereof, stating the reasons for such rejection, or objection or requirement, together with such information and references as may be useful in judging of the propriety of continuing the prosecution of his application*; and if after receiving such notice, the applicant persists in his claim for a patent, with or without amendment, the application shall be reexamined. No amendment shall introduce new matter into the disclosure of the invention.

35 U.S.C. § 132(a) (emphasis added).

In purporting to interpret and apply the PTA statute, Section 154(b), the District Court correctly began its analysis by noting that when "construing a statutory provision, a court's 'inquiry begins with the statutory text, and ends there as well if the text is unambiguous.'" (JA0014 (quoting *BedRoc, Ltd. v. United States*, 541 U.S. 176, 183 (2004)).  But the District Court ended its inquiry prematurely when it failed to consider the entirety of the relevant statutory text, particularly the specific reference in Section 154 to the requirement that a notification that stops the "A Delay" clock be one that is made "under Section 132."  The District Court's failure to consider whether or not the defective August 2005 Restriction Requirement met the requirements of Section 132 renders its analysis incomplete, and therefore erroneous.

### A.  Section 154(b) Unambiguously Specifies That The "A Delay" Clock Stops Upon Provision Of "One Of The Notifications Under Section 132"

"The general rule" of statutory interpretation "is that when one statute adopts a provision of another statute by specific reference, it is as if the adopting statute had itself spelled out the terms of the adopted provision." *United States v. Myers*, 553 F.3d 328, 331 (4th Cir. 2009) (citing *Hassett v. Welch*, 303 U.S. 303, 314 (1938)).  While the statutory

text is where the inquiry begins, that text must necessarily be read in the context of the entire statutory provision, *i.e.*, the inquiry must take into account the entirety of the statutory text at issue. *See Kelly v. United States*, 826 F.2d 1049, 1053 (Fed. Cir. 1987); *see also Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute.") (citation omitted). Accordingly, any inquiry into the issue of whether a particular notification stopped the "A Delay" clock under Section 154(b) must also include an inquiry into whether the notification at issue complied with Section 132.

While the District Court correctly recognized that Section 154(b) requires "that the PTO 'provide at least one of the notifications under section 132,' in order to stop the clock" for the purposes of calculating "A Delay," (JA0015), the District Court failed to then address whether the notification at issue in this case, *i.e.*, the August 2005 Restriction Requirement, met the statutory requirements to qualify it as falling

21

"under section 132."  The issue here is not whether a restriction requirement is a *type* of notification that qualifies under Section 132; there is no dispute that it does.  The question, however, is whether an admittedly-defective restriction requirement -- such as the August 2005 Restriction Requirement here -- meets the statutory requirements of Section 132 merely because it is labeled "restriction requirement."  The District Court did not expressly address this fundamental issue.

Instead, the District Court, following the PTO's arguments nearly verbatim, based its decision on whether or not stoppage of the "A Delay" clock is "dependent on the ultimate accuracy of the office action," deciding in the end that the clock stopped regardless of whether the PTO action was ultimately accurate.  (JA0015 (citing *University of Massachusetts v. Kappos ("UMass")*, 903 F. Supp. 2d 77 (2012))[8]; *see also* JA2317-18 at 28:24-29:1 ("The way the statute is written, it does not require me [*i.e.*, the Court] to focus in on the quality of the notice, but the fact that a notice was issued."); JA2218 (The PTO arguing that "[t]he explicit statutory and regulatory language thus only references

---

[8]  Pfizer addresses the District Court's improper reliance on *UMass* further, *infra*.

the *provision* (or issuance) of an Office action, not the eventual accuracy of that Office action.") (emphasis in original); JA2281 (The PTO arguing that "a restriction requirement (like any other Office action) serves to stop the 'A Delay' clock from running, regardless of the ultimate accuracy or propriety of that requirement.")).  The District Court did not determine the threshold issue of whether or not the requirements of Section 132 were satisfied; rather, its focus was on the wrong inquiry, *i.e.*, the "ultimate accuracy of the office action."

> **B.    Section 132(a) Requires That A Restriction Requirement Include "The Reasons For Such … Requirement, Together With Such Information And References As May Be Useful In Judging Of The Propriety of Continuing The Prosecution Of His Application"**

Under Section 132(a), if a patent examiner concludes that a patent should not be granted, "the Director *shall* notify the applicant thereof, stating the reasons for such rejection, or objection or requirement, *together with* such information and references as may be useful in judging of the propriety of continuing the prosecution of his application."  (emphasis added).  Contrary to the PTO's statement before the District Court that "the statute does not modify 'notification' with *any* term," (JA2279 (emphasis in original)), the use of the words

"together with" makes clear that the statute modifies all types of "notifications" -- whether a rejection, objection, or restriction requirement -- by requiring that those notifications include additional "information and references."  35 U.S.C. § 132(a).

Pfizer directed the Court to this provision of Section 132(a) during oral arguments, as well as in its summary judgment briefing.  (JA2295 at 6:6-25; *see also* JA1893).  But the District Court's adoption of the PTO's erroneous arguments as the basis for its decision did not address the requirements of Section 132(a) at all, violating well-established principles of statutory construction.  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." ) (internal quotations omitted).

In the context of a rejection, one of the three types of potential notifications identified as falling under Section 132, this Court has previously addressed the requirement that a notification contain certain information, explaining that "Section 132 is violated when a rejection is so uninformative that it prevents the applicant from recognizing and

seeking to counter the grounds for rejection." *Chester v. Miller*, 906 F.2d 1574, 1578 (Fed. Cir. 1990). Likewise, a restriction requirement must contain certain information in order to satisfy Section 132(a). [9]

The District Court failed to even consider whether the August 2005 Restriction Requirement -- relied on by the PTO to "stop the clock" on the accrual of "A Delay" -- satisfied the minimal requirements of Section 132(a). Firstly, the Court failed to recognize that the PTO had not satisfied the first requirement of Section 132 by not providing a rejection, objection or requirement for some claims presented for examination and secondly, therefore the PTO could not have met the second requirement to provide information and references as may be

---

[9] By its plain wording, Section 132(a) encompasses PTO rejections, objections or requirements, including restriction requirements. However, first enacted pursuant to the 1870 Patent Act, the provision initially applied only to rejections. Patent Act of 1870, ch. 230, § 41, 16 Stat. 198-217, 204 (1870). The provision was revised in 1952 to encompass objections and requirements in an effort to "incorporate present practice." S. Rep. No. 1979, at 21 (1952). The Congressional intent behind the amendment, therefore, was to apply an identical burden on the PTO when issuing rejections, objections, *and* requirements: provide an applicant with enough information to effectively continue prosecution of the application, and to decide whether it is even prudent to do so. Based on the fact that Congress applied the language in § 132(a) to rejections *and* requirements, the *Chester v. Miller* standard should apply equally to Restriction Requirements.

useful in judging of the propriety of continuing the prosecution of the application. The PTO cannot exercise its examination powers for patent applications by failing to comply with explicit statutory requirements. Accordingly, when considered in the context of the proper statutory framework, the inescapable conclusion is that the Restriction Requirement did not meet these requirements, and thus the clock continued to run, entitling Pfizer to an additional 197 days of "A Delay."[10] Indeed, the PTO itself admitted the Restriction Requirement was defective and agreed it would be "redone and resent." (JA0579). To track the statute, by the Examiner's own admission, the defective and incomplete August 2005 Restriction Requirement failed to provide "such information and references as may be useful in judging of the propriety of continuing the prosecution of [the] application" and thus could not satisfy Section 132 and, by extension, Section 154(b).

---

[10] It is noteworthy that in accordance with 35 U.S.C. § 154(b)(2)(c)(ii), any period beyond three months in which Pfizer delayed filing a response to a Section 132(a) notification would have been subtracted from the overall PTA calculation. If the PTO had considered the August 2005 Restriction Requirement to be a proper notification, the overall "A Delay" would have been offset during the period after November 10, 2005 in which Pfizer had not yet submitted a reply. This did not occur, reinforcing the view that even the PTO deemed its defective Restriction Requirement to be a nullity.

For these reasons alone, the District Court's grant of summary judgment in the PTO's favor should be reversed, and this Court should award 197 days of additional patent term adjustment for Pfizer's '768 Patent.

## III.    THE STATUTORY FRAMEWORK GOVERNING RESTRICTION PRACTICE FURTHER CONFIRMS THE INSUFFICIENCY OF THE AUGUST 2005 RESTRICTION REQUIREMENT

As explained above, the Examiner's August 2005 Restriction Requirement failed to meet the exacting standard of Section 132(a) and, by extension, Section 154(b).  This inescapable conclusion is further supported by the statutory framework governing restriction practice. The District Court's implicit conclusion that an admittedly defective restriction requirement satisfies -- without question -- the minimum requirements of Section 132 and 154(b), fails to adhere to and indeed undermines Congressional intent with respect to restriction practice.

35 U.S.C. § 121 governs divisional application practice in view of a restriction requirement, and provides:

> If two or more independent and distinct inventions are claimed in one application, the Director may require the application to be restricted to one of the

27

> inventions…. A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application….

In short, Section 121 provides a form of "immunity" from invalidity attacks -- including obviousness-type double patenting attacks -- as between applications and/or patents issuing separately as a result of a PTO restriction requirement. Importantly, however, to obtain the benefit of this so-called immunity, the patentee must ensure that the patent issuing from the divisional application passes a strict "consonance" test. "Consonance requires that the line of demarcation between the 'independent and distinct inventions' that prompted the restriction requirement be maintained. . . . Where that line is crossed the prohibition of the third sentence of Section 121 does not apply." *Gerber Garment Tech., Inc. v. Lectra Sys.*, 916 F.2d 683, 688 (Fed. Cir. 1990).

Where, as here, a restriction requirement does not account for all pending claims and is thus facially deficient, there is no clear "line of

demarcation," and a patentee cannot possibly be expected to maintain consonance in subsequent applications.   Indeed, the patentee has no way of knowing whether certain subject matter, not specified in any restriction grouping, crosses over the line of demarcation, leaving the patentee to engage in mere guesswork.  Thus, this Court has held that "restriction requirements *must* provide a clear demarcation between restricted subject matter to allow determination that claims in continuing applications are consonant and therefore deserving of § 121's protections."   *Geneva Pharm., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1381 (Fed. Cir. 2003) (emphasis added).

Consistent with this Court's directives and the underpinnings of Section 121, the Patent Office itself has incorporated the requirement that the examiner "provide a *clear and detailed record* of the restriction requirement" so that the proper application of Section 121 can be ascertained.  *See Manual of Patent Examining Procedure* (8th ed., Rev. 9) ("MPEP") ch. 814 (emphasis added); *see also* MPEP ch. 815 ("When

making a restriction requirement every effort should be made to have the requirement complete.")[11]

In view of the above, the District Court's holding that an admittedly defective restriction requirement is sufficient to stop the clock on "A Delay" cannot be correct.  Based on the plain wording of Section 154(b), only a proper notification under Section 132 is sufficient to stop the clock.  A defective restriction requirement that subverts the clear underpinnings of Section 121 and prevents the patentee from ascertaining -- let alone complying with -- consonance simply cannot be a proper notification under Section 132.  Any conclusion otherwise would contravene this Court's prior decisions as well as the PTO's own guidance as set forth in the MPEP, not to mention Congress' clear intent in enacting Section 121.

Thus, consistent with the purpose of Section 121 and the exacting standards for maintaining consonance, the only proper conclusion is

---

[11] Likewise, MPEP ch. 817 sets forth an outline for setting forth a restriction requirement, and calls for the examiner to explain that the restriction is being made pursuant to Section 121, and specifically to "look for omitted claims" as the restriction requirement is being drafted, reinforcing the importance of including all pending claims in order to satisfy the intent of Section 121.

that an admittedly defective restriction requirement -- one which does not account for all pending claims and does not enable the patentee to ascertain or comply with the line of demarcation -- is not a true restriction requirement at all, and thus not a proper notification within the scope of Section 132 (and by extension, Section 154(b)).

## IV. PRIOR PATENT OFFICE PRACTICES ARE CONSISTENT WITH PFIZER'S REQUESTED RELIEF

In support of its ruling that a defective restriction requirement stops the clock on "A Delay," the District Court erroneously relied on *UMass*, as advocated by the PTO. (*See* JA0015-17).  But *UMass* did not address the issue present in the case at bar, namely whether a restriction requirement that the PTO admittedly recognizes as defective meets the standards of Section 132.  The facts in *UMass* are inapposite, and the court's holding therefore cannot apply to this case.

### A. *UMass* Did Not Address Whether A Restriction Requirement Met The Requirements of Section 132

In *UMass*, the court determined that an initial Restriction Requirement stops the "A Delay" clock even if an applicant "successfully convinces an Examiner to change a ruling contained in an Office Action" during the normal give-and-take process of examination.  *UMass*, 903 F. Supp. 2d at 81.  This is *not* the situation here, where the initial August

31

2005 Restriction Requirement was so deficient that by the Examiner's own admission it would need to be "redone and resent." This admission, contained *within the administrative record*, confirms that the applicant was unable to respond, thereby removing it from this "give-and-take process."

As an initial matter, the sequence of communications between the PTO and applicant in *UMass* demonstrates the key differences between that decision and the case at bar. As shown in the diagram below, in *UMass*, the office action alleged to be defective was a first restriction requirement that accounted for *all* of applicant's claims, to which the applicants replied by making a provisional election and cancelling the remaining claims. *Id.* at 81 ("On October 9, 2007, plaintiffs filed a Preliminary Amendment and Response to the [initial] Restriction Requirement.").



In this regard, *UMass* is immediately distinguishable and inapplicable to the case at bar, because there was no question in *UMass* that the restriction requirement accounted for all pending claims, and was therefore *fully* in compliance with Section 132(a), such that neither the parties nor the district court needed to even address the threshold issue of whether the notification at issue met the requirements of Section 132.[12]  Nor was there any dispute that the applicants in *UMass*

---

[12] *See UMass*, 903 F. Supp. 2d at 86-87 ("Plaintiffs do not dispute, nor can they, that 'an action' is clearly defined under 35 U.S.C. 132 as a rejection, an objection, or a requirement.  And plaintiffs do not dispute that a requirement was issued in this case on July 13,

were able to respond to the allegedly "defective" office action in that case—because they did indeed respond.    Unlike in *UMass*, the resolution of the instant dispute *requires* consideration of Section 132(a) and compliance therewith, a separate and earlier question in the overall inquiry.    *UMass* is accordingly inapplicable.

### B.    The PTO In *UMass* Never Admitted That The Restriction Requirement Was Defective Such That It Needed To Be "Redone and Resent"

Additional facts further distinguish the *UMass* from the present case.    Following the initial back-and-forth between applicant and the PTO in *UMass*, the applicants participated in telephone conversations with the Examiner wherein they expressed disagreement with the manner in which the claims had been grouped.    *Id*.    The Examiner responded by asking the applicants to file a Supplemental Amendment so that the Examiner could issue a new Restriction Requirement.    *Id*. at 81 ("Since the applicants already had complied with the Examiner's first Restriction Requirement by making an election and canceling the 'non-elected' claims, it was suggested by the Examiner's Supervisor that the applicants file a Supplemental Amendment to add the canceled

_____

2007.  Therefore, the PTO correctly interpreted the statute to find that the period of A Delay ends on that date.")

claims back into the application, so the Examiner could essentially start over and issue a proper restriction requirement."). The applicants complied, and in the Supplemental Amendment, also "amended and broadened claims … by adding additional, alternative limitations to the claims and added new claims … to the application," *i.e.*, filing a substantive response to the original requirement. *Id*. at 82. Rejecting the applicants' assertion that the initial Restriction Requirement should be treated as a "nullity" for purposes of calculating "A Delay", the *UMass* court instead found the communications at issue to be part of the typical "give-and-take process of examination," and accordingly denied plaintiffs' claims for additional PTA due to "A Delay." *Id*. at 85.

The present situation is decidedly different from the one addressed by the court in *UMass*. Unlike in *UMass*, the PTO's August 2005 Restriction Requirement omitted claims, thereby precluding applicants from being able to provide a response and further rendering it impossible for applicants (and third parties) to understand the line of demarcation underlying the Restriction Requirement, as explained above. The administrative record accords with this understanding, as evidenced by the Examiner's statement that "claims 75-76 and 103-106

were missing from the Restriction Requirement," and as a result it would have to be "redone and resent." (JA0579). After being notified by the applicants of the fundamental flaw in the August 2005 Restriction Requirement, the Examiner undertook an *affirmative obligation* to take action. This directly conflicts with the operative facts in *UMass* where the Examiner placed the onus on the *applicant* to make the next move, *i.e.* file a Supplemental Amendment. The fact that the Supplemental Amendment in *UMass* was found to be a substantive response in that it added new claims to the application only further distinguishes *UMass* from the present case.[13]    Finally, the Court in *UMass* found it significant that the only record evidence establishing that the Restriction Requirement had been "vacated" consisted solely of the

---

[13] The Court in *UMass* pointed out that in spite of the parties' assertion that there were no factual matters in dispute, the parties disagreed on whether new claims were added in the Supplemental Amendment. The Court ultimately accepted the PTO's version of the facts. *UMass*, 903 F. Supp. 2d at 85 ("[W]hile purportedly agreeing that there are no facts in dispute, the parties argue about whether plaintiffs' Supplemental Amendment included new claims or merely restated the original, canceled claims, and whether the second restriction requirement was intended to vacate the first restriction requirement or merely to respond to the 'new' claims. The PTO has decided these disputes based on the evidence before it, and the Court has no basis to disturb the PTO's factual findings.").

applicants' own self-serving statements. *UMass*, 903 F. Supp. 2d at 85 ("[T]he Court is unconvinced by plaintiffs' attempts to attribute an adoptive admission to defendant by arguing that the Examiner 'never refuted or denied' plaintiffs' statements in their correspondence that the restriction requirement had been vacated."). In stark contrast to *UMass*, the Examiner's own interview summary from the February 6, 2006 interview in the instant case confirms that the PTO itself concluded that the August 2005 Restriction Requirement was defective and needed to be re-issued, *i.e.* confirming that it would be "redone and resent." (JA0579). Thus, *UMass* simply is not informative of the case at hand, and the District Court's reliance on that case to grant the PTO's motion for summary judgment -- and deny Pfizer's motion -- was improper.[14]

---

[14] Although the court in *UMass* stated that Section 154(b) "does not require that the first Office action be correct … [or] ultimately stand," *UMass*, 903 F. Supp. 2d at 87, there is clearly a difference between an Office Action that is subject to debate on the merits and ultimately subject to modification in the course of the "give and take" between the applicant and the PTO, on the one hand, and an Office Action that fails to comply with the rigors of Sections 121 and 132, relevant jurisprudence, and the applicable MPEP chapters such that it is facially deficient and unanswerable, on the other hand. This case presents the latter situation, and cannot fairly be lumped in under the broad statements, made in dicta, set forth in *UMass*.

**C.    The PTO Has A Record Of Treating Defective Office Actions As A Nullity For The Purpose Of Calculating A Delay**

Unlike *UMass*, the instant facts are remarkably similar to at least two decisions wherein the PTO awarded additional "A Delay" where restriction requirements were withdrawn and replaced during prosecution.

One such decision was in *Oncolytics*, an example cited to the District Court.  In *Oncolytics*, the patentee filed a timely reply to an initial Restriction Requirement in which it challenged the examiner's findings. The PTO issued a second office action on August 26, 2009, within the four-month statutory time frame for responding to a reply filed by the applicant.  *See* 35 U.S.C. § 154(b)(1)(A)(ii).  That action was subsequently vacated in a third office action dated January 26, 2010, which adopted the patentee's original election of claims.  The patentee sought a PTA that included "A Delay" of 122 days -- the time frame between four months from applicant's earlier May 6, 2009 reply and the issuance of the January 26, 2010 office action.

The PTO denied the petition in part because "the fact that the Office later withdrew the non-final Office action does not negate the fact

that the Office took action within the meaning of 37 C.F.R.
§ 1.702(a)(2)." (JA2157-59 at JA2158). Upon challenge (JA2161-65),
the PTO upheld its decision. (JA2167-72). Oncolytics then filed a
complaint in district court which was stayed pending the PTO's review
and decision on applicants' subsequently-filed Petition Under 37 C.F.R.
§ 1.181(a)(3) to Invoke the Supervisory Authority of the Director.
(JA2174-78). On May 24, 2012, the PTO decided the Petition in
applicants' favor, noting that it was appropriate for the PTO to treat the
August 2009 Office Action as a "non-event" for purposes of calculating
"A Delay", and thus awarding the 122 days of term adjustment.
(JA2151-55 at JA2154-55 ("[T]he USPTO has determined that the
specific facts of this case constitute the rare occurrence in which it is
appropriate for the USPTO to treat an Office action issued in an
application as a non-event for the purposes of calculating USPTO delay
under 37 CFR 1.702(a)(2) and 1.703(a)(2).")).

The District Court discounted *Oncolytics* in part because the PTO
in *Oncolytics* had taken a number of months to issue a corrected
Restriction Requirement. (*See* JA0016-17 ("Here, similar to *UMass* and
contrary to *Oncolytics*, the PTO *immediately* provided a revised

39

Restriction Requirement") (emphasis added)).  As an initial matter, this misstates the facts because here, the PTO did not issue a revised Restriction Requirement until 197 days after the issuance of the initial defective Restriction Requirement.  This is far from "immediate."  In any event, there is nothing in the statutory framework that conditions the decision whether to award "A Delay" at all on the relative promptness with which the PTO acts to correct a defective notice.  The statutory framework provides clear guidance on the types of PTO delay that entitle an applicant to patent term adjustment, none of which may be wholly negated based on how promptly the PTO remedies its delay.  Indeed, the purpose of the statute itself is to award patent adjustment based on delays of precisely the type discussed here.

In addition to *Oncolytics*, in a more recent decision, the PTO awarded an applicant additional "A Delay" by distinguishing *UMass* in much the same way as discussed above.  Upon remand from the District Court for the District of Columbia in *Janssen Pharmaceutica, N.V. v. Rea*, 928 F. Supp. 2d 102 (D.D.C. 2013), the PTO reconsidered its previous denial of "A Delay" and awarded applicant an additional 98 days due to a rescinded initial Restriction Requirement.  (JA2402-03).

40

In *Janssen*, the PTO mailed an initial Restriction Requirement on April 9, 2007. The PTO then mailed a subsequent Restriction Requirement on July 16, 2007, stating that the previous Restriction Requirement was "rescinded and replaced."[15] The PTO found that the April 9 Restriction Requirement was a "non-event for the purposes of calculating [A Delay]" because it "was not part of the give-and-take process between the Office and an applicant that is typical during the normal course of patent examination." (JA2403). Importantly, in rendering its decision, the PTO expressly cited and distinguished *UMass*. *Id*. The District Court here failed to appropriately do the same.

Although the PTO in *Janssen* characterized the facts as constituting "the rare occurrence in which it is appropriate for the USPTO to treat an Office action as a non-event for the purposes of

---

[15] Unlike the case at hand, the prosecution history for the patent-at-issue in the *Janssen* case reveals no facial deficiency in the initial restriction requirement such that it was inherently unanswerable. Rather, it appears that the PTO re-assigned the file to a new examiner in the interim period, and the new examiner had a different view about the proper groupings for restriction. In this regard, the case at bar presents an even clearer case for treating the initial August 2005 Restriction Requirement as a nullity because that action was facially deficient and unanswerable, and then, ultimately withdrawn as in *Janssen*.

calculating USPTO delay…" *id.*, the undisputed facts here are so similar to *Janssen* that even if the District Court found the requested relief to be unorthodox or anomalous in some way, they nonetheless present the proper circumstances for awarding additional "A Delay", as rare as the case may be.  Indeed, as in *Janssen* and unlike in *UMass*, the PTO determined that the initial Restriction Requirement did not require a response from applicants, and took the initiative to re-issue a corrected Restriction Requirement.  For this reason, it was outside of the normal give-and-take that constitutes normal patent prosecution, and should not stop the clock for purposes of "A Delay". In contrast, applicants were able to respond to the *corrected* February 2006 Restriction Requirement, which is part of the normal give-and-take in patent prosecution.

The PTO's reasoning in *Oncolytics* and *Janssen* should guide this Court's decision.  In both cases, as in this one, the initial Restriction Requirement was a "non-event" for purposes of "A Delay" due to the fact that it was defective and/or withdrawn without requiring reply from the applicant, and not -- as in *UMass* -- modified as part of the "give and take" between the PTO and the applicants.  This Court should

42

accordingly overturn the District Court's ruling and award Pfizer 197 additional days of "A Delay," *i.e.*, 601 total days of "A Delay."

## V.    POLICY CONCERNS SUPPORT THE REQUESTED RELIEF

PTO policy further supports Pfizer's position.  As a matter of PTO policy, which must be consistent with congressional intent, a facially incomplete and/or defective Restriction Requirement should not operate to satisfy the PTO's obligation to provide a notification sufficient to toll the accrual of "A Delay."  Take for example the analogous situation from the applicant's perspective, *i.e.* when the applicant mistakenly omits necessary information from a response to an Office action.  Even though the applicant is allowed another chance to provide the omitted information in a subsequent filing, the PTO nevertheless counts the time between omission and ultimate correction as applicant delay due to applicant's submission of a deficient response.  Delay should accordingly be attributed to the PTO when the situation is reversed, as is the case here.  Indeed, the PTO's own regulations and practices contradict its current disparate interpretation of the governing statute.

Specifically -- and consistent with what occurred in the instant case -- MPEP § 710.06 states that when "an Office action contains [an

error] *that affects applicant's ability to reply to the Office action* and this error is called to the attention of the Office," the PTO will set a new time period for the applicant to reply. (emphasis added). As discussed above, an omission by the applicant is treated in the same fashion.

According to 37 C.F.R. § 1.135(c), when an applicant's reply "is a bona fide attempt to advance the application to final action, and is substantially a complete reply to the non-final Office action, but consideration of some matter or compliance with some requirement has been inadvertently omitted, *applicant may be given a new time period for reply*." (emphasis added). As set forth in pertinent regulations, however, "A Delay" must then be adjusted by the amount of delay that resulted from the omission. 37 C.F.R. § 1.704(c)(7) (reducing "A Delay" for "[s]ubmission of a reply having an omission (§ 1.135(c) ), in which case the period of adjustment set forth in § 1.703 shall be reduced by the number of days, if any, beginning on the day after the date the reply having an omission was filed and ending on the date that the reply or other paper correcting the omission was filed"). That is to say, when an applicant makes an inadvertent omission in providing a reply, the PTO will forgive that omission and set a new period for reply to provide the

missing information, but the additional time taken to provide such information is subtracted from the overall calculation of "A Delay," *i.e.* because it constitutes *applicant delay*.

As adopted by the District Court, the PTO essentially advocated for a lack of parity in this regard, *i.e.* where an applicant should be effectively penalized for delay caused by its own error, yet the applicant should have no recourse when the delay is caused by PTO error. Certainly this contravenes the whole purpose and intent of Section 154(b), which is to compensate patent owners for delays that occur, through no fault of the applicant, during the examination process.

At the District Court level, the court raised additional policy concerns which, while not made part of the ultimate decision, appear to have colored the court's ruling, albeit improperly. Specifically, the court expressed concern that ruling in favor of Pfizer would require courts to perform an inquiry into the sufficiency of a specific office action, a task best left to the PTO.[16] Such misgivings are misplaced. A ruling for

---

[16] "THE COURT: I was more focused on the issue of whether I would be required to reexamine and put myself in the shoes of the patent examiner who issues an office action and try to determine whether the office action complied with all the requirements of the patent

Pfizer here will *not* result in courts having to "put [themselves] in the shoes of the patent examiner." Specifically, this is not a situation where reasonable minds can differ regarding the adequacy of the restriction requirement; the Examiner, as well as the Supervisory Examiner, *admitted* the restriction was deficient and needed to be "redone and resent." (JA0579). Thus, this Court need only dictate a rule -- consistent with the statutory language -- that an admittedly defective notification is not a notification at all for purposes of Section 154(b).

Such a rule would not require a reviewing court to ascertain the merits of the action or "put [itself] in the shoes of the patent examiner," but only look at the face of the prosecution history to see what occurred. Where, as here, the Examiner admits the defect and withdraws and reissues the notification, no guesswork or analysis is required. Rather, the reviewing court's role in this situation is as it should be, which is to "apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision *based on the record the agency presents to the reviewing court.*" *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44

---

examiner manual, whether or not it was a sufficient notice." (JA2317 at 28:17–23).

(1985) (emphasis added); *see also UMass*, 903 F. Supp. 2d at 84 ("Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas *the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did*.") (quotation omitted) (emphasis added).

The District Court was well within its mandate to award an additional PTA of 197 days to Pfizer, and based on the clear statutory language, the administrative record, and underlying policy concerns, it should have done so.

## CONCLUSION

For the foregoing reasons, Pfizer respectfully requests that the Court reverse the District Court's grant of summary judgment in the PTO's favor and award 197 days of "A Delay" patent term adjustment for Pfizer's '768 Patent.

March 25, 2015                    Respectfully submitted,


                                  */s/ Daniel Forchheimer*


Patricia A. Carson               Simeon G. Papacostas
Daniel Forchheimer               KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS LLP             300 North LaSalle Street
601 Lexington Avenue             Chicago, IL 60654
New York, NY 10022               (312) 862-2000
(212) 446-4800


*Counsel for Plaintiffs/Appellants Pfizer Inc. and
Wyeth Holdings Corporation*

# ADDENDUM

Final Judgment (Dkt. No. 45)……………………………….……JA1

Memorandum Opinion and Order (Dkt. No. 43)…………….JA2-JA17

U.S. Patent No. 8,153,768………………………………....JA2320-JA2401

35 U.S.C. § 121 (2012)…………………………………….A-1 to A-4

35 U.S.C. § 132 (2012)………………………………………….…A-5

35 U.S.C. § 154 (2012)……………………………………A-6 to A-10

37 C.F.R. § 1.135……………………………………….A-11 to A-13

37 C.F.R. § 1.702……………………………………....A-14 to A-15

37 C.F.R. § 1.703……………………………………….A-15 to A-17

37 C.F.R. § 1.704……………………………………….A-17 to A-20

MPEP ch. 710.06……………………………………….A-21 to A-25

MPEP ch. 814……………………………………...............A-26

MPEP ch. 815…………………………………….....A-26 to A-27

MPEP ch. 817…………………………………….A-27 to A-28

Patent Act of 1870, ch. 230, § 41, 16,
    Stat. 198-217 (1870)………………………...............A-30 to A-32

S. Rep. No. 1979 (1952)………………………………….A-33 to A-36

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| PFIZER, INC. & WYETH HOLDINGS CORPORATION, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. 1:12-cv-01131-GBL-TRJ |
| MICHELLE K. LEE, Deputy Under Secretary Of Commerce for Intellectual Property and Deputy Director of the United States Patent and Trademark Office, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## FINAL JUDGMENT

For the reasons stated in the Memorandum Opinion and Order dated November 6, 2014

(Doc. 44), IT IS HEREBY ORDERED that JUDGMENT is ENTERED in favor of Defendant

Michelle K. Lee and against Plaintiffs Pfizer, Inc. and Wyeth Holdings Corporation jointly and

severally, pursuant to Rule 58 of the Federal Rules of Civil Procedure.

ENTERED this _____ day of November, 2014.

Alexandria, Virginia
11 /___ / 2014

_____/s/_____
Gerald Bruce Lee
United States District Judge

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| PFIZER, INC. & WYETH HOLDINGS CORPORATION, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:12-cv-01131-GBL-TRJ |
| MICHELLE K. LEE, Deputy Under Secretary Of Commerce for Intellectual Property and Deputy Director of the United States Patent and Trademark Office, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Plaintiffs Pfizer, Inc. and Wyeth Holdings

Corporations' (collectively, "Pfizer") Motion for Summary Judgment (Doc. 28) and Defendant

Michelle K. Lee on behalf of the USPTO's Motion for Summary Judgment (Doc. 32). This case

involves the United States Patent and Trademark Offices' ("USPTO" or "PTO") decision of

abandonment as to Patent Application No. 10/428,894 ("'894 Application") and the Patent Term

Adjustment applied to U.S. Patent No. 8,153,768 (the "768 Patent"). Pfizer seeks a

determination of no abandonment from the Court, and what it deems, a correction, of the patent

term adjustment. The USPTO alleges that the Court lacks jurisdiction as to the issue of

abandonment and claims the patent term adjustment applied to the '768 Patent need not be

modified.

There are two issues before the Court. The first issue is whether the Court should grant

Plaintiffs' Motion for Summary Judgment to reverse the USPTO's determination that the '768

patent was abandoned, where Pfizer argues that the PTO's decision of abandonment was not

based on substantial evidence, and relied on several erroneous factual findings.  The Court

DENIES as MOOT Pfizer's Motion for Summary Judgment as to the abandonment issue because

the USPTO, since the filing of these motions, reviewed its ruling and withdrew the agency's

earlier finding of abandonment.

The second issue is whether the Court should grant Pfizer's Motion for Summary

Judgment and modify the Patent Term Adjustment ("PTA") granted to Pfizer from 404 to 601

days, where Pfizer argues the first Office Action—a Restriction Requirement, was defective and

thus the time for "A-Delay" continued to run until the corrected Restriction Requirement was

issued 197 days after the defective one.  The Court DENIES Pfizer's Motion for Summary

Judgment on the issue of PTA because the defects in the initial Restriction Requirement do not

entitle Pfizer to an additional 197 days of "A-Delay," and the Court GRANTS Defendant

Michelle Lee of the USPTO's Motion for Summary Judgment because the  relevant statutory

provision clearly and unambiguously provides that a notification, like a Restriction Requirement

will "stop the clock" on the accumulation of "A-Delay," absent any requirement that the notice

be free of defects.

## I.    BACKGROUND

Prior to a recitation of the facts, it is a worthwhile exercise to discuss the statutory

framework relevant to the case.  Particularly, an overview of the patent application process, the

term of a patent, and Patent Term Adjustment calculation are necessary to understand the

analysis applied by the Court.

A.    **STATUTORY FRAMEWORK**

*1. Patent Application Process*

The patent application process begins with an applicant filing a patent application with the USPTO.  35 U.S.C. § 111(a). The patent application undergoes a process of examination to determine whether the requirements for patentability have been met. *Id.* § 131. Often the first official action of the USPTO is the issuance of a restriction requirement. *Id.* § 132.

A restriction requirement is issued when a patent examiner determines that a patent application contains two or more independent and distinct inventions. *Id.* § 121. The restriction requirement divides the claims presented in the application into multiple groups. One group can be pursued in the application where the restriction requirement is made, while the other group(s) can be pursued by filing one or more divisional applications. *Id.*

*2. Term of a Patent*

A patent's enforceability begins on the issue date of the patent and ends twenty years from the patent application's effective filing date, which is the earliest filing date for which priority is claimed.  35 U.S.C. § 154(a)(2).  Accordingly, when a divisional application results in a patent, its twenty year term is measured from the filing date of the parent patent application.

Because the examination process takes time, the enforceable lifetime of a patent is necessarily reduced by the amount of time it takes the USPTO to conduct the patent's examination. As such, Congress established patent term adjustments, or PTA, to compensate inventors for unreasonably long delays by the USPTO.

**a. Patent Term Adjustment Statute (35 U.S.C. § 154)**

To understand the role of PTA in the enforceable life of a patent, it is important to understand the history of 35 U.S.C. § 154(b). Prior to 1994, before adoption of the General

3

Agreement on Tariffs and Trade ("GATT"), a patent term was seventeen years from the issue date. *Novartis AG v. Lee*, 740 F.3d 593, 595 (Fed. Cir. 2014). In 1994, Congress changed the effective term of a patent from seventeen years commencing from issuance to twenty years commencing from filing.[1] *See* Uruguay Round Agreements Act, Pub. L. No. 103-465, § 532, 108 Stat. 4809, 4984 (1994). Under the seventeen-year regime, USPTO delays did not affect patent terms because a term commenced upon issuance rather than filing. Under the twenty-year regime, however, USPTO delays had the potential to consume the entirety of a patent's effective term. *See Wyeth v. Kappos*, 591 F.3d 1364, 1366 (Fed. Cir. 2010).

Most recently, in 1999, the American Inventors Protection Act ("AIPA") amended 35 U.S.C. § 154(b) to address this problem and protect patent terms from the effects of USPTO delay. "The new Act promised patent applicants a full patent term adjustment for any delay during prosecution caused by the PTO." *Wyeth*, 591 F.3d at 1366. Under the amended statute, the USPTO calculates patent term adjustments by considering three classes of USPTO delay: (i) an "A-Delay," which awards PTA for delays arising from the USPTO's failure to act by certain examination deadlines; (ii) a "B-Delay," which awards PTA for an application pendency exceeding three years; and (iii) a "C-Delay," which awards PTA for delays due to interferences, secrecy orders, and appeals. The USPTO calculates PTA by adding the A-, B-, and C-Delays,

---

[1] This change was partly a response to the problem of "submarine" patents. Submarine patents involve an applicant's use of delay tactics during patent prosecution to have a period of control over patents as late as possible to "maximize the economic returns from when the patent right is enforced." 3 Moys Walker on Patents § 11:20 (4th ed. 2013); *see also Exelixis, Inc. v. Kappos*, 919 F. Supp. 2d 689, 698 (E.D. Va. 2013) *vacated and remanded sub nom. Exelixis, Inc. v. Lee*, 2013-1175, 2014 WL 128612 (Fed. Cir. Jan. 15, 2014) ("The decision to measure the term of a patent from the date of filing instead of the date of issuance was at least partly motivated by fear of so-called 'submarine' patents filed by applicants who had discovered that they could file 'continuation prosecution applications' (CPAs) to indefinitely delay the USPTO's completion of its examination, thereby keeping their applications 'pending and secret until an industry with substantial investment in the technology can be targeted in an infringement suit.'" (citing *House Panel Examines Bills on Patent Law Reforms*, 51 Pat. Trademark & Copyright J. (BNA) 50 (1995)).

4

subtracting any overlapping days, and then subtracting any days attributable to applicant delay. *Wyeth*, 591 F.3d at 1367.

A-Delay is applicable to this case. The relevant portion of the PTA Statute describing A-Delay provides as follows:

> **(A) Guarantee of prompt Patent and Trademark Office responses.**—Subject to the limitations under paragraph (2), if the issue of an original patent is delayed due to the failure of the Patent and Trademark Office to—
>
> **(i)** provide at least one of the notifications under section 132[2] or a notice of allowance under section 151 not later than 14 months after—
>
> **(I)** the date on which an application was filed under section 111(a);
>
> . . .
>
> the term of the patent shall be extended 1 day for each day after the end of the period specified in clause (i), (ii), (iii), or (iv), as the case may be, until the action described in such clause is taken.

35 U.S.C. § 154(b)(1)(A).

The PTA Statute also accounts for delays by the patent applicant. PTA is reduced for a patent applicant's "fail[ure] to engage in reasonable efforts to conclude prosecution of the application." *Id.* § 154(b)(2)(C)(i). Section 154(b)(2)(C)(iii) explicitly provides that "[t]he Director shall prescribe regulations establishing the circumstances that constitute a failure of an applicant to engage in reasonable efforts to conclude processing or examination of an application." In addition to this grant of substantive rulemaking authority, the PTA Statute provides for general procedural rulemaking authority in section 154(b)(3)(A) stating that "[t]he

---

[2] The USPTO counts the mailing of a restriction requirement as a "notification under 35 U.S.C. § 132" for purposes of calculating A-delay. 35 U.S.C. § 132 ("any claim for a patent is rejected, or any objection or requirement made")

5

Director shall prescribe regulations establishing procedures for the application for and determination of patent term adjustments under this subsection."

To the extent that an applicant is dissatisfied with the USPTO's determination of PTA, the PTA Statute grants the applicant one opportunity to request reconsideration of the PTA determination. *Id.* § 154(b)(3)(B)(ii). If an applicant is still dissatisfied following the USPTO's reconsideration of PTA, the applicant "shall have exclusive remedy by a civil action against the Director filed in the United States District Court for the Eastern District of Virginia within 180 days after the date of the Director's decision on the applicant's request for reconsideration." *Id.* § 154(b)(4).

**B.     FACTS**

Plaintiffs Pfizer, Inc. and Wyeth Holdings Corporation bring this action seeking judgment on five counts. Plaintiffs seek judgment on a patent term adjustment pursuant to 35 U.S.C. § 154 (Count I), Violation of the Fifth Amendment (Count II), and Declaratory Judgment under the Administrative Procedures Act, 5 U.S.C. § 702 et seq. (Count III and IV), and a Declaratory Judgment of Maximum Applicant Delay Under 35 U.S.C. § 154 (Count V). (Doc. 1.) Wyeth is the assignee of all rights, title and interest in U.S. Patent No. 8,153,768 (the "768 Patent"). (*Id.* ¶ 9.) Wyeth was acquired by Pfizer in 2009. (Doc. 29 ¶ 5.)

On May 2, 2003, Wyeth filed Patent Application No. 10/428,894 ("'894 Application") which issued as the '768 Patent on April 10, 2012. (*Id.*) As part of its application, and pursuant to 37 C.F.R. § 1.136(a)(3), Plaintiffs filed an authorization for the extension of time for its timely submission for the appropriate length of time during the pendency of the '894 application. (*Id.* ¶ 6.) In other words, the PTO was authorized to charge all required extension of fees during the entire pendency of the application. On July 28, 2003, the PTO mailed a Notice to File Missing

6

Parts of Nonprovisional Application. (*Id.* ¶ 8.)  Plaintiffs timely filed the missing parts of its

application on December 8, 2003.  (*Id.*)  The statutory deadline for the PTO to issue its first

office action expired on July 2, 2004, fourteen (14) months from the date the application was

filed.  (*Id.*)  On August 5, 2005, having received no office action, Plaintiffs sent a letter to the

PTO asking when an office action on the merits might be expected.  (*Id.* ¶ 9.)

On August 10, 2005, the PTO mailed a Restriction Requirement, 404 days after the July

2, 2004 deadline.  (*Id.* ¶ 10.)  The deadline for Plaintiffs to reply to the Restriction Requirement

was extendable up to six months based on their previously filed authorization for extension of

time.  (*Id.*)  Accordingly, the deadline for Pfizer to respond was February 10, 2006.  (*Id.*)  On

February 6, 2006, Plaintiffs participated in a telephonic interview with the Examiner and

explained that the Restriction Requirement was defective because it omitted claims 75, 76, 103-

106.  (*Id.* ¶ 12.)  During the interview the Examiner acknowledged that the Restriction

Requirement was defective and agreed to withdraw it and issue a corrected Restriction

Requirement.  (*Id.* ¶ 13.)  This conversation is memorialized in a February 7, 2006 Interview

Summary signed by the Supervisory Examiner.  (*Id.* ¶ 14.)

The PTO issued a corrected Restriction Requirement on February 23, 2006, 601 days

after the July 2, 2004 deadline of fourteen (14) months.  (*Id.* ¶ 16.)  Plaintiffs were given a new

deadline to respond to the corrected Restriction Requirement, which was also extendable by up

to six months.  (*Id.*)  On May 22, 2006 Plaintiffs filed a timely response.  (*Id.* ¶ 17.)

Prosecution for the '894 application continued without interruption until October 11,

2011 when a Notice of Allowance[3] was issued.  (*Id.* ¶ 18.)  The PTO also mailed their

Determination of Patent Adjustment as of that date for the '894 Application—257 days.  (*Id.*)

---

[3] A notice of allowance is issued by the United States Patent & Trademark Office to indicate that it believes an invention qualifies for a patent.

7

On January 10, 2012, Plaintiffs filed a petition requesting confirmation that the '894 application was not abandoned at any point during its pendency before the PTO or in the alternative a finding of revival so that the patent may issue. (*Id.* ¶ 19.) On March 7, 2012, the PTO dismissed the no abandonment petition and granted the revival petition. (*Id.* ¶ 21.) The petition decision incorrectly stated several facts, including the date of the interview with the Examiner. (*Id.* ¶¶ 21-22.) On April 10, 2012, the '894 application issued as the '768 patent, reflecting a patent term adjustment ("PTA") of 1291, including 404 days of "A-Delay." (*Id.* ¶ 23.) The PTA excluded the 197 days from the date of the first Restriction Requirement to the mailing of the corrected Restriction Requirement. (*Id.* ¶ 24.)

On May 30, 2012, Plaintiff filed a Request for Reconsideration asking the PTO to reverse its decision on the No Abandonment Petition. (*Id.* ¶ 25.) On June 7, 2012, the PTO again dismissed the No Abandonment Petition, finding it to be moot in view of the grant of the Revival Petition and the issuance of the patent. (*Id.* ¶ 26.) On August 7, 2012, Plaintiffs again filed a petition requesting reconsideration of the PTO's March 2012 and June 2012 decision on their No Abandonment Petition. (*Id.* ¶ 27.) On September 25, 2012, the PTO affirmed its previous March 2012 and June 2012 findings to which Plaintiffs now base their Complaint. (*Id.* ¶ 28.)

## II.   PROCEDURAL HISTORY

Plaintiffs Pfizer, Inc. and Wyeth Holdings Corporation filed a Complaint on October 5, 2012, against David Kappos on behalf of the U.S. Patent and Trademark Office, seeking judgment that the patent term for U.S. Patent No. 8,153,768 (the "768 Patent") be altered to account for additional "A-Delay," which the Plaintiffs claimed was miscalculated by Defendants. (Doc. 1.) Additionally, Plaintiffs sought a judgment that the '768 patent was never abandoned. (*Id.*) On January 4, 2013, the parties moved to stay the proceedings pending a decision from the

8

United States Court of Appeals for the Federal Circuit in *Exelixis, Inc. v. Kappos*, 55 Fex. Appx. 894, (Fed. Cir. 2014). The Court granted the stay on January 8, 2013. Subsequently, on April 14, 2014, the parties agreed to proceed with the action.

On June 13, 2014, Plaintiffs filed a Motion for Summary Judgment for a Determination of No Abandonment and to Correct the Patent Term Adjustment for U.S. Patent No. 8,153,768 (Doc. 28). On July 15, 2014, Defendant Michelle K. Lee on behalf of the USPTO filed a Motion for Summary Judgment and its Opposition to Plaintiffs Motion for Summary Judgment (Doc 32). Plaintiffs filed their Reply on July 29 (Doc 36). On August 8, Defendants filed a Consent Motion for Extension of Time to File their Reply to Plaintiffs Motion to Dismiss, so that the USPTO could reconsider its administrative decision on the abandonment of the '768 patent. The Court granted the extension and Defendants filed their Reply on August 18 (Doc. 40).

### III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Normally, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). However, "[i]n a case involving review of a final agency action under the [APA]. . . the standard set forth in Rule 56(c) does not apply because of the limited role of a court reviewing that administrative record." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006). The USPTO's final determination of Patent Term Adjustment ("PTA") is reviewable under the

9

standards set forth in the Administrative Procedure Act. 35 U.S.C. § 154(b)(4)(A); *see also Dickinson v. Zurko,* 527 U.S. 150, 165 (1999).

Under the APA, this Court may only set aside the USPTO's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Star Fruits S.N.C. v. United States,* 393 F.3d 1277, 1281 (Fed. Cir. 2005). The Court is therefore limited to the task of reviewing the agency action to determine whether the agency conformed to controlling statutes, and whether the agency has committed a clear error of judgment. *Holly Hill Farm v. United States,* 447 F.3d 258, 263 (4th Cir. 2006). The "function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club,* 459 F. Supp. 2d at 90.

Where an agency's interpretation is at odds with the plain language of an unambiguous statute no deference is afforded to that interpretation. *Smith v. City of Jackson, Miss.,* 544 U.S. 228, 267 (2005) (citations omitted). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *City of Arlington v. FCC,* 133 S.Ct. 1863, 1868 (2013) (internal citations omitted). However, when a court reviews a challenge to an agency's construction of an ambiguous statute administered by that agency, it will follow the two-step approach set out in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842 (1984). The U.S. Court of Appeals for the Federal Circuit, however, has held that with respect to USPTO regulations, "[b]ecause Congress has not vested the Commissioner with any general substantive rulemaking power," USPTO regulations "cannot possibly have the 'force and effect of law' " and "[t]hus, the rule of controlling deference set forth in *Chevron* does not apply." *Merck & Co.,*

10

*Inc. v. Kessler,* 80 F.3d 1543, 1550 (Fed. Cir. 1996).  While *Chevron* deference may not be warranted "where a party challenges a USPTO regulation that was established pursuant to the general procedural rulemaking authority of § 154(b)(3)(A), the USPTO's interpretation may be entitled to some deference." *Abraxis Bioscience, LLC v. Kappos,* 2014 WL 65739, at *10–11 (D.D.C. Jan. 8, 2014) (granting *Skidmore* deference to USPTO regulation 37 C.F.R. § 1.703(b) because it was issued pursuant to statutory authority to address procedural issues in § 154(b)(3)(A)).

Pursuant to *Skidmore v. Swift & Co.* an agency's decision will only receive deference based upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. 134 (1944).  In other words, "the agency's position constitutes a reasonable conclusion as to the proper construction of the statute." *Cathedral Candle Co. v. United States Int'l Trade Comm'n,* 400 F.3d 1352, 1366 (Fed. Cir. 2005).

## IV.    ANALYSIS

The Court DENIES Plaintiffs Pfizer and Wyeth's Motion for Summary Judgment and GRANTS Defendant Michelle Lee of the USPTO's Motion for Summary Judgment. Specifically, the Court DENIES Pfizer's Motion because the abandonment issue has since been mooted by the USPTO's withdrawal of its previous findings of abandonment and vacatur of its previous petition decisions on the issue.  Additionally, the Court DENIES Pfizer's Motion because the defects in the initial Restriction Requirement do not entitle Pfizer to an additional 197 days of "A-Delay."

11

The Court GRANTS Defendant Michelle Lee of the USPTO's Motion for Summary

Judgment because the plain language of § 154(B) provides that the issuance of a Restriction

Requirement stops the accumulation of "A-Delay."

**A.      USPTO's Voluntary Decision to Withdraw its Administrative Finding of
         Abandonment Renders Plaintiffs' Claim of Abandonment Moot.**

The Court DENIES Pfizer's Motion because the abandonment issue has since been

mooted by the USPTO's withdrawal of its findings on abandonment and vacatur of its previous

petition decisions on the issue.  Article III of the United States Constitution confers on federal

courts jurisdiction over cases and controversies; both litigants must have personal stake in the

case at the beginning of litigation, and their interests must persist throughout its entirety.

U.S.C.A. Const. Art. 3, § 1 et seq.  In other words, there must be a continuing "case or

controversy" for federal courts to have jurisdiction.  A "claim for civil penalties must be

dismissed as moot when the defendant, albeit after commencement of the litigation, has come

into compliance." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167,

173-74 (U.S. 2000).  Further it is well settled that "mootness can arise at any stage of litigation."

*Steffel v. Thompson,* 415 U.S. 452, 459, n.10 (1974).

Plaintiffs' summary judgment motion requests that the Court find that the PTO's

determination of abandonment was made in error.  Specifically, Plaintiffs ask the Court to

reverse the PTO's March 7, 2012, June 7, 2012, and September 25, 2012 petition decisions

which concluded that Plaintiffs' petitions for reconsideration on abandonment were mooted by

the subsequent revival of the abandoned application and the issuance of the '768 patent.  On

August 8, 2014, Defendants filed a Consent Motion for Extension of Time to File a

Reply/Response arguing that the PTO intended to reconsider its position on abandonment

regarding the '894 application.  (Doc. 38.)  On August 15, 2014, the USPTO voluntarily elected

12

to vacate its previous administrative decisions and withdraw its previous abandonment findings. (Doc. 40, at 4.) Accordingly, because the USPTO has voluntarily provided Plaintiffs with the very relief that they request in this motion and there is no present controversy, the Court holds that Plaintiffs' claim concerning the USPTO's finding of abandonment is moot.

**B.   Plaintiffs are not Entitled to Additional "A-Delay" as a Result of the Defective First Restriction Requirement.**

The Court GRANTS Defendant Michelle Lee's Motion for Summary Judgment because the plain language of § 154(B) provides that the issuance of a Restriction Requirement stops the accumulation of "A-Delay." In construing a statutory provision, a court's "inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc, Ltd. v. United States*, 541 U.S. 176, 183 (2004). The relevant statutory provision, 35 U.S.C. § 154(b)(1)(A), provides

> (A) **Guarantee of prompt Patent and Trademark Office responses.**--Subject to the limitations under paragraph (2), if the issue of an original patent is delayed due to the failure of the Patent and Trademark Office to—
>
>    **(i)** provide at least one of the notifications under section 132 or a notice of allowance under section 151 not later than 14 months after—
>
>       **(I)** the date on which an application was filed under section 111(a); or
>
>       **(II)** the date of commencement of the national stage under section 371 in an international application.

The statute is unambiguous on its face.

JA0014

Plaintiffs argue that the PTO's calculation of "A-Delay" cannot be reconciled with the words of the statute. Pfizer contends that the first Restriction Requirement, which was defective, should be treated as a non-event, or rather that the "A-Delay" should instead be calculated from the time the PTO sent the corrected Restriction Requirement. Further, Plaintiffs rest on the PTO's acknowledgment that the Restriction Requirement was incorrect. In support of their argument for correction of the patent term adjustment, Plaintiffs also point to the PTO's May 24, 2012 Decision on Application for PTA in *Oncolytics*. Plaintiffs' arguments on this point are not persuasive.

Plaintiffs' argument that the defective Restriction Requirement should not stop the "A-Delay" clock is contrary to the plain meaning of the statute. The language of the statute requires only that the PTO "provide at least one of the notifications under section 132," in order to stop the clock. As the U.S. District Court for the District of Columbia found in *University of Massachusetts v. Kappos* (*UMass*), stoppage of the "A-Delay" clock is not dependent on the ultimate accuracy of the office action. 903 F. Supp. 2d 77 (2012). Specifically the Court held that

> Under § 154(b)(1)(A), "A delay" is calculated based on the time that passes between the fourteen-month deadline and the mailing of the first Office action. The statute does not require that the first Office action be correct. The statute does not require that the first Office action ultimately stand, either completely unaltered or with only minor tweaks. The statute does not award additional A delay if an applicant successfully convinces the PTO that the Office action was erroneous.

> * * *

> Plaintiffs do not dispute, nor can they, that "an action" is clearly defined under 35 U.S.C. § 132 as a rejection, an objection, or a requirement.[5] And plaintiffs do not dispute that a requirement was issued in this case on July 13, 2007. Therefore, the PTO correctly interpreted the statute to find that the period of A delay ends on

14

> that date. For the PTO or the Court to take into account whether
> the restriction requirement was subsequently modified or reversed
> would be to rewrite the statutory provisions regarding A delay in
> contravention of well-established law. *Blount v. Rizzi,* 400 U.S.
> 410, 419, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971) ("... it is for
> Congress, not this Court, to rewrite the statute....").

*Kappos*, 903 F. Supp. 2d at 86-87.

Similar to the plaintiffs in *UMass*, here, Plaintiffs' interpretation runs contrary to the

plain meaning of the statute. Plaintiffs' argument that the holding in *UMass* was meant to be

narrowly construed and only applied to the facts of that case are meritless. Though the PTO

acknowledged that the first Restriction Requirement was defective and issued a corrected one,

these actions alone do not suffice to disregard the clear language of the statute.

Plaintiffs' reliance on the PTO's decision is *Oncolytics* is also unpersuasive. In

*Oncolytics*, the Examiner issued a Restriction Requirement with a proposed grouping of claims,

similar to the Restriction Requirement here. (Doc. 29 Ex. M.) Applicants in *Oncolytics*, timely

filed a written response which contained a different grouping of claims. (*Id.*) The Examiner

adopted Oncolytics' proposed grouping and issued a new office action rejecting the elected

claims on the merits. (*Id.*) Subsequently, the Examiner issued another office action but reversed

course, rejecting Oncolytics' regrouping, and instead adopting the original groups set forth in the

initial Restriction Requirement. (*Id.*) The applicants in *Oncolytics* sought a Patent Term

Adjustment which the PTO granted, finding that the facts presented, "constitute[d] the rare

occurrence in which it is appropriate for the USPTO to treat an office action issued in an

application as a non-event." (*Id.* at 4.)

As the district court found in *UMass*, the PTO's actions in *Oncolytics* "were anomalous

and caused significant delay at applicant's expense." *UMass*, 903 F. Supp. 2d at 89. The court

in *UMass* distinguished *Oncolytics* finding that the PTO's immediate responsiveness for a

15

revised Restriction Requirement was a "meaningful distinction" between the two cases. Here,

similar to *UMass* and contrary to *Oncolytics*, the PTO immediately provided a revised

Restriction Requirement. Accordingly, Plaintiffs are not entitled to 197 additional "A-Delay"

days as a result of the defective first Restriction Requirement.

## V.     CONCLUSION

The Court DENIES Pfizer's Motion for Summary Judgment on the issue of PTA because

the defects in the initial Restriction Requirement do not entitle Pfizer to an additional 197 days of

"A-Delay," and the Court GRANTS Defendant Michelle Lee of the USPTO's Motion for

Summary Judgment because the relevant statutory provision clearly and unambiguously

provides that a notification, like a Restriction Requirement will "stop the clock" on the

accumulation of "A-Delay," absent any requirement that the notice be free of defects.

Accordingly, it is herby

**ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 28) is **DENIED**; and it

is further

**ORDERED** that Defendant's Motion for Summary Judgment (Doc. 32) is **GRANTED**.

The clerk is **ORDERED** to close the case.

**IT IS SO ORDERED.**

ENTERED this ___ day of November, 2014.

Alexandria, Virginia
11/ _ /2014

_____ /s/ _____
Gerald Bruce Lee
United States District Judge

16

JA0017



US008153768B2

(12) **United States Patent**
Kunz et al.

(10) Patent No.: **US 8,153,768 B2**
(45) Date of Patent: **Apr. 10, 2012**

(54) **CALICHEAMICIN DERIVATIVE-CARRIER CONJUGATES**

(75) Inventors: **Arthur Kunz**, New City, NY (US); **Justin Keith Moran**, Valley Cottage, NY (US); **Joseph Thomas Rubino**, Towaco, NJ (US); **Neera Jain**, New City, NY (US); **Eugene Joseph Vidunas**, Middletown, NY (US); **John McLean Simpson**, Upper Nyack, NY (US); **Paul David Robbins**, Upper Nyack, NY (US); **Nishith Merchant**, Palisades Park, NJ (US); **John Francis DiJoseph**, Woodbridge, NJ (US); **Mark Edward Ruppen**, Garnerville, NY (US); **Nitin Krishnaji Damle**, Upper Saddle River, NJ (US); **Andrew George Popplewell**, Staines (GB)

(73) Assignee: **Wyeth Holdings Corporation**, Madison, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1291 days.

(21) Appl. No.: **10/428,894**

(22) Filed: **May 2, 2003**

(65) **Prior Publication Data**

US 2004/0082764 A1     Apr. 29, 2004

**Related U.S. Application Data**

(60) Provisional application No. 60/377,440, filed on May 2, 2002.

(51) **Int. Cl.**
*C07K 16/00* (2006.01)
*C07K 17/00* (2006.01)
*C07K 16/28* (2006.01)

(52) **U.S. Cl.** ............... 530/391.1; 530/391.7; 530/391.9; 530/409

(58) **Field of Classification Search** ............... 530/391.1, 530/391.7, 387.3; 424/178.1, 181.1, 1.49
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,134,075 A | 7/1992 | Hellstrom et al. | |
| 5,225,539 A | 7/1993 | Winter | |
| 5,382,510 A | 1/1995 | Levine | |
| 5,436,265 A | 7/1995 | Black | |
| 5,530,101 A | 6/1996 | Queen | |
| 5,558,864 A | 9/1996 | Bendig | |
| 5,686,072 A | 11/1997 | Uhr | |
| 5,693,762 A | 12/1997 | Queen | |
| 5,712,374 A * | 1/1998 | Kuntsmann et al. ....... 530/391.7 |
| 5,714,350 A | 2/1998 | Co | |
| 5,714,586 A | 2/1998 | Kunstmann | |
| 5,789,554 A | 8/1998 | Leung | |
| 6,180,377 B1 | 1/2001 | Morgan | |
| 6,183,477 B1 * | 2/2001 | Pepper .......................... 606/104 |
| 6,183,744 B1 * | 2/2001 | Goldenberg ............... 424/141.1 |

| | | | |
|---|---|---|---|
| 6,267,958 B1 | 7/2001 | Andya et al. | |
| 6,777,390 B1 | 8/2004 | Matthiessen | |
| 7,012,135 B2 | 3/2006 | Athwal | |
| 7,115,723 B1 | 10/2006 | Hong | |
| 7,129,053 B1 | 10/2006 | Reiter | |
| 7,147,851 B1 | 12/2006 | Ponath | |
| 7,355,011 B2 * | 4/2008 | Popplewell et al. ....... 530/387.3 |
| 7,541,034 B1 | 6/2009 | Fitzgerald | |
| 2002/0141990 A1 | 10/2002 | Deen | |
| 2004/0082764 A1 | 4/2004 | Kunz et al. | |
| 2005/0095238 A1 | 5/2005 | Brettman | |
| 2006/0073137 A1 | 4/2006 | Adair | |
| 2007/0172920 A1 | 7/2007 | Leung | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 11-508232 | 7/1999 |
| JP | 2001-128691 | 5/2001 |
| JP | 2001-518930 | 10/2001 |
| WO | WO 91/09967 A1 | 7/1991 |
| WO | WO 92/00311 | 1/1992 |
| WO | 96/05306 | 2/1996 |
| WO | WO 96/04925 | 2/1996 |
| WO | WO 98/41641 | 2/1996 |
| WO | WO 96/40261 | 12/1996 |
| WO | WO 98/42378 | 10/1998 |
| WO | 98/56418 | 12/1998 |
| WO | WO 99/66031 | 12/1999 |
| WO | 00/74718 | 12/2000 |
| WO | PCT US03/13910 | 12/2003 |

OTHER PUBLICATIONS

Paul (Fundamental Immunology, 3rd Edition, 1993, pp. 292-295, under the heading "Fv Structure and Diversity in Three Dimensions").*

Rudikoff et al (Proc. Natl. Acad. Sci. USA, 79:1979-1983, Mar. 1982).*

Bendig (Methods: A Companion to Methods in Enzymology 1995; 8:83-93).*

Trail et al. (Current Opinion in Immunology 1999, 11: 584-588).*

Benhar et al., "Mutations of two lysine residues in the CDR loops of a recombinant immunotoxin that reduce its sensitivity to chemical derivatization," *Bioconjugate Chem.*, 1994, 5: 321-326.

Browning et al., "B cells move to centre stage: novel opportunities for autoimmune disease treatment," *Nat. Rev. Drug Discov.*, 2006, 5: 564-576.

Carnahan et al., "Epratuzumab, a humanized nomoclonal antibody targeting CD22: characterization in vitro properties," *Clinical Cancer Res.*, 2003, 9, suppl.: 3982s-3990s.

(Continued)

*Primary Examiner* — Peter J Reddig
*Assistant Examiner* — Yan Xiao

(74) *Attorney, Agent, or Firm* — Womble Carlyle Sandridge & Rice, LLP

(57) **ABSTRACT**

Methods for preparing monomeric cytotoxic drug/carrier conjugates with a drug loading significantly higher than in previously reported procedures and with decreased aggregation and low conjugate fraction (LCF) are described. Cytotoxic drug derivative/antibody conjugates, compositions comprising the conjugates and uses of the conjugates are also described. Monomeric calicheamicin derivative/anti-CD22 antibody conjugates, compositions comprising the conjugates and uses of the conjugates are also described.

**5 Claims, 35 Drawing Sheets**

## US 8,153,768 B2

Page 2

### OTHER PUBLICATIONS

DiJoseph et al., "Antibody-targeted chemotherapy of B-cell lymphoma using calicheamicin conjugated to murine or humanized antibody against CD22," *Cancer Immunol. Immunother.*, 2005, 54: 11-24.

DiJoseph et al., "Antibody-targeted chemotherapy with CMC-544: a CD22-targed immunoconjugte of calicheamicin for the treatment of B-lymphoid malignancies," *Blood*, 2004, 103: 1807-1814.

Leung et al., "Construction and characterization of a humanized, internalizing, B-cell (CD22)-specific, leukemia/lymphoma antibody, LL2," *Mol. Immunol.*, 1995, 32: 1413-1427.

Leung et al., "Effect of Vk framework-1 glycosylation on the binding affinity of lymphoma-specific murine and chimeric LL2 antibodies and its potential use as a novel conjugation site," *Intl. J. Cancer.*, 1995, 60: 534-538.

Riechmann et al., "Reshaping human antibodies for therapy," *Nature*, 1988, 332:323-327.

Vaughan et al., "Human antibodies by design," *Nature Biotech.*, 1998, 16: 535-539.

van Rossenberg et al., "A structure-function study of ligand recognition by CD22 beta," *J. Bio. Chem.*, 2001, 276: 12967-12973.

Verhoeyen et al., "Reshaping human antibodies: Grafting an antilysozyme activity," *Science*, 1988, 239:1534-1536.

Vose, J.M., "Therapeutic uses of MAbs directed against CD20" *Cytotherapy*, 2000, 2:455-461.

Hinman et al., "Preparation and characterization of monoclonal antibody conjugates of the calicheamicins: a novel and potent family of antitumor antibiotics," *Cancer Res.*, 1993, 53:3336-3342.

Hamann et al., "An anti-CD33 antibody-calicheamicin conjugate for treatment of acute myeloid leukemia. Choice of linker.", *Bioconjug. Chem.*, 2002, 13:40-46.

Jendreyko et al., "Antitumour activity of Calicheamicin theta, Doxorubicin and anti-CD19 immunoconjugates in a human pre-B ALL cell line," *Blood*, 2001, 98: 105a (Abstract #440).

Siegel et al., "Calicheamicin derivatives conjugated to monoclonal antibodies: determination of loading values and distributions by infrared and UV matrix-assisted laser desorption/ionization mass spectrometry and electrospray ionization mass spectrometry," *Anal. Chem.*, 1997, 69: 2716-2726.

Yelton et al. Affinity maturation of the BR96 anti-carcinoma antibody by codon-based mutagenesis. The Journal of Immunology. 1995, vol. 155, pp. 1994-2004.

Ghetie et al. (Blood 1992: 80(9): 2315-2320.).

Newton et al. (Blood 2001; 97(2): 528-535).

Maloney et al. (Blood 1997; 90(6): 2188-2195).

Gura (Science 1997; 278: 1041-1042).

Saijo (Cancer Sci. 2004; 95(10): 772-776).

Bendig, Mary M.; "Humanization of Rodent Monoclonal Antibodies by CDR Grafting" *Methods*: A Companion to Methods in Enzymology; vol. 8, pp. 83-93, 1995.

Gussow et al. "Humanization of Monoclonal Antibodies" *Methods in Enzymology*, (1991) 203:99-121.

Hamann et al., "An Anti-MUC1 Antibody-Calicheamicin Conjugate for Treatment of Solid Tumors. Choice of Linker and Overcoming Drug Resistance" Bioconjugate Chem. 2005, 16, 346-353.

Kashmiri et al., "SDR grafting—a new approach to antibody hmanization", *Methods* 2005, 36:25-34.

Low et al, "Mimicking Somatic Hypermutation: Affinity Maturation of Antibodies Displayed on Bacteriohage Using a Bacterial Mutator Strain", *J. Mol. Biol* (1996) 260, 359-368.

Paul, "Fv Structure and Diversity in Three Dimensions" Fundamental Immunology, 3rd Ed.: pp. 292-295, 1993.

Press et al, "Immunotherapy of Non-Hodgkin's Lymphomas" *Hematology Am Soc Hematol Educ Program*, 2001: 221-240.

Rudikoff et al, *Proc. Natl. Acad. Sci.* USA, vol. 79, pp. 1979-1983, Mar. 1982.

Trail et al "Monoclonal antibody drug conjugates in the treatment of cancer" Current Opinion in Immunology 1999, 11:584-588.

Tsai et al, "Progressive Intermediate-Grade Non-Hodgkin's Lymphoma After High-Dose Therapy and Autologous Peripheral Stem-Cell Transplantation: Changing the Natural History with Monoclonal Antibody Therapy", *Clinical Lymphoma*. Jun. 2000: 1(1):62-66).

Wu et al, "Humanization of a Murine Monoclonal Antibody by Simultaneous Optimization of Framework and CDR Residues" *J. Mol. Biol.* (1999)294, 151-162.

* cited by examiner

**FIGURE 1:**    **SEQUENCE OF CDRS OF MOUSE MONOCLONAL 5/44**

| H1 | NYWIH | (SEQ ID NO:1) |
| H2 | GINPGNNYTTYKRNLKG | (SEQ ID NO:2) |
| H3 | EGYGNYGAWFAY | (SEQ ID NO:3) |
| L1 | RSSQSLANSYGNTFLS | (SEQ ID NO:4) |
| L2 | GISNRFS | (SEQ ID NO:5) |
| L3 | LQGTHQPYT | (SEQ ID NO:6) |

FIGURE 2:    DNA/PROTEIN SEQUENCE OF 5/44 V$_L$

```
        10            20            30            40            50
GAT GTT GTG GTG ACT CAA ACT CCA CTC TCC CTG CCT GTC AGC TTT GGA GAT CAA GTT
CTA CAA CAC CAC TGA GTT TGA GGT GAG AGG GAC GGA CAG TCG AAA CCT CTA GTT CAA
 D   V   V   V   T   Q   T   P   L   S   L   P   V   S   F   G   D   Q   V>

    60            70            80            90           100           110
TCT ATC TCT TGC AGG TCT AGT CAG AGT CTT GCA AAC AGT TAT GGG AAC ACC TTT TTG
AGA TAG AGA ACG TCC AGA TCA GTC TCA GAA CGT TTG TCA ATA CCC TTG TGG AAA AAC
 S   I   S   C   R   S   S   Q   S   L   A   N   S   Y   G   N   T   F   L>

   120           130           140           150           160           170
TCT TGG TAC CTG CAC AAG CCT GGC CAG TCT CCA CAG CTC CTC ATC TAT GGG ATT TCC
AGA ACC ATG GAC GTG TTC GGA CCG GTC AGA GGT GTC GAG GAG TAG ATA CCC TAA AGG
 S   W   Y   L   H   K   P   G   Q   S   P   Q   L   L   I   Y   G   I   S>

              180           190           200           210           220
AAC AGA TTT TCT GGG GTG CCA GAC AGG TTC ACT GGC AGT GGT TCA GGG ACA GAT TTC
TTG TCT AAA AGA CCC CAC GGT CTG TCC AAG TGA CCG TCA CCA AGT CCC TGT CTA AAG
 N   R   F   S   G   V   P   D   R   F   T   G   S   G   S   G   T   D   F>

230           240           250           260           270           280
ACA CTC AAG ATC AGC ACA ATA AAG CCT GAG GAC TTG GGA ATG TAT TAC TGC TTA CAA
TGT GAG TTC TAG TCG TGT TAT TTC GGA CTC CTG AAC CCT TAC ATA ATG ACG AAT GTT
 T   L   K   I   S   T   I   K   P   E   D   L   G   M   Y   Y   C   L   Q>

    290           300           310           320           330
GGT ACA CAT CAG CCG TAC ACG TTC GGA GGG GGG ACC AAG CTG GAA ATA AAA CGT
CCA TGT GTA GTC GGC ATG TGC AAG CCT CCC CCC TGG TTC GAC CTT TAT TTT GCA
 G   T   H   Q   P   Y   T   F   G   G   G   T   K   L   E   I   K   R>
```

FIGURE 3:    DNA/PROTEIN SEQUENCE OF 5/44 V$_H$

```
          10            20            30            40            50
GAG GTC CAA CTG CAG CAG TCT GGG ACT GTA CTG GCA AGG CCT GGG GCT TCC GTG AAG
CTC CAG GTT GAC GTC GTC AGA CCC TGA CAT GAC CGT TCC GGA CCC CGA AGG CAC TTC
 E   V   Q   L   Q   Q   S   G   T   V   L   A   R   P   G   A   S   V   K>

    60            70            80            90           100           110
ATG TCC TGC AAG GCT TCT GGC TAC AGG TTT ACC AAC TAC TGG ATT CAC TGG GTA AAA
TAC AGG ACG TTC CGA AGA CCG ATG TCC AAA TGG TTG ATG ACC TAA GTG ACC CAT TTT
 M   S   C   K   A   S   G   Y   R   F   T   N   Y   W   I   H   W   V   K>

   120           130           140           150           160           170
CAG AGG CCT GGG CAG GGT CTA GAA TGG ATT GGT GGT ATT AAT CCT GGA AAT AAT TAT
GTC TCC GGA CCC GTC CCA GAT CTT ACC TAA CCA CCA TAA TTA GGA CCT TTA TTA ATA
 Q   R   P   G   Q   G   L   E   W   I   G   G   I   N   P   G   N   N   Y>

          180           190           200           210           220
ACT ACG TAT AAG AGG AAC TTG AAG GGC AAG GCC ACA CTG ACT GCA GTC ACA TCC GCC
TGA TGC ATA TTC TCC TTG AAC TTC CCG TTC CGG TGT GAC TGA CGT CAG TGT AGG CGG
 T   T   Y   K   R   N   L   K   G   K   A   T   L   T   A   V   T   S   A>

230           240           250           260           270           280
AGC ACT GCC TAC ATG GAC CTC AGC AGC CTG ACA AGT GAG GAC TCT GCG GTC TAT TAC
TCG TGA CGG ATG TAC CTG GAG TCG TCG GAC TGT TCA CTC CTG AGA CGC CAG ATA ATG
 S   T   A   Y   M   D   L   S   S   L   T   S   E   D   S   A   V   Y   Y>

   290           300           310           320           330           340
TGT ACA AGA GAG GGC TAT GGT AAC TAC GGG GCC TGG TTT GCT TAC TGG GGC CAG GGG
ACA TGT TCT CTC CCG ATA CCA TTG ATG CCC CGG ACC AAA CGA ATG ACC CCG GTC CCC
 C   T   R   E   G   Y   G   N   Y   G   A   W   F   A   Y   W   G   Q   G>

   350           360
ACT CTG GTC ACC GTC TCC TCA
TGA GAC CAG TGG CAG AGG AGT
 T   L   V   T   V   S   S>
```

FIGURE 4:    REMOVAL OF GLYCOSYLATION SITE AND REACTIVE LYSINE: PCR
STRATEGY TO MUTATE CDR-H2 IN CH VECTOR



FIGURE 5:  5/44 LIGHT CHAIN SEQUENCE GRAFT DESIGN



```
                  10          20                                  40
VL     DVVVTQTPLSLPVSFGDQVSISC RSSQSLANSYGNTFLS WYLHKPGQSPQLLIY
       ||| |  | || | | | |                         ||    || |
DPK9   DIQMTQSPSSLSASVGDRVTITC                   WYQQKPGKAPKLLIY
       | |
gL1    DVQVTQSPSSLSASVGDRVTITC RSSQSLANSYGNTFLS WYLHKPGKAPQLLIY
gL2    DVVVTQSPSSLSASVGDRVTITC RSSQSLANSYGNTFLS WYLHKPGKAPQLLIY


                  60          70          80          90
VL     GISNRFS GVPDRFTGSGSGTDFTLKISTIKPEDLGMYYC LQGTHQPYT
                | |            |  |||    |||
DPK9           GVPSRFSGSGSGTDFTLTISSLQPEDFATYYC
                |
gL1    GISNRFS GVPDRFSGSGSGTDFTLTISSLQPEDFATYYC LQGTHQPYT
gL2    GISNRFS GVPDRFSGSGSGTDFTLTISSLQPEDFATYYC LQGTHQPYT


       100
VL     FGGGTKLEIKR
         |   |
JK1    FGQGTKVEIKR

gL1    FGQGTKVEIKR

gL2    FGQGTKVEIKR
```

JA2326

**FIGURE 6:    5/44 HEAVY CHAIN SEQUENCE GRAFT DESIGN**



# FIGURE 7:  MAP OF VECTOR PMRR14



## FIGURE 8:  MAP OF VECTOR PMRR10.1



**FIGURE 9:  BIACORE ASSAY OF CHIMERIC 5/44 AND MUTANTS**

| 5/44 | Ka e$^5$ | Kd e$^{-4}$ | KD e$^{-10}$ | ~KD nM |
|------|---------|-------------|--------------|--------|
| cLcH | 2.9 | 1.14 | 3.93 | 0.4 |
| N55Q | 5.81 | 1.9 | 3.27 | 0.3 |
| T57A | 7.8 | 0.51 | 0.66 | 0.07 |
| K60R | 4.95 | 1.01 | 2.04 | 0.2 |

**FIGURE 10: OLIGONUCLEOTIDES FOR 5/44 GH1 AND GL1 GENE ASSEMBLIES**

Heavy Chain

544gH1 T1
AGTGTGAGGTGCAATTGGTCCAGTCAGGAGCAGAGGTTAAGAAGCCTGGTGCTTCCGTC
AAAGTTTCGTGTAAGGCTAGCGGCTACAGGTTCAC

544gH1 T2
GTGGCATTAATCCCGGGAATCAGTACACTACATATAAAAGAAATCTAAAGGGCAGAGCA
ACGCTGACCGCGGACACCTCCACAAGCACTGTCTACA

544gH1 T3
AGAGAAGGCTACGGTAATTACGGAGCCTGGTTCGCCTACTGGGGCCAGGGTACCCTAGT
CACAGTCTCCTCAGCTTCTACAAAGGGCCCAAGAAA

544 gH1 B1
GGACCAATTGCACCTCACACTGCACTCCCTTGAGAATGAGTGCCAGGAACACGAGAGAG
AATCCGAAGTCCATGGTGGCGGCAAGCTTTTATTC

544 gH1 B2
GATTCCCGGGATTAATGCCACCGATCCATTCCAGGCCTTGTCCCGGAGCCTGCCTGACCC
AATGAATCCAATAATTTGTGAACCTGTAGCCGCTAGC

544gH1 B3
CGTAATTACCGTAGCCTTCTCTAGTACAATAGTACACTGCGGTGTCCTCGGATCTCAGAG
ATGACAGCTCCATGTAGACAGTGCTTGTGGAGG

544gH1 F1
GAATAAAAGCTTGCCGCCACC

544gH1 R1
TTTCTTGGGCCCTTTGTAGAAG

**FIGURE 10 CONT.**

<u>Light Chain</u>

544 gL1 T1
GCTTCCCGGGGTGACGTTCAAGTGACCCAGAGCCCATCCAGCCTGAGCGCATCTGTAGG
AGACCGGGTCACCATCACTTGTAGATCC

544 gL1 T2
TATCTGCACAAACCAGGTAAAGCCCCACAATTGCTCATCTACGGAATCTCTAACAGATTT
AGTGGTGTACCAGACAGGTTCAGCGGTTCC

544gL1 T3
AGATTTCGCCACTTATTACTGTTTACAAGGTACACATCAGCCGTACACATTCGGTCAGGG
TACTAAAGTAGAAATCAAACGTACGGCGTGC

544gL1 B1
GAACGTCACCCCGGGAAGCAGGAATCCAGAACAACAGAAGCACCAACAGCCTAACAGG
CAACTTCATGGTGGCGGCTTCGAATCATCC

544gL1 B2
CTTTACCTGGTTTGTGCAGATACCAAGACAAAAAGGTGTTCCCATAACTGTTTGCAAGAC
TCTGACTGGATCTACAAGTGATGGTGAC

544gL1 B3
AACAGTAATAAGTGGCGAAATCTTCTGGCTGGAGAGACGAGATCGTGAGGGTGAAATCA
GTACCACTTCCGGAACCGCTGAACCTGTCTG

544gL1 F1
GGATGATTCGAAGCCGCCAC

544gL1 R1
GCACGCCGTACGTTTGATTTC

FIGURE 11: PLASMID MAPS OF INTERMEDIATE VECTORS PCR2.1 (544GH1)



FIGURE 12:  PLASMID MAPS OF INTERMEDIATE VECTORS PCR2.1 (544GL1)



**FIGURE 13:  OLIGONUCLEOTIDE CASSETTES USED TO MAKE FURTHER GRAFTS**

gH4

```
    XmaI     10          20          30          40          50      SacII
    CC GGG AAT AAC TAC GCT ACA TAT AGG AGA AAT CTA AAG GGC AGA GCA ACG CTG ACC GC
         C TTA TTG ATG CGA TGT ATA TCC TCT TTA GAT TTC CCG TCT CGT TGC GAC TGG
    P   G   N   N   Y   A   T   Y   R   R   N   L   K   G   R   A   T   L   T   A
```

gH5

```
    XmaI     10          20          30          40          50      SacII
    CC GGG AAT AAC TAC GCT ACA TAT AGG AGA AAT CTA AAG GGC AGA GTT ACG ATG ACC GC
         C TTA TTG ATG CGA TGT ATA TCC TCT TTA GAT TTC CCG TCT CAA TGC TAC TGG
    P   G   N   N   Y   A   T   Y   R   R   K   F   Q   G   R   V   T   M   T   A
```

gH6

```
    XmaI     10          20          30          40          50      SacII
    CC GGG AAT AAC TAC GCT ACA TAT AGG AGA AAA TTC CAG GGC AGA GCA ACG CTG ACC GC
         C TTA TTG ATG CGA TGT ATA TCC TCT TTT AAG GTC CCG TCT CGT TGC GAC TGG
    P   G   N   N   Y   A   T   Y   R   R   K   F   Q   G   R   A   T   L   T   A
```

gH7

```
    XmaI      10          20          30          40          50      SacII
    CC GGG AAT AAC TAC GCT ACA TAT AGG AGA AAA TTC CAG GGC AGA GTT ACG ATG ACC GC
         C TTA TTG ATG CGA TGT ATA TCC TCT TTT AAG GTC CCG TCT CAA TGC TAC TGG
    P   G   N   N   Y   A   T   Y   R   R   K   F   Q   G   R   V   T   M   T   A
```

gL2

```
         XmaI   10          20          30          40          50          60
BstEII
         C CGG GGT GAC GTT GTC GTG ACC CAG AGC CCA TCC AGC CTG AGC GCA TCT GTA GGA GAC CGG
           CCA CTG CAA CAG CAC TGG GTC TCG GGT AGG TCG GAC TCG CGT AGA CAT CCT CTG GCC CAG TG
         S   R   G   D   V   V   V   T   Q   S   P   S   S   L   S   A   S   V   G   D   R   V   T
```

FIGURE 14:  COMPETITION ASSAY, COMPETING BINDING OF FLUORESCENTLY
LABELLED MOUSE 5/44 ANTIBODY WITH GRAFTED VARIANTS.



FIGURE 15: COMPETITION ASSAY, COMPETING BINDING OF FLUORESCENTLY
LABELLED MOUSE 5/44 ANTIBODY WITH GRAFTED VARIANTS.



## FIGURE 16: FULL DNA SEQUENCE OF GRAFTED HEAVY AND LIGHT CHAINS

a) Heavy Chain

```
          10          20          30          40          50          60
AAGCTTGCCG CCACC ATG GAC TTC GGA TTC TCT CTC GTG TTC CTG GCA CTC ATT CTC AAG
TTCGAACGGC GGTGG TAC CTG AAG CCT AAG AGA GAG CAC AAG GAC CGT GAG TAA GAG TTC
               M   D   F   G   F   S   L   V   F   L   A   L   I   L   K>

          70          80          90          100         110
GGA GTG CAG TGT GAG GTG CAA TTG GTC CAG TCA GGA GCA GAG GTT AAG AAG CCT GGT
CCT CAC GTC ACA CTC CAC GTT AAC CAG GTC AGT CCT CGT CTC CAA TTC TTC GGA CCA
G   V   Q   C   E   V   Q   L   V   Q   S   G   A   E   V   K   K   P   G>

120         130         140         150         160         170
GCT TCC GTC AAA GTT TCG TGT AAG GCT AGC GGC TAC AGG TTC ACA AAT TAT TGG ATT
CGA AGG CAG TTT CAA AGC ACA TTC CGA TCG CCG ATG TCC AAG TGT TTA ATA ACC TAA
A   S   V   K   V   S   C   K   A   S   G   Y   R   F   T   N   Y   W   I>

          180         190         200         210         220         230
CAT TGG GTC AGG CAG GCT CCG GGA CAA GGC CTG GAA TGG ATC GGT GGC ATT AAT CCC
GTA ACC CAG TCC GTC CGA GGC CCT GTT CCG GAC CTT ACC TAG CCA CCG TAA TTA GGG
H   W   V   R   Q   A   P   G   Q   G   L   E   W   I   G   G   I   N   P>

          240         250         260         270         280
GGG AAT AAC TAC GCT ACA TAT AGG AGA AAA TTC CAG GGC AGA GTT ACG ATG ACC GCG
CCC TTA TTG ATG CGA TGT ATA TCC TCT TTT AAG GTC CCG TCT CAA TGC TAC TGG CGC
G   N   N   Y   A   T   Y   R   R   K   F   Q   G   R   V   T   M   T   A>

290         300         310         320         330         340
GAC ACC TCC ACA AGC ACT GTC TAC ATG GAG CTG TCA TCT CTG AGA TCC GAG GAC ACC
CTG TGG AGG TGT TCG TGA CAG ATG TAC CTC GAC AGT AGA GAC TCT AGG CTC CTG TGG
D   T   S   T   S   T   V   Y   M   E   L   S   S   L   R   S   E   D   T>

          350         360         370         380         390         400
GCA GTG TAC TAT TGT ACT AGA GAA GGC TAC GGT AAT TAC GGA GCC TGG TTC GCC TAC
CGT CAC ATG ATA ACA TGA TCT CTT CCG ATG CCA TTA ATG CCT CGG ACC AAG CGG ATG
A   V   Y   Y   C   T   R   E   G   Y   G   N   Y   G   A   W   F   A   Y>

          410         420         430         440         450
TGG GGC CAG GGT ACC CTA GTC ACA GTC TCC TCA GCT TCT ACA AAG GGC CCA TCC GTC
ACC CCG GTC CCA TGG GAT CAG TGT CAG AGG AGT CGA AGA TGT TTC CCG GGT AGG CAG
W   G   Q   G   T   L   V   T   V   S   S   A   S   T   K   G   P   S   V>

460         470         480         490         500         510
TTC CCC CTG GCG CCC TGC TCC AGG AGC ACC TCC GAG AGC ACA GCC GCC CTG GGC TGC
AAG GGG GAC CGC GGG ACG AGG TCC TCG TGG AGG CTC TCG TGT CGG CGG GAC CCG ACG
F   P   L   A   P   C   S   R   S   T   S   E   S   T   A   A   L   G   C>

520         530         540         550         560         570
CTG GTC AAG GAC TAC TTC CCC GAA CCG GTG ACG GTG TCG TGG AAC TCA GGC GCC CTG
GAC CAG TTC CTG ATG AAG GGG CTT GGC CAC TGC CAC AGC ACC TTG AGT CCG CGG GAC
L   V   K   D   Y   F   P   E   P   V   T   V   S   W   N   S   G   A   L>

          580         590         600         610         620         630
ACC AGC GGC GTG CAC ACC TTC CCG GCT GTC CTA GAC TCC TCA GGA CTC TAC TCC CTC
TGG TCG CCG CAC GTG TGG AAG GGC CGA CAG GAT GTC AGG AGT CCT GAG ATG AGG GAG
T   S   G   V   H   T   F   P   A   V   L   Q   S   S   G   L   Y   S   L>
```

## FIGURE 16 CONT.

```
          640         650         660         670         680
AGC AGC GTG GTG ACC GTG CCC TCC AGC AGC TTG GGC ACG AAG ACC TAC ACC TGC AAC
TCG TCG CAC CAC TGG CAC GGG AGG TCG TCG AAC CCG TGC TTC TGG ATG TGG ACG TTG
 S   S   V   V   T   V   P   S   S   S   L   G   T   K   T   Y   T   C   N>

 690         700         710         720         730         740
GTA GAT CAC AAG CCC AGC AAC ACC AAG GTG GAC AAG AGA GTT G GTGAGAGGCC
CAT CTA GTG TTC GGG TCG TTG TGG TTC CAC CTG TTC TCT CAA C CACTCTCCGG
 V   D   H   K   P   S   N   T   K   V   D   K   R   V>

      750         760         770         780         790         800         810
AGCACAGGGA GGGAGGGTGT CTGCTGGAAG CCAGGCTCAG CCCTCCTGCC TGGACGCACC CCGGCTGTGC
TCGTGTCCCT CCCTCCCACA GACGACCTTC GGTCCGAGTC GGGAGGACGG ACCTGCGTGG GGCCGACACG

      820         830         840         850         860         870         880
AGCCCCAGCC CAGGGCAGCA AGGCATGCCC CATCTGTCTC CTCACCCGGA GGCCTCTGAC CACCCCACTC
TCGGGGTCGG GTCCCGTCGT TCCGTACGGG GTAGCAGAG GAGTGGGCCT CCGGAGACTG GTGGGGTGAG

      890         900         910         920         930         940         950
ATGCCCAGGG AGAGGGTCTT CTGGATTTTT CCACCAGGCT CCGGGCAGCC ACAGGCTGGA TGCCCCTACC
TACGGGTCCC TCTCCCAGAA GACCTAAAAA GGTGGTCCGA GGCCCGTCGG TGTCCGACCT ACGGGGATGG

      960         970         980         990        1000        1010        1020
CCAGGCCCTG CGCATACAGG GGCAGGTGCT GCGCTCAGAC CTGCCAAGAG CCATATCCGG GAGGACCCTG
GGTCCGGGAC GCGTATGTCC CCGTCCACGA CGCGAGTCTG GACGGTTCTC GGTATAGGCC CTCCTGGGAC

     1030        1040        1050        1060        1070        1080        1090
CCCCTGACCT AAGCCCACCC CAAAGGCCAA ACTCTCCACT CCCTCAGCTC AGACACCTTC TCTCCTCCCA
GGGGACTGGA TTCGGGTGGG GTTTCCGGTT TGAGAGGTGA GGGAGTCGAG TCTGTGGAAG AGAGGAGGGT

     1100        1110        1120        1130        1140        1150
GATCTGAGTA ACTCCCAATC TTCTCTCTGC A GAG TCC AAA TAT GGT CCC CCA TGC CCA CCA
CTAGACTCAT TGAGGGTTAG AAGAGAGACG T CTC AGG TTT ATA CCA GGG GGT ACG GGT GGT
                                  E   S   K   Y   G   P   P   C   P   P>

 1160        1170        1180        1190        1200        1210        1220
   TGC CCA GGT AAGCCAACCC AGGCCTCGCC CTCCAGCTCA AGGCGGGACA GGTGCCCTAG AGTAGCCTGC
   ACG GGT CCA TTCGGTTGGG TCCGGAGCGG GAGGTCGAGT TCCGCCCTGT CCACGGGATC TCATCGGACG
   C   P>

     1230        1240        1250        1260        1270        1280
ATCCAGGGAC AGGCCCCAGC CGGGTGCTGA CGCATCCACC TCCATCTCTT CCTCA GCA CCT GAG TTC
TAGGTCCCTG TCCGGGGTCG GCCCACGACT GCGTAGGTGG AGGTAGAGAA GGAGT CGT GGA CTC AAG
                                                          A   P   E   F>

 1290        1300        1310        1320        1330        1340
CTG GGG GGA CCA TCA GTC TTC CTG TTC CCC CCA AAA CCC AAG GAC ACT CTC ATG ATC
GAC CCC CCT GGT AGT CAG AAG GAC AAG GGG GGT TTT GGG TTC CTG TGA GAG TAC TAG
 L   G   G   P   S   V   F   L   F   P   P   K   P   K   D   T   L   M   I>

     1350        1360        1370        1380        1390        1400
TCC CGG ACC CCT GAG GTC ACG TGC GTG GTG GTG GAC GTG AGC CAG GAA GAC CCC GAG
AGG GCC TGG GGA CTC CAG TGC ACG CAC CAC CAC CTG CAC TCG GTC CTT CTG GGG CTC
 S   R   T   P   E   V   T   C   V   V   V   D   V   S   Q   E   D   P   E>
```

**FIGURE 16 CONT.**

```
        1410            1420            1430            1440            1450
   GTC CAG TTC AAC TGG TAC GTG GAT GGC GTG GAG GTG CAT AAT GCC AAG ACA AAG CCG
   CAG GTC AAG TTG ACC ATG CAC CTA CCG CAC CTC CAC GTA TTA CGG TTC TGT TTC GGC
    V   Q   F   N   W   Y   V   D   G   V   E   V   H   N   A   K   T   K   P>

  1460            1470            1480            1490            1500            1510
   CGG GAG GAG CAG TTC AAC AGC ACG TAC CGT GTG GTC AGC GTC CTC ACC GTC CTG CAC
   GCC CTC CTC GTC AAG TTG TCG TGC ATG GCA CAC CAG TCG CAG GAG TGG CAG GAC GTG
    R   E   E   Q   F   N   S   T   Y   R   V   V   S   V   L   T   V   L   H>

    1520            1530            1540            1550            1560            1570
   CAG GAC TGG CTG AAC GGC AAG GAG TAC AAG TGC AAG GTC TCC AAC AAA GGC CTC CCG
   GTC CTG ACC GAC TTG CCG TTC CTC ATG TTC ACG TTC CAG AGG TTG TTT CCG GAG GGC
    Q   D   W   L   N   G   K   E   Y   K   C   K   V   S   N   K   G   L   P>

           1580            1590            1600            1610            1620            1630
   TCC TCC ATC GAG AAA ACC ATC TCC AAA GCC AAA GGTGG GACCCACGGG GTGCGAGGGC
   AGG AGG TAG CTC TTT TGG TAG AGG TTT CGG TTT CCACC CTGGGTGCCC CACGCTCCCG
    S   S   I   E   K   T   I   S   K   A   K>

          1640            1650            1660            1670            1680            1690            1700
   CACATGGACA GAGGTCAGCT CGGCCCACCC TCTGCCCTGG GAGTGACCGC TGTGCCAACC TCTGTCCCTA
   GTGTACCTGT CTCCAGTCGA GCCGGGTGGG AGACGGGACC CTCACTGGCG ACACGGTTGG AGACAGGGAT

            1710            1720            1730            1740            1750
   CA GGG CAG CCC CGA GAG CCA CAG GTG TAC ACC CTG CCC CCA TCC CAG GAG GAG ATG
   GT CCC GTC GGG GCT CTC GGT GTC CAC ATG TGG GAC GGG GGT AGG GTC CTC CTC TAC
      G   Q   P   R   E   P   Q   V   Y   T   L   P   P   S   Q   E   E   M>

     1760            1770            1780            1790            1800            1810
   ACC AAG AAC CAG GTC AGC CTG ACC TGC CTG GTC AAA GGC TTC TAC CCC AGC GAC ATC
   TGG TTC TTG GTC CAG TCG GAC TGG ACG GAC CAG TTT CCG AAG ATG GGG TCG CTG TAG
    T   K   N   Q   V   S   L   T   C   L   V   K   G   F   Y   P   S   D   I>

        1820            1830            1840            1850            1860            1870
   GCC GTG GAG TGG GAG AGC AAT GGG CAG CCG GAG AAC AAC TAC AAG ACC ACG CCT CCC
   CGG CAC CTC ACC CTC TCG TTA CCC GTC GGC CTC TTG TTG ATG TTC TGG TGC GGA GGG
    A   V   E   W   E   S   N   G   Q   P   E   N   N   Y   K   T   T   P   P>

                1880            1890            1900            1910            1920
   GTG CTG GAC TCC GAC GGC TCC TTC TTC CTC TAC AGC AGG CTA ACC GTG GAC AAG AGC
   CAC GAC CTG AGG CTG CCG AGG AAG AAG GAG ATG TCG TCC GAT TGG CAC CTG TTC TCG
    V   L   D   S   D   G   S   F   F   L   Y   S   R   L   T   V   D   K   S>

  1930            1940            1950            1960            1970            1980
   AGG TGG CAG GAG GGG AAT GTC TTC TCA TGC TCC GTG ATG CAT GAG GCT CTG CAC AAC
   TCC ACC GTC CTC CCC TTA CAG AAG AGT ACG AGG CAC TAC GTA CTC CGA GAC GTG TTG
    R   W   Q   E   G   N   V   F   S   C   S   V   M   H   E   A   L   H   N>

     1990            2000            2010            2020            2030            2040
   CAC TAC ACA CAG AAG AGC CTC TCC CTG TCT CTG GGT AAA TGA GTGC CAGGGCCGGC
   GTG ATG TGT GTC TTC TCG GAG AGG GAC AGA GAC CCA TTT ACT CACG GTCCCGGCCG
    H   Y   T   Q   K   S   L   S   L   S   L   G   K   *>

        2050            2060            2070            2080            2090            2100            2110
   AAGCCCCCGC TCCCCGGGCT CTCGGGGTCG CGCGAGGATG CTTGGCACGT ACCCCGTCTA CATACTTCCC
   TTCGGGGGCG AGGGGCCCGA GAGCCCCAGC GCGCTCCTAC GAACCGTGCA TGGGGCAGAT GTATGAAGGG
```

JA2340

## FIGURE 16 CONT

```
         2120        2130        2140        2150        2160
AGGCACCCAG CATGGAAATA AAGCACCCAC CACTGCCCTG GCTCGAATTC
TCCGTGGGTC GTACCTTTAT TTCGTGGGTG GTGACGGGAC CGAGCTTAAG
```

FIGURE 16 CONT.

b) Light Chain

```
         10          20          30          40          50          60
TTCGAAGCCG CCACC ATG AAG TTG CCT GTT TTG TTG GTG CTT CTG TTG TTC TGG ATT
AAGCTTCGGC GGTGG TAC TTC AAC GGA CAA TCC GAC AAC CAC GAA GAC AAC AAG ACC TAA
               M   K   L   P   V   R   L   L   V   L   L   L   F   W   I>

         70          80          90         100         110
CCT GCT TCC CGG GGT GAC GTT CAA GTG ACC CAG AGC CCA TCC AGC CTG AGC GCA TCT
GGA CGA AGG GCC CCA CTG CAA GTT CAC TGG GTC TCG GGT AGG TCG GAC TCG CGT AGA
 P   A   S   R   G   D   V   Q   V   T   Q   S   P   S   S   L   S   A   S>

120         130         140         150         160         170
GTA GGA GAC CGG GTC ACC ATC ACT TGT AGA TCC AGT CAG AGT CTT GCA AAC AGT TAT
CAT CCT CTG GCC CAG TGG TAG TGA ACA TCT AGG TCA GTC TCA GAA CGT TTG TCA ATA
 V   G   D   R   V   T   I   T   C   R   S   S   Q   S   L   A   N   S   Y>

        180         190         200         210         220         230
GGG AAC ACC TTT TTG TCT TGG TAT CTG CAC AAA CCA GGT AAA GCC CCA CAA TTG CTC
CCC TTG TGG AAA AAC AGA ACC ATA GAC GTG TTT GGT CCA TTT CGG GGT GTT AAC GAG
 G   N   T   F   L   S   W   Y   L   H   K   P   G   K   A   P   Q   L   L>

        240         250         260         270         280
ATC TAC GGA ATC TCT AAC AGA TTT AGT GGT GTA CCA GAC AGG TTC AGC GGT TCC GGA
TAG ATG CCT TAG AGA TTG TCT AAA TCA CCA CAT GGT CTG TCC AAG TCG CCA AGG CCT
 I   Y   G   I   S   N   R   F   S   G   V   P   D   R   F   S   G   S   G>

290         300         310         320         330         340
AGT GGT ACT GAT TTC ACC CTC ACG ATC TCG TCT CTC CAG CCA GAA GAT TTC GCC ACT
TCA CCA TGA CTA AAG TGG GAG TGC TAG AGC AGA GAG GTC GGT CTT CTA AAG CGG TGA
 S   G   T   D   F   T   L   T   I   S   S   L   Q   P   E   D   F   A   T>

        350         360         370         380         390         400
TAT TAC TGT TTA CAA GGT ACA CAT CAG CCG TAC ACA TTC GGT CAG GGT ACT AAA GTA
ATA ATG ACA AAT GTT CCA TGT GTA GTC GGC ATG TGT AAG CCA GTC CCA TGA TTT CAT
 Y   Y   C   L   Q   G   T   H   Q   P   Y   T   F   G   Q   G   T   K   V>

        410         420         430         440         450
GAA ATC AAA CGT ACG GTA GCG GCC CCA TCT GTC TTC ATC TTC CCG CCA TCT GAT GAG
CTT TAG TTT GCA TGC CAT CGC CGG GGT AGA CAG AAG TAG AAG GGC GGT AGA CTA CTC
 E   I   K   R   T   V   A   A   P   S   V   F   I   F   P   P   S   D   E>

460         470         480         490         500         510
CAG TTG AAA TCT GGA ACT GCC TCT GTT GTG TGC CTG CTG AAT AAC TTC TAT CCC AGA
GTC AAC TTT AGA CCT TGA CGG AGA CAA CAC ACG GAC GAC TTA TTG AAG ATA GGG TCT
 Q   L   K   S   G   T   A   S   V   V   C   L   L   N   N   F   Y   P   R>

520         530         540         550         560         570
GAG GCC AAA GTA CAG TGG AAG GTG GAT AAC GCC CTC CAA TCG GGT AAC TCC CAG GAG
CTC CGG TTT CAT GTC ACC TTC CAC CTA TTG CGG GAG GTT AGC CCA TTG AGG GTC CTC
 E   A   K   V   Q   W   K   V   D   N   A   L   Q   S   G   N   S   Q   E>

        580         590         600         610         620         630
AGT GTC ACA GAG CAG GAC AGC AAG GAC AGC ACC TAC AGC CTC AGC AGC ACC CTG ACG
TCA CAG TGT CTC GTC CTG TCG TTC CTG TCG TGG ATG TCG GAG TCG TCG TGG GAC TGC
 S   V   T   E   Q   D   S   K   D   S   T   Y   S   L   S   S   T   L   T>

         640         650         660         670         680
```

**FIGURE 16 CONT**

```
CTG AGC AAA GCA GAC TAC GAG AAA CAC AAA GTC TAC GCC TGC GAA GTC ACC CAT CAG
GAC TCG TTT CGT CTG ATG CTC TTT GTG TTT CAG ATG CGG ACG CTT CAG TGG GTA GTC
 L   S   K   A   D   Y   E   K   H   K   V   Y   A   C   E   V   T   H   Q>

690          700         710         720         730         740
GGC CTG AGC TCG CCC GTC ACA AAG AGC TTC AAC AGG GGA GAG TGT TAG AGGGA
CCG GAC TCG AGC GGG CAG TGT TTC TCG AAG TTG TCC CCT CTC ACA ATC TCCCT
 G   L   S   S   P   V   T   K   S   F   N   R   G   E   C   *>

      750         760         770         780
GAAGTGCCCC CACCTGCTCC TCAGTTCCAG CCTGGGAATT C
CTTCACGGGG GTGGACGAGG AGTCAAGGTC GGACCCTTAA G
```

FIGURE 17:  STRUCTURE OF AN ANTIBODY-NAC-GAMMA CALICHEAMICIN DMH
CONJUGATE

FIGURE 18:  EFFECT OF CMC-544 ON GROWTH OF RAMOS B-CELL LYMPHOMA



**FIGURE 19: EFFECT OF CMC-544 ON LARGE B-CELL LYMPHOMAS**



FIGURE 20: EFFECT OF CMC-544 MADE WITH THE CMA AND CMC CONJUGATION PROCEDURES ON THE GROWTH OF RL LYMPHOMA



**FIGURE 21:  RITUXIMAB (RITUXAN™)-TREATED LARGE RL LYMPHOMA IS
SUSCEPTIBLE TO CMC-544**



FIGURE 22: EFFECT OF RITUXIMAB (RITUXAN™) ON THE CYTOTOXIC ACTIVITY OF CMC-544



**FIGURE 23: EFFECT OF CMC-544, RITUXIMAB (RITUXAN™)-, AND CMA-676 ON SURVIVAL OF SCID MICE WITH DISSEMINATED EARLY RAMOS B LYMPHOMA**



FIGURE 24:  EFFECT OF CMC-544, RITUXIMAB (RITUXAN™), AND CMA-676 ON
SURVIVAL OF SCID MICE WITH DISSEMINATED LATE RAMOS B LYMPHOMA



**FIGURE 25:  EFFECT OF CMC-544, RITUXIMAB (RITUXAN™), AND CMA-676 ON SURVIVAL OF SCID MICE WITH DISSEMINATED LATE RAMOS B LYMPHOMA**



FIGURE 26:  EFFECT OF CMC-544, RITUXIMAB (RITUXAN™), AND CMA-676 ON
SURVIVAL OF SCID MICE WITH DISSEMINATED LATE RAMOS B LYMPHOMA



FIGURE 27:  EFFECT OF CMC-544, RITUXIMAB (RITUXAN™), AND CMA-676 ON
SURVIVAL OF SCID MICE WITH DISSEMINATED LATE RAMOS B LYMPHOMA



FIGURE 28:  ANTI-TUMOR ACTIVITY OF CMC-544 WITH/WITHOUT RITUXIMAB
(RITUXAN™) ON RL NON-HODGKINS LYMPHOMA



FIGURE 29: ANTI-TUMOR ACTIVITY OF CMC-544 AND CHOP ON RL NON-HODGKINS LYMPHOMA



US 8,153,768 B2

1

# CALICHEAMICIN DERIVATIVE-CARRIER CONJUGATES

## FIELD OF THE INVENTION

The present invention relates to methods for the production of monomeric cytotoxic drug/carrier conjugates (the "conjugates") with higher drug loading and substantially reduced low conjugate fraction (LCF). Particularly, the invention relates to anti-CD22 antibody-monomeric calicheamicin conjugates. The invention also relates to the conjugates of the invention, to methods of purification of the conjugates, to pharmaceutical compositions comprising the conjugates, and to uses of the conjugates.

## BACKGROUND OF THE INVENTION

Drug conjugates developed for systemic pharmacotherapy are target-specific cytotoxic agents. The concept involves coupling a therapeutic agent to a carrier molecule with specificity for a defined target cell population. Antibodies with high affinity for antigens are a natural choice as targeting moieties. With the availability of high affinity monoclonal antibodies, the prospects of antibody-targeting therapeutics have become promising. Toxic substances that have been conjugated to monoclonal antibodies include toxins, low-molecular-weight cytotoxic drugs, biological response modifiers, and radionuclides. Antibody-toxin conjugates are frequently termed immunotoxins, whereas immunoconjugates consisting of antibodies and low-molecular-weight drugs such as methothrexate and Adriamycin are called chemoimmunoconjugates. Immunomodulators contain biological response modifiers that are known to have regulatory functions such as lymphokines, growth factors, and complement-activating cobra venom factor (CVF). Radioimmunoconjugates consist of radioactive isotopes, which may be used as therapeutics to kill cells by their radiation or used for imaging. Antibody-mediated specific delivery of cytotoxic drugs to tumor cells is expected to not only augment their antitumor efficacy, but also prevent nontargeted uptake by normal tissues, thus increasing their therapeutic indices

The present invention relates to immunoconjugates comprising an antibody as a targeting vehicle and having specificity for antigenic determinants on the surface of malignant cells conjugated to a cytotoxic drug. The invention relates to cytotoxic drug-antibody conjugates, wherein the antibody has specificity for antigenic determinants on B-malignancies, lymphoproliferative disorders and chronic inflammatory diseases. The present invention also relates to methods for producing immunoconjugates and to their therapeutic use(s).

A number of antibody-based therapeutics for treating a variety of diseases including cancer and rheumatoid arthritis have been approved for clinical use or are in clinical trials for a variety of malignancies such as Non-Hodgkin's lymphoma. One such antibody-based therapeutic is rituximab (Rituxan™), an unlabelled chimeric human γ1 (+mγ1V-region) antibody, which is specific for cell surface antigen CD20, which is expressed on B-cells. These antibody based therapeutics rely either on complement-mediated cytotoxicity (CDCC) or antibody-dependent cellular cytotoxicity (ADCC) against B cells, or on the use of radionuclides, such as $^{131}$I or $^{90}$Y, which have associated preparation and use problems for clinicians and patients. Consequently, there is a need for the generation of immunoconjugates which can overcome the shortcomings of current antibody-based therapeutics to treat a variety of malignancies including hematopoietic malignancies like

2

non-Hodgkin's lymphoma (NHL), which can be produced easily and efficiently, and which can be used repeatedly without inducing an immune response.

Immunoconjugates comprising a member of the potent family of antibacterial and antitumor agents, known collectively as the calicheamicins or the LL-E33288 complex, (see U.S. Pat. No. 4,970,198 (1990)), were developed for use in the treatment of myelomas. The most potent of the calicheamicins is designated $\gamma_1$, which is herein referenced simply as gamma. These compounds contain a methyltrisulfide that can be reacted with appropriate thiols to form disulfides, at the same time introducing a functional group such as a hydrazide or other functional group that is useful in attaching a calicheamicin derivative to a carrier. (See U.S. Pat. No. 5,053, 394). The use of the monomeric calicheamicin derivative/ carrier conjugates in developing therapies for a wide variety of cancers has been limited both by the availability of specific targeting agents (carriers) as well as the conjugation methodologies which result in the formation of protein aggregates when the amount of the calicheamicin derivative that is conjugated to the carrier (i.e., the drug loading) is increased. Since higher drug loading increases the inherent potency of the conjugate, it is desirable to have as much drug loaded on the carrier as is consistent with retaining the affinity of the carrier protein. The presence of aggregated protein, which may be nonspecifically toxic and immunogenic, and therefore must be removed for therapeutic applications, makes the scale-up process for the production of these conjugates more difficult and decreases the yield of the products. The amount of calicheamicin loaded on the carrier protein (the drug loading), the amount of aggregate that is formed in the conjugation reaction, and the yield of final purified monomeric conjugate that can be obtained are all related. A compromise must therefore be made between higher drug loading and the yield of the final monomer by adjusting the amount of the reactive calicheamicin derivative that is added to the conjugation reaction.

The tendency for cytotoxic drug conjugates, especially calicheamicin conjugates to aggregate is especially problematic when the conjugation reactions are performed with the linkers described in U.S. Pat. No. 5,877,296 and U.S. Pat. No. 5,773,001, which are incorporated herein in their entirety. In this case, a large percentage of the conjugates produced are in an aggregated form, and it is quite difficult to purify conjugates made by these original processes (CMA process) for therapeutic use. For some carrier proteins, conjugates with even modest loadings are virtually impossible to make except on a small scale. Consequently, there is a critical need to improve methods for conjugating cytotoxic drugs, such as the calicheamicins, to carriers that minimize the amount of aggregation and thereby allow for as high a drug loading as possible with a reasonable yield of product.

Previously, conjugation methods for preparing monomeric calicheamicin derivative/carrier with higher drug loading/ yield and decreased aggregation were disclosed (see U.S. Pat. No. 5,712,374 and U.S. Pat. No. 5,714,586, incorporated herein in their entirety). Although these processes resulted in conjugate preparations with substantially reduced aggregate content, it was discovered later that it produced conjugates containing undesirably high levels (45-65% HPLC Area %) of a low conjugated fraction (LCF), a fraction consisting mostly of unconjugated antibody. The presence of the LCF in the product is an inefficient use of the antibody, as it does not contain the cytotoxic drug. It may also compete with the calicheamicin-carrier conjugate for the target and potentially reduce the targetability of the latter resulting in reduced efficacy of the cytotoxic drug. Therefore, an improved conjuga-

US 8,153,768 B2

**3**

tion process that would result in significantly lower levels of the LCF and have acceptable levels of aggregation, without significantly altering the physical properties of the conjugate, is desirable.

## SUMMARY OF THE INVENTION

The present invention relates to methods for the production of monomeric cytotoxic drug derivative/carrier conjugates (the "conjugates") with higher loading and substantially reduced low conjugate fraction (LCF). Particularly, the invention relates to the production of monomeric calicheamicin derivative-carrier conjugates, to the conjugates, to compositions, to a method of purification of the conjugates, and to use of the conjugates. More particularly, the invention relates to methods for producing a monomeric calicheamicin derivative-anti-CD22 antibody conjugate (CMC-544).

In one embodiment, the present invention discloses an improved conjugation process for the production of the conjugates that resulted in significantly lower levels of the LCF (below 10 percent) without any significant alteration of the physical or chemical properties. The invention also discloses a further improvement to the conjugation process which results in not only a significant reduction in the levels of the LCF, but also results in a significant reduction in aggregation from previously disclosed processes, and produces substantially increased drug loading. The conjugates of the present invention have the formula:

$$Pr(-X-W)_m$$

wherein:

Pr is a proteinaceous carrier,

X is a linker that comprises a product of any reactive group that can react with a proteinaceous carrier,

W is a cytotoxic drug;

m is the average loading for a purified conjugation product such that the cytotoxic drug constitutes 7-9% of the conjugate by weight; and

$(-X-W)_m$ is a cytotoxic drug derivative.

The conjugates of the present invention, in one embodiment, are generated by the method of the invention comprising the steps of: (1) adding the cytotoxic drug derivative to the proteinaceous carrier wherein the cytotoxic drug derivative is 4.5-11% by weight of the proteinaceous carrier; (2) incubating the cytotoxic drug derivative and a proteinaceous carrier in a non-nucleophilic, protein-compatible, buffered solution having a pH in a range from about 7 to 9 to produce a monomeric cytotoxic drug/carrier conjugate, wherein the solution further comprises (a) an organic cosolvent, and (b) an additive comprising at least one $C_6$-$C_{18}$ carboxylic acid or its salt, and wherein the incubation is conducted at a temperature ranging from about 30° C. to about 35° C. for a period of time ranging from about 15 minutes to 24 hours; and (3) subjecting the conjugate produced in step (2) to a chromatographic separation process to separate the monomeric cytotoxic drug derivative/proteinaceous carrier conjugates with a loading in the range of 4-10% by weight of cytotoxic drug and with low conjugated fraction (LCF) below 10 percent from unconjugated proteinaceous carrier, cytotoxic drug derivative, and aggregated conjugates.

In one aspect of the invention, the proteinaceous carrier of the conjugate is selected from a group consisting of hormones, growth factors, antibodies, antibody fragments, antibody mimics, and their genetically or enzymatically engineered counterparts.

In one embodiment, the proteinaceous carrier is an antibody. In a preferred embodiment, the antibody is selected

**4**

from a group consisting of a monoclonal antibody, a chimeric antibody, a human antibody, a humanized antibody, a single chain antibody, a Fab fragment and a F(ab)2 fragment.

In another embodiment, the humanized antibody is directed against the cell surface antigen CD22.

In a preferred embodiment, the humanized anti-CD22 antibody is a CDR-grafted antibody, and comprises a light chain variable region 5/44-gL1 (SEQ ID NO:19), and a heavy chain variable region 5/44-gH7 (SEQ ID NO:27).

In another preferred embodiment, the humanized anti-CD22 antibody is a CDR-grafted antibody comprising a light chain having a sequence set forth in SEQ ID NO: 28.

In yet another preferred embodiment, the humanized anti-CD22 antibody is a CDR-grafted antibody comprising a heavy chain having a sequence set forth in SEQ ID NO:30.

In another preferred embodiment, the humanized anti-CD22 antibody is a CDR-grafted antibody comprising a light chain having a sequence set forth in SEQ ID NO: 28 and a heavy chain having a sequence set forth in SEQ ID NO: 30.

In another embodiment, the humanized anti-CD22 antibody is a CDR-grafted antibody that is a variant antibody obtained by an affinity maturation protocol and has increased specificity for human CD22.

In another aspect, the cytotoxic drug used to generate the monomeric cytotoxic drug/carrier conjugate of the present invention is either an inhibitor of tubulin polymerization, an alkylating agent that binds to and disrupts DNA, an inhibitor protein synthesis, or an inhibitor of tyrosine kinases.

In one embodiment, the cytotoxic drug is selected from calicheamicins, thiotepa, taxanes, vincristine, daunorubicin, doxorubicin, epirubicin, esperamicins, actinomycin, authramycin, azaserines, bleomycins, tamoxifen, idarubicin, dolastatins/auristatins, hemiasterlins, and maytansinoids.

In a preferred embodiment, the cytotoxic drug is calicheamicin. In a particularly preferred embodiment, the calicheamicin is gamma calicheamicin or N-acetyl gamma calicheamicin derivative.

In yet another aspect, the cytotoxic drug is functionalized with 3-mercapto-3-methyl butanoyl hydrazide and conjugated to a proteinaceous carrier via a hydrolyzable linker that is capable of releasing the cytotoxic drug from the conjugate after binding and entry into target cells.

In a preferred embodiment of this aspect, the hydrolyzable linker is 4-(4-acetylphenoxy)butanoic acid (AcBut).

In yet another aspect of the invention, octanoic acid or its salt, or decanoic acid or its salt is used as an additive during the conjugation process to decrease aggregation and increase drug loading.

In yet another aspect of the invention, the conjugates of the invention are purified by a chromatographic separation process.

In one embodiment, the chromatographic separation process used to separate the monomeric drug derivative-carrier conjugate is size exclusion chromatography (SEC).

In another embodiment, the chromatographic separation process used to separate the monomeric drug derivative-carrier conjugate is HPLC, FPLC or Sephacryl S-200 chromatography.

In a preferred embodiment, the chromatographic separation process used to separate the monomeric drug derivative-carrier conjugate is hydrophobic interaction chromatography (HIC). In a particularly preferred embodiment, HIC is carried out using Phenyl Sepharose 6 Fast Flow chromatographic medium, Butyl Sepharose 4 Fast Flow chromatographic medium, Octyl Sepharose 4 Fast Flow chromatographic medium, Toyopearl Ether-650M chromatographic medium, Macro-Prep methyl HIC medium or Macro-Prep t-Butyl HIC

US 8,153,768 B2

| 5 | 6 |

medium. In a more particularly preferred embodiment, HIC is carried out using Butyl Sepharose 4 Fast Flow chromatographic medium.

In another aspect, the invention is directed to a monomeric cytotoxic drug derivative/carrier conjugate produced by the method of the invention. In a preferred embodiment of this aspect, the cytotoxic drug used is calicheamicin and the carrier used is an antibody.

In another preferred embodiment, the antibody is selected from a group consisting of a monoclonal antibody, a chimeric antibody, a human antibody, a humanized antibody, a single chain antibody, a Fab fragment and a F(ab)2 fragment. In a more particularly preferred aspect, a humanized antibody directed against the cell surface antigen CD22 is used.

In one embodiment, the humanized anti-CD22 antibody is a CDR-grafted antibody, and comprises a light chain variable region 5/44-gL1 (SEQ ID NO:19), and a heavy chain variable region 5/44-gH7 (SEQ ID NO:27).

In another embodiment, the humanized anti-CD22 antibody is a CDR-grafted antibody comprising a light chain having a sequence set forth in SEQ ID NO: 28.

In a preferred embodiment, the humanized anti-CD22 antibody is a CDR-grafted antibody comprising a heavy chain having a sequence set forth in SEQ ID NO: 30.

In another preferred embodiment, the humanized anti-CD22 antibody is a CDR-grafted antibody comprising a light chain having a sequence set forth in SEQ ID NO: 28 and a heavy chain having a sequence set forth in SEQ ID NO: 30.

In still another embodiment, the humanized anti-CD22 antibody is a CDR-grafted antibody that is a variant antibody obtained by an affinity maturation protocol which has increased specificity for human CD22.

In a preferred embodiment, the calicheamicin is gamma calicheamicin or N-acetyl gamma calicheamicin.

In one embodiment, the calicheamicin derivative is functionalized with 3-mercapto-3-methyl butanoyl hydrazide.

In another embodiment, the linker used to conjugate the drug to the carrier is a hydrolyzable linker that is capable of releasing the cytotoxic drug from the conjugate after binding and entry into target cells. In a preferred embodiment, the hydrolyzable linker is 4-(4-acetylphenoxy) butanoic acid (AcBut).

Another aspect of the invention is directed to a monomeric calicheamicin derivative/anti-CD22 antibody conjugate having the formula, Pr(—X—S—S—W)$_m$ wherein: Pr is an anti-CD22 antibody; X is a hydrolyzable linker that comprises a product of any reactive group that can react with an antibody; W is a calicheamicin radical; m is the average loading for a purified conjugation product such that the calicheamicin constitutes 4-10% of the conjugate by weight; and (—X—S—S—W)$_m$ is a calicheamicin derivative generated by the process of the invention.

In one embodiment of this aspect, the antibody is selected from a group consisting of a monoclonal antibody, a chimeric antibody, a human antibody, a humanized antibody, a single chain antibody, a Fab fragment and a F(ab)2 fragment.

In a preferred embodiment, the antibody is an anti-CD22 antibody that has specificity for human CD22, and comprises a heavy chain wherein the variable domain comprises a CDR having at least one of the sequences given as H1 in FIG. 1 (SEQ ID NO:1) for CDR-H1, as H2 in FIG. 1 (SEQ ID NO:2) or H2' (SEQ ID NO:13) or H2'' (SEQ ID NO:15) or H2''' (SEQ ID NO:16) for CDR-H2, or as H3 in FIG. 1 (SEQ ID NO:3) for CDR-H3, and comprises a light chain wherein the variable domain comprises a CDR having at least one of the sequences given as L1 in FIG. 1 (SEQ ID NO:4) for CDR-L1,

as L2 in FIG. 1 (SEQ ID NO:5) for CDR-L2, or as L3 in FIG. 1 (SEQ ID NO:6) for CDR-L3.

In another preferred embodiment, the anti-CD22 antibody comprises a heavy chain wherein the variable domain comprises a CDR having at least one of the sequences given in SEQ ID NO:1 for CDR-H1, SEQ ID NO:2 or SEQ ID NO:13 or SEQ ID NO:15 or SEQ ID NO:16 for CDR-H2, or SEQ ID NO:3 for CDR-H3, and a light chain wherein the variable domain comprises a CDR having at least one of the sequences given in SEQ ID NO:4 for CDR-L1, SEQ ID NO:5 for CDR-L2, or SEQ ID NO:6 for CDR-L3.

In yet another preferred embodiment, the anti-CD22 antibody comprises SEQ ID NO:1 for CDR-H1, SEQ ID NO: 2 or SEQ ID NO:13 or SEQ ID NO:15 or SEQ ID NO:16 for CDR-H2, SEQ ID NO:3 for CDR-H3, SEQ ID NO:4 for CDR-L1, SEQ ID NO:5 for CDR-L2, and SEQ ID NO:6 for CDR-L3.

In another embodiment, the humanized anti-CD22 antibody is a CDR-grafted anti-CD22 antibody and comprises a variable domain comprising human acceptor framework regions and non-human donor CDRs.

In another embodiment, the humanized anti-CD22 antibody has a human acceptor framework wherein regions of the variable domain of the heavy chain of the antibody are based on a human sub-group I consensus sequence and comprise non-human donor residues at positions 1, 28, 48, 71 and 93. In another embodiment, the humanized antibody further comprises non-human donor residues at positions 67 and 69.

In one preferred embodiment, the CDR-grafted humanized antibody comprises a variable domain of the light chain comprising a human acceptor framework region based on a human sub-group I consensus sequence and further comprising non-human donor residues at positions 2, 4, 37, 38, 45 and 60. In another embodiment, the CDR-grafted antibody further comprises a non-human donor residue at position 3.

In yet another embodiment, the CDR-grafted antibody comprises a light chain variable region 5/44-gL1 (SEQ ID NO:19) and a heavy chain variable region 5/44-gH7 (SEQ ID NO:27).

In another embodiment, the CDR-grafted antibody comprises a light chain having the sequence as set forth in SEQ ID NO: 28 and a heavy chain having the sequence as set forth in SEQ ID NO:30.

In yet another embodiment, the CDR-grafted antibody comprises a light chain having the sequence as set forth in SEQ ID NO: 28 and a heavy chain having the sequence as set forth in SEQ ID NO: 30.

In one embodiment, the anti-CD22 CDR-grafted antibody is a variant antibody obtained by an affinity maturation protocol and has increased specificity for human CD22.

In another embodiment, the anti-CD22 antibody is a chimeric antibody comprising the sequences of the light and heavy chain variable domains of the monoclonal antibody set forth in SEQ ID NO:7 and SEQ ID NO:8, respectively.

In yet another embodiment, the anti-CD22 antibody comprises a hybrid CDR with a truncated donor CDR sequence wherein the missing portion of the donor CDR is replaced by a different sequence and forms a functional CDR.

In a particularly preferred embodiment, the cytotoxic drug derivative is either a gamma calicheamicin or a N-acetyl gamma calicheamicin derivative.

In another aspect, the invention is directed to a method for the preparation of a stable lyophilized composition of a monomeric cytotoxic drug derivative/carrier conjugate. In a preferred embodiment, the stable lyophilized composition of the monomeric cytotoxic drug derivative/carrier conjugate is prepared by (a) dissolving the monomeric cytotoxic drug

US 8,153,768 B2

7                                                      8

derivative/carrier conjugate to a final concentration of 0.5 to 2 mg/ml in a solution comprising a cryoprotectant at a concentration of 1.5%-5% by weight, a polymeric bulking agent at a concentration of 0.5-1.5% by weight, electrolytes at a concentration of 0.01M to 0.1M, a solubility facilitating agent at a concentration of 0.005-0.05% by weight, buffering agent at a concentration of 5-50 mM such that the final pH of the solution is 7.8-8.2, and water; (b) dispensing the above solution into vials at a temperature of +5° C. to +10° C.; (c) freezing the solution at a freezing temperature of −35° C. to −50° C.; (d) subjecting the frozen solution to an initial freeze drying step at a primary drying pressure of 20 to 80 microns at a shelf temperature at −10° C. to −40° C. for 24 to 78 hours; and (e) subjecting the freeze-dried product of step (d) to a secondary drying step at a drying pressure of 20 to 80 microns at a shelf temperature of +10° C. to +35° C. for 15 to 30 hours.

In one embodiment, the cryoprotectant used in the lyophilization of the cytotoxic drug/carrier conjugate is selected from alditol, mannitol, sorbitol, inositol, polyethylene glycol, aldonic acid, uronic acid, aldaric acid, aldoses, ketoses, amino sugars, alditols, inositols, glyceraldehydes, arabinose, lyxose, pentose, ribose, xylose, galactose, glucose, hexose, idose, mannose, talose, heptose, glucose, fructose, glucose, gluconic acid, sorbitol, lactose, mannitol, methyl α-glucopyranoside, maltose, isoascorbic acid, ascorbic acid, lactone, sorbose, glucaric acid, erythrose, threose, arabinose, allose, altrose, gulose, idose, talose, erythrulose, ribulose, xylulose, psicose, tagatose, glucuronic acid, gluconic acid, glucaric acid, galacturonic acid, mannuronic acid, glucosamine, galactosamine, sucrose, trehalose, neuraminic acid, arabinans, fructans, fucans, galactans, galacturonans, glucans, mannans, xylans, levan, fucoidan, carrageenan, galactocarolose, pectins, pectic acids, amylose, pullulan, glycogen, amylopectin, cellulose, dextran, pustulan, chitin, agarose, keratin, chondroitin, dermatan, hyaluronic acid, alginic acid, xanthan gum, starch, sucrose, glucose, lactose, trehalose, ethylene glycol, polyethylene glycol, polypropylene glycol, glycerol, and pentaerythritol.

In a preferred embodiment, the cryoprotectant is sucrose, which is present at a concentration of 1.5% by weight.

In one embodiment, the polymeric bulking agent used during the lyophilization process is selected from Dextran 40 or hydroxyethyl starch 40, and is at a concentration of 0.9% by weight.

In another embodiment, the electrolyte used in the lyophilization solution is sodium chloride, which is present at a concentration of 0.05 M.

In a preferred embodiment, a solubility-facilitating agent is used during the lyophilization process. Preferably, this solubility-facilitating agent is a surfactant. In a particularly preferred embodiment, the surfactant is polysorbate 80, which is present at a concentration of 0.01% by weight.

In one embodiment, the buffering agent used is tromethamine, which is present at a concentration of 0.02 M. It is preferable for the pH of the solution to be 8.0 at the start of the lyophilization process. The solution containing the cytotoxic drug/carrier conjugate is dispensed into vials at a temperature of +5° C. prior to the start of the process.

In a preferred embodiment, the solution in the vials is frozen at a temperature of −45° C.; the frozen solution is subjected to an initial freeze drying step at a primary drying pressure of 60 microns and at a shelf temperature of −30° C. for 60 hours; and the freeze-dried product is subjected to a secondary drying step at a drying pressure of 60 microns at a shelf temperature of +25° C. for 24 hours.

Another aspect of the invention is directed to a composition comprising a therapeutically effective dose of a monomeric cytotoxic drug derivative/carrier conjugate prepared by a method of the invention.

In one embodiment, the carrier in the monomeric cytotoxic drug derivative/carrier conjugate is a proteinaceous carrier selected from hormones, growth factors, antibodies and antibody mimics.

In a preferred embodiment, the proteinaceous carrier is a human monoclonal antibody, a chimeric antibody, a human antibody or a humanized antibody.

In a preferred embodiment, the humanized antibody is directed against the cell surface antigen CD22.

In a particularly preferred, embodiment of this aspect of the invention, the anti-CD22 antibody has specificity for human CD22, and comprises a heavy chain wherein the variable domain comprises a CDR having at least one of the sequences given as H1 in FIG. **1** (SEQ ID NO:1) for CDR-H1, as H2 in FIG. **1** (SEQ ID NO:2) or H2′ (SEQ ID NO:13) or H2″ (SEQ ID NO:15) or H2‴ (SEQ ID NO:16) for CDR-H2, or as H3 in FIG. **1** (SEQ ID NO:3) for CDR-H3, and comprises a light chain wherein the variable domain comprises a CDR having at least one of the sequences given as L1 in FIG. **1** (SEQ ID NO:4) for CDR-L1, as L2 in FIG. **1** (SEQ ID NO:5) for CDR-L2, or as L3 in FIG. **1** (SEQ ID NO:6) for CDR-L3.

In another preferred embodiment, anti-CD22 antibody has a heavy chain wherein the variable domain comprises a CDR having at least one of the sequences given in SEQ ID NO:1 for CDR-H1, SEQ ID NO:2 or SEQ ID NO:13 or SEQ ID NO:15 or SEQ ID NO:16 for CDR-H2, or SEQ ID NO:3 for CDR-H3, and a light chain wherein the variable domain comprises a CDR having at least one of the sequences given in SEQ ID NO:4 for CDR-L1, SEQ ID NO:5 for CDR-L2, or SEQ ID NO:6 for CDR-L3.

In yet another preferred embodiment, the anti-CD22 antibody comprises SEQ ID NO:1 for CDR-H1, SEQ ID NO:2 or SEQ ID NO:13 or SEQ ID NO:15 or SEQ ID NO:16 for CDR-H2, SEQ ID NO:3 for CDR-H3, SEQ ID NO:4 for CDR-L1, SEQ ID NO:5 for CDR-L2, and SEQ ID NO:6 for CDR-L3.

In a particularly preferred embodiment, the humanized anti-CD22 antibody is a CDR-grafted humanized anti-CD22 antibody and comprises a light chain variable region 5/44-gL1 (SEQ ID NO:19), and a heavy chain variable region 5/44-gH7 (SEQ ID NO:27).

In another particularly preferred embodiment, the humanized anti-CD22 antibody is a CDR-grafted antibody having specificity for human CD22 and comprises a light chain having a sequence set forth in SEQ ID NO: 28 and a heavy chain having a sequence set forth in SEQ ID NO:30.

In one embodiment, the CDR-grafted antibody is a variant antibody which has increased specificity for human CD22, and the antibody is obtained by an affinity maturation protocol.

In one embodiment, the monomeric cytotoxic drug is calicheamicin and is preferably selected from gamma calicheamicin or N-acetyl calicheamicin.

In one embodiment, the composition may optionally contain an additional bioactive agent. Such a bioactive agent may be a cytotoxic drug, a growth factor or a hormone.

Yet another aspect of the invention is directed to a method of treating a subject with a proliferative disorder by administering to the subject a therapeutically effective dose of the composition of the invention. The composition may be administered subcutaneously, intraperitoneally, intravenously, intraarterially, intramedullarly, intrathecally, transdermally, transcutaneously, intranasally, topically, entereally,

US 8,153,768 B2

9

intravaginally, sublingually or rectally. In a preferred embodiment, the composition of the invention is administered intravenously.

In one embodiment, the composition is administered to a human subject suffering from a proliferative disorder such as cancer. In a preferred embodiment, the cancer is a B-cell malignancy. The B-cell malignancy may be a leukemia or lymphoma that express cell surface antigen CD22.

In yet another embodiment, the cancer is a carcinoma or a sarcoma.

Another aspect of the present invention is directed to a method of treating a B-cell malignancy by administering to a patient with such malignancy a therapeutically effective composition comprising a cytotoxic drug-anti-CD22-antibody conjugate of the invention. In a preferred embodiment, the B-cell malignancy is a lymphoma, particularly Non-Hodgkin's lymphoma.

In one embodiment, the cytotoxic drug used to prepare the conjugates of the present invention is selected from the group consisting of calicheamicins, thiotepa, taxanes, vincristine, daunorubicin, doxorubicin, epirubicin, actinomycin, authramycin, azaserines, bleomycins, tamoxifen, idarubicin, dolastatins/auristatins, hemiasterlins, maytansinoids, and esperamicins.

In a preferred embodiment, the cytotoxic drug is gamma calicheamicin or N-acetyl calicheamicin.

In another embodiment, the treatment comprises administering the cytotoxic drug conjugate of the invention with one or more bioactive agents selected from antibodies, growth factors, hormones, cytokines, anti-hormones, xanthines, interleukins, interferons, and cytotoxic drugs.

In a preferred embodiment, the bioactive agent is an antibody, and is directed against a cell surface antigen expressed on B-cell malignancies. In a further preferred embodiment, the antibody directed against cell surface antigens expressed on B-cell malignancies is selected from a group consisting of anti-CD19, anti-CD20 and anti-CD33 antibodies. Such antibodies include the anti-CD20 antibody, rituximab (Rituxan™).

In another embodiment, the bioactive agents are cytokines or growth factors and include, but are not limited to, interleukin 2 (IL-2), TNF, CSF, GM-CSF and G-CSF.

In another embodiment, bioactive agents are hormones and include estrogens, androgens, progestins, and corticosteroids.

In yet another embodiment, the bioactive agent is a cytotoxic drug selected from doxorubicin, daunorubicin, idarubicin, aclarubicin, zorubicin, mitoxantrone, epirubicin, carubicin, nogalamycin, menogaril, pitarubicin, valrubicin, cytarabine, gemcitabine, trifluridine, ancitabine, enocitabine, azacitidine, doxifluridine, pentostatin, broxuridine, capecitabine, cladribine, decitabine, floxuridine, fludarabine, gougerotin, puromycin, tegafur, tiazofurin, adriamycin, cisplatin, carboplatin, cyclophosphamide, dacarbazine, vinblastine, vincristine, mitoxantrone, bleomycin, mechlorethamine, prednisone, procarbazine methotrexate, flurouracils, etoposide, taxol, taxol analogs, and mitomycin.

In a preferred embodiment, the therapeutically effective composition of the cytotoxic drug-anti-CD22-antibody conjugate is administered together with one or more combinations of cytotoxic agents as a part of a treatment regimen, wherein the combination of cytotoxic agents is selected from: CHOPP (cyclophosphamide, doxorubicin, vincristine, prednisone, and procarbazine); CHOP (cyclophosphamide, doxorubicin, vincristine, and prednisone); COP (cyclophosphamide, vincristine, and prednisone); CAP-BOP (cyclophosphamide, doxorubicin, procarbazine, bleomycin,

10

vincristine, and prednisone); m-BACOD (methotrexate, bleomycin, doxorubicin, cyclophosphamide, vincristine, dexamethasone, and leucovorin); ProMACE-MOPP (prednisone, methotrexate, doxorubicin, cyclophosphamide, etoposide, leucovorin, mechloethamine, vincristine, prednisone, and procarbazine); ProMACE-CytaBOM (prednisone, methotrexate, doxorubicin, cyclophosphamide, etoposide, leucovorin, cytarabine, bleomycin, and vincristine); MACOP-B (methotrexate, doxorubicin, cyclophosphamide, vincristine, prednisone, bleomycin, and leucovorin); MOPP (mechloethamine, vincristine, prednisone, and procarbazine); ABVD (adriamycin/doxorubicin, bleomycin, vinblastine, and dacarbazine); MOPP (mechloethamine, vincristine, prednisone, and procarbazine) alternating with ABV (adriamycin/doxorubicin, bleomycin, and vinblastine); MOPP (mechloethamine, vincristine, prednisone, and procarbazine) alternating with ABVD (adriamycin/doxorubicin, bleomycin, vinblastine, and dacarbazine); ChIVPP (chlorambucil, vinblastine, procarbazine, and prednisone); IMVP-16 (ifosfamide, methotrexate, and etoposide); MIME (methyl-gag, ifosfamide, methotrexate, and etoposide); DHAP (dexamethasone, high-dose cytaribine, and cisplatin); ESHAP (etoposide, methylpredisolone, high-dose cytarabine, and cisplatin); CEPP(B) (cyclophosphamide, etoposide, procarbazine, prednisone, and bleomycin); CAMP (lomustine, mitoxantrone, cytarabine, and prednisone); and CVP-1 (cyclophosphamide, vincristine, and prednisone).

In a preferred embodiment, the therapeutically effective composition of the cytotoxic drug-anti-CD22-antibody conjugate is administered prior to the administration of one or more of the above combinations of cytotoxic drugs. In another preferred embodiment, the therapeutically effective composition of the cytotoxic drug-anti-CD22-antibody conjugate is administered subsequent to the administration of one or more of the above combinations of cytotoxic drugs as a part of a treatment regimen.

Another aspect of the invention is directed to a method of treating aggressive lymphomas comprising administering to a patient in need of said treatment a therapeutically effective composition of a monomeric calicheamicin derivative-anti-CD22-antibody conjugate together with one or more bioactive agents.

Yet another aspect of the present invention is directed to the use of the composition of the invention in treating a subject with a proliferative disorder such as cancer. In particular, the cancer is a B-cell malignancy that expresses CD22 antigen on the cell surface. In particular, the B-cell malignancy is either a leukemia or a lymphoma. In one embodiment, the cancer is a carcinoma or a leukemia.

In one embodiment, a therapeutically effective dose of the composition is administered subcutaneously, intraperitoneally, intravenously, intraarterially, intramedullary, intrathecally, transdermally, transcutaneously, intranasally, topically, entereally, intravaginally, sublingually or rectally.

In a preferred embodiment, the therapeutically effective dose of the pharmaceutical composition of the invention is administered intravenously.

Another aspect of the invention is directed to the use of a monomeric calicheamicin derivative/anti-CD22 antibody conjugate of the present invention for use in the treatment of a subject with a B-cell malignancy such as Non-Hodgkin's lymphoma. In one embodiment, the monomeric calicheamicin derivative/anti-CD22 antibody conjugate of the present invention is administered with one or more bioactive agents.

US 8,153,768 B2

11                                                    12

In one embodiment, the bioactive agents are selected from a group consisting of antibodies, growth factors, hormones, cytokines, anti-hormones, xanthines, interleukins, interferons, and cytotoxic drugs.

In a preferred embodiment, the bioactive agent is an antibody directed against a cell surface antigen expressed on B-cell malignancies, such as anti-CD19, anti-CD20 and anti-CD33 antibodies. In a preferred embodiment, the anti-CD20 antibody is rituximab (Rituxan™).

In another embodiment, the bioactive agents include cytokines or growth factors such as interleukin 2 (IL-2), TNF, CSF, GM-CSF and G-CSF or hormones, which include estrogens, androgens, progestins, and corticosteroids.

In another embodiment, the bioactive agent is a cytotoxic drug selected from doxorubicin, daunorubicin, idarubicin, aclarubicin, zorubicin, mitoxantrone, epirubicin, carubicin, nogalamycin, menogaril, pitarubicin, valrubicin, cytarabine, gemcitabine, trifluridine, ancitabine, enocitabine, azacitidine, doxifluridine, pentostatin, broxuridine, capecitabine, cladribine, decitabine, floxuridine, fludarabine, gougerotin, puromycin, tegafur, tiazofurin, adriamycin, cisplatin, carboplatin, cyclophosphamide, dacarbazine, vinblastine, vincristine, mitoxantrone, bleomycin, mechlorethamine, prednisone, procarbazine, methotrexate, flurouracils, etoposide, taxol, taxol analogs, and mitomycin.

In a preferred embodiment, the therapeutically effective dose of the monomeric calicheamicin derivative/anti-CD22 antibody conjugate is administered together with one or more combinations of cytotoxic agents as a part of a treatment regimen, wherein the combination of cytotoxic agents is selected from: CHOPP (cyclophosphamide, doxorubicin, vincristine, prednisone, and procarbazine); CHOP (cyclophosphamide, doxorubicin, vincristine, and prednisone); COP (cyclophosphamide, vincristine, and prednisone); CAP-BOP (cyclophosphamide, doxorubicin, procarbazine, bleomycin, vincristine, and prednisone); m-BACOD (methotrexate, bleomycin, doxorubicin, cyclophosphamide, vincristine, dexamethasone, and leucovorin); ProMACE-MOPP (prednisone, methotrexate, doxorubicin, cyclophosphamide, etoposide, leucovorin, mechloethamine, vincristine, prednisone, and procarbazine); ProMACE-CytaBOM (prednisone, methotrexate, doxorubicin, cyclophosphamide, etoposide, leucovorin, cytarabine, bleomycin, and vincristine); MACOP-B (methotrexate, doxorubicin, cyclophosphamide, vincristine, prednisone, bleomycin, and leucovorin); MOPP (mechloethamine, vincristine, prednisone, and procarbazine); ABVD (adriamycin/doxorubicin, bleomycin, vinblastine, and dacarbazine); MOPP (mechloethamine, vincristine, prednisone and procarbazine) alternating with ABV (adriamycin/doxorubicin, bleomycin, and vinblastine); MOPP (mechloethamine, vincristine, prednisone, and procarbazine) alternating with ABVD (adriamycin/doxorubicin, bleomycin, vinblastine, and dacarbazine); ChlVPP (chlorambucil, vinblastine, procarbazine, and prednisone); IMVP-16 (ifosfamide, methotrexate, and etoposide); MIME (methyl-gag, ifosfamide, methotrexate, and etoposide); DHAP (dexamethasone, high-dose cytaribine, and cisplatin); ESHAP (etoposide, methylpredisolone, high-dose cytarabine, and cisplatin); CEPP(B) (cyclophosphamide, etoposide, procarbazine, prednisone, and bleomycin); CAMP (lomustine, mitoxantrone, cytarabine, and prednisone); CVP-1 (cyclophosphamide, vincristine, and prednisone), ESHOP (etoposide, methylpredisolone, high-dose cytarabine, vincristine and cisplatin); EPOCH (etoposide, vincristine, and doxorubicin for 96 hours with bolus doses of cyclophosphamide and oral prednisone), ICE (ifosfamide, cyclophosphamide, and etoposide), CEPP(B) (cyclophosphamide, etoposide, procarba-

zine, prednisone, and bleomycin), CHOP-B. (cyclophosphamide, doxorubicin, vincristine, prednisone, and bleomycin), CEPP-B (cyclophosphamide, etoposide, procarbazine, and bleomycin), and P/DOCE (epirubicin or doxorubicin, vincristine, cyclophosphamide, and prednisone).

In one preferred embodiment, the monomeric calicheamicin derivative/anti-CD22 antibody conjugate is administered prior to the administration of one or more combinations of cytotoxic agents as a part of a treatment regimen.

In another preferred embodiment, the therapeutically effective dose of the monomeric calicheamicin derivative/anti-CD22 antibody conjugate is administered subsequent to the administration of one or more combinations of cytotoxic agents as part of a treatment regimen.

In yet another preferred embodiment, the therapeutically effective dose of the monomeric calicheamicin derivative/anti-CD22 antibody conjugate is administered together with an antibody directed against a cell surface antigen on B-cell malignancies, and optionally comprising one or more combinations of cytotoxic agents as part of a treatment regimen.

In another aspect, the invention is directed to the use of the monomeric calicheamicin derivative/anti-CD22 antibody conjugate of the present invention in the manufacture of a medicament for the treatment of a proliferative disorder. Such a medicament can be used to treat B-cell proliferative disorders either alone or in combination with other bioactive agents.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows the amino acid sequence of the CDRs of mouse monoclonal antibody 5/44 (SEQ ID NOS:1 to 6).

FIG. **2** shows the DNA and protein sequence of the light chain variable ($V_L$) domain of mouse monoclonal antibody 5/44 (SEQ ID NO: 7).

FIG. **3** shows the complete sequence of the heavy chain variable domain ($V_H$) of mouse monoclonal antibody 5/44 (SEQ ID NO:8).

FIG. **4** shows the strategy for removal of the glycosylation site and reactive lysine in CDR-H2 (SEQ ID NOS: 9-12 and 14).

FIG. **5** shows the graft design for the 5/44 light chain sequence (SEQ ID NO: 7). DPK-9 is the human germ-line acceptor framework sequence (SEQ ID NO: 17). Vertical lines indicate differences between mouse and human residues. Sequences underlined indicate donor residues that have been retained in the graft. CDRs are indicated in bold italicized letters (not shown for DPK-9). Graft gL1 has 6 donor framework residues (SEQ ID NO: 19), gL2 has 7 (SEQ ID NO: 20).

FIG. **6** shows the graft design for the 5/44 heavy chain sequence (SEQ ID NO: 8); DP7 is the human germ-line acceptor framework sequence (SEQ ID NO: 21). Vertical lines indicate differences between mouse and human residues. Sequences underlined indicate donor residues that have been retained in the graft. CDRs are indicated in italicized, bold letters (not shown for DP7). Grafts gH4 (SEQ ID NO: 24) and gH6 (SEQ ID NO: 26) have 6 donor framework residues. Grafts gH5 (SEQ ID NO: 25) and gH7 (SEQ ID NO: 27) have 4 donor framework residues.

FIG. **7** shows the map of vector pMRR14.

FIG. **8** shows the map of vector pMRR10.1.

FIG. **9** shows the Biacore assay results of the chimeric 5/44 mutants.

FIG. **10** shows the oligonucleotides for 5/44 gH1 and gL1 gene assemblies SEQ ID NOS: 32-47).

US 8,153,768 B2

13                                          14

FIG. 11 shows the plasmid map of intermediate vector pCR2.1 (544gH1).

FIG. 12 shows the plasmid map of intermediate vector pCR2.1 (544gL1).

FIG. 13 shows the oligonucleotide cassettes used to make further grafts (SEQ ID NOS: 52-61).

FIG. 14 is a graph which shows a competition assay between fluorescently labeled mouse 5/44 antibody and grafted variants.

FIG. 15 is a graph which shows a competition assay between fluorescently labeled mouse 5/44 antibody and grafted variants.

FIG. 16 shows the full DNA and protein sequence of the grafted heavy and light chains (SEQ ID NO: 31 and SEQ ID NO:30, respectively, for the heavy chain, and SEQ ID NO:29 and SEQ ID NO:28, respectively, for the light chain).

FIG. 17 is a schematic representation of an antibody-NAc-gamma calicheamicin DMH conjugate.

FIG. 18 is a graph which shows the effect of CMC-544 on growth of RAMOS B-cell lymphoma.

FIG. 19 is a graph which shows the effect of CMC-544 on large B-cell lymphomas in an in vivo xenograft model in nude mice.

FIG. 20 is a graph which compares the effects of CMC-544 made with the CMA-676 conjugation process and the CMC-544 conjugation process on the growth of RL lymphoma.

FIG. 21 is a graph which shows that rituximab (Rituxan™)-treated large RL lymphoma is susceptible to CMC-544 treatment.

FIG. 22 is a graph which shows the effect of rituximab (Rituxan™) on the cytotoxic effect of CMC-544.

FIG. 23 is a graph which shows the effect of CMC-544, rituximab (Rituxan™), and CMA-676 on the survival of SCID mice with disseminated early RAMOS B lymphoma.

FIG. 24 is a graph which shows the effect of CMC-544, rituximab (Rituxan™), and CMA-676 on the survival of SCID mice with disseminated late RAMOS B lymphoma.

FIG. 25 is a graph which shows the effect of CMC-544, rituximab (Rituxan™), and CMA-676 on the survival of SCID mice with disseminated late RAMOS B lymphoma.

FIG. 26 is a graph which shows the effect of CMC-544, rituximab (Rituxan™), and CMA-676 on the survival of SCID mice with disseminated late RAMOS B lymphoma.

FIG. 27 is a graph which shows the effect of CMC-544, rituximab (Rituxan™), and CMA-676 on the survival of SCID mice with disseminated late RAMOS B lymphoma.

FIG. 28 is a graph which shows the anti-tumor activity of CMC-544 with and without rituximab (Rituxan™) on RL Non-Hodgkin's lymphoma.

FIG. 29 is a graph which shows the antitumor activity of CMC-544 and CHOP on RL Non-Hodgkin's lymphoma.

DETAILED DESCRIPTION OF THE INVENTION

The conjugates of the present invention comprise a cytotoxic drug derivatized with a linker that includes any reactive group that reacts with a proteinaceous carrier to form a cytotoxic drug derivative-proteinaceous carrier conjugate. Specifically, the conjugates of the present invention comprise a cytotoxic drug derivatized with a linker that includes any reactive group which reacts with an antibody used as a proteinaceous carrier to form a cytotoxic drug derivative-antibody conjugate. Specifically, the antibody reacts against a cell surface antigen on B-cell malignancies. Described below is an improved process for making and purifying such conjugates. The use of particular cosolvents, additives, and specific reaction conditions together with the separation process

results in the formation of a monomeric cytotoxic drug derivative/antibody conjugate with a significant reduction in the LCF. The monomeric form as opposed to the aggregated form has significant therapeutic value, and minimizing the LCF and substantially reducing aggregation results in the utilization of the antibody starting material in a therapeutically meaningful manner by preventing the LCF from competing with the more highly conjugated fraction (HCF).

I. Carriers

The carriers/targeting agents of the present invention are preferably proteinaceous carriers/targeting agents. Included as carrier/targeting agents are hormones, growth factors, antibodies, antibody fragments, antibody mimics, and their genetically or enzymatically engineered counterparts, hereinafter referred to singularly or as a group as "carriers". The essential property of a carrier is its ability to recognize and bind to an antigen or receptor associated with undesired cells and to be subsequently internalized. Examples of carriers that are applicable in the present invention are disclosed in U.S. Pat. No. 5,053,394, which is incorporated herein in its entirety. Preferred carriers for use in the present invention are antibodies and antibody mimics.

A number of non-immunoglobulin protein scaffolds have been used for generating antibody mimics that bind to antigenic epitopes with the specificity of an antibody (PCT publication No. WO 00/34784). For example, a "minibody" scaffold, which is related to the immunoglobulin fold, has been designed by deleting three beta strands from a heavy chain variable domain of a monoclonal antibody (Tramontano et al., J. Mol. Recognit. 7:9, 1994). This protein includes 61 residues and can be used to present two hypervariable loops. These two loops have been randomized and products selected for antigen binding, but thus far the framework appears to have somewhat limited utility due to solubility problems. Another framework used to display loops is tendamistat, a protein that specifically inhibits mammalian alpha-amylases and is a 74 residue, six-strand beta-sheet sandwich held together by two disulfide bonds, (McConnell and Hoess, J. Mol. Biol. 250:460, 1995). This scaffold includes three loops, but, to date, only two of these loops have been examined for randomization potential.

Other proteins have been tested as frameworks and have been used to display randomized residues on alpha helical surfaces (Nord et al., Nat. Biotechnol. 15:772, 1997; Nord et al., Protein Eng. 8:601, 1995), loops between alpha helices in alpha helix bundles (Ku and Schultz, Proc. Natl. Acad. Sci. USA 92:6552, 1995), and loops constrained by disulfide bridges, such as those of the small protease inhibitors (Markland et al., Biochemistry 35:8045, 1996; Markland et al., Biochemistry 35:8058, 1996; Rottgen and Collins, Gene 164; 243, 1995; Wang et al., J. Biol. Chem. 270:12250, 1995).

Examples of antibody carriers that may be used in the present invention include monoclonal antibodies, chimeric antibodies, humanized antibodies, human antibodies and biologically active fragments thereof. Preferably, such antibodies are directed against cell surface antigens expressed on target cells and/or tissues in proliferative disorders such as cancer. Examples of specific antibodies directed against cell surface antigens on target cells include without limitation, antibodies against CD22 antigen which is over-expressed on most B-cell lymphomas; G5/44, a humanized form of a murine anti-CD22 monoclonal antibody; antibodies against cell surface antigen CD33, which is prevalent on certain human myeloid tumors especially acute myeloid leukemia; hP67.6, a humanized form of the anti-CD33 murine antibody (see U.S. Pat. No. 5,773,001); an antibody against the PEM antigen found on many tumors of epithelial origin designated

**15**

mP67.6 (see I. D. Bernstein et al., *J. Clin. Invest.* 79:1153 (1987) and I. D. Bernstein et al., *J. Immunol.* 128:867-881 (1992)); and a humanized antibody against the Lewis Y carbohydrate antigen overexpressed on many solid tumors designated hu3S193, (see U.S. Pat. No. 6,310,185 B1). In addition, there are several commercially available antibodies such as rituximab (Rituxan™) and trastuzumab (Herceptin™), which may also be used as carriers/targeting agents. Rituximab (Rituxan™) is a chimeric anti-CD20 antibody used to treat various B-cell lymphomas and trastuzumab (Herceptin™) is a humanized anti-Her2 antibody used to treat breast cancer.

Exemplified herein for use as a carrier in the present invention is a CDR-grafted humanized antibody molecule directed against cell surface antigen CD22, designated G5/44. This antibody is a humanized form of a murine anti-CD22 monoclonal antibody that is directed against the cell surface antigen CD22, which is prevalent on certain human lymphomas. The term "a CDR-grafted antibody molecule" as used herein refers to an antibody molecule wherein the heavy and/or light chain contains one or more complementarity determining regions (CDRs) including, if desired, a modified CDR (hereinafter CDR) from a donor antibody (e.g., a murine monoclonal antibody) grafted into a heavy and/or light chain variable region framework of an acceptor antibody (e.g., a human antibody). Preferably, such a CDR-grafted antibody has a variable domain comprising human acceptor framework regions as well as one or more of the donor CDRs referred to above.

When the CDRs are grafted, any appropriate acceptor variable region framework sequence may be used having regard to the class/type of the donor antibody from which the CDRs are derived, including mouse, primate and human framework regions. Examples of human frameworks, which can be used in the present invention are KOL, NEWM, REI, EU, TUR, TEI, LAY and POM (Kabat et al. Seq. of Proteins of Immunol. Interest, 1:310-334 (1994)). For example, KOL and NEWM can be used for the heavy chain, REI can be used for the light chain and EU, LAY and POM can be used for both the heavy chain and the light chain.

In a CDR-grafted antibody of the present invention, it is preferred to use as the acceptor antibody one having chains which are homologous to the chains of the donor antibody. The acceptor heavy and light chains do not necessarily need to be derived from the same antibody and may, if desired, comprise acceptor chains having framework regions derived from different chains.

Also, in a CDR-grafted antibody of the present invention, the framework regions need not have exactly the same sequence as those of the acceptor antibody. For instance, unusual residues may be changed to more frequently occurring residues for that acceptor chain class or type. Alternatively, selected residues in the acceptor framework regions may be changed so that they correspond to the residue found at the same position in the donor antibody or to a residue that is a conservative substitution for the residue found at the same position in the donor antibody. Such changes should be kept to the minimum necessary to recover the affinity of the donor antibody. A protocol for selecting residues in the acceptor framework regions which may need to be changed is set forth in PCT Publication No. WO 91/09967, which is incorporated herein in its entirety.

Donor residues are residues from the donor antibody, i.e., the antibody from which the CDRs were originally derived.

The antibody of the present invention may comprise a heavy chain wherein the variable domain comprises as CDR-H2 (as defined by Kabat et al., (supra)) an H2' in which a

**16**

potential glycosylation site sequence has been removed in order to increase the affinity of the antibody for the antigen.

Alternatively or additionally, the antibody of the present invention may comprise a heavy chain wherein the variable domain comprises as CDR-H2 (as defined by Kabat et al., (supra)) an H2″ in which a lysine residue is at position 60. This lysine residue, which is located at an exposed position within CDR-H2, and is considered to have the potential to react with conjugation agents resulting in a reduction of antigen binding affinity, is substituted with an alternative amino acid.

Additionally, the antibody of the present invention may comprise a heavy chain wherein the variable domain comprises as CDR-H2 (as defined by Kabat et al., (supra)) an H2‴ in which both the potential glycosylation site sequence and the lysine residue at position 60, are substituted with alternative amino acids.

The antibody of the present invention may comprise: a complete antibody having full length heavy and light chains; a biologically active fragment thereof, such as a Fab, modified Fab, Fab', F(ab')₂ or Fv fragment; a light chain or heavy chain monomer or dimer; or a single chain antibody, e.g., a single chain Fv in which the heavy and light chain variable domains are joined by a peptide linker. Similarly, the heavy and light chain variable regions may be combined with other antibody domains as appropriate.

The antibody of the present invention may also include a modified Fab fragment wherein the modification is the addition of one or more amino acids to allow for the attachment of an effector or reporter molecule to the C-terminal end of its heavy chain. Preferably, the additional amino acids form a modified hinge region containing one or two cysteine residues to which the effector or reporter molecule may be attached.

The constant region domains of the antibody of the present invention, if present, may be selected having regard to the proposed function of the antibody, and in particular the effector functions which may or may not be required. For example, the constant region domains may be human IgA, IgD, IgE, IgG or IgM domains. In particular, human IgG constant region domains may be used, especially of the IgG1 and IgG3 isotypes when the antibody is intended for therapeutic uses and antibody effector functions are required. Alternatively, IgG2 and IgG4 isotypes may be used or the IgG1 Fc region may be mutated to abrogate the effector function when the antibody is intended for therapeutic purposes and antibody effector functions are not required or desired.

The antibody of the present invention has a binding affinity of at least $5\times10^{-8}$ M, preferably at least $1\times10^{-9}$ M, more preferably at least $0.75\times10^{-10}$ M, and most preferably at least $0.5\times10^{-10}$ M.

In one embodiment, the present invention relates to immunotoxin conjugates and methods for making these conjugates using antibody variants or antibody mimics. In a preferred embodiment, variants of the antibody of the present invention are directed against CD22 and display improved affinity for CD22. Such variants can be obtained by a number of affinity maturation protocols including mutating the CDRs (Yang et al., J. Mol. Biol., 254, 392-403, 1995), chain shuffling (Marks et al., BioTechnology, 10, 779-783, 1992), use of mutator strains of *E. coli* (Low et al., J. Mol. Biol., 260, 359-368, 1996), DNA shuffling (Patten et al., Curr. Opin. Biotechnol., 8, 724-733, 1997), phage display (Thompson et al., J. Mol. Biol., 256, 77-88, 1996) and sexual PCR (Crameri et al., Nature, 391, 288-291, 1998).

Any suitable host cell/vector system may be used for expression of the DNA sequences encoding the carrier

US 8,153,768 B2

17

18

including antibodies of the present invention. Bacterial, for example *E. coli*, and other microbial systems may be used, in part, for expression of antibody fragments such as Fab and F(ab')$_2$ fragments, and especially Fv fragments and single chain antibody fragments, for example, single chain Fvs. Eukaryotic, e.g. mammalian, host cell expression systems may be used for production of larger antibody, including complete antibody molecules. Suitable mammalian host cells include CHO, myeloma, yeast cells, insect cells, hybridoma cells, NSO, VERO or PER C6 cells. Suitable expression systems also include transgenic animals and plants.

II. Therapeutic Agents

The therapeutic agents suitable for use in the present invention are cytotoxic drugs that inhibit or disrupt tubulin polymerization, alkylating agents that bind to and disrupt DNA, and agents which inhibit protein synthesis or essential cellular proteins such as protein kinases, enzymes and cyclins. Examples of such cytotoxic drugs include, but are not limited to thiotepa, taxanes, vincristine, daunorubicin, doxorubicin, epirubicin, actinomycin, authramycin, azaserines, bleomycins, tamoxifen, idarubicin, dolastatins/auristatins, hemiasterlins, calicheamicins, esperamicins and maytansinoids. Preferred cytotoxic drugs are the calicheamicins, which are an example of the methyl trisulfide antitumor antibiotics. Examples of calicheamicins suitable for use in the present invention are disclosed, for example, in U.S. Pat. No. 4,671,958; U.S. Pat. No. 4,970,198, U.S. Pat. No. 5,053,394, U.S. Pat. No. 5,037,651; and U.S. Pat. No. 5,079,233, which are incorporated herein in their entirety. Preferred calicheamicins are the gamma-calicheamicin derivatives or the N-acetyl gamma-calicheamicin derivatives.

III. Cytotoxic Drug Derivative/Carrier Conjugates

The conjugates of the present invention have the formula Pr(—X—W)$_m$ wherein:

Pr is a proteinaceous carrier,

X is a linker that comprises a product of any reactive group that can react with a proteinaceous carrier,

W is the cytotoxic drug

m is the average loading for a purified conjugation product such that the calicheamicin constitutes 4-10% of the conjugate by weight; and

(—X—W)$_m$ is a cytotoxic drug

Preferably, X has the formula

(CO-Alk$^1$-Sp$^1$-Ar-Sp$^2$-Alk$^2$-C(Z$^1$)=Q-Sp)

wherein

Alk$^1$ and Alk$^2$ are independently a bond or branched or unbranched (C$_1$-C$_{10}$) alkylene chain;

Sp$^1$ is a bond, —S—, —O—, —CONH—, —NHCO—, —NR'—, —N(CH$_2$CH$_2$)$_2$N—, or —X—Ar'-Y—(CH$_2$)$_n$-Z wherein X, Y, and Z are independently a bond, —NR'—, —S—, or —O—, with the proviso that when n=0, then at least one of Y and Z must be a bond and Ar' is 1,2-, 1,3-, or 1,4-phenylene optionally substituted with one, two, or three groups of (C$_1$-C$_5$) alkyl, (C$_1$-C$_4$) alkoxy, (C$_1$-C$_4$) thioalkoxy, halogen, nitro, —COOR', —CONHR', —O(CH$_2$)$_n$COOR', —S(CH$_2$)$_n$COOR', —O(CH$_2$)$_n$CONHR', or —S(CH$_2$)$_n$CONHR', with the proviso that when Alk$^1$ is a bond, Sp$^1$ is a bond;

n is an integer from 0 to 5;

R' is a branched or unbranched (C$_1$-C$_5$) chain optionally substituted by one or two groups of —OH, (C$_1$-C$_4$) alkoxy, (C$_1$-C$_4$) thioalkoxy, halogen, nitro, (C$_1$-C$_3$) dialkylamino, or (C$_1$-C$_3$) trialkylammonium -A$^−$ where A$^−$ is a pharmaceutically acceptable anion completing a salt;

Ar is 1,2-, 1,3-, or 1,4-phenylene optionally substituted with one, two, or three groups of (C$_1$-C$_6$) alkyl, (C$_1$-C$_5$) alkoxy, (C$_1$-C$_4$) thioalkoxy, halogen, nitro, —COOR', —CONHR', —O(CH$_2$)$_n$COOR', —S(CH$_2$)$_n$COOR', —O(CH$_2$)$_n$CONHR', or —S(CH$_2$)$_n$CONHR' wherein n and R' are as hereinbefore defined or a 1,2-, 1,3-, 1,4-, 1,5-, 1,6-, 1,7-, 1,8-, 2,3-, 2,6-, or 2,7-naphthylidene or



with each naphthylidene or phenothiazine optionally substituted with one, two, three, or four groups of (C$_1$-C$_6$) alkyl, (C$_1$-C$_5$) alkoxy, (C$_1$-C$_4$) thioalkoxy, halogen, nitro, —COOR', —CONHR', —O(CH$_2$)$_n$COOR', —S(CH$_2$)$_n$COOR', or —S(CH$_2$)$_n$CONHR' wherein n and R' are as defined above, with the proviso that when Ar is phenothiazine, Sp$^1$ is a bond only connected to nitrogen;

Sp$^2$ is a bond, —S—, or —O—, with the proviso that when Alk$^2$ is a bond, Sp$^2$ is a bond;

Z$^1$ is H, (C$_1$-C$_5$) alkyl, or phenyl optionally substituted with one, two, or three groups of (C$_1$-C$_5$) alkyl, (C$_1$-C$_5$) alkoxy, (C$_1$-C$_4$) thioalkoxy, halogen, nitro, —COOR', —ONHR', —O(CH$_2$)$_n$COOR', —S(CH$_2$)$_n$COOR', —O(CH$_2$)$_n$CONHR', or —S(CH$_2$)$_n$CONHR' wherein n and R' are as defined above;

Sp is a straight or branched-chain divalent or trivalent (C$_1$-C$_{18}$) radical, divalent or trivalent aryl or heteroaryl radical, divalent or trivalent (C$_3$-C$_{18}$) cycloalkyl or heterocycloalkyl radical, divalent or trivalent aryl- or heteroaryl-aryl (C$_1$-C$_{18}$) radical, divalent or trivalent cycloalkyl- or heterocycloalkyl-alkyl (C$_1$-C$_{18}$) radical or divalent or trivalent (C$_2$-C$_{18}$) unsaturated alkyl radical, wherein heteroaryl is preferably furyl, thienyl, N-methylpyrrolyl, pyridinyl, N-methylimidazolyl, oxazolyl, pyrimidinyl, quinolyl, isoquinolyl, N-methylcarbazoyl, aminocourmarinyl, or phenazinyl and wherein if Sp is a trivalent radical, Sp can be additionally substituted by lower (C$_1$-C$_5$) dialkylamino, lower (C$_1$-C$_5$) alkoxy, hydroxy, or lower (C$_1$-C$_5$) alkylthio groups; and

Q is =NHNCO—, =NHNCS—, =NHNCONH—, =NHNCSNH—, or =NHO—.

Preferably, Alk$^1$ is a branched or unbranched (C$_1$-C$_{10}$) alkylene chain; Sp$^1$ is a bond, —S—, —O—, —CONH—, —NHCO—, or —NR' wherein R' is as hereinbefore defined, with the proviso that when Alk$^1$ is a bond, Sp$^1$ is a bond;

Ar is 1,2-, 1,3-, or 1,4-phenylene optionally substituted with one, two, or three groups of (C$_1$-C$_6$) alkyl, (C$_1$-C$_5$) alkoxy, (C$_1$-C$_4$) thioalkoxy, halogen, nitro, —COOR', —CONHR', —O(CH$_2$)$_n$COOR', —S(CH$_2$)$_n$COOR', —O(CH$_2$)$_n$CONHR', or —S(CH$_2$)$_n$CONHR' wherein n and R' are as hereinbefore defined, or Ar is a 1,2-, 1,3-, 1,4-, 1,5-, 1,6-, 1,7-, 1,8-, 2,3-, 2,6-, or 2,7-naphthylidene each optionally substituted with one, two, three, or four groups of (C$_1$-C$_6$) alkyl, (C$_1$-C$_5$) alkoxy, (C$_1$-C$_4$) thioalkoxy, halogen, nitro, —COOR', —CONHR', —O(CH$_2$)$_n$COOR', —S(CH$_2$)$_n$COOR', —O(CH$_2$)$_n$CONHR', or —S(CH$_2$)$_n$CONHR'.

Z$^1$ is (C$_1$-C$_5$) alkyl, or phenyl optionally substituted with one, two, or three groups of (C$_1$-C$_5$) alkyl, (C$_1$-C$_4$)

US 8,153,768 B2

19

20

alkoxy, $(C_1-C_4)$ thioalkoxy, halogen, nitro, —COOR′, —CONHR′, —O(CH$_2$)$_a$COOR′, —S(CH$_2$)$_a$COOR′, —O(CH$_2$)$_a$CONHR′, or —S(CH$_2$)$_a$CONHR′; Alk$^2$ and Sp$^2$ are together a bond; and Sp and Q are as immediately defined above.

U.S. Pat. No. 5,773,001, incorporated herein in its entirety, discloses linkers that can be used with nucleophilic derivatives, particularly hydrazides and related nucleophiles, prepared from the calicheamicins. These linkers are especially useful in those cases where better activity is obtained when the linkage formed between the drug and the linker is hydrolyzable. These linkers contain two functional groups. One group typically is a carboxylic acid that is utilized to react with the carrier. The acid functional group, when properly activated, can form an amide linkage with a free amine group of the carrier, such as, for example, the amine in the side chain of a lysine of an antibody or other proteinaceous carrier. The other functional group commonly is a carbonyl group, i.e., an aldehyde or a ketone, which will react with the appropriately modified therapeutic agent. The carbonyl groups can react with a hydrazide group on the drug to form a hydrazone linkage. This linkage is hydrolyzable, allowing for release of the therapeutic agent from the conjugate after binding to the target cells.

A most preferred bifunctional linker for use in the present invention is 4-(4-acetylphenoxy) butanoic acid (AcBut), which results in a preferred product wherein the conjugate consists of β-calicheamicin, γ-calicheamicin or N-acetyl γ-calicheamicin functionalized by reacting with 3-mercapto-3-methyl butanoyl hydrazide, the AcBut linker, and a human or humanized IgG antibody targeting carrier.

IV. Monomeric Conjugation

The natural hydrophobic nature of many cytotoxic drugs including the calicheamicins creates difficulties in the preparation of monomeric drug conjugates with good drug loadings and reasonable yields which are necessary for therapeutic applications. The increased hydrophobicity of the linkage provided by linkers, such as the AcBut linker, disclosed in U.S. Pat. No. 5,773,001, as well as the increased covalent distance separating the therapeutic agent from the carrier (antibody), exacerbate this problem.

Aggregation of cytotoxic drug derivative/carrier conjugates with higher drug loadings occurs due to the hydrophobic nature of the drugs. The drug loading often has to be limited to obtain reasonable quantities of monomeric product. In some cases, such as with the conjugates in U.S. Pat. No. 5,877,296, it is often difficult to make conjugates in useful yields with useful loadings for therapeutic applications using the reaction conditions disclosed in U.S. Pat. No. 5,053,394 due to excessive aggregation. These reaction conditions utilized DMF as the co-solvent in the conjugation reaction. Methods which allow for higher drug loadings/yield without aggregation and the inherent loss of material are therefore needed.

Improvements to reduce aggregation are described in U.S. Pat. Nos. 5,712,374 and 5,714,586, which are incorporated herein in their entirety. Disclosed in those patents are proteinaceous carriers including, but not limited to, proteins such as human or humanized antibodies that are used to target the cytotoxic therapeutic agents, such as, for example, hP67.6 and the other humanized antibodies disclosed therein. In those patents, the use of a non-nucleophilic, protein-compatible, buffered solution containing (i) propylene glycol as a cosolvent and (ii) an additive comprising at least one $C_6$-$C_{18}$ carboxylic acid was found to generally produce monomeric cytotoxic drug derivative derivative/carrier conjugates with higher drug loading/yield and decreased aggregation having

excellent activity. Preferred acids described therein were $C_7$ to $C_{12}$ acids, and the most preferred acid was octanoic acid (such as caprylic acid) or its salts. Preferred buffered solutions for conjugates made from N-hydroxysuccinimide (OSu) esters or other comparably activated esters were phosphate-buffered saline (PBS) or N-2-hydroxyethyl piperazine-N′-2-ethanesulfonic acid (HEPES buffer). The buffered solution used in those conjugation reactions cannot contain free amines or nucleophiles. For other types of conjugates, acceptable buffers can be readily determined. Alternatively, the use of a non-nucleophilic, protein-compatible, buffered solution containing t-butanol without the additional additive was also found to produce monomeric calicheamicin derivative/carrier conjugates with higher drug loading/yield and decreased aggregation.

The amount of cosolvent needed to form a monomeric conjugate varies somewhat from protein to protein and can be determined by those of ordinary skill in the art without undue experimentation. The amount of additive necessary to effectively form a monomeric conjugate also varies from antibody to antibody. This amount can also be determined by one of ordinary skill in the art without undue experimentation. In U.S. Pat. Nos. 5,712,374 and 5,714,586, additions of propylene glycol in amounts ranging from 10% to 60%, preferably 10% to 40%, and most preferably about 30% by volume of the total solution, and an additive comprising at least one $C_6$-$C_{18}$ carboxylic acid or its salt, preferably caprylic acid or its salt, in amounts ranging from 20 mM to 100 mM, preferably from 40 mM to 90 mM, and most preferably about 60 mM to 90 mM were added to conjugation reactions to produce monomeric cytotoxic drug derivative/carrier conjugates with higher drug loading/yield and decreased aggregation. Other protein-compatible organic cosolvents other than propylene glycol, such as ethylene glycol, ethanol, DMF, DMSO, etc., could also be used. Some or all of the organic cosolvent was used to transfer the drug into the conjugation mixture.

Alternatively, in those patents, the concentration of the $C_6$-$C_{18}$ carboxylic acid or its salt could be increased to 150-300 mM and the cosolvent dropped to 1-10%. In one embodiment, the carboxylic acid was octanoic acid or its salt. In a preferred embodiment, the carboxylic acid was decanoic acid or its salt. In another preferred embodiment, the carboxylic acid was caprylic acid or its salt, which was present at a concentration of 200 mM caprylic acid together with 5% propylene glycol or ethanol.

In another alternative embodiment in those patents, t-butanol at concentrations ranging from 10% to 25%, preferably 15%, by volume of the total solution could be added to the conjugation reaction to produce monomeric cytotoxic drug derivative/carrier conjugates with higher drug loading/yield and decreased aggregation.

These established conjugation conditions were applied to the formation of CMA-676 (Gemtuzumab Ozogamicin), which is now commercially sold as Mylotarg™. Since introduction of this treatment for acute myeloid leukemia (AML), it has been learned through the use of ion-exchange chromatography that the calicheamicin is not distributed on the antibody in a uniform manner. Most of the calicheamicin is on approximately half of the antibody, while the other half exists in a LCF that contains only small amounts of calicheamicin. Consequently, there is a critical need to improve the methods for conjugating cytotoxic drugs such as calicheamicins to carriers which minimize the amount of aggregation and allow for a higher uniform drug loading with a significantly improved yield of the conjugate product.

A specific example is that of the G5/44-NAc-gamma-calicheamicin DMH AcBut conjugate, which is referred to as

US 8,153,768 B2

21

CMC-544 and is generically shown in FIG. **17**. The reduction of the amount of the LCF to <10% of the total antibody was desired for development of CMC-544, and various options for reduction of the levels of the LCF were considered. Other attributes of the immunoconjugate, such as antigen binding and cytotoxicity, must not be affected by the ultimate solution. The options considered included genetic or physical modification of the antibody, the chromatographic separation techniques, or the modification of the reaction conditions.

Reaction of the G5/44 antibody with NAc-gamma-calicheamicin DMH AcBut OSu using the old reaction conditions (CMA-676 Process Conditions) resulted in a product with similar physical properties (drug loading, LCF, and aggregation) as CMA-676. However, the high level (50-60%) of LCF present after conjugation was deemed undesirable. Optimal reaction conditions were determined through statistical experimental design methodology in which key reaction variables such as temperature, pH, calicheamicin derivative input, and additive concentration, were evaluated. Analysis of these experiments demonstrated that calicheamicin input and additive concentration had the most significant effects on the level of the low conjugated fraction LCF and aggregate formation, while temperature and pH exerted smaller influences. In additional experiments, it was also shown that the concentrations of protein carrier (antibody) and cosolvent (ethanol) were similarly of lesser importance (compared to calicheamicin input and additive concentration) in controlling LCF and aggregate levels. In order to reduce the LCF to <10%, the calicheamicin derivative input was increased from 3% to 8.5% (w/w) relative to the amount of antibody in the reaction. The additive was changed from octanoic acid or its salt at a concentration of 200 mM (CMA-676 process) to decanoic acid or its salt at a concentration of 37.5 mM. The conjugation reaction proceeded better at slightly elevated temperature (30-35° C.) and pH (8.2-8.7). The reaction conditions incorporating these changes reduced the LCF to below 10 percent while increasing calicheamicin loading, and is hereinafter referred to as CMC-544 Process Condition or "new" process conditions. A comparison of the results obtained with the CMA-676 and CMC-544 Process Conditions is shown in Table 1.

TABLE 1

COMPARISON OF THE CMA-676 AND CMC-544 PROCESS CONDITIONS

| CONDITIONS/ RESULTS | CMA-676 PROCESS CONDITIONS | CMC-544 PROCESS CONDITIONS |
|---|---|---|
| Calicheamicin Input | 3.0% (w/w powder weight basis) | 8.5% (w/w) |
| Additive Identity and Concentration | Octanoic acid/Sodium octanoic; 200 mM | Decanoic acid/Sodium decanoate; 37.5 mM |
| Temperature | 26° C. | 31-35° C. |
| PH | 7.8 | 8.2-8.7 |
| Calicheamicin Loading (percent by weight; by UV assay) | 2.4-3.5 | 7.0-9.0 |
| Low Conjugated Fraction (LCF) (before purification) | 45-65 HPLC Area % | <10% |
| Aggregation (before purification) | ~5% | <5% |
| Aggregation (after purification) | ≦2% | <2% |

The increase in calicheamicin input increased the drug loading from 2.5-3.0 weight percent to 7.0-9.0 (most typically 7.5-8.5) weight percent, and resulted in no increase in protein aggregation in the reaction. Due to reduction of aggre-

22

gate and LCF, the CMC-544 Process Conditions resulted in a more homogeneous product. CMC-544 has been reproducibly prepared by this new conjugation procedure at the multigram antibody scale.

In the foregoing reactions, the concentration of antibody can range from 1 to 15 mg/ml and the concentration of the calicheamicin derivative, e.g., N-Acetyl gamma-calicheamicin DMH AcBut OSu ester (used to make the conjugates shown in FIG. **17**), ranges from about 4.5-11% by weight of the antibody. The cosolvent was ethanol, for which good results have been demonstrated at concentrations ranging from 6 to 11.4% (volume basis). The reactions were performed in PBS, HEPES, N-(2-Hydroxyethyl)piperazine-N'-(4-butanesulfonic acid) (HEPBS), or other compatible buffer at a pH of 8 to 9, at a temperature ranging from 30° C. to about 35° C., and for times ranging from 15 minutes to 24 hours. Those who are skilled in the art can readily determine acceptable pH ranges for other types of conjugates. For various antibodies the use of slight variations in the combinations of the aforementioned additives have been found to improve drug loading and monomeric conjugate yield, and it is understood that any particular protein carrier may require some minor alterations in the exact conditions or choice of additives to achieve the optimum results.

V. Conjugate Purification and Separation

Following conjugation, the monomeric conjugates may be separated from the unconjugated reactants (such as proteinaceous carrier and free cytotoxic drug/calicheamicin) and/or the aggregated form of the conjugates by conventional methods, for example, size exclusion chromatography (SEC), hydrophobic interaction chromatography (HIC), ion exchange chromatography (IEC), or chromatofocusing (CF). The purified conjugates are monomeric, and usually contain from 4 to 10% by weight cytotoxic drug/calicheamicin. In a preferred embodiment, the conjugates are purified using hydrophobic interaction chromatography (HIC). In the processes previously used for the production-scale manufacturing of cytotoxic drug/calicheamicin-antibody conjugates (CMA-676 process), the sole post-conjugation separation step employed was size exclusion chromatography (SEC). While this step is quite effective at both removing aggregated conjugate and in accomplishing buffer exchange for formulation, it is ineffective at reducing the LCF content. Consequently, the SEC-based process relies entirely on the chemistry of the conjugation reaction to control the LCF content of the final product. Another disadvantage of SEC is the limitation of the volume of conjugate reaction mixture applied to the column (typically not exceeding 5 percent of the process column bed volume). This severely limits the batch size (and therefore production capacity) that can be supported in a given production space. Finally, the SEC purification process also results in significant dilution of the conjugate solution, which places constraints on the protein concentration that can be dependably achieved in formulation.

When a cytotoxic drug has a highly hydrophobic nature, such as a calicheamicin derivative, and is used in a conjugate, hydrophobic interaction chromatography (HIC) is a preferred candidate to provide effective separation of conjugated and unconjugated antibody. HIC presents three key advantages over SEC: (1) it has the capability to efficiently reduce the LCF content as well as the aggregate; (2) the column load capacity for HIC is much higher; and (3) HIC avoids excessive dilution of the product.

A number of high-capacity HIC media suitable for production scale use, such as Butyl, Phenyl and Octyl Sepharose 4 Fast Flow (Amersham Biosciences, Piscataway, N.J.), can effectively separate unconjugated components and aggre-

23                                    24

gates of the conjugate from monomeric conjugated components following the conjugation process.

VI. Compositions and Formulations

The present invention also provides a process for the preparation of a therapeutic or diagnostic composition/formulation comprising admixing the monomeric cytotoxic drug derivative/carrier conjugate of the present invention together with a pharmaceutically acceptable excipient, diluent or carrier.

The monomeric cytotoxic drug derivative/carrier conjugate may be the sole active ingredient in the therapeutic or diagnostic composition/formulation or may be accompanied by other active ingredients including other antibody ingredients, for example anti-CD19, anti-CD20, anti-CD33, anti-T cell, anti-IFNγ or anti-LPS antibodies, or non-antibody ingredients such as cytokines, growth factors, hormones, anti-hormones, cytotoxic drugs and xanthines.

Cytokines and growth factors that may be used to treat proliferative disorders such as cancer, and which may be used together with the cytotoxic drug derivative/carrier conjugates of the present invention include interferons, interleukins such as interleukin 2 (IL-2), TNF, CSF, GM-CSF and G-CSF.

Hormones commonly used to treat proliferative disorders such as cancer and which may be used together with the cytotoxic drug derivative/carrier conjugates of the present invention include estrogens such as diethylstilbestrol and estradiol, androgens such as testosterone and Halotestin, progestins such as Megace and Provera, and corticosteroids such as prednisone, dexamethasone, and hydrocortisone.

Antihormones such as antiestrogens, i.e., tamoxifen, antiandrogens i.e., flutamide and antiadrenal agents are commonly used to treat proliferative disorders such as cancer, and may be used together with the cytotoxic drug derivative/carrier conjugate of the present invention.

Chemotherapeutic/antineoplastic agents commonly used to treat proliferative disorders such as cancer, and which may be used together with the cytotoxic drug derivative/carrier conjugate of the present invention include, but are not limited to, Adriamycin, cisplatin, carboplatin, vinblastine, vincristine, bleomycin, methotrexate, doxorubicin, flurouracils, etoposide, taxol and its various analogs, and mitomycin.

The compositions should preferably comprise a therapeutically effective amount of a conjugate of the invention. The term "therapeutically effective amount" as used herein refers to an amount of a therapeutic agent needed to treat, ameliorate or prevent a targeted disease or condition, or to exhibit a detectable therapeutic or preventative effect. For any conjugate, the therapeutically effective dose can be estimated initially either in cell culture assays or in animal models, usually in rodents, rabbits, dogs, pigs or primates. The animal model may also be used to determine the appropriate concentration range and route of administration. Such information can then be used to determine useful doses and routes for administration in humans.

The precise effective amount for a human subject will depend upon the severity of the disease state, the general health of the subject, the age, weight and gender of the subject, diet, time and frequency of administration, drug combination(s), reaction sensitivities and tolerance/response to therapy. This amount can be determined by routine experimentation and is within the judgment of the clinician. Generally, an effective dose will be from 0.1 mg/m² to 50 mg/m², preferably 0.4 mg/m² to 30 mg/m², more preferably 2 mg/m² to 9 mg/m², which dose is calculated on the basis of the proteinaceous carrier.

Compositions may be administered individually to a patient or may be administered in combination with other agents, drugs or hormones. The dose at which the monomeric cytotoxic drug derivative/antibody conjugate of the present invention is administered depends on the nature of the condition to be treated, the grade of the malignant lymphoma or leukemia and on whether the conjugate is being used prophylactically or to treat an existing condition.

The frequency of dose will depend on the half-life of the conjugate and the duration of its effect. If the conjugate has a short half-life (e.g., 2 to 10 hours) it may be necessary to give one or more doses per day. Alternatively, if the conjugate molecule has a long half-life (e.g., 2 to 15 days) it may only be necessary to give a dosage once per day, once per week or even once every 1 or 2 months.

A composition may also contain a pharmaceutically acceptable carrier for administration of the antibody conjugate. The carrier should not itself induce the production of antibodies harmful to the individual receiving the composition and should not be toxic. Suitable carriers may be large, slowly metabolized macromolecules such as proteins, polypeptides, liposomes, polysaccharides, polylactic acids, polyglycolic acids, polymeric amino acids, amino acid copolymers and inactive virus particles.

Pharmaceutically acceptable salts can be used, for example mineral acid salts, such as hydrochlorides, hydrobromides, phosphates and sulfates, or salts of organic acids, such as acetates, propionates, malonates and benzoates.

Pharmaceutically acceptable carriers in these compositions may additionally contain liquids such as water, saline, glycerol, and ethanol. Additionally, auxiliary substances, such as wetting or emulsifying agents or pH buffering substances, may be present in such compositions. Such carriers enable the compositions to be formulated as tablets, pills, dragees, capsules, liquids, gels, syrups, slurries or suspensions, for ingestion by the patient.

Preferred forms for administration include forms suitable for parenteral administration, e.g., by injection or infusion, for example by bolus injection or continuous infusion. Where the product is for injection or infusion, it may take the form of a suspension, solution or emulsion in an oily or aqueous vehicle and it may contain formulatory agents, such as suspending, preserving, stabilizing and/or dispersing agents.

Although the stability of the buffered conjugate solutions is adequate for short-term stability, long-term stability is poor. To enhance stability of the conjugate and to increase its shelf life, the antibody-drug conjugate may be lyophilized to a dry form, for reconstitution before use with an appropriate sterile liquid. The problems associated with lyophilization of a protein solution are well documented. Loss of secondary, tertiary and quaternary structure can occur during freezing and drying processes. Consequently, cryoprotectants may have to be included to act as an amorphous stabilizer of the conjugate and to maintain the structural integrity of the protein during the lyophilization process. In one embodiment, the cryoprotectant useful in the present invention is a sugar alcohol, such as alditol, mannitol, sorbitol, inositol, polyethylene glycol, and combinations thereof. In another embodiment, the cryoprotectant is a sugar acid, including an aldonic acid, an uronic acid, an aldaric acid, and combinations thereof.

The cryoprotectant of this invention may also be a carbohydrate. Suitable carbohydrates are aldehyde or ketone compounds containing two or more hydroxyl groups. The carbohydrates may be cyclic or linear and include, for example, aldoses, ketoses, amino sugars, alditols, inositols, aldonic acids, uronic acids, or aldaric acids, or combinations thereof. The carbohydrate may also be a mono-, a di-, or a poly-carbohydrate, such as for example, a disaccharide or polysaccharide. Suitable carbohydrates include for example, glyceraldehydes, arabinose, lyxose, pentose, ribose, xylose,

US 8,153,768 B2

25                                                    26

galactose, glucose, hexose, idose, mannose, talose, heptose, glucose, fructose, gluconic acid, sorbitol, lactose, mannitol, methyl α-glucopyranoside, maltose, isoascorbic acid, ascorbic acid, lactone, sorbose, glucaric acid, erythrose, threose, arabinose, allose, altrose, gulose, idose, talose, erythrulose, ribulose, xylulose, psicose, tagatose, glucuronic acid, gluconic acid, glucaric acid, galacturonic acid, mannuronic acid, glucosamine, galactosamine, sucrose, trehalose or neuraminic acid, or derivatives thereof. Suitable polycarbohydrates include, for example, arabinans, fructans, fucans, galactans, galacturonans, glucans, mannans, xylans (such as, for example, inulin), levan, fucoidan, carrageenan, galactocarolose, pectins, pectic acids, amylose, pullulan, glycogen, amylopectin, cellulose, dextran, pustulan, chitin, agarose, keratin, chondroitin, dermatan, hyaluronic acid, alginic acid, xanthin gum, or starch. Among particularly useful carbohydrates are sucrose, glucose, lactose, trehalose, and combinations thereof. Sucrose is a particularly useful cryoprotectant.

Preferably, the cryoprotectant of the present invention is a carbohydrate or "sugar" alcohol, which may be a polyhydric alcohol. Polyhydric compounds are compounds that contain more than one hydroxyl group. Preferably, the polyhydric compounds are linear. Suitable polyhydric compounds include, for example, glycols such as ethylene glycol, polyethylene glycol, and polypropylene glycol, glycerol, or pentaerythritol; or combinations thereof.

In some preferred embodiments, the cryoprotectant agent is sucrose, trehalose, mannitol, or sorbitol.

Once formulated, the compositions of the invention can be administered directly to the subject. The subjects to be treated can be animals. However, it is preferred that the compositions are adapted for administration to human subjects.

The compositions of the present invention may be administered by any number of routes including, but not limited to, oral, intravenous, intramuscular, intraarterial, intramedullary, intrathecal, intraventricular, transdermal, transcutaneous (see PCT Publication No. WO98/20734), subcutaneous, intraperitoneal, intranasal, enteral, topical, sublingual, intravaginal or rectal routes. Hyposprays may be used to administer the compositions of the invention. Typically, the compositions may be prepared as injectables, either as liquid solutions or suspensions. Solid forms suitable for solution in, or suspension in, liquid vehicles prior to injection may also be prepared.

Direct delivery of the compositions will generally be accomplished by injection, subcutaneously, intraperitoneally, intravenously or intramuscularly, or delivered to the interstitial space of a tissue. The compositions can also be administered into a lesion. Dosage treatment may be a single dose schedule or a multiple dose schedule.

It will be appreciated that the active ingredient in the composition will be a cytotoxic drug/proteinaceous carrier conjugate. As such, it will be susceptible to degradation in the gastrointestinal tract. Thus, if the composition is to be administered by a route using the gastrointestinal tract, the composition will need to contain agents which protect the conjugate from degradation, but which release the conjugate once it has been absorbed from the gastrointestinal tract.

A thorough discussion of pharmaceutically acceptable carriers is available in Remington's Pharmaceutical Sciences (Mack Publishing Company, N.J. 1991).

The present invention in particular provides a monomeric calicheamicin derivative/humanized anti-CD22 antibody (G5/44), CMC-544, for use in treating proliferative disorders characterized by cells expressing CD22 antigen on their surface.

The present invention further provides the use of CMC-544 in the manufacture of a composition or a medicament for the treatment of a proliferative disorder characterized by cells expressing CD22.

CMC-544 may also be utilized in any therapy where it is desired to reduce the level of cells expressing CD22 that are present in the subject being treated with the composition or a medicament disclosed herein. Specifically, the composition or medicament is used to treat humans or animals with proliferative disorders namely lymphomas and leukemias, which express CD22 antigen on the cell surface. These CD22-expressing cells may be circulating in the body or be present in an undesirably large number localized at a particular site in the body.

CMC-544 may also be preferably used for treatment of malignancies of B-lymphocyte lineage including lymphomas and leukemias, most preferably Non-Hodgkin's Lymphoma (NHL), acute lymphocytic leukemia (ALL), multiple myeloma, acute lymphocyte leukemia (ALL) and chronic lymphocytic leukemia (CLL). CMC-544 can be used alone or in combination with other bioactive agents to treat subjects suffering from B-cell malignancies.

Bioactive agents commonly used include growth factors, cytokines, and cytotoxic drugs. Cytotoxic drugs commonly used to treat proliferative disorders such as cancer, and which may be used together with CMC-544 include an anthracycline such as doxorubicin, daunorubicin, idarubicin, aclarubicin, zorubicin, mitoxantrone, epirubicin, carubicin, nogalamycin, menogaril, pitarubicin, and valrubicin for up to three days; and a pyrimidine or purine nucleoside such as cytarabine, gemcitabine, trifluridine, ancitabine, enocitabine, azacitidine, doxifluridine, pentostatin, broxuridine, capecitabine, cladribine, decitabine, floxuridine, fludarabine, gougerotin, puromycin, tegafur, tiazofurin. Other chemotherapeutic/antineoplastic agents that may be administered in combination with CMC-544 include Adriamycin, cisplatin, carboplatin, cyclophosphamide, dacarbazine, vinblastine, vincristine, mitoxantrone, bleomycin, mechlorethamine, prednisone, procarbazine, methotrexate, flurouracils, etoposide, taxol and its various analogs, and mitomycin. CMC-544 may be administered concurrently with one or more of these therapeutic agents. Alternatively, CMC-544 may be administered sequentially with one or more of these therapeutic agents.

CMC-544 may also be administered alone, concurrently, or sequentially with a combination of other bioactive agents such as growth factors, cytokines, steroids, antibodies such as anti-CD20 antibody, rituximab (Rituxan™), and chemotherapeutic agents as a part of a treatment regimen. Established treatment regimens for the treatment of malignant lymphoproliferative disorders include CHOPP (cyclophosphamide, doxorubicin, vincristine, prednisone, and procarbazine), CHOP (cyclophosphamide, doxorubicin, vincristine, and prednisone), COP (cyclophosphamide, vincristine, and prednisone), CAP-BOP (cyclophosphamide, doxorubicin, procarbazine, bleomycin, vincristine, and prednisone), m-BACOD (methotrexate, bleomycin, doxorubicin, cyclophosphamide, vincristine, dexamethasone, and leucovorin), ProMACE-MOPP (prednisone, methotrexate, doxorubicin, cyclophosphamide, etoposide, leucovorin, mechloethamine, vincristine, prednisone, and procarbazine), ProMACE-CytaBOM (prednisone, methotrexate, doxorubicin, cyclophosphamide, etoposide, leucovorin, cytarabine, bleomycin, and vincristine), MACOP-B (methotrexate, doxorubicin, cyclophosphamide, vincristine, fixed dose prednisone, bleomycin, and leucovorin), MOPP (mechloethamine, vincristine, prednisone, and procarbazine), ABVD

US 8,153,768 B2

27                                                    28

(adriamycin/doxorubicin, bleomycin, vinblastine, and dacarbazine), MOPP alternating with ABV (adriamycin/doxorubicin, bleomycin, and vinblastine), and MOPP (mechloethamine, vincristine, prednisone, and procarbazine) alternating with ABVD (adriamycin/doxorubicin, bleomycin, vinblastine, and dacarbazine), and ChIVPP (chlorambucil, vinblastine, procarbazine, and prednisone). Therapy may comprise an induction therapy phase, a consolidation therapy phase and a maintenance therapy phase. CMC-544 may also be administered alone, concurrently, or sequentially with any of the above identified therapy regimens as a part of induction therapy phase, a consolidation therapy phase and a maintenance therapy phase.

The conjugates of the present invention may also be administered together with other bioactive and chemotherapeutic agents as a part of combination chemotherapy regimen for the treatment of relapsed aggressive lymphomas. Such a treatment regimen includes IMVP-16 (ifosfamide, methotrexate, and etoposide), MIME (methyl-gag, ifosfamide, methotrexate, and etoposide), DHAP (dexamethasone, high-dose cytaribine, and cisplatin), ESHAP (etoposide, methylpredisolone, high-dose cytarabine, and cisplatin), EPOCH (etoposide, vincristine, and doxorubicin for 96 hours with bolus doses of cyclophosphamide and oral prednisone), CEPP(B) (cyclophosphamide, etoposide, procarbazine, prednisone, and bleomycin), CAMP (lomustine, mitoxantrone, cytarabine, and prednisone), CVP-1 (cyclophosphamide, vincristine and prednisone), CHOP-B. (cyclophosphamide, doxorubicin, vincristine, prednisone, and Bleomycin), CEPP-B (cyclophosphamide, etoposide, procarbazine, and bleomycin), and P/DOCE (epirubicin or doxorubicin, vincristine, cyclophosphamide, and prednisone) Additional treatment regimens for aggressive lymphomas may include in phase 1 a first line of treatment with CHOP (cyclophosphamide, doxorubicin, vincristine, and prednisone)-rituximab (Rituxan™)-CMC-544, followed in phase 2 and phase 3 with CHOP-rituximab (Rituxan™), CHOP-CMC-544 or CHOP-rituximab (Rituxan™)-CMC-544. Alternatively, phase 1 may have a first line of treatment with COP (cyclophosphamide, vincristine, and prednisone)-rituximab (Rituxan™)-CMC-544, followed in phase 2 and phase 3 with COP-rituximab (Rituxan™), COP-CMC-544 or COP-rituximab (Rituxan™)-CMC-544. In a further embodiment, treatment of aggressive lymphomas may include a first or second line of treatment with the antibody drug conjugate CMC-544 in phase 1, followed in phase 2 and 3 with CMC-544 and CHOP (cyclophosphamide, doxorubicin, vincristine, and prednisone), CMC-544 and COP (cyclophosphamide, vincristine, and prednisone), CMC-544 with rituximab (Rituxan™) or rituximab (Rituxan™) alone. In yet another embodiment, the treatment of aggressive lymphomas may include a first or line of treatment with the antibody drug conjugate CMC-544 followed in phase 2 and 3 with CMC-544 alone or in combination with other treatment regimens including, but not limited to, ESHOP (etoposide, methylpredisolone, high-dose cytarabine, vincristine and cisplatin), EPOCH (etoposide, vincristine, and doxorubicin for 96 hours with bolus doses of cyclophosphamide and oral prednisone), IMVP-16 (ifosfamide, methotrexate, and etoposide), ASHAP (Adriamycin, solumedrol, Ara-C, and cisplatin), MIME (methyl-gag, ifosfamide, methotrexate, and etoposide) and ICE (ifosfamide, cyclophosphamide, and etoposide). Details of various cytotoxic drugs used in chemotherapy of malignancies including combination chemotherapeutic regimens, dosages etc. that

are provided in this application can be found in Cancer Principles and Practice of Oncology, Eds. Vincent T. DeVita, Samuelo Hellman, Steven A. Rosenberg, 6th Edition, Publishers: Lippincott, Williams and Wilkins (2001) and Physician's Cancer Chemotherapy Drug Manual, Eds. Edward Chu and Vincent T. DeVita, Publishers: Jones and Bartlett, (2002).

The present invention also provides a method of treating human or animal subjects suffering from or at risk of a proliferative disorder characterized by cells expressing CD22, the method comprising administering to the subject an effective amount of CMC-544 of the present invention.

The present invention is further described below in specific working examples, which are intended to further describe the invention without limiting its scope.

Example 1

Generation of Candidate Antibodies

A panel of antibodies against CD22 were selected from hybridomas using the following selection criteria: binding to Daudi cells, internalization on Daudi cells, binding to peripheral blood mononuclear cells (PBMC), internalization on PBMC, affinity (greater than $10^{-9}$M), mouse γ1 and production rate. 5/44 was selected as the preferred antibody.

I. Gene Cloning and Expression of a Chimeric 5/44 Antibody Molecule)

a) Preparation of 5/44 Hybridoma Cells and RNA Preparation Therefrom

Hybridoma 5/44 was generated by conventional hybridoma technology following immunization of mice with human CD22 protein. RNA was prepared from 5/44 hybridoma cells using a RNEasy kit (Qiagen, Crawley, UK; Catalogue No. 74106). The RNA obtained was reverse transcribed to cDNA, as described below.

b) Distribution of CD22 on NHL Tumors

An immunohistochemistry study was undertaken to examine the incidence and distribution of staining using the 5/44 anti-CD22 monoclonal antibodies. Control anti-CD20 and anti-CD79a antibodies were included in the study to confirm B cell areas of tumors.

A total of 50 tumors were studied and these were categorized as follows by using the Working Formulation and REAL classification systems:

7 B lymphoblastic leukemia/lymphoma (High/I)
4 B-CLL/small lymphocytic lymphoma (Low/A)
3 lymphoplasmacytoid/Immunocytoma (Low/A)
1 Mantle cell (Int/F)
14 Follicle center lymphoma (Low to Int/D)
13 Diffuse large cell lymphoma (Int to High/G,H)
6 Unclassifiable (K)
2 T cell lymphomas

Forty B cell lymphomas were positive for CD22 antigen with the 5/44 antibody at 0.1 µg/ml and a further six became positive when the concentration was increased to 0.5 µg/ml. For the remaining two B cell tumors that were negative at 0.1 µg/ml, there was insufficient tissue remaining to test at the higher concentration. However, parallel testing with another anti-CD22 antibody designated 6/13 (Celltech, Slough, UK), which gave stronger staining than 5/44, resulted in all 48 B cell lymphomas staining positive for CD22.

Thus, it is possible to conclude that the CD22 antigen is widely expressed on B cell lymphomas and therefore provides a suitable target for immunotherapy in NHL.

US 8,153,768 B2

29 30

c) PCR Cloning of 5/44 $V_H$ and $V_L$

cDNA sequences coding for the variable domains of 5/44 heavy and light chains were synthesized using reverse transcriptase to produce single stranded cDNA copies of the mRNA present in the total RNA. This was then used as the template for amplification of the murine V-region sequences using specific oligonucleotide primers by the Polymerase Chain Reaction (PCR).

i) cDNA Synthesis

cDNA was synthesized in a 20 μl reaction volume containing the following reagents: 50 mM Tris-HCl pH 8.3, 75 mM KCl, 10 mM dithiothreitol, 3 mM MgCl₂, 0.5 mM of dATP, dTTP, dCTP, and dGTP, 20 units RNAsin, 75 ng random hexanucleotide primer, 2 μg 5/44 RNA and 200 units Moloney Murine Leukemia Virus reverse transcriptase. After incubation at 42° C. for 60 minutes, the reaction was terminated by heating at 95° C. for 5 minutes.

ii) PCR

Aliquots of the cDNA were subjected to PCR using combinations of primers specific for the heavy and light chains. Degenerate primer pools designed to anneal with the conserved sequences of the signal peptide were used as forward primers. These sequences all contain, in order, a restriction

site ($V_L$ SfuI; $V_H$ HindIII) starting 7 nucleotides from their 5' ends, the sequence GCCGCCACC (SEQ ID NO:50), to allow optimal translation of the resulting mRNAs, an initiation codon and 20-30 nucleotides based on the leader peptide sequences of known mouse antibodies (Kabat et al., Sequences of Proteins of Immunological Interest, 5th Edition, 1991, U.S. Department of Health and Human Services, Public Health Service, National Institutes of Health).

The 3' primers are designed to span the framework 4 J-C junction of the antibody and contain a restriction site for the enzyme BsiWI to facilitate cloning of the $V_L$ PCR fragment. The heavy chain 3' primers are a mixture designed to span the J-C junction of the antibody. The 3' primer includes an ApaI restriction site to facilitate cloning. The 3' region of the primers contains a mixed sequence based on those found in known mouse antibodies (Kabat et al., 1991, supra).

The combinations of primers described above enable the PCR products for $V_H$ and $V_L$ to be cloned directly into an appropriate expression vector (see below) to produce chimeric (mouse-human) heavy and light chains and for these genes to be expressed in mammalian cells to produce chimeric antibodies of the desired isotype.

Incubations (100 μl) for the PCR were set up as follows. Each reaction contained 10 mM Tris-HCl pH 8.3, 1.5 mM MgCl₂, 50 mM KCl, 0.01% w/v gelatin, 0.25 mM of dATP, dTTP, dCTP, and dGTP, 10 pmoles 5' primer mix, 10 pmoles 3' primer, 1 μl cDNA and 1 unit Taq polymerase. Reactions were incubated at 95° C. for 5 minutes and then cycled through 94° C. for 1 minute, 55° C. for 1 minute and 72° C. for 1 minute. After 30 cycles, aliquots of each reaction were analyzed by electrophoresis on an agarose gel.

For the heavy chain V-region, an amplified DNA product was only obtained when a primer pool annealing within the start of framework I replaced the signal peptide primer pool. The fragments were cloned into DNA sequencing vectors. The DNA sequence was determined and translated to give a

deduced amino acid sequence. This deduced sequence was verified by reference to the N-terminal protein sequence determined experimentally. FIG. **1** shows the amino acid sequence of the CDRs of the mouse monoclonal antibody 5/44. FIGS. **2** and **3** shows the DNA/protein sequence of the mature light and heavy chain V-regions of mouse monoclonal 5/44, respectively.

iii) Molecular Cloning of the PCR Fragments

The murine V-region sequences were then cloned into the expression vectors pMRR10.1 and pMRR14 (FIGS. **7** and **8**). These are vectors for the expression of light and heavy chain containing DNA encoding constant regions of human kappa light chain and human gamma-4 heavy chain. The $V_L$ region was sub-cloned into the expression vector by restriction digest and ligation from the sequencing vector, using SfuI and BsiWI restriction sites, creating plasmid pMRR10 (544cL) (FIG. **8**). The heavy chain DNA was amplified by PCR using a 5' primer to introduce a signal peptide, since this was not obtained in the cloning strategy—a mouse heavy chain antibody leader from a different in-house hybridoma (termed 162) was employed. The 5' primer had the following sequence:

```
5'GCGCGCAAGCTTGCCGCCACCATGGACTTCGGATTCTCTCTCGTGTTCCTGG (SEQ ID NO:51)
CACTCATTCTCAAGGGAGTGCAGTGTGAGGTGCAGCTCGTCGAGTCTGG3'.
```

The reverse primer was identical to that used in the original $V_H$ gene cloning. The resultant PCR product was digested with enzymes HindIII and ApaI, was sub-cloned, and its DNA sequence was confirmed, creating plasmid pMRR14 (544cH) (FIG. **7**). Transient co-transfection of both expression vectors into CHO cells generated chimeric c5/44 antibody. This was achieved using the Lipofectamine reagent according to the manufacturer's protocols (InVitrogen: Life Technology, Groningen, The Netherlands. Catalogue no. 11668-027).

II. Removal of Glycosylation Site and Reactive Lysine

A potential N-linked glycosylation site sequence was observed in CDR-H2, having the amino acid sequence N-Y-T (FIG. **3**, SEQ ID NO: 8). SDS-PAGE, Western blotting and carbohydrate staining of gels of 5/44 and its fragments (including Fab) indicated that this site was indeed glycosylated (not shown). In addition, a lysine residue was observed at an exposed position within CDR-H2, which had the potential to reduce the binding affinity of the antibody by providing an additional site for conjugation with an agent with which the antibody may be conjugated.

A PCR strategy was used to introduce amino acid substitutions into the CDR-H2 sequence in an attempt to remove the glycosylation site and/or the reactive lysine, as shown in FIG. **4** (SEQ ID NOS: 9-12 and 14). Forward primers encoding the mutations N55Q, T57A or T57V were used to remove the glycosylation site (FIG. **4**, SEQ ID NOS 10-12) and a fourth forward primer containing the substitution K60R, was generated to remove the reactive lysine residue (FIG. **4**, SEQ ID NO: 14). A framework 4 reverse primer was used in each of these PCR amplifications. The PCR products were digested with the enzymes XbaI and ApaI and were inserted into pMRR14(544cH) (also cleaved with XbaI and ApaI) to generate expression plasmids encoding these mutants. The N55Q, T57A and T57V mutations ablate the glycosylation site by changing the amino acid sequence away from the consensus N-X-T/S while the K60R mutation replaces the

US 8,153,768 B2

**31**

potentially reactive lysine with the similarly positively charged residue arginine. The resultant cH variant plasmids were co-transfected with the cL plasmid to generate expressed chimeric antibody variants.

III. Evaluation of Activities of Chimeric Genes

The activities of the chimeric genes were evaluated following transient transfection into CHO cells and determination of affinity constants by BiaCore analysis

The affinities of chimeric 5/44 or its variants, which have had their glycosylation site or their reactive lysine removed, were investigated using BIA technology for binding to CD22-mFc constructs. The results are shown in FIG. **9**. All binding measurements were performed in the BIAcore™ 2000 instrument (Pharmacia Biosensor AB, Uppsala, Sweden). The assay was performed by capture of CD22mFc via the immobilized anti-mouse Fc. The antibody was in the soluble phase. Samples, standard, and controls (50 μl) were injected over immobilized anti-mouse Fc followed by antibody in the soluble phase. After each cycle, the surface was regenerated with 50 μl of 40 mM HCl at 30 μl/min. The kinetic analysis was performed using the BIAevaluation 3.1 software (Pharmacia).

Removal of the glycosylation site in construct T57A resulted in a slightly faster on-rate and a significantly slower off-rate compared to the chimeric 5/44, giving an affinity improvement of approximately 5-fold. The N55Q mutation had no effect on affinity. This result was unexpected as it suggests that the removal of the carbohydrate itself apparently has no effect on binding (as with the N55Q change). The improved affinity was observed only with the T57A change. One possible explanation is that, regardless of the presence of carbohydrate, the threonine at position 57 exerts a negative effect on binding that is removed on conversion of threonine to alanine. The hypothesis that the small size of alanine is important, and that the negative effect of threonine is related to its size, is supported from the result obtained using the T57V mutation: that replacement with valine at position 57 is not beneficial (results not shown).

Removal of the lysine residue by the K60R mutation had a neutral effect on affinity, i.e. the introduction of the arginine residue removes a potential reactive site without compromising affinity.

The mutations for removal of the glycosylation site and removal of the reactive lysine were therefore both included in the humanization design.

Example 2

CDR-Grafting of 5/44

The molecular cloning of genes for the variable regions of the heavy and light chains of the 5/44 antibody and their use to produce chimeric (mouse/human) 5/44 antibodies has been described above. The nucleotide and amino acid sequences of the mouse 5/44 V$_L$ and V$_H$ domains are shown in FIGS. **2** and **3** (SEQ ID NOS:7 and 8), respectively. This example describes the CDR-grafting of the 5/44 antibody onto human frameworks to reduce potential immunogenicity in humans, according to the method of Adair et al., (PCT application No. WO91/09967).

I. CDR-Grafting of 5/44 Light Chain

Protein sequence alignment with consensus sequences from human sub-group I kappa light chain V region indicated 64% sequence identity. Consequently, for constructing the CDR-grafted light chain, the acceptor framework regions chosen corresponded to those of the human VK sub-group I

**32**

germline O12,DPK9 sequence. The framework 4 acceptor sequence was derived from the human J-region germline sequence JK1 (SEQ ID NO: 18).

A comparison of the amino acid sequences of the framework regions of murine 5/44 (SEQ ID NO: 7) and the acceptor sequence (SEQ ID NO: 17) is given in FIG. **5** and shows that there are 27 differences between the donor and acceptor chains. At each position, an analysis was made of the potential of the murine residue to contribute to antigen binding, either directly or indirectly, through effects on packing or at the V$_H$/V$_L$ interface. If a murine residue was considered important and sufficiently different from the human residue in terms of size, polarity or charge, then that murine residue was retained. Based on this analysis, two versions of the CDR-grafted light chain, having the sequences given in SEQ ID NO:19 and SEQ ID NO:20 (FIG. **5**), were constructed.

II. CDR-Grafting of 5/44 Heavy Chain

CDR-grafting of the 5/44 heavy chain was accomplished using the same strategy as described for the light chain. The V-domain of the 5/44 heavy chain was found to be homologous to human heavy chains belonging to sub-group I (70% sequence identity) and therefore the acceptor of the human sub-group I germline framework VH1-3,DP7 was used as an acceptor framework. The framework 4 acceptor sequences were derived from human J-region germline sequence JH4 (SEQ ID NO: 22).

A comparison of the 5/44 heavy chain with the framework regions is shown in FIG. **6** where it can be seen that the 5/44 heavy chain (SEQ ID NO: 8) differs from the acceptor sequence (SEQ ID NO: 21) at 22 positions. Analysis of the contribution that any of these might make to antigen binding led to 5 versions of the CDR-grafted heavy chains were constructed, having the sequences given in SEQ ID NO:23, SEQ ID NO:24, SEQ ID NO:25, SEQ ID NO:26 and SEQ ID NO:27 (FIG. **6**).

III. Construction of Genes for Grafted Sequences

Genes were designed to encode the grafted sequences gH1 and gL1, and a series of overlapping oligonucleotides were designed and constructed (FIG. **10**, SEQ ID NOS: 32-47). A PCR assembly technique was employed to construct the CDR-grafted V-region genes. Reaction volumes of 100 μl were set up containing 10 mM Tris-HCl pH8.3, 1.5 mM MgCl$_2$, 50 mM KCl, 0.001% gelatin, 0.25 mM of dATP, dTTP, dCTP, and dGTP, 1 pmole each of the 'internal' primers (T1, T2, T3, B1, B2, B3), 10 pmole each of the 'external' primers (F1, R1), and 1 unit of Taq polymerase (AmpliTaq, Applied BioSystems, catalogue no. N$_8$O$_8$-0171). PCR cycle parameters were 94° C. for 1 minute, 55° C. for 1 minute and 72° C. for 1 minute, for 30 cycles. The reaction products were then run on a 1.5% agarose gel, excised and recovered using QIAGEN spin columns (QIAuick gel extraction kit, cat no. 28706). The DNA was eluted in a volume of 30 μl. Aliquots (1 μl) of the gH1 and gL1 DNA were then cloned into the InVitrogen TOPO TA cloning vector pCR2.1 TOPO (catalogue no. K4500-01) according to the manufacturer's instructions. This non-expression vector served as a cloning intermediate to facilitate sequencing of a large number of clones. DNA sequencing using vector-specific primers was used to identify correct clones containing gH1 and gL1, creating plasmids pCR2.1 (544gH1) and pCR2.1(544gL1) (FIGS. **11** and **12**).

An oligonucleotide cassette replacement method was used to create the humanized grafts gH4, 5, 6 and 7, and gL2. FIG. **13** shows the design of the oligonucleotide cassettes (SEQ ID NOS: 52-61). To construct each variant, the vector pCR2.1 (544gH1) or pCR2.1(544gL1)) was cut with the restriction enzymes shown (XmaI/SacII for the heavy chain, XmaI/

US 8,153,768 B2

**33**

BstEII for the light chain). The large vector fragment was gel purified from agarose and was used in ligation with the oligonucleotide cassette. These cassettes are composed of 2 complementary oligonucleotides (shown in FIG. **13**, SEQ ID NOS: 52-61), mixed at a concentration of 0.5 pmoles/µl in a volume of 200 µl 12.5 mM Tris-HCl pH 7.5, 2.5 mM MgCl₂, mM NaCl, 0.25 mM dithioerythritol. Annealing was achieved by heating to 95° C. for 3 minutes in a water bath (volume 500 ml) then allowing the reaction to slow-cool to room temperature. The annealed oligonucleotide cassette was then diluted ten-fold in water before ligation into the appropriately cut vector. DNA sequencing was used to confirm the correct sequence, creating plasmids pCR2.1 (5/44-gH4-7) and pCR2.1 (5/44-gL2). The verified grafted sequences were then sub-cloned into the expression vectors pMRR14 (heavy chain) and pMR10.1 (light chain).

IV. CD22 Binding Activity of CDR-Grafted Sequences

The vectors encoding grafted variants were co-transfected into CHO cells in a variety of combinations, together with the original chimeric antibody chains. Binding activity was compared in a competition assay, competing the binding of the original mouse 5/44 antibody for binding to Ramos cells (obtained from ATCC, a Burkitt's lymphoma lymphoblast human cell line expressing surface CD22). This assay was considered the best way to compare the grafts in their ability to bind to cell surface CD22. The results are shown in FIGS. **14** and **15**. As can be seen, there is very little difference between any of the grafts, all performed more effectively than the chimeric at competing against the murine parent. The introduction of the 3 additional human residues at the end of CDR-H2 (H6 and gH7) did not appear to have affected binding.

The graft combination with the least number of murine residues gL1gH7 was selected. The light chain graft gL1 has 6 donor residues. Residues V2, V4, L37 and Q45 are potentially important packing residues. Residue H38 is at the $V_H/V_L$ interface. Residue D60 is a surface residue close to the CDR-L2 and may directly contribute to antigen binding. Of these residues, V2, L37, Q45 and D60 are found in germline sequences of human kappa genes from other sub-groups. The heavy chain graft gH7 has 4 donor framework residues. Residue R28 is considered to be part of CDR-H1 under the structural definition used in CDR-grafting (see Adair et al. (1991), PCT application No. WO91/09967)). Residues E1 and A71 are surface residues close to the CDRs. Residue I48 is a potential packing residue. Residue T93 is present at the $V_H/V_L$ interface. Of these residues, E1 and A71 are found in other germline genes of human sub-group 1. Residue I48 is found in human germline sub-group 4, and T73 is found in human germline sub-group 3.

The full DNA and protein sequence of both the light chain and heavy chain, including approximate position of introns within the constant region genes provided by the vectors, are shown in FIG. **16** and are given in SEQ ID NO:29 and SEQ ID NO:28, respectively, for the light chain and SEQ ID NO: 31 and SEQ ID NO:30, respectively, for the heavy chain.

DNA encoding these light and heavy chain genes was excised from these vectors. Heavy chain DNA was digested at the 5' HindIII site, then was treated with the Klenow fragment of *E. coli* DNA polymerase I to create a 5' blunt end. Cleavage at the 3' EcoRI site resulted in the heavy chain fragment, which was purified, from agarose gels. In the same way, a light chain fragment was produced, blunted at the 5' SfuI site and with a 3' EcoRI site. Both fragments were cloned into DHFR based expression vectors and used to generate stable cell lines in CHO cells.

**34**

Example 3

Conjugation of NAc-Gamma Calicheamicin DMH AcBut to Humanized Anti-CD22 Antibody (G5/44)

In a typical conjugation reaction, humanized anti-CD22 antibody (G5/44) was conjugated to NAc-gamma calicheamicin DMH AcBut OSu (calicheamicin derivative) (see FIG. **17**), where the target protein concentration was 7.5 mg/ml and the target calicheamicin derivative loading was 8.5 percent by weight of the protein. The target reaction pH was 8.5±0.2, and the target concentrations of the other reaction components were as follows: 50 mM N-(2-Hydroxyethyl) piperazine-N'-(4-butanesulfonic acid) (HEPBS), 37.5 mM sodium decanoate, and 9% v/v total ethanol. The reaction was conducted at 330±2° C. for one hour. Results of the analysis of this typical reaction prior to purification were as follows: Protein: 7.34 mg/ml; Calicheamicin Loading: 82.7 µg/mg; Aggregate: 93.25%; and Unconjugated Protein (LCF): 1.07% (UV Area % by HPLC).

Effect of various surfactant additives and their concentrations on product yield and purity were tested to determine their effect on the production of conjugated monomer (see Table 2). Reactions were run where everything was held constant except for the additive and its concentration. The conjugates produced from these reactions were analyzed for protein concentration, calicheamicin loading, aggregate content, and LCF. Although all n-carboxylic acids in the range of $C_6$ (hexanoate) to $C_{12}$ (dodecanoate) gave acceptable results, the best overall results (low LCF, low aggregate, and high recovery of monomeric conjugate) were obtained with decanoate in a concentration range of 30 mM to 50 mM.

TABLE 2

EFFECT OF ADDITIVE IDENTITY AND CONCENTRATION ON CONJUGATION RESULTS

| Additive/concentration | Protein Recovery (% recovery) | Percent Aggregate | Percent LCF |
|---|---|---|---|
| Hexanoate-500 mM | 51.3 | 3.36 | 38.3 |
| Heptanoate-400 mM | 49.9 | 4.7 | 20.6 |
| Octanoate-200 mM | 57.3 | 3.27 | 10.6 |
| Nanonoate-100 mM | 54.7 | 1.41 | 0.3 |
| Decanoate-50 mM | 56.7 | 1.35 | 0.2 |
| Undecanoate-20 mM | 46.9 | 2.95 | 0.6 |
| Dodecanoate-5 mM | 65.6 | 0.78 | 7.0 |

Example 4

Chromatographic Purification Process

I. Chromatographic Separation Processes

Although Butyl Sepharose 4 Fast Flow was identified as the best HIC media, acceptable results can be obtained with slight alterations in the chromatographic conditions using other resins such as Octyl Sepharose Fast Flow, PPG-60° C. (Tosoh Biosep), Fractogel EMD Propyl (EM Processing) and Source 15ISO (Amersham Biosciences, Piscataway, N.J.).

The starting material for the purification was a conjugation reaction mixture containing 7.2 mg/mL protein at a calicheamicin derivative loading of 83 µg/mg, with an aggregate content of 10.1% (area percent by HPLC), and an LCF content of 5.6% (area percent by HPLC)

After the conjugation reaction was completed, the reaction mixture was diluted four-fold by the addition of potassium phosphate solution to a final phosphate concentration of 0.7

US 8,153,768 B2

35

M (pH 8.2). After mixing, this solution was filtered through 0.45 micron filters. The diluted solution was loaded on a Butyl Sepharose 4 Fast Flow column. The total amount of protein loaded on the column was 29 mg per ml bed volume. After a wash with 0.7 M potassium phosphate, the column was eluted using a step gradient from 0.7 M to 4 mM potassium phosphate, pH 8.2. The fractions eluted in the step gradient were pooled for further processing, with the pool consisting of monomeric conjugate with less than 1 area percent each of aggregate and LCF. This pool was loaded on a Sephadex G-25 (Amersham Biosciences) desalting column for exchange to a buffer appropriate for formulation, consisting of 20 mM Tris-Cl and 100 mM sodium chloride at pH 8.0. The purified, buffer-exchanged CMC-544 preparation had the following properties: Calicheamicin Loading: 81 µg/mg; Aggregate: 0.4% (area percent by HPLC) LCF: 0.8% (area percent by HPLC).

Example 5

Binding Analysis of NAc-Gamma Calicheamicin DMH AcBut-G5/44 Immunoconjugate (CMC-544)

Immunoconjugate of humanized anti-CD22 antibody (G5/44) with calicheamicin (CMC-544) generated by the above conjugation process was analyzed in a binding study to determine whether the conjugate generated using the improved process had any adverse effect on antigen binding. Table 3 shows that the conjugation procedure does not have any impact on the antigen binding affinity of the antibody. CMC-544 immunoconjugate made by either the old or new conjugation procedure bound the target antigen with similar affinities, which did not differ from that of the unconjugated antibody G5/44.

TABLE 3

Biosensor analyses were carried out using a BIAcore 2000 (BIAcore AB, Uppsala, Sweden). CD22mFc was covalently immobilized on the N-hydroxysuccinimide-activated carboxymethyl dextran-coated biosensor chip (CM5) using a standard amine-coupling chemistry at a protein density of approximately 2000 resonance units. Samples of CMC-544 or G5/44 were diluted in the HBS buffer (10 mM HEPES, pH 7.4, containing 150 mM NaCl, 3 mM EDTA and 0.005% polysorbate 20 (v/v)) and injected in the concentration range of 1 to 100 nM over the CD22mFc-coated biosensor chip surface at a flow rate of 30 µl/min for 3 min to allow binding. After the binding phase, dissociation of the bound antibody was monitored by washing the chip with the HBS buffer over a 15 minute period. The antigenic surface was regenerated by washing the Biosensor chip with 15 µl of the regeneration buffer (10 mM NaOH and 200 mM NaCl) for 30 seconds, followed by a stabilization time of 2 minutes before the next cycle. Kinetic constants were calculated by nonlinear least square regression analysis using a 1:1 Langmuir binding

36

curve fitting model and BIAevaluation program (version 3.0, BIAcore). The antigen binding of CMC-544 was evaluated by surface plasmon resonance analysis using CD22mFc covalently immobilized on a biosensor chip. The results of kinetic analyses of the binding of CMC-544 and G5/44 to CD22mFc show that, after the data were fitted globally to a 1:1 Langmuir binding model with compensation for mass transfer, both CMC-544 and unconjugated G5544 bound CD22 with a similar affinity (CMC-544:CD22 $K_D$=200 µM; G5/44:CD22 $K_D$=235 µM). Conjugation to calicheamicin did not impact the ability of G5/44 to effectively bind CD22mFc.

The binding of CMC-544 and G5/44 to CD22 expressed on the surface of B lymphoma cells was also examined by flow cytometry. Anti-CD33 mAb gemtuzumab (hP67.6) and its calicheamicin conjugate CMA-676 (gemtuzumab ozogamicin) were used as isotype-matched controls in this evaluation. Rituximab (Rituxan™), a chimeric human IgG1 anti-human CD20 mAb, was used as a positive control. Purified human polyclonal IgG1 and IgG4 were also used as negative controls. Binding of CMC-544 and G5/44 to CD22 on Ramos or RL BCL was similar and distinguishable from that of human polyclonal IgG4. RL BCL displayed lower surface expression of CD22 than Ramos BCL. In contrast, the binding of CMA-676 or gL1gH7 to either BCL was similar to that of human polyclonal IgG4 consistent with their lack of expression of CD33 (data not shown). The same cells demonstrated strong binding of anti-CD20 rituximab (Rituxan™). Unlike hP67.6 and CMA-676, neither CMC-544 nor G5/44 demonstrated any binding to CD22⁻ CD33⁺ HL-60 leukemia cells (data not shown). These results suggest that the conjugation of G5/44 to calicheamicin does not affect its antigen specificity. CMC-544 specifically recognizes CD22 on human B cells, but not on murine, rat, canine, porcine or primate (cynomolgus and rhesus) B cells (data not shown).

Example 6

Analysis of In Vitro and In Vivo Effects of CMC-544

I. In Vitro Cytotoxicity

The effect of CMC-544 made by using CMA-676 and CMC-544 processes on the in vitro growth of CD22+ B-Cell lymphoma cell lines, RL, Daudi, Raji and Ramos, were compared. An isotype-matched calicheamicin conjugate targeted at human CD33 (CMA-676) was used to reflect antigen-nonspecific effects of the conjugate. The use of unconjugated N-Ac gamma calicheamicin DMH (the drug released from the conjugate upon acid hydrolysis) in this evaluation indicated that each of these cell lines used was sensitive to the lethal effects of calicheamicin. Table 4 shows the results of these evaluations based on the calicheamicin equivalence and

| | | | BINDING AFFINITIES OF CMC-544 MADE BY USING CMA-676 AND CMC-544 CONJUGATION PROCEDURES | | |
|---|---|---|---|---|---|
| Anti-CD22 antibody | $K_D$(M) | $K_A$(1/M) | $k_d$(1/s) | $k_a$(1/Ms) | Percent LCF |
| Humanized G5/44 | $1.30 \times 10^{-10}$ | $7.90 \times 10^9$ | $2.80 \times 10^{-5}$ | $2.20 \times 10^5$ | 100 |
| CMC-544 (21 µg/mg) (CMA-676 procedure) | $1.20 \times 10^{-10}$ | $8.10 \times 10^9$ | $6.10 \times 10^{-5}$ | $4.90 \times 10^5$ | 25 |
| CMC-544 (87 µg/mg) (CMC-544 procedure) | $1.50 \times 10^{-10}$ | $6.60 \times 10^9$ | $6.90 \times 10^{-5}$ | $4.60 \times 10^5$ | 3.3 |

US 8,153,768 B2

**37**

Table 5 shows these results expressed as the concentrations of conjugated antibody protein. CD22-mediated delivery of calicheamicin to the CD22$^+$ cells was at least 10 times more efficient in killing the target cells than the unconjugated drug itself. The isotype-matched control conjugate (CMA-676) showed cytotoxicity that was either less than or similar to the unconjugated calicheamicin derivative. It is apparent from Table 4 that conjugate made by the CMC-544 conjugation process can generate equivalent cytotoxic effect at lower antibody concentrations than conjugate made by the CMA-676 conjugation process.

TABLE 4

GROWTH INHIBITION BY CONJUGATED CALICHEAMICIN
(IC$_{50}$ Pm Of Calicheamicin)

| B-CELL LYMPHOMA LINES | CMC-544 PROCESS CMC-544 LOADING: 65 µG/MG | CMA-676 PROCESS CMC-544 LOADING: 35 µG/MG | NEGATIVE CONTROL CMA-676 LOADING: 35 µG/MG | N-ACETYL GAMMA CALICHEA-MICIN DMH |
|---|---|---|---|---|
| RL | | | | |
| #1 | 6 | 30 | 600 | 226 |
| #2 | 12 | 40 | 400 | 270 |
| Daudi #1 | 21 | 80 | 1886 | 260 |
| Raji | | | | |
| #1 | 500 | ND* | 2800 | 460 |
| #2 | 560 | 520 | 4100 | 490 |
| Ramos | | | | |
| #1 | 200 | 130 | ND | 700 |
| #2 | 260 | ND | ND | 1000 |

*ND, not determined

TABLE 5

GROWTH INHIBITION BY CONJUGATED ANTIBODY
(IC$_{50}$ µG/ML OF ANTIBODY)

| B-CELL LYMPHOMA LINES | CMC-544 PROCESS CMC-544 LOADING: 65 µG/MG | CMA-676 PROCESS CMC-544 LOADING: 35 µG/MG | NEGATIVE CONTROL CMA-676 LOADING: 35 µG/MG | ANTI-BODY CONTROL G5/44 |
|---|---|---|---|---|
| RL | | | | |
| #1 | 0.09 | 0.86 | 17.14 | >100 |
| #2 | 0.18 | 1.14 | 11.43 | >100 |
| Daudi #1 | 0.32 | 2.29 | 53.89 | >100 |
| Raji | | | | |
| #1 | 7.69 | ND* | 80.00 | >100 |
| #2 | 8.62 | 14.86 | 117.14 | >100 |
| Ramos | | | | |
| #1 | 3.08 | 3.71 | ND | >100 |
| #2 | 4.00 | ND | ND | >100 |

*ND, not determined

In Vivo Cytotoxicity. CMC-544 made by the CMC-544 process was further evaluated in B-cell lymphoma xenografts. In these studies, two B-cell lymphoma tumors, RAMOS and RL, were used. RL lymphoma is a non-Burkitt's NHL-derived cell line whereas RAMOS was originally derived from a Burkitt's lymphoma. In a representative experiment shown in FIG. **18**, CMC-544 and its murine antibody counterpart were shown to be efficacious in inhibiting, in a dose-dependent manner, the growth of RAMOS B-cell lymphoma.

**38**

The conjugate of the humanized antibody was shown to be more potent than its murine counterpart. In this study, the lowest dose of calicheamicin conjugate capable of causing significant growth inhibition of lymphoma was 10 µg/kg of conjugated NAc-gamma calicheamicin DMH. In contrast, the unconjugated antibody, G5/44, at 10 mg/Kg administered intraperitoneal on a similar schedule as conjugates had no effect on tumor growth.

Similar studies were carried out using the RL lymphoma model. Table 6 shows the combined analyses of three independent experiments in which the anti-tumor effects of CMC-544 were assessed on RL NHL tumors staged to 300-400 mg in size in nude mice. CMC-544 in a dose-dependent manner caused tumors to regress over a 3-week time frame. The minimally effective dose of CMC-544 in the RL lymphoma model was established from statistical analyses of these studies to be 20 µg/kg based on calicheamicin content. There were no deaths in any of these three studies. Higher doses (60-320 µg/kg) of CMC-544 caused almost complete regression of RL lymphoma. Taken together, the results obtained with the two B-cell lymphoma models clearly demonstrate the capability of CMC-544 to cause tumor regression.

TABLE 6

ANTI-TUMOR EFFECT OF CMC-544 AGAINST RL NHL
XENOGRAFTS IN NUDE MICE

| CALICHEAMICIN DOSE µG/KG | MEAN RELATIVE TUMOR GROWTH[1] | % T/C[2] | P-VALUE VS VEHICLE[3] |
|---|---|---|---|
| Vehicle | 6.74 | — | — |
| 20 | 2.87 | 43 | 0.011 |
| 40 | 1.34 | 20 | <0.001 |
| 60 | 0.58 | 9 | <0.001 |
| 80 | 0.54 | 8 | <0.001 |
| 160 | 0.21 | 3 | <0.001 |
| 320 | 0.10 | 1 | <0.001 |

[1]Relative tumor growth (RTG) computed as (tumor mass at Week 3/tumor mass on Day 1) for each animal.
[2]100*(mean RTG for CMC-544 dose/mean RTG for the vehicle group)
[3]p-value from one-sided t-test comparison of CMC-544 vs. vehicle, using rank-transformed RTG as the response variable, Error term for all t-tests based on the pooled variance, S², across all treatment groups (S² = 154.54).

The ability of CMC-544 made by the new procedure to inhibit growth of large established B-cell lymphoma xenografts using both the RAMOS and RL lymphoma models was also investigated. The tumors were allowed to grow and staged to 1.5 or 2 g of tumor mass after which CMC-544 or an isotype-matched negative control conjugate (CMA-676) were administered intraperitoneally at the dose of 160 µg/Kg of conjugated calicheamicin keeping the original schedule of dosing on days 1, 5 and 9. The same schedule of dosing was shown earlier to cause long lasting regression of small staged tumors (see Table 6). As shown in FIG. **19**, administration of CMC-544 to large RAMOS lymphoma-bearing mice caused gradual regression of the preexisting lymphoma mass and by day 20, 3 out of 4 tumor-bearing mice were tumor-free. Monitoring these tumor-freed mice up to day 50 did not indicate any re-growth of regressed RAMOS lymphoma. In contrast, an isotype matched control, CMA-676, had no effect on the tumor growth. Four out of five CMA-676-treated large tumor-bearing mice had to be sacrificed before day 15 because their tumor burden reached close to 15% of their body weight.

A similar experiment using CMC-544 was carried out in the RL lymphoma model. Intraperitoneal administration of CMC-544 at a dose of 160 µg/kg on a similar schedule as described before caused >90% regression of the pre-existing

US 8,153,768 B2

39

mass of RL lymphoma within 30 days. However by day 45, 2 mice in this group with shrunken lymphomas showed regrowth of the tumors. These results indicate that CMC-544 is able to cause regression of small, as well as large, established lymphomas. In a small number of studies not shown here, RL lymphomas that re-grew sporadically after the initial CMC-544-induced regression were retreated with CMC-544 again. These studies showed that the RL tumors were still responsive to the second course of the treatment with CMC-544 and regressed again. Thus, the treatment with CMC-544 can be effective against both small and large masses of B-cell lymphomas with the potential for repeat therapy.

II. In Vivo Comparison of Conjugate Made with CMA-676 and CMC-544 Conjugation Processes

FIG. **20** shows the results of a representative experiment in which staged RL lymphoma-bearing mice received two different doses (80 and 320 µg/kg of conjugated calicheamicin) of CMC-544 made using the CMA-676 conjugation process and the CMC-544 conjugation process using the standard dosing schedule. The observed anti-tumor efficacy was dose-dependent as expected and there was no difference in the efficacies of either of the two CMC-544 preparations. In contrast, unconjugated N Acetyl-gamma calicheamicin DMH administered intraperitoneally at 160 µg/kg was inactive. However, it should be emphasized that for each dose of conjugated calicheamicin, the quantity of antibody protein administered in the form of a conjugate was four times higher for CMC-544 made by the CMA-676 process versus that made by the CMC-544 process. Since the calicheamicin content of the targeted conjugate is primarily responsible for causing the anti-tumor effect, it is possible to deliver the required quantity of calicheamicin via the conjugate made by the new procedure using much smaller quantities of the targeting antibody. The increased loading of the conjugate made by the CMC-544 process is, in effect, due to the lack of significant amounts of the low conjugated fraction (LCF).

III. Treatment of Rituximab (Rituxan™)-Resistant Tumors

The next question to be explored was whether the B-cell lymphomas grown after the discontinuation of the commercially available, anti-CD20 rituximab (Rituxan™) treatment would still responsive to the CMC-544 treatment. To this end, developing (unstaged) RL lymphomas were treated with rituximab (Rituxan™) for three weeks. As long as the rituximab (Rituxan™) therapy was continued, the growth of RL lymphoma was inhibited. Upon cessation of rituximab (Rituxan™) therapy, RL lymphomas grew rapidly to the size of ~1 g mass at which time they were treated with CMC-544 at the intraperitoneal dose of 160 µg/Kg. As shown in FIGS. **21** and **22**, these RL lymphomas were still responsive to CMC-544 with 80% of mice becoming tumor-free by day 60. Thus, CMC-544 is able to cause regression of B-cell lymphomas with three doses that could only be inhibited by the continuous dosing of rituximab (Rituxan™).

Example 7

In Vitro and In Vitro Effect of CMC-544

I. Binding and Toxicity Studies

CMC-544 was evaluated for its binding to CD22 and also for its activity in in vitro and in vivo models. CMC-544 was also compared to CMA-676, an isotype-matched control conjugate of hP67.6 (IgG4) with AcBut linked calicheamicin, and to rituximab (Rituxan™), a chimeric IgG1 anti-CD 20 mAb, (IDEC Pharmeceuticals, San Diego, Calif.), which is commercially available and was purchased from Medworld Pharmacy (Chestnut Ridge, N.Y.). The following antibodies

40

were used in the G5/44 binding domain studies: BU12 (Celltech, Slough, UK); BLCAM, HD239 (Santa Cruz Biotech, Santa Cruz, Calif.); RFB-4 (Ancell Corp, Bayport, Minn.); SHCL-1, Leu 14 (Becton Dickinson, Franklin Lakes, N.J.); 4 KB128 and To 15 (Dako Corp, Carpinteria, Calif.); M6/13 and M5/44 (Celltech, Slough, UK). Additional antibodies used in the blocking studies were SJ10 (Immunotech, Fullerton, Calif.) and M17.1.1, M19.1.1, M38.1.1 (Celltech, Slough, UK). Cell lines for the studies including Burkitt's lymphoma cell line Ramos (CRL-1923) and the Non-Hodgkin's lymphoma (NHL) cell line RL (CRL-2261) were all obtained from the American Type Culture Collection. The cell lines were determined to be mycoplasma free by a polymerase chain reaction mycoplasma detection assay (ATCC, Manassas, Va.). The cell lines were maintained as suspension cultures in RPMI medium plus 10% FBS, 10 mM HEPES, 1 mM sodium pyruvate, 0.2% glucose, Penicillin G sodium 100 U/ml, and streptomycin sulfate 100 µg/ml.

Whether or not G5/44 can inhibit the binding of murine mAbs of known specificity to CD22 was evaluated by BIAcore analysis using Fc-CD22 immobilized to a BIAcore CM5 chip. The surface plasmon resonance units (RU) obtained with and without prior saturation of the immobilized Fc-CD22 with G5/44 were compared. Biomolecular interaction analysis was performed using a BIACORE 2000. Antibodies were passed over a blank control surface (flowcell 1, serves as a control, no protein was coupled) and the test surface of Fc-CD22 (flowcell 2) immobilized on a CM5 sensor chip via amine coupling chemistry to a level of 9,042 RU. The resultant sensorgram was the response (RU) on flowcell 2 minus the response (RU) on flowcell 1. A second sensorgram was obtained by first saturating the flowcells with G5/44 (100 µg/ml) before the introduction of murine mAbs against CD22 that had been previously characterized for their binding. Immediately upon measuring the G5/44 response, murine anti-CD22 mAbs were individually perfused without removing G544. The second combined response generated due to the binding of murine anti-CD22 mAb to G5/44-coated CD22 was also recorded. If the murine antibody bound to CD22 at sites unrelated to those occupied by G5/44, then the combined responses would be additive. If the binding of G5/44 to CD22 interfered with or prevented the binding of the second antibody, then the combined responses would not be additive. Each of the second combined measurements were corrected for the "off-rate" of the G5/44:CD22 interaction.

G5/44 blocked the binding of only those antibodies that bound to epitope A/Ig-like domain 1 of CD22 (SHCL1 Leu 14 and HD239), indicating that G5/44 also binds in this domain of CD22. Antibodies that bind to epitope B/Ig-like domain 3 of CD22 (RFB-4), epitope C/Ig-like domain 4 of CD22 (To 15) and Ig-like domain 2 of CD22 (4 KB128), were not blocked by G5/44. These results indicate that G5/44-binding site on CD22 is located on the first Ig-like domain because it prevents the binding of those anti-CD22 mAbs that recognize the first Ig-like domain of CD22 (epitope A). Another anti-CD22 antibody, M6/13 (Celltech, Slough, UK), of unknown subspecificity was also blocked by G5/44 (Celltech, Slough, UK), thus mapping the binding site of M6/13 to epitope A/Ig-like domain 1 of CD22. The antibody M5/44, the murine parent of G5/44 that has the same specificity as G5/44, inhibits the binding of G5/44, and serves as a positive control. Anti-CD19 antibody BU12 serves as a negative control in these evaluations. The results are summarized in Table 7.

41
42

TABLE 7

BINDING OF MURINE ANTI-CD22 M/AB WITH DEFINED
SPECIFICITIES TO G544-PRETREATED FC-CD22. BINDING RESPONSE
EXPRESSED AS SURFACE PLASMON RESONANCE UNITES (RU)

| Antibody | Epitope Ig Domain of CD22 | Response 1 with G544 | Response 2 after 2nd Anti-CD22 mAb | Response 3 (Response 2-1) | Response 3 adjusted for "OFF" rate of G544 | Binding of 2nd mAb without G544 adjusted for background | Inhibition by G544 (%) |
|---|---|---|---|---|---|---|---|
| Anti CD22, SHCL-1 | A | 654.3 | 579.8 | −74.5 | 9 | 29.3 | 69 |
| Leu 14 | 1,2 | | | | | | |
| Anti CD22 HD239 | A 1 | 710.5 | 628.7 | −81.8 | 1.7 | 19.3 | 91 |
| Anti CD22 M 6/13 | ? ? | 710.0 | 652.7 | −57.3 | 262 | 152.4 | 83 |
| Anti CD22 RFB-4 | B 3 | 703.5 | 1108.5 | 405 | 488.5 | 534 | 9 |
| Anti CD22 4KB128 | ? 2 | 691.0 | 1343.5 | 652.5 | 736.0 | 738.8 | 0 |
| Anti CD22 To 15 | C 4 | 676.9 | 1163.6 | 486.7 | 570.2 | 614.6 | 7 |
| Anti CD22 M 5/44 | Positive control | 725.1 | 679.3 | −45.8 | 37.7 | 613.9 | 94 |
| Anti CD19 BU12 | Negative control | 686.2 | 602.7 | −83.5 | 0 | 0 | 0 |

Using murine mAbs of known binding specificities for individual domains to CD22, the ability of G5/44 to block the binding of these antibodies to B cells was investigated. Additionally, the ability of the mAbs to block the binding of G5/44 to B cells was also investigated. In these studies, $1 \times 10^5$ Ramos cells were first exposed to murine anti-CD22 antibody (10 µg/ml humanized G5/44 or mouse monoclonal anti-CD22) for 1 hour at 4° C. prior to the exposure of the cells to G5/44 (10 µg/ml). Cells were incubated for an additional 1 hour at 4° C. After the antibody treatments, B cells were pelleted and washed with PBS-1% BSA and the appropriate secondary antibody was added (either FITC-goat anti-human (heavy and light chain) or FITC-goat anti-mouse (heavy and light chain)) at 100 µl of a 1:100 dilution in PBS-1% BSA for 30 minutes at 4° C. Cells were again pelleted, washed, and resuspended in PBS-1% BSA and added to a tube containing 250 µl of PBS-1% formaldehyde. Fluorescence intensity associated with cells was measured by flow cytometry using a BD FACSort flow cytometer.

The results showed that prior exposure of G5/44 to CD22+ B cells resulted in significant inhibition of the subsequent binding of anti-CD22 mAbs to B cells. In contrast, the binding of anti-CD22 mAbs RFB4, Tol5, HD239, and 4 KB to B cells was not inhibited by G5/44. The lack of significant inhibition of HD239 binding to B cells by G5/44 as detected by flow cytometry was unexpected, especially since the BIAcore analysis indicated that G5/44 can block the binding of HD239 to CD22. The lack of strong inhibition of HD239 binding by G5/44 may be explained based on the differences in their relative affinities for CD22. When the above murine anti-CD22 mAbs were examined for their ability to inhibit the binding of G5/44 to CD22+ B cells, SHCL1 and M6/13, but the not other anti-CD22 mAbs, inhibited the binding of G5/44. The binding epitopes of HD239 and SHCL1 have been mapped to the first Ig-like domain of CD22. However, the epitopes recognized by M6/13 or M5/44 have not been mapped. The blocking studies detailed above indicate that the above antibodies recognize epitopes located on the first Ig-like domain of CD22, collectively known as epitope A.

Twenty thousand Ramos cells were incubated with various doses of CMC-544 with and without rituximab (Rituxan™) for 96 hours. After 96 hours, cell viability was measured by propidium iodide exclusion analyzed by flow cytometry. The mean viability of 3 to 6 wells was calculated and the dose response inhibition of cell viability was calculated for the various treatments. The background response inhibition of cell viability was calculated from a zero concentration of CMC-544. Logistic regression was used to test whether CMC-544 caused a statistically significant dose-dependent inhibition of Ramos cell growth over the dose range of 0.01 to 3 ng calicheamicin DMH/ml. Logistic regression was also used to determine whether the interaction of CMC-544 with rituximab (Rituxan™) was statistically significant. Median inhibitory concentrations ($IC_{50}$) were also computed and the effectiveness of each treatment relative to the treatment with CMC-544 alone was recorded. The statistical analysis was conducted using the PROBIT procedure in SAS version 8.2.

The results of the study showed that CMC-544 caused a dose-dependent inhibition of Ramos cell growth over the dose range of 0.01 to 3 ng calicheamicin DMH/ml. The median inhibitory concentration ($IC_{50}$) of CMC-544 alone was 0.029 ng/ml. The concentrations of 2, 20, and 200 µg/ml of rituximab (Rituxan™) were added to CMC-544 treated cells to determine whether the interaction of rituximab (Rituxan™) with the cytotoxicity activity of CMC-544 is statistically significant. Rituximab (Rituxan™), added at 20 and 200 µg/ml without CMC-544, had no significant effect on cell growth by itself (111.7% and 94.0% of vehicle growth, respectively). In combination with CMC-544, all three con-

US 8,153,768 B2

43

44

centrations of (Rituxan™) produced statistically significant (p<0.05) shifts to the left in the slope and intercept of the CMC-544 dose-response curve. The combination with 2 and 200 µg/ml of rituximab produced the largest shifts in the dose-response curves. These 2 curves were not statistically different from each other but were significantly different (p<0.05) from the 20 µg/ml dose combination. A second study (results not reported) confirmed the results observed in the first study. The median inhibitory concentrations for the combinations of 2, 20, and 200 µg/ml of rituximab (Rituxan™) plus CMC-544 are 0.0072, 0.0081, and 0.0072 ng/ml, respectively. The median inhibitory concentrations of CMC-544 plus rituximab (Rituxan™) are approximately four-fold more potent than the $IC_{50}$ of CMC-544 alone.

II In Vivo Anti-Tumor Activity Subcutaneous Xenografts and Systematically Disseminated B-Cell Lymphomas in SCID Mice

Female, athymic nude mice, 18-22 g, were given total body irradiation (400 rads). Irradiation further suppressed the immune system of the mice to enhance tumor take. Three days after irradiation, mice were injected subcutaneously with 107 RL cells in Matrigel (Collaborative Biomedical Products, Belford, Mass., diluted 1:1 in RPMI medium) in the dorsal, right flank. When the tumors reached the appropriate size, (0.3 g, typically 21 days later), CMC-544, rituximab (Rituxan™) or CHOP therapy (see below) was administered in sterile saline, 0.2 ml/mouse ip. The initial day of drug administration was considered day 1. Two additional doses were given on days 5 and 9 (treatment=q4Dx3). CHOP therapy consisted of cyclophosphamide (C), (Cytoxan™, Bristol-Meyers Squibb Co., Princeton, N.J.) 40 mg/kg ip; doxorubicin HCl (H), (Sigma-Aldrich, Co., St Louis, Mo.) 3.3 mg/kg ip; vincristine (O), (GensiaSicor Pharmaceuticals, Irvine, Calif.) 0.5 mg/kg ip; and prednisone (P), (Roxane Labs., Columbia, Ohio) 0.2 mg/kg po. CHO was administered according to the same dosing schedule as both CMC-544 and rituximab (Rituxan™) (q4Dx3) while prednisone was administered orally every other day for 5 doses (q2Dx5). Tumors were measured at least once a week and calculated as tumor mass (g)=0.5 (tumor width/2)(tumor length). Group means. SEM were calculated and compared to the vehicle-treated group for statistical significance using multiple T-tests. Group means were recorded up to 50 days or until either a mouse died (which disrupted the group mean) or the tumor grew too large (>3.5 g) and the mouse had to be euthanized. After this time, tumor mass was reported only for each individual mouse in all treatment groups. The number of tumor free mice at the end of each study for each treatment group was also recorded.

To determine the effect of CMC-544 alone or in combination with other bioactive agents on disseminated lymphomas,

the SCID mouse model was used. Male, SCID mice (CB17 SCID), 20-25 g, were injected with 106 Ramos cells through the tail vein (0.2 ml). Either 3 or 9 days after cell injection, the mice were administered vehicle, conjugates (CMC-544 or CMC-676), or rituximab (Rituxan™), ip, for a total of 3 doses. For the day 3 treatment schedule, mice were dosed on days 3, 7, and 11. For the day 9 treatment schedule, mice were dosed on days 9, 13 and 17. In the day 9 treatment schedule, combinations of CMC-544 and rituximab (Rituxan™) were also given as described below. Mice were monitored daily for the presence of hind limb paralysis at which time they were killed. Seven to 10 mice per treatment group were used. The group average survival time (±SD), median, minimum, and maximum survival times were all calculated. The difference in survival distribution between groups was determined by using a nonparametric Log-rank test with significance reported at the 0.05 level. The survival curves were constructed using the Kaplan-Meier method.

The initial study examined the effect of two different dosing schedules on survival times of the SCID mice with the disseminated lymphoma. The first study looked at initiating drug dosing 3 days after the tumor cells were injected intravenously (developing model), while the second study delayed drug dosing until 9 days post tumor cell injection (established model). In each study, CMC-544 (160 µg/kg), CMA-676 (160 µg/kg), or rituximab (Rituxan™) (20 mg/kg) were administered 3 doses ip, 4 days apart (Q4Dx3). In the developing model, vehicle-treated mice had an average survival time of 27 days (FIG. 23, Table 8). CMA-676, the isotype-matched control for CMC-544, did not increase survival time significantly (p>0.05). CMC-544 significantly increased survival time to 41 days while rituximab had a profound effect, increasing survival time to >125 days (significantly greater than CMC-544, p<0.05). Delaying drug dosing until the tumor cells had an opportunity to circulate (homing) and deposit in the target tissues (established model) changed the results for CMC-544 and rituxumab (Rituxan™). CMA-676 again had no significant effect on survival times (FIG. 24, Table 8). Rituximab (Rituxan™) increased the average survival time to 62.6 days while CMC-544 improved the average survival time to 83.5 days. There was no significant difference between the effects of CMC-544 and rituximab (Rituxan™) in the established model.

TABLE 8

| DESCRIPTIVE MEASURES OF SURVIVAL TIMES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Study | Compound | Average Survival Time | Median Survival time | Standard Deviation | Minimum Survival Time | Maximum Survival time | Number of Animals |
| Developing Model | CMA-676 | 32.9 | 34.0 | 3.9 | 28.0 | 36.0 | 7 |
| | CMC-544 | 41.0 | 38.0 | 10.1 | 32.0 | 60.0 | 7 |
| | Rituximab | 128.4 | >130.0 | 4.7 | 119.0 | >130.0 | 7 |
| | Vehicle | 27.2 | 28.0 | 1.4 | 25.0 | 28.0 | 8 |
| Established Model | CMA-676 | 33.7 | 31.0 | 4.6 | 30.0 | 42.0 | 7 |
| | CMC-544 | 83.5 | 76.5 | 41.6 | 34.0 | >130.0 | 8 |
| | Rituximab | 62.6 | 37.0 | 46.2 | 31.0 | >130.0 | 7 |
| | Vehicle | 30.5 | 29.0 | 3.6 | 27.0 | 36.0 | 8 |

A preliminary study was conducted to determine if rituximab (Rituxan™) had any effect, either positive or negative, on the survival response of CMC-544. CMC-544 (160 µg/kg) was administered with and without rituximab (Rituxan™) (20 mg/kg, labeled the high dose drug combination (HD)). In addition, lower doses of CMC-544 (80 µg/kg) were co-administered with lower doses of rituximab (Rituxan™) (10 mg/kg). The compounds were not given separately at the

US 8,153,768 B2

45

respective 80 μg/kg or 10 mg/kg doses due to the limited number of mice in the study. This combination, CMC-544 (80 μg/kg) with rituximab (Rituxan™) (10 mg/kg), was labeled the medium dose combination (MD) and was run to determine the feasibility of lower dose combinations of drugs on SCID mouse survival. CMC-544 (160 μg/kg) and rituximab (Rituxan™) (20 mg/kg), administered alone, performed as reported in the established model above. Each prolonged average survival times to 58.5 and 50.5 days, respectively (FIG. 25, Table 9). In combination, the average survival time was slightly (though not statistically significant, p>0.05) improved to 64.4 days for the high-dose combination. The medium dose combination of 80 μg/kg CMC-544 and 10 mg/kg rituximab (Rituxan™) significantly improved (p<0.05 vs vehicle-treated) survival time to an average of 92.4 days. These results suggested that lower dose combinations of CMC-544 and rituximab (Rituxan™) were warranted.

TABLE 9

DESCRIPTIVE MEASURES OF SURVIVAL TIMES FOR INITIAL COMBINATION STUDY

| Compound | Average Survival time | Median Survival Time | Standard Deviation | Minimum Survival time | Maximum Survival Time | Number of Animals |
|---|---|---|---|---|---|---|
| CMC MD + Ritux MD | 92.4 | >100.0 | 16.0 | 62.0 | >100.0 | 10 |
| CMC HD + Ritux HD | 64.4 | 58.5 | 26.7 | 29.0 | >100.0 | 10 |
| CMC-544 | 58.5 | 34.5 | 35.8 | 27.0 | >100.0 | 10 |
| Rituximab | 50.5 | 41.0 | 26.4 | 30.0 | >100.0 | 10 |
| Vehicle | 31.0 | 27.0 | 9.7 | 27.0 | 56.0 | 9 |

CMC MD = CMC544 medium dose, 80 μg/kg
CMC HD = CMC544 high dose, 160 μg/kg
Ritux MD = Rituximab medium dose, 10 mg/kg
Ritux HD = Rituximab high dose, 20 mg/kg

A further combination study with CMC-544 and rituximab (Rituxan™) was conducted. The following treatment groups were run: CMC-544 at 40, 80 and 160 μg/kg; rituximab (Rituxan™) at 5, 10, and 20 mg/kg; and CMC-544 at 40 μg/kg plus rituximab (Rituxan™) 5 mg/kg, CMC-544 at 80 μg/kg plus rituximab (Rituxan™) 10 mg/kg, and CMC-544 at 160 μg/kg plus rituximab (Rituxan™) 20 mg/kg. All doses of rituximab (Rituxan™) slightly improved average survival time to the range of 33-40 days, (all doses p<0.05 compared with the vehicle-treated average survival time of 25.8, FIG. 26, Table 10). The CMC-544 high dose, 160 μg/kg, improved average survival time to 85 days, consistent with the results reported in the earlier two studies. Combining CMC-544 with rituximab (Rituxan™) made no significant improvement in the survival times (FIG. 27, Table 10). The two lower doses of CMC-544 (80 and 40 μg/kg) each significantly improved (p<0.05) average survival times above that of the high dose CMC-544. For the 40 and 80 μg/kg doses of CMC-544, 90% and 80% of the mice, respectively, were still surviving at 125 days. Both drug combination groups had 100% of the mice survive until day 125. Lower doses of CMC-544 are more efficacious than the high dose of 160 μg/kg.

Rituximab (Rituxan™), in combination with CMC-544, had no obvious effect on CMC-544's activity in the disseminated B-cell model in SCID mice at the doses tested (see above). Whether CMC-544, co-administered with rituximab (Rituxan™), resulted in either enhancement or inhibition of anti-tumor activity was also evaluated using the subcutaneous RL B lymphoma xenograft model in Balb/c nude mice. In the subcutaneous B lymphoma model, tumors were staged to an

46

average tumor mass of 300 mg after which the two therapeutics under study were administered IP. CMC-544 was used at 20 or 80 μg/kg Q4Dx3 with or without rituximab (Rituxan™) (20 mg/kg Q4Dx3). The co-administration of rituximab (Rituxan™) neither enhanced nor inhibited significantly (p>0.05) the therapeutic efficacy of CMC-544 (FIG. 28). Rituximab (Rituxan™), administered alone, inhibited RL B lymphoma growth (57% inhibition of tumor growth at day 20, p<0.05 vs vehicle-treated) in this study, similar to that observed with the lower dosage of CMC-544.

The combination chemotherapeutic regimen CHOP (cyclophosphamide, doxorubicin, vincristine, and prednisone) is the most commonly used treatment modality for non-Hodgkin lymphoma patients. The anti-tumor effect of CHOP was compared with that of CMC-544 in established RL B lymphoma xenografts. Individual components of the CHOP regimen were used at their respective maximum tolerated doses assessed in nude mice (data not reported) and were as follows: Cyclophosphamide (C) 40 mg/kg IP, doxorubicin (H) 3.3 mg/kg IP, vincristine (O) 0.5 mg/kg IP, and prednisone (P) 0.2 mg/kg PO. CHO were administered Q4Dx3 and P was administered P0, Q2Dx5. CMC-544 was administered IP, Q4Dx3 at a dosage of 160 μg/kg calicheamicin equivalents. The CHOP treatment initially caused a significant inhibition of the RL B lymphoma growth (FIG. 29). However, 3 weeks later, tumors re-grew with similar growth rates as the vehicle-treated group. In contrast, the antitumor effect of CMC-544 was complete and lasted throughout the experimental period. These results suggest that CMC-544, at a dose significantly lower than the maximum nonlethal dose in nude mice, was more efficacious than the CHOP combination therapy.

These studies showed that rituximab (Rituxan™), added to CMC-544 caused a significant increase in CMC-544's cytotoxic activity observed with Ramos B lymphoma cells. A synergistic interaction in Ramos cells for rituximab (Rituxan™) and glucocorticoids was also recently reported. Additionally, a synergistic growth inhibition in 4 of 8 additional cell lines was observed with rituximab (Rituxan™) when given in combination with 10 μM dexamethasone.

Rituximab (Rituxan™) by itself, 0.4 to 10 μg/ml, was reported to cause a significant, though small (18% maximum) inhibition of Ramos cell growth. Additionally, it was active in 6 of 8 B-cell non-Hodgkin lymphoma cell lines when incubated at 10 μg/ml (48 h incubation). Ghetie et al, showed that rituximab (Rituxan™), 10 μg/ml, caused a 6.2% increase in apoptosis (versus 3.5% in vehicle-treated cells) after 24 hours incubation with Ramos cells. In the current studies, rituximab

US 8,153,768 B2

47

(Rituxan™), at doses 20 and 200 μg/ml had no effect on Ramos cell growth when administered alone. In mice, there was no evidence of any interaction between CMC-544 and rituximab (Rituxan™) in either the disseminated model or the subcutaneous xenograft model. The drug combinations tested did not interfere with each other's effects nor enhance them. Whether reducing the doses of each drug in the disseminated model will change this observation needs to be determined.

The disseminated B-cell lymphoma model with Ramos cells has been described by Flavell et al. Median survival times for vehicle-treated mice were reported to be 34-36 days. Mice developed hind-limb paralysis and progressed to becoming moribund, dying soon after. Histological analysis of the organs revealed that the most commonly involved organs were the adrenal gland, spleen and sub-arachnoid space. The sub-arachnoid space infiltrate frequently extended into the brain. Rituximab (Rituxan™) performed well when administered in the early phase of the disease process for the disseminated SCID mice (FIG. **23**), but was less impressive when administered at day 9 in the established phase of the model (FIG. **24**). Rituximab (Rituxan™), being of the IgG1 isotype, most likely works through the mouse host effector mechanisms. These mechanisms include complement-mediated cytotoxicity and/or antibody dependent cellular cytotoxicity through recruitment of natural killer cells that are present in SCID mice. The injected Ramos tumor cells are probably more susceptible early on to the host immune

48

Calicheamicin conjugated G5/44 (CMC-544) behaved in the opposite fashion than rituximab (Rituxan™), producing better results when administered in the established phase of the disease. The reason for CMC-544 performing better in the established phase is not clear, but the established phase more closely represents the clinical situation. CMA-676, the isotype matched, nonbonding control conjugate, did no have any significant effects on the average survival times. The results in the disseminated SCID model clearly suggest that the doses of CMC-544 need to be reduced to determine the maximum efficacious dose (MED). The 160 μg/kg dose was less active than the lower doses of 80 and 40 p/kg. It is not clear why this is so but the 160 μg/kg dose may be well over the MED. Further studies are planned to address this issue.

Mohammad et al., used CHOP therapy (Cyclophosphamide (C) 40 mg/kg IV, doxorubicin (H) 3.3 mg/kg IV, vincristine (O) 0.5 mg/kg IV, and prednisone (P) 0.2 mg/kg PO) in a model of subcutaneous xenografts with a diffuse large cell lymphoma cell line, DLCL. The doses used for the CHOP therapy were determined to be their maximum tolerated dose. Therapy, CHO given once IV and P, given daily for 5 days, was rated 'active', producing a T/C of 25.8%. No tumor cures were recorded. The results in the model described by Mohammad et al., appear similar to those observed with CHOP therapy (administered IP, Q4Dx3) in the RL model described herein. In neither study did CHOP produce long-term cures, unlike CMC-544.

TABLE 10

DESCRIPTIVE MEASURES OF SURVIVAL TIME FOR COMBINATION STUDIES

| Treatment | Average Survival Time | Median Survival Time | Standard Deviation | Minimum Survival Time | Maximum Survival Time | Number of Animals |
|---|---|---|---|---|---|---|
| CMC-544 40 μg/kg | 118.90 | 125.00 | 19.29 | 64.00 | 125.00 | 10 |
| CMC LD + Ritux LD | 125.00 | 125.00 | 0.00 | 125.00 | 125.00 | 10 |
| CMC-544 80 μ/kg | 118.22 | 125.00 | 17.86 | 71.00 | 125.00 | 9 |
| CMC MD + Ritux MD | 125.00 | 125.00 | 0.00 | 125.00 | 125.00 | 10 |
| CMC-544 160 μg/kg | 85.22 | 82.00 | 40.37 | 35.00 | 125.00 | 9 |
| CMC HD + Ritux HD | 91.30 | 100.00 | 36.31 | 44.00 | 125.00 | 10 |
| Rituximab 5 mg/kg | 40.70 | 36.50 | 9.57 | 34.00 | 64.00 | 10 |
| Rituximab 10 mg/kg | 33.80 | 34.00 | 3.26 | 29.00 | 41.00 | 10 |
| Rituximab 20 mg/kg | 40.50 | 34.00 | 15.45 | 31.00 | 82.00 | 10 |
| Vehicle | 25.80 | 25.00 | 3.12 | 22.00 | 34.00 | 10 |

CMC LD = CMC-544 low dose, 40 μg/kg
CMC MD = CMC-544 medium dose, 80 μg/kg
CMC HD = CMC-544 high dose, 160 μg/kg
Ritux LD = Rituximab low dose, 5 mg/kg
Ritux MD = Rituximab medium dose, 10 mg/kg
Ritux HD = Rituximab high dose, 20 mg/kg

mechanisms that are activated by rituximab (Rituxan™), before the cells have an opportunity to infiltrate into the affected organs. The unconjugated G5/44 antibody (the targeting molecule in CMC-544) had not yet been tested in the disseminated tumor model in SCID mice, but it had no effect when administered in subcutaneous xenografts. G5/44, being of the IgG4 isotype, would not be expected to activate the host effector mechanisms and, therefore, would not produce anti-tumor activity.

Example 8

Stable Formulations of CMC-544

Stable formulations of CMC-544 for in vivo administration were prepared by adding diluents, excipients, carriers and stabilizers. Following HIC chromatography, the chromatographic fractions are assayed by SEC-HPLC and multiwavelength UV analysis. Appropriate fractions were selected for

2

US 8,153,768 B2

51

TABLE 13

STABILITY AND PHYSICO-CHEMICAL OBSERVATIONS OF THE
CMA-676 AND CMC-544
FORMULATION LYOPHILIZED AND STORED AT 25° C.

| | CMA-676 FORMULATION | | CMC-544 Formulation | |
|---|---|---|---|---|
| Time | Initial | 4 weeks | Initial | 4 weeks |
| Physical Observation of Reconstituted Conjugates | Slightly turbid | Slightly turbid | Clear | Clear |
| PH | 7.5 | 7.5 | 7.8 | 7.8 |
| Total Protein (mg/mL) | 1.03 | 1.03 | 0.51 | 0.51 |
| Total Calicheamicin (µg/mg of protein) | 67 | 67 | 57 | 57 |
| Unconjugated Calicheamicin (µg/mg of protein) | 1.13 | 1.03 | 1.03 | 0.94 |
| % Aggregates | 2.63 | 2.96 | 1.49 | 2.09 |

All references and patents cited above are incorporated herein by reference. Numerous modifications and variations of the present inventions are included in the above-identified specification and are expected to be obvious to one of skill in the art. Such modifications and alterations to the conjugation process, the conjugates made by the process, and to the compositions/formulations comprising conjugates are believed to be encompassed within the scope of the claims.

BIBLIOGRAPHY

1. G. Kohler and Milstein, C., Nature, 256:495 (1975).
2. T. G. Hose and Blair, A. H. CRC Critical Rev. Drug Carrier Systems 3:263 (1987).
3. U.S. Pat. No. 5,877,296
4. U.S. Pat. No. 5,773,001
5. U.S. Pat. No. 5,714,586
6. U.S. Pat. No. 5,712,374
7. U.S. Pat. No. 5,053,394
8. J. Tramontano; et al., J. Mol. Recognit. 7:9 (1994).
9. H. McConnell and Hoess., J., J. Mol. Biol. 250:460 (1995).
10. Nord et al., Nat Biotechnol. 15:772 (1997).
11. Nord et al., Protein Eng. 8:601 (1995).
12. Ku and Schultz, Proc. Natl. Acad. Sci., USA 92:6552 (1995).
13. Markand et al., Biochemistry 35:8045 (1996).
14. Markand et al., Biochemistry 35:8098 (1996).
15. Rottgen and Collins, Gene 164:243 (1995).
16. Wang et al, J. Biol. Chem., 270:12250 (1995).
17. I.D. Bernstein et al., J. Clin. Invest. 79:1153 (1987).
18. I.D. Bernstein et al., J. Immunol. 128:867-881 (1992).
19. Kabat et al. Seqencing. of Proteins of Immunological. Interest, 1:310-334 (1994).
20. PCT publication No. WO 91/09967.
21. Yang et al, J. Mol. Biol., 254, 392-403 (1995).
22. Low et al., J. Mol. Biol., 250, 359-368 (1996).
23. Patten et al., Curr. Opin. Biotechnol., 8, 724-733, (1997).
24. Thompson et al., J. Mol. Biol., 256, 77-88, (1996).
25. Crameri et al., Nature, 391, 288-291, (1998).
26. U.S. Pat. No. 4,671,958
27. U.S. Pat. No. 4,970,198
28. U.S. Pat. No. 5,037,651
29. U.S. Pat. No. 5,079,233
30. U.S. Pat. No. 5,877,296
31. PCT publication No. WO 98/20734
32. Trail P and Bianchi A., Current Opin. Immunol. 11:584-588, (1999).

52

33. Dubowchik G. and Walker M., Pharmacol. & Therapeutics, 83:67-123 (1999).
34. Bross P. F., Beitz J., Chen G., Chen X. H., Duffy E., Keiffer-Bross P., Beitz J., Chen G., Chen X., Duffy E., Kieffer L., Roy S., Sridhara R., Rahman A., Williams G., Pazdur R., Clin. Cancer Res., 7:1490-1496 (2001).
35. Berger M., Leopold L., Dowell J., Korth-Bradley J., Sherman M., Invest. New Drugs; 20: 395-406 (2002).
36. Sievers E., Larson R., Stadmauer E., Estey E., Lowenberg B., Dombret H., Karanes C., Theobald M., Bennet J., Sherman M., et al., J. Clin. Oncol.; 19:3244-3254 (2001).
37. Larson R., Boogaerts M., Estey E., Karanes C., Stadtmauer E., Sievers E., Mineur P., Bennett J., Berger M., Eten C. et al. Leukemia; 16:1627-1636 (2002).
38. Hamann P., Hinman L., Beyer C., Kindh D., Upeslacis J., Flowers D., Bernstein I., Choice of Linker. Bioconj. Chem.; 13:40-46 (2002).
39. Hamann P., Hinman L., Hollander I., Beyer C., Lindh D., Holcomb R., Hallet W., Tsou H., Upeslacis J., Shochat D., et al., Bioconj. Chem.; 13:47-58 (2002).
40. Lee M., Dunne T., Chang C., Siegal M., Morton G., Ellestad G., McGahren W., Borders D., J. Am. Chem. Soc. 1992; 114:985-987 (1992).
41. Zein N., Sinha A., McGahren W., Ellestad G., Science; 240:1198-1201 (1988).
42. Thorson J., Sievers E., Ahlert J., Shepard E., Whitwam R., Onwueme K., Ruppen M., Current Pharmaceut. Design; 6:1841-1879 (2000).
43. Andrews R., Singer J., Bernstein I., J. Exp. Med.; 169: 1721-1731 (1989).
44. Kreitman R. J., Current Pharmaceut. Biotech.; 2:313-325 (2001).
45. Pastan I., Kreitman R. J., Current Opin. Investig. Drugs, 3(7):1089-1091 (2002).
46. Kreitman R. J., Curr. Opin. Mol. Ther.; 5:44-551 (2003).
47. Crocker P. R. and Varki A. Siglecs, Trends in Immunol.; 22:337-342 (2001).
48. Hursey M., Newton D. L., Hansen H. J., Ruby D., Goldenberg D. M., Rybak S. M., Leukemia and Lymphoma; 43:953-959 (2002).
49. Nitschke L., Floyd H., and Crocker P. R., Scand. J. Immunol.; 53:227-234 (2001).
50. Moyron-Quiroz J. E., Partida-Sanchez S., Donis-Hernandez R., Sandoval-Montes C. and Santos-Argumedo L., Scand. J. Immunol.; 55:343-351 (2002).
51. Tedder T. F., Tuscano J., Sato S., Kehrl J. H., Ann. Rev. Immunol.; 15:481-504 (1997).
52. Hanna R., Ong G. L., Mattes M. J., Cancer Res.; 56:3062-3068 (1996).
53. Shan D. and Press O. W., J. Immunol. 1995; 154:4466-4475 (1995).
54. Dowell J. A., Korth-Bradley J., Liu H., King S. P., Berger M. S., J. Clin. Pharmacol.; 41:1206-1214 (2001).
55. Gibaldi M., Perrier D., Pharmacokinetics, 2nd ed., Marcel-Dekker Inc., NY (1982).
56. Van Horssen P. J., Preijers, F. W., Van Oosterhout, Y. V., Eling W. M. and De Witte, T., Leukemia & Lymphoma; 39(5-6):591-599 (2000).
57. Hinman L. M., Hamann P. R., Wallace R., Menendez A. T., Durr F. E., Upeslacis J., Cancer Res. 53:3336-3342 (1993).

US 8,153,768 B2

**53**

58. Kreitman R. J., Wilson W. H., Bergeron K., Raggio M., Stetler-Stevenson M., Fitzgerald D. J., Pastan I., N. Engl. J. Med.; 345:241-247 (2001).

59. Leonard J. P. and Link B. K., Sem. Oncol. 29:81-86 (2002).

60. Schindler J., Sausville E., Messmann R., Uhr J. W. & Vitetta, E. S., Clin. Cancer Res., 7,255-258 (2001).

**54**

61. Vincent T. DeVita, Samuelo Hellman, Steven A. Rosenberg, Eds., Cancer Principles and Practice of Oncology, 6th Edition, Publishers: Lippincott, Williams and Wilkins (2001).

62. Edward Chu and Vincent T. DeVita, Physician's Cancer Chemotherapy Drug Manual, Publishers: Jones and Bartlett (2002).

```
                         SEQUENCE LISTING


<160> NUMBER OF SEQ ID NOS: 61

<210> SEQ ID NO 1
<211> LENGTH: 5
<212> TYPE: PRT
<213> ORGANISM: mouse
<220> FEATURE:
<223> OTHER INFORMATION: 5/44g CDR-H1
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 1


Asn Tyr Trp Ile His
1               5


<210> SEQ ID NO 2
<211> LENGTH: 17
<212> TYPE: PRT
<213> ORGANISM: mouse
<220> FEATURE:
<223> OTHER INFORMATION: mouse monoclonal 5/44 CDR-H2gL1 T3
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 2


Gly Ile Asn Pro Gly Asn Asn Tyr Thr Thr Tyr Lys Arg Asn Leu Lys
1               5                   10                  15

Gly


<210> SEQ ID NO 3
<211> LENGTH: 12
<212> TYPE: PRT
<213> ORGANISM: mouse
<220> FEATURE:
<223> OTHER INFORMATION: mouse monoclonal 5/44 CDR-H3
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 3


Glu Gly Tyr Gly Asn Tyr Gly Ala Trp Phe Ala Tyr
1               5                   10


<210> SEQ ID NO 4
<211> LENGTH: 16
<212> TYPE: PRT
<213> ORGANISM: mouse
<220> FEATURE:
<223> OTHER INFORMATION: mouse monoclonal 5/44 CDR-L1
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 4


Arg Ser Ser Gln Ser Leu Ala Asn Ser Tyr Gly Asn Thr Phe Leu Ser
1               5                   10                  15


<210> SEQ ID NO 5
<211> LENGTH: 7
<212> TYPE: PRT
```

<213> ORGANISM: mouse
<220> FEATURE:
<223> OTHER INFORMATION: mouse monoclonal 5/44 CDR-L2
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 5

Gly Ile Ser Asn Arg Phe Ser
1               5


<210> SEQ ID NO 6
<211> LENGTH: 9
<212> TYPE: PRT
<213> ORGANISM: mouse
<220> FEATURE:
<223> OTHER INFORMATION: mouse monoclonal 5/44CDR-L3
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 6

Leu Gln Gly Thr His Gln Pro Tyr Thr
1               5


<210> SEQ ID NO 7
<211> LENGTH: 113
<212> TYPE: PRT
<213> ORGANISM: mouse
<220> FEATURE:
<223> OTHER INFORMATION: mouse monoclonal 5/44g VL domain
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 7

Asp Val Val Val Thr Gln Thr Pro Leu Ser Leu Pro Val Ser Phe Gly
1               5                   10                  15

Asp Gln Val Ser Ile Ser Cys Arg Ser Ser Gln Ser Leu Ala Asn Ser
            20                  25                  30

Tyr Gly Asn Thr Phe Leu Ser Trp Tyr Leu His Lys Pro Gly Gln Ser
        35                  40                  45

Pro Gln Leu Leu Ile Tyr Gly Ile Ser Asn Arg Phe Ser Gly Val Pro
    50                  55                  60

Asp Arg Phe Thr Gly Ser Gly Ser Gly Thr Asp Phe Thr Leu Lys Ile
65                  70                  75                  80

Ser Thr Ile Lys Pro Glu Asp Leu Gly Met Tyr Tyr Cys Leu Gln Gly
                85                  90                  95

Thr His Gln Pro Tyr Thr Phe Gly Gly Gly Thr Lys Leu Glu Ile Lys
            100                 105                 110

Arg


<210> SEQ ID NO 8
<211> LENGTH: 121
<212> TYPE: PRT
<213> ORGANISM: mouse monoclonal 5/44 VH domain
<220> FEATURE:
<223> OTHER INFORMATION: mouse monoclonal 5/44 VH domain
<220> FEATURE:
<221> NAME/KEY:

US 8,153,768 B2

**57**                                                                    **58**

-continued

```
<400> SEQUENCE: 8

Glu Val Gln Leu Gln Gln Ser Gly Thr Val Leu Ala Arg Pro Gly Ala
1               5                   10                  15

Ser Val Lys Met Ser Cys Lys Ala Ser Gly Tyr Arg Phe Thr Asn Tyr
            20                  25                  30

Trp Ile His Trp Val Lys Gln Arg Pro Gly Gln Gly Leu Glu Trp Ile
        35                  40                  45

Gly Gly Ile Asn Pro Gly Asn Asn Tyr Thr Thr Tyr Lys Arg Asn Leu
    50                  55                  60

Lys Gly Lys Ala Thr Leu Thr Ala Val Thr Ser Ala Ser Thr Ala Tyr
65                  70                  75                  80

Met Asp Leu Ser Ser Leu Thr Ser Glu Asp Ser Ala Val Tyr Tyr Cys
            85                  90                  95

Thr Arg Glu Gly Tyr Gly Asn Tyr Gly Ala Trp Phe Ala Tyr Trp Gly
            100                 105                 110

Gln Gly Thr Leu Val Thr Val Ser Ser
        115                 120


<210> SEQ ID NO 9
<211> LENGTH: 13
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: cH
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 9

Gly Asn Asn Tyr Thr Thr Tyr Lys Arg Asn Leu Lys Gly
1               5                   10


<210> SEQ ID NO 10
<211> LENGTH: 13
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: N55Q
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 10

Gly Asn Gln Tyr Thr Thr Tyr Lys Arg Asn Leu Lys Gly
1               5                   10


<210> SEQ ID NO 11
<211> LENGTH: 13
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: T57A
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 11

Gly Asn Asn Tyr Ala Thr Tyr Lys Arg Asn Leu Lys Gly
1               5                   10


<210> SEQ ID NO 12
<211> LENGTH: 13
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: T57V
<220> FEATURE:
<221> NAME/KEY:
```

US 8,153,768 B2

**59**                                                                                          **60**

-continued

```
<400> SEQUENCE: 12

Gly Asn Asn Tyr Val Thr Tyr Lys Arg Asn Leu Lys Gly
1               5                   10


<210> SEQ ID NO 13
<211> LENGTH: 17
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: CDR-H2 (T57)A H'
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 13

Gly Ile Asn Pro Gly Asn Asn Tyr Ala Thr Tyr Lys Arg Asn Leu Lys
1               5                   10                  15

Gly


<210> SEQ ID NO 14
<211> LENGTH: 13
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: K60R
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 14

Gly Asn Asn Tyr Thr Thr Tyr Arg Arg Asn Leu Lys Gly
1               5                   10


<210> SEQ ID NO 15
<211> LENGTH: 17
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: CDR-H2 (K60R)R H''
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 15

Gly Ile Asn Pro Gly Asn Asn Tyr Thr Thr Tyr Arg Arg Asn Leu Lys
1               5                   10                  15

Gly


<210> SEQ ID NO 16
<211> LENGTH: 17
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: CDR-H2 (T57A K60R) H'''
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 16

Gly Ile Asn Pro Gly Asn Asn Tyr Ala Thr Tyr Arg Arg Asn Leu Lys
1               5                   10                  15

Gly


<210> SEQ ID NO 17
<211> LENGTH: 70
<212> TYPE: PRT
<213> ORGANISM: Homo sapien
<220> FEATURE:
<223> OTHER INFORMATION: DPK9
<220> FEATURE:
```

US 8,153,768 B2

**61**　　　　　　　　　　　　　　　　　　　　　　**62**

-continued

```
<221> NAME/KEY:

<400> SEQUENCE: 17

Asp Ile Gln Met Thr Gln Ser Pro Ser Ser Leu Ser Ala Ser Val Gly
1               5                   10                  15

Asp Arg Val Thr Ile Thr Cys Trp Tyr Gln Gln Lys Pro Gly Lys Ala
            20                  25                  30

Pro Lys Leu Leu Ile Tyr Gly Val Pro Ser Arg Phe Ser Gly Ser Gly
        35                  40                  45

Ser Gly Thr Asp Phe Thr Leu Thr Ile Ser Ser Leu Gln Pro Glu Asp
    50                  55                  60

Phe Ala Thr Tyr Tyr Cys
65                  70


<210> SEQ ID NO 18
<211> LENGTH: 11
<212> TYPE: PRT
<213> ORGANISM: Homo sapiens
<220> FEATURE:
<223> OTHER INFORMATION: JK1
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 18

Phe Gly Gln Gly Thr Lys Val Glu Ile Lys Arg
1               5                   10


<210> SEQ ID NO 19
<211> LENGTH: 113
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: gL1
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 19

Asp Val Gln Val Thr Gln Ser Pro Ser Ser Leu Ser Ala Ser Val Gly
1               5                   10                  15

Asp Arg Val Thr Ile Thr Cys Arg Ser Ser Gln Ser Leu Ala Asn Ser
            20                  25                  30

Tyr Gly Asn Thr Phe Leu Ser Trp Tyr Leu His Lys Pro Gly Lys Ala
        35                  40                  45

Pro Gln Leu Leu Ile Tyr Gly Ile Ser Asn Arg Phe Ser Gly Val Pro
    50                  55                  60

Asp Arg Phe Ser Gly Ser Gly Ser Gly Thr Asp Phe Thr Leu Thr Ile
65                  70                  75                  80

Ser Ser Leu Gln Pro Glu Asp Phe Ala Thr Tyr Tyr Cys Leu Gln Gly
                85                  90                  95

Thr His Gln Pro Tyr Thr Phe Gly Gln Gly Thr Lys Val Glu Ile Lys
            100                 105                 110

Arg


<210> SEQ ID NO 20
<211> LENGTH: 113
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: gL2
<220> FEATURE:
<221> NAME/KEY:
```

**JA2387**

US 8,153,768 B2

-continued

```
<400> SEQUENCE: 20

Asp Val Val Val Thr Gln Ser Pro Ser Ser Leu Ser Ala Ser Val Gly
1               5                   10                  15

Asp Arg Val Thr Ile Thr Cys Arg Ser Ser Gln Ser Leu Ala Asn Ser
            20                  25                  30

Tyr Gly Asn Thr Phe Leu Ser Trp Tyr Leu His Lys Pro Gly Lys Ala
        35                  40                  45

Pro Gln Leu Leu Ile Tyr Gly Ile Ser Asn Arg Phe Ser Gly Val Pro
    50                  55                  60

Asp Arg Phe Ser Gly Ser Gly Ser Gly Thr Asp Phe Thr Leu Thr Ile
65                  70                  75                  80

Ser Ser Leu Gln Pro Glu Asp Phe Ala Thr Tyr Tyr Cys Leu Gln His
                85                  90                  95

Thr His Gln Pro Tyr Thr Phe Gly Gln Gly Thr Lys Val Glu Ile Lys
            100                 105                 110

Arg


<210> SEQ ID NO 21
<211> LENGTH: 80
<212> TYPE: PRT
<213> ORGANISM: Homo sapiens
<220> FEATURE:
<223> OTHER INFORMATION: DP7
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 21

Gln Val Gln Leu Val Gln Ser Gly Ala Glu Val Lys Lys Pro Gly Ala
1               5                   10                  15

Ser Val Lys Val Ser Cys Lys Ala Ser Gly Tyr Thr Phe Thr Trp Val
            20                  25                  30

Arg Gln Ala Pro Gly Gln Gly Leu Glu Trp Met Gly Lys Phe Gln Gly
        35                  40                  45

Arg Val Thr Met Thr Arg Asp Thr Ser Thr Ser Thr Val Tyr Met Glu
    50                  55                  60

Leu Ser Ser Leu Arg Ser Glu Asp Thr Ala Val Tyr Tyr Cys Ala Arg
65                  70                  75                  80


<210> SEQ ID NO 22
<211> LENGTH: 11
<212> TYPE: PRT
<213> ORGANISM: Homo sapiens
<220> FEATURE:
<223> OTHER INFORMATION: JH4
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 22

Trp Gly Gln Gly Thr Leu Val Thr Val Ser Ser
1               5                   10


<210> SEQ ID NO 23
<211> LENGTH: 121
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: gH1
<220> FEATURE:
<221> NAME/KEY:
```

US 8,153,768 B2

65                                                          66

-continued

<400> SEQUENCE: 23

Glu Val Gln Leu Val Gln Ser Gly Ala Glu Val Lys Lys Pro Gly Ala
1               5                   10                  15

Ser Val Lys Val Ser Cys Lys Ala Ser Gly Tyr Arg Phe Thr Asn Tyr
                20                  25                  30

Trp Ile His Trp Val Arg Gln Ala Pro Gly Gln Gly Leu Glu Trp Ile
        35                  40                  45

Gly Gly Ile Asn Pro Gly Asn Gln Tyr Thr Thr Tyr Lys Arg Asn Leu
    50                  55                  60

Lys Gly Arg Ala Thr Leu Thr Ala Asp Thr Ser Thr Ser Thr Val Tyr
65                  70                  75                  80

Met Glu Leu Ser Ser Leu Arg Ser Glu Asp Thr Ala Val Tyr Tyr Cys
                85                  90                  95

Thr Arg Glu Gly Tyr Gly Asn Tyr Gly Ala Trp Phe Ala Tyr Trp Gly
            100                 105                 110

Gln Gly Thr Leu Val Thr Val Ser Ser
        115                 120

<210> SEQ ID NO 24
<211> LENGTH: 121
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: gH4
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 24

Glu Val Gln Leu Val Gln Ser Gly Ala Glu Val Lys Lys Pro Gly Ala
1               5                   10                  15

Ser Val Lys Val Ser Cys Lys Ala Ser Gly Tyr Arg Phe Thr Asn Tyr
                20                  25                  30

Trp Ile His Trp Val Arg Gln Ala Pro Gly Gln Gly Leu Glu Trp Ile
        35                  40                  45

Gly Gly Ile Asn Pro Gly Asn Asn Tyr Ala Thr Tyr Arg Arg Asn Leu
    50                  55                  60

Lys Gly Arg Ala Thr Leu Thr Ala Asp Thr Ser Thr Ser Thr Val Tyr
65                  70                  75                  80

Met Glu Leu Ser Ser Leu Arg Ser Glu Asp Thr Ala Val Tyr Tyr Cys
                85                  90                  95

Thr Arg Glu Gly Tyr Gly Asn Tyr Gly Ala Trp Phe Ala Tyr Trp Gly
            100                 105                 110

Gln Gly Thr Leu Val Thr Val Ser Ser
        115                 120

<210> SEQ ID NO 25
<211> LENGTH: 121
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: gH5
<220> FEATURE:
<221> NAME/KEY:

JA2389

US 8,153,768 B2

67 68

-continued

```
<400> SEQUENCE: 25

Glu Val Gln Leu Val Gln Ser Gly Ala Glu Val Lys Lys Pro Gly Ala
1               5                   10                  15

Ser Val Lys Val Ser Cys Lys Ala Ser Gly Tyr Arg Phe Thr Asn Tyr
            20                  25                  30

Trp Ile His Trp Val Arg Gln Ala Pro Gly Gln Gly Leu Glu Trp Ile
        35                  40                  45

Gly Gly Ile Asn Pro Gly Asn Asn Tyr Ala Thr Tyr Arg Arg Asn Leu
    50                  55                  60

Lys Gly Arg Val Thr Met Thr Ala Asp Thr Ser Thr Ser Thr Val Tyr
65                  70                  75                  80

Met Glu Leu Ser Ser Leu Arg Ser Glu Asp Thr Ala Val Tyr Tyr Cys
                85                  90                  95

Thr Arg Glu Gly Tyr Gly Asn Tyr Gly Ala Trp Phe Ala Tyr Trp Gly
            100                 105                 110

Gln Gly Thr Leu Val Thr Val Ser Ser
        115                 120


<210> SEQ ID NO 26
<211> LENGTH: 121
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: gH6
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 26

Glu Val Gln Leu Val Gln Ser Gly Ala Glu Val Lys Lys Pro Gly Ala
1               5                   10                  15

Ser Val Lys Val Ser Cys Lys Ala Ser Gly Tyr Arg Phe Thr Asn Tyr
            20                  25                  30

Trp Ile His Trp Val Arg Gln Ala Pro Gly Gln Gly Leu Glu Trp Ile
        35                  40                  45

Gly Gly Ile Asn Pro Gly Asn Asn Tyr Ala Thr Tyr Arg Arg Lys Phe
    50                  55                  60

Gln Gly Arg Ala Thr Leu Thr Ala Asp Thr Ser Thr Ser Thr Val Tyr
65                  70                  75                  80

Met Glu Leu Ser Ser Leu Arg Ser Glu Asp Thr Ala Val Tyr Tyr Cys
                85                  90                  95

Thr Arg Glu Gly Tyr Gly Asn Tyr Gly Ala Trp Phe Ala Tyr Trp Gly
            100                 105                 110

Gln Gly Thr Leu Val Thr Val Ser Ser
        115                 120


<210> SEQ ID NO 27
<211> LENGTH: 121
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: gH7
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 27

Glu Val Gln Leu Val Gln Ser Gly Ala Glu Val Lys Lys Pro Gly Ala
1               5                   10                  15

Ser Val Lys Val Ser Cys Lys Ala Ser Gly Tyr Arg Phe Thr Asn Tyr
            20                  25                  30
```

US 8,153,768 B2

69    70

-continued

```
Trp Ile His Trp Val Arg Gln Ala Pro Gly Gln Gly Leu Glu Trp Ile
        35                  40                  45

Gly Gly Ile Asn Pro Gly Asn Asn Tyr Ala Thr Tyr Arg Arg Lys Phe
    50                  55                  60

Gln Gly Arg Val Thr Met Thr Ala Asp Thr Ser Thr Ser Thr Val Tyr
65                  70                  75                  80

Met Glu Leu Ser Ser Leu Arg Ser Glu Asp Thr Ala Val Tyr Tyr Cys
                85                  90                  95

Thr Arg Glu Gly Tyr Gly Asn Tyr Gly Ala Trp Phe Ala Tyr Trp Gly
            100                 105                 110

Gln Gly Thr Leu Val Thr Val Ser Ser
        115                 120


<210> SEQ ID NO 28
<211> LENGTH: 239
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Full sequence of grafted light chain
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 28

Met Lys Leu Pro Val Arg Leu Leu Val Leu Leu Leu Phe Trp Ile Pro
1                   5                   10                  15

Ala Ser Arg Gly Asp Val Gln Val Thr Gln Ser Pro Ser Ser Leu Ser
                20                  25                  30

Ala Ser Val Gly Asp Arg Val Thr Ile Thr Cys Arg Ser Ser Gln Ser
        35                  40                  45

Leu Ala Asn Ser Tyr Gly Asn Thr Phe Leu Ser Trp Tyr Leu His Lys
    50                  55                  60

Pro Gly Lys Ala Pro Gln Leu Leu Ile Tyr Tyr Ile Ser Asn Arg Phe
65                  70                  75                  80

Ser Gly Val Pro Asp Arg Phe Ser Gly Ser Gly Ser Gly Thr Asp Phe
                85                  90                  95

Thr Leu Thr Ile Ser Ser Leu Gln Pro Glu Asp Phe Ala Thr Tyr Tyr
            100                 105                 110

Cys Leu Gln Gly Thr His Gln Pro Tyr Thr Phe Gly Gln Gly Thr Lys
        115                 120                 125

Val Glu Ile Lys Arg Thr Val Ala Ala Pro Ser Val Phe Ile Phe Pro
    130                 135                 140

Pro Ser Asp Glu Gln Leu Lys Ser Gly Thr Ala Ser Val Val Cys Leu
145                 150                 155                 160

Leu Asn Asn Phe Tyr Pro Arg Glu Ala Lys Val Gln Trp Lys Val Asp
                165                 170                 175

Asn Ala Leu Gln Ser Gly Asn Ser Gln Glu Ser Val Thr Glu Gln Asp
            180                 185                 190

Ser Lys Asp Ser Thr Tyr Ser Leu Ser Ser Thr Leu Thr Leu Ser Lys
        195                 200                 205

Ala Asp Tyr Glu Lys His Lys Val Tyr Ala Cys Glu Val Thr His Gln
    210                 215                 220

Gly Leu Ser Ser Pro Val Thr Lys Ser Phe Asn Arg Gly Glu Cys
225                 230                 235


<210> SEQ ID NO 29
<211> LENGTH: 781
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
```

US 8,153,768 B2

-continued

```
<220> FEATURE:
<223> OTHER INFORMATION: Full sequence of grafted light chain
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 29

ttcgaagccg ccaccatgaa gttgcctgtt aggctgttgg tgcttctgtt gttctggatt      60

cctgcttccc ggggtgacgt tcaagtgacc cagagcccat ccagcctgag cgcatctgta     120

ggagaccggg tcaccatcac ttgtagatcc agtcagagtc ttgcaaacag ttatgggaac     180

accttttgt cttggtatct gcacaaacca ggtaaagccc cacaattgct catctacgga      240

atctctaaca gatttagtgg tgtaccagac aggttcagcg gttccggaag tggtactgat     300

ttcaccctca cgatctcgtc tctccagcca gaagatttcg ccacttatta ctgtttacaa     360

ggtacacatc agccgtacac attcggtcag ggtactaaag tagaaatcaa acgtacggta     420

gcggcccccat ctgtcttcat cttccgcca tctgatgagc agttgaaatc tggaactgcc      480

tctgttgtgt gcctgctgaa taacttctat cccagagagg ccaaagtaca gtggaaggtg     540

gataacgccc tccaatcggg taactcccag gagagtgtca cagagcagga cagcaaggac     600

agcacctaca gcctcagcag caccctgacg ctgagcaaag cagactacga gaaacacaaa     660

gtctacgcct gcgaagtcac ccatcagggc ctgagctcgc ccgtcacaaa gagcttcaac     720

aggggagagt gttagaggga gaagtgcccc cacctgctcc tcagttccag cctgggaatt     780

c                                                                     781


<210> SEQ ID NO 30
<211> LENGTH: 467
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Full sequence of grafted heavy chain
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 30

Met Asp Phe Gly Phe Ser Leu Val Phe Leu Ala Leu Ile Leu Lys Gly
1               5                   10                  15

Val Gln Cys Glu Val Gln Leu Val Gln Ser Gly Ala Glu Val Lys Lys
                20                  25                  30

Pro Gly Ala Ser Val Lys Val Ser Cys Lys Ala Ser Gly Tyr Arg Phe
            35                  40                  45

Thr Asn Tyr Trp Ile His Trp Val Arg Gln Ala Pro Gly Gln Gly Leu
        50                  55                  60

Glu Trp Ile Gly Gly Ile Asn Pro Gly Asn Asn Tyr Ala Thr Tyr Arg
65                  70                  75                  80

Arg Lys Phe Gln Gly Arg Val Thr Met Thr Ala Asp Thr Ser Thr Ser
                85                  90                  95

Thr Val Tyr Met Glu Leu Ser Ser Leu Arg Ser Glu Asp Thr Ala Val
                100                 105                 110

Tyr Tyr Cys Thr Arg Glu Gly Tyr Gly Asn Tyr Gly Ala Trp Phe Ala
            115                 120                 125

Tyr Trp Gly Gln Gly Thr Leu Val Thr Val Ser Ser Ala Ser Thr Lys
        130                 135                 140

Gly Pro Ser Val Phe Pro Leu Ala Pro Cys Ser Arg Ser Thr Ser Glu
145                 150                 155                 160

Ser Thr Ala Ala Leu Gly Cys Leu Val Lys Asp Tyr Phe Pro Glu Pro
                165                 170                 175
```

US 8,153,768 B2

| 73 | | 74 |
|---|---|---|

-continued

```
Val Thr Val Ser Trp Asn Ser Gly Ala Leu Thr Ser Gly Val His Thr
            180                 185                 190

Phe Pro Ala Val Leu Gln Ser Ser Gly Leu Tyr Ser Leu Ser Ser Val
            195                 200                 205

Val Thr Val Pro Ser Ser Ser Leu Gly Thr Lys Thr Tyr Thr Cys Asn
    210                 215                 220

Val Asp His Lys Pro Ser Asn Thr Lys Val Asp Lys Arg Val Glu Ser
225                 230                 235                 240

Lys Tyr Gly Pro Pro Cys Pro Pro Cys Pro Ala Pro Glu Phe Leu Gly
                245                 250                 255

Gly Pro Ser Val Phe Leu Phe Pro Pro Lys Pro Lys Asp Thr Leu Met
                260                 265                 270

Ile Ser Arg Thr Pro Glu Val Thr Cys Val Val Val Asp Val Ser Gln
        275                 280                 285

Glu Asp Pro Glu Val Gln Phe Asn Trp Tyr Val Asp Gly Val Glu Val
        290                 295                 300

His Asn Ala Lys Thr Lys Pro Arg Glu Glu Gln Phe Asn Ser Thr Tyr
305                 310                 315                 320

Arg Val Val Ser Val Leu Thr Val Leu His Gln Asp Trp Leu Asn Gly
                325                 330                 335

Lys Glu Tyr Lys Cys Lys Val Ser Asn Lys Gly Leu Pro Ser Ser Ile
                340                 345                 350

Glu Lys Thr Ile Ser Lys Ala Lys Gly Gln Pro Arg Glu Pro Gln Val
            355                 360                 365

Tyr Thr Leu Pro Pro Ser Gln Glu Glu Met Thr Lys Asn Gln Val Ser
    370                 375                 380

Leu Thr Cys Leu Val Lys Gly Phe Tyr Pro Ser Asp Ile Ala Val Glu
385                 390                 395                 400

Trp Glu Ser Asn Gly Gln Pro Glu Asn Asn Tyr Lys Thr Thr Pro Pro
                405                 410                 415

Val Leu Asp Ser Asp Gly Ser Phe Phe Leu Tyr Ser Arg Leu Thr Val
            420                 425                 430

Asp Lys Ser Arg Trp Gln Glu Gly Asn Val Phe Ser Cys Ser Val Met
            435                 440                 445

His Glu Ala Leu His Asn His Tyr Thr Gln Lys Ser Leu Ser Leu Ser
    450                 455                 460

Leu Gly Lys
465
```

```
<210> SEQ ID NO 31
<211> LENGTH: 2160
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Full DNA sequence of grafted heavy chain
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 31

aagcttgccg ccaccatgga cttcggattc tctctcgtgt tcctggcact cattctcaag     60

gggagtgcagt gtgaggtgca attggtccag tcaggagcag aggttaagaa gcctggtgct    120

tccgtcaaag tttcgtgtaa ggctagcggc tacaggttca caattattg gattcattgg     180

gtcaggcagg ctccgggaca aggcctggaa tggatcggtg gcattaatcc cgggaataac    240

tacgctacat ataggagaaa attccagggc agagttacga tgaccgcgga cacctccaca    300

agcactgtct acatggagct gtcatctctg agatccgagg acaccgcagt gtactattgt    360
```

US 8,153,768 B2

**75**                                                                                                    **76**

-continued

```
actagagaag gctacggtaa ttacggagcc tggttcgcct actggggcca gggtacccta    420

gtcacagtct cctcagcttc tacaaagggc ccatccgtct tccccctggc gccctgctcc    480

aggagcacct ccgagagcac agccgccctg ggctgcctgg tcaaggacta cttccccgaa    540

ccggtgacgg tgtcgtggaa ctcaggcgcc ctgaccagcg gcgtgcacac cttcccggct    600

gtcctacagt cctcaggact ctactccctc agcagcgtgg tgaccgtgcc ctccagcagc    660

ttgggcacga agacctacac ctgcaacgta gatcacaagc ccagcaacac caaggtggac    720

aagagagttg gtgagaggcc agcacaggga gggaggtgt ctgctggaag ccaggctcag    780

ccctcctgcc tggacgcacc ccggctgtgc agccccagcc cagggcagca aggcatgccc    840

catctgtctc ctcaccgga ggcctctgac caccccactc atgcccaggg agagggtctt    900

ctggatttt ccaccaggct ccgggcagcc acaggctgga tgccctacc ccaggccctg    960

cgcatacagg ggcaggtgct gcgctcagac ctgccaagag ccatatccgg gaggaccctg   1020

cccctgacct aagcccaccc caaaggccaa actctccact ccctcagctc agacaccttc   1080

tctcctccca gatctgagta actcccaatc ttctctctgc agagtccaaa tatggtcccc   1140

catgcccacc atgcccaggt aagccaaccc aggcctcgcc ctccagctca aggcgggaca   1200

ggtgccctag agtagcctgc atccagggac aggccccagc cgggtgctga cgcatccacc   1260

tccatctctt cctcagcacc tgagttcctg gggggaccat cagtcttcct gttcccccca   1320

aaacccaagg acactctcat gatctcccgg acccctgagg tcacgtgcgt ggtggtggac   1380

gtgagccagg aagaccccga ggtccagttc aactggtacg tggatggcgt ggaggtgcat   1440

aatgccaaga caaagccgcg ggaggagcag ttcaacagca cgtaccgtgt ggtcagcgtc   1500

ctcaccgtcc tgcaccagga ctggctgaac ggcaaggagt acaagtgcaa ggtctccaac   1560

aaaggcctcc cgtcctccat cgagaaaacc atctccaaag ccaaaggtgg gacccacggg   1620

gtgcgagggc cacatggaca gaggtcagct cggcccaccc tctgccctgg gagtgaccgc   1680

tgtgccaacc tctgtcccta cagggcagcc ccgagagcca caggtgtaca ccctgccccc   1740

atcccaggag gagatgacca agaaccaggt cagcctgacc tgcctggtca aaggcttcta   1800

ccccagcgac atcgccgtgg agtgggagag caatgggcag ccggagaaca actacaagac   1860

cacgcctccc gtgctggact ccgacggctc cttcttcctc tacagcaggc taacctggga   1920

caagagcagg tggcaggagg ggaatgtctt ctcatgctcc gtgatgcatg aggctctgca   1980

caaccactac acacagaaga gcctctccct gtctctgggt aaatgagtgc cagggccggc   2040

aagccccgc tccccggggct ctcggggtcg cgcgaggatg cttggcacgt accccgtcta   2100

catacttccc aggcacccag catggaaata aagcacccac cactgccctg gctcgaattc   2160
```

```
<210> SEQ ID NO 32
<211> LENGTH: 94
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: 544gH1 T1
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 32

agtgtgaggt gcaattggtc cagtcaggag cagaggttaa gaagcctggt gcttccgtca     60

aagtttcgtg taaggctagc ggctacaggt tcac                                 94


<210> SEQ ID NO 33
<211> LENGTH: 96
```

**JA2394**

-continued

```
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: 544gH1 T2
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 33

gtggcattaa tcccgggaat cagtacacta catataaaag aaatctaaag ggcagagcaa      60

cgctgaccgc ggacacctcc acaagcactg tctaca                                96


<210> SEQ ID NO 34
<211> LENGTH: 95
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: 544gH1 T3
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 34

agagaaggct acggtaatta cggagcctgg ttcgcctact ggggccaggg taccctagtc      60

acagtctcct cagcttctac aaagggccca agaaa                                 95


<210> SEQ ID NO 35
<211> LENGTH: 94
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: 544 gH1 B1
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 35

ggaccaattg cacctcacac tgcactccct tgagaatgag tgccaggaac acgagagaga      60

atccgaagtc catggtggcg gcaagctttt attc                                  94


<210> SEQ ID NO 36
<211> LENGTH: 97
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: 544gH1 B2
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 36

gattcccggg attaatgcca ccgatccatt ccaggccttg tcccggagcc tgcctgaccc      60

aatgaatcca ataatttgtg aacctgtagc cgctagc                               97


<210> SEQ ID NO 37
<211> LENGTH: 93
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: 544gH1B3
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 37

cgtaattacc gtagccttct ctagtacaat agtacactgc ggtgtcctcg gatctcagag      60

atgacagctc catgtagaca gtgcttgtgg agg                                   93


<210> SEQ ID NO 38
<211> LENGTH: 21
```

US 8,153,768 B2

| 79 | 80 |
|---|---|

-continued

```
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: 544gH1 F1
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 38

gaataaaagc ttgccgccac c                                          21


<210> SEQ ID NO 39
<211> LENGTH: 22
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: 544gH1 R1
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 39

tttcttgggc cctttgtaga ag                                         22


<210> SEQ ID NO 40
<211> LENGTH: 87
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: 544gL1 T1
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 40

gcttcccggg gtgacgttca agtgacccag agcccatcca gcctgagcgc atctgtagga   60

gaccgggtca ccatcacttg tagatcc                                    87


<210> SEQ ID NO 41
<211> LENGTH: 90
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: 544gL1 T2
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 41

tatctgcaca aaccaggtaa agccccacaa ttgctcatct acggaatctc taacagattt   60

agtggtgtac cagacaggtt cagcggttcc                                 90


<210> SEQ ID NO 42
<211> LENGTH: 91
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: 544gL1 T3
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 42

agatttcgcc acttattact gtttacaagg tacacatcag ccgtacacat tcggtcaggg   60

tactaaagta gaaatcaaac gtacggcgtg c                               91


<210> SEQ ID NO 43
<211> LENGTH: 88
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: 544gL1 B1
```

US 8,153,768 B2

| 81 | 82 |
|---|---|

-continued

```
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 43

gaacgtcacc ccgggaagca ggaatccaga acaacagaag caccaacagc ctaacaggca      60

acttcatggt ggcggcttcg aatcatcc                                         88


<210> SEQ ID NO 44
<211> LENGTH: 88
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: 544gL1 B2
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 44

ctttacctgg tttgtgcaga taccaagaca aaaaggtgtt cccataactg tttgcaagac      60

tctgactgga tctacaagtg atggtgac                                         88


<210> SEQ ID NO 45
<211> LENGTH: 90
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: 544gL1B3
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 45

aacagtaata agtggcgaaa tcttctggct ggagagacga gatcgtgagg gtgaaatcag      60

taccacttcc ggaaccgctg aacctgtctg                                       90


<210> SEQ ID NO 46
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: 544gL1 F1
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 46

ggatgattcg aagccgccac                                                  20


<210> SEQ ID NO 47
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial sequence
<220> FEATURE:
<223> OTHER INFORMATION: 544gL1 R1
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 47

gcacgccgta cgtttgattt c                                                21


<210> SEQ ID NO 48
<211> LENGTH: 339
<212> TYPE: DNA
<213> ORGANISM: mouse
<220> FEATURE:
<223> OTHER INFORMATION: DNA sequence of mouse monoclonal 5/44 VL
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 48
```

US 8,153,768 B2

**83**                                                                                  **84**

-continued

```
gatgttgtgg tgactcaaac tccactctcc ctgcctgtca gctttggaga tcaagtttct      60

atctcttgca ggtctagtca gagtcttgca aacagttatg ggaacacctt tttgtcttgg     120

tacctgcaca agcctggcca gtctccacag ctcctcatct atgggatttc caacagattt     180

tctggggtgc cagacaggtt cactggcagt ggttcaggga cagatttcac actcaagatc     240

agcacaataa agctgagga cttgggaatg tattactgct tacaaggtac acatcagccg      300

tacacgttcg gagggggggac caagctggaa ataaaacgt                           339


<210> SEQ ID NO 49
<211> LENGTH: 363
<212> TYPE: DNA
<213> ORGANISM: mouse
<220> FEATURE:
<223> OTHER INFORMATION: DNA sequence of mouse monoclonal 5/44 VH
<220> FEATURE:
<221> NAME/KEY:

<400> SEQUENCE: 49

gaggtccaac tgcagcagtc tgggactgta ctggcaaggc ctggggcttc cgtgaagatg      60

tcctgcaagg cttctggcta caggtttacc aactactgga ttcactgggt aaaacagagg     120

cctgggcagg gtctagaatg gattggtggt attaatcctg gaaataatta tactacgtat     180

aagaggaact tgaagggcaa ggcacactg actgcagtca catccgccag cactgcctac      240

atggacctca gcagcctgac aagtgaggac tctgcggtct attactgtac aagagagggc     300

tatggtaact acgggccctg gtttgcttac tggggccagg ggactctggt caccgtctcc     360

tca                                                                   363


<210> SEQ ID NO 50
<211> LENGTH: 9
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: sequence within oligonucleotide primer

<400> SEQUENCE: 50

gccgccacc                                                               9


<210> SEQ ID NO 51
<211> LENGTH: 101
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: 5' oligonucleotide primer

<400> SEQUENCE: 51

gcgcgcaagc ttgccgccac catggacttc ggattctctc tcgtgttcct ggcactcatt      60

ctcaagggag tgcagtgtga ggtgcagctc gtcgagtctg g                        101


<210> SEQ ID NO 52
<211> LENGTH: 110
<212> TYPE: DNA
<213> ORGANISM: Artificial
<220> FEATURE:
<223> OTHER INFORMATION: gH4 oligonucleotide

<400> SEQUENCE: 52

ccgggaataa ctacgctaca tataggagaa atctaaaggg cagagcaacg ctgaccgcct      60

tattgatgcg atgtatatcc tctttagatt tcccgtctcg ttgcgactgg                110
```

**JA2398**

US 8,153,768 B2

85                                                                                           86

-continued

```
<210> SEQ ID NO 53
<211> LENGTH: 20
<212> TYPE: PRT
<213> ORGANISM: Artificial
<220> FEATURE:
<223> OTHER INFORMATION: gH4 graft

<400> SEQUENCE: 53

Pro Gly Asn Asn Tyr Ala Thr Tyr Arg Arg Asn Leu Lys Gly Arg Ala
1               5                   10                  15

Thr Leu Thr Ala
          20


<210> SEQ ID NO 54
<211> LENGTH: 110
<212> TYPE: DNA
<213> ORGANISM: Artificial
<220> FEATURE:
<223> OTHER INFORMATION: gH5 oligonucleotide

<400> SEQUENCE: 54

ccgggaataa ctacgctaca tataggagaa atctaaaggg cagagttacg atgaccgcct      60

tattgatgcg atgtatatcc tctttagatt tcccgtctca atgctactgg                110


<210> SEQ ID NO 55
<211> LENGTH: 20
<212> TYPE: PRT
<213> ORGANISM: Artificial
<220> FEATURE:
<223> OTHER INFORMATION: gH5 graft

<400> SEQUENCE: 55

Pro Gly Asn Asn Tyr Ala Thr Tyr Arg Arg Lys Phe Gln Gly Arg Val
1               5                   10                  15

Thr Met Thr Ala
          20


<210> SEQ ID NO 56
<211> LENGTH: 110
<212> TYPE: DNA
<213> ORGANISM: Artificial
<220> FEATURE:
<223> OTHER INFORMATION: gH6 oligonucleotide

<400> SEQUENCE: 56

ccgggaataa ctacgctaca tataggagaa aattccaggg cagagcaacg ctgaccgcct      60

tattgatgcg atgtatatcc tcttttaagg tcccgtctcg ttgcgactgg                110


<210> SEQ ID NO 57
<211> LENGTH: 20
<212> TYPE: PRT
<213> ORGANISM: Artificial
<220> FEATURE:
<223> OTHER INFORMATION: gH6 graft

<400> SEQUENCE: 57

Pro Gly Asn Asn Tyr Ala Thr Tyr Arg Arg Lys Phe Gln Gly Arg Ala
1               5                   10                  15

Thr Leu Thr Ala
          20


<210> SEQ ID NO 58
<211> LENGTH: 110
<212> TYPE: DNA
<213> ORGANISM: Artificial
```

```
<220> FEATURE:
<223> OTHER INFORMATION: gH7 oligonucleotide

<400> SEQUENCE: 58

ccgggaataa ctacgctaca tataggagaa aattccaggg cagagttacg atgaccgcct      60

tattgatgcg atgtatatcc tcttttaagg tcccgtctca atgctactgg               110


<210> SEQ ID NO 59
<211> LENGTH: 20
<212> TYPE: PRT
<213> ORGANISM: Artificial
<220> FEATURE:
<223> OTHER INFORMATION: gH7 graft

<400> SEQUENCE: 59

Pro Gly Asn Asn Tyr Ala Thr Tyr Arg Arg Lys Phe Gln Gly Arg Val
1               5                   10                  15

Thr Met Thr Ala
            20


<210> SEQ ID NO 60
<211> LENGTH: 123
<212> TYPE: DNA
<213> ORGANISM: Artificial
<220> FEATURE:
<223> OTHER INFORMATION: gL2 oligonucleotide

<400> SEQUENCE: 60

ccggggtgac gttgtcgtga cccagagccc atccagcctg agcgcatctg taggagaccg      60

gccactgcaa cagcactggg tctcgggtag gtcggactcg cgtagacatc ctctggccca     120

gtg                                                                  123


<210> SEQ ID NO 61
<211> LENGTH: 23
<212> TYPE: PRT
<213> ORGANISM: Artificial
<220> FEATURE:
<223> OTHER INFORMATION: gL2 graft

<400> SEQUENCE: 61

Ser Arg Gly Asp Val Val Val Thr Gln Ser Pro Ser Ser Leu Ser Ala
1               5                   10                  15

Ser Val Gly Asp Arg Val Thr
            20
```

US 8,153,768 B2

**89**

What is claimed is:

**1**. A composition comprising a drug conjugate, wherein said drug conjugate comprises calicheamicin derivatives and an antibody and has the formula:



**90**

wherein the antibody comprises SEQ ID NO: 1 for CDR-H1, residues 50-66 of SEQ ID NO: 27 for CDR-H2, SEQ ID NO: 3 for CDR-H3, SEQ ID NO: 4 for CDR-L1, SEQ ID NO: 5 for CDR-L2 and SEQ ID NO: 6 for CDR-L3;

wherein n is 3 to 9; and

wherein the composition is less than 10% by weight of unconjugated antibody.

**2**. The composition of claim **1**, wherein the antibody comprises a light chain variable region as set forth in SEQ ID NO: 19 and a heavy chain variable region as set forth in SEQ ID NO: 27.

**3**. The composition of claim **1**, wherein the antibody comprises a light chain consisting of residues 21 to 239 of SEQ ID NO: 28 and a heavy chain consisting of residues 20 to 466 of SEQ ID NO: 30, and wherein the antibody is expressed in a mammalian cell.

**4**. The composition of claim **1**, wherein the antibody comprises a light chain consisting of an amino acid sequence resulting from the expression of SEQ ID NO: 29 in a mammalian cell and a heavy chain consisting of an amino acid sequence resulting from the expression of SEQ ID NO: 31 in a mammalian cell.

**5**. A pharmaceutical composition comprising the composition of claim **1** and a pharmaceutically acceptable excipient, diluent or carrier.

\*    \*    \*    \*    \*

# UNITED STATES CODE

## 2012 EDITION

CONTAINING THE GENERAL AND PERMANENT LAWS
OF THE UNITED STATES ENACTED THROUGH THE
112TH CONGRESS

(ending January 2, 2013, the last law of which was signed on January 15, 2013)

Prepared and published under authority of Title 2, U.S. Code, Section 285b,
by the Office of the Law Revision Counsel of the House of Representatives



## VOLUME TWENTY–THREE

TITLE 31—MONEY AND FINANCE

TO

TITLE 35—PATENTS

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 2013

This book has been digitally archived to maintain
the quality of the original work for future generations
of legal researchers by William S. Hein & Co., Inc.

This volume printed on acid-free paper
by William S. Hein & Co., Inc.



Printed in the United States of America.

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512-1800
Fax: (202) 512-2104   Mail: Stop SSOP, Washington, DC 20402–0001

*that effective date and patent applications pending on or filed after that effective date, and not effective with respect to patents in litigation commenced before that effective date, this section is amended in the fourth sentence by substituting "including the requirement for payment of the fee specified in section 41(a)(7)" for "including the payment of a surcharge". See 2012 Amendment note below.*

### Historical and Revision Notes

This section represents present law not expressed in the statute, except for the added requirement that the first application must be specifically mentioned in the second.

### Amendments

2012—Pub. L. 112–211, §202(b)(3), substituted "including the requirement for payment of the fee specified in section 41(a)(7)" for "including the payment of a surcharge".

Pub. L. 112–211, §102(5), substituted "section 363 or 385" for "section 363".

2011—Pub. L. 112–29, §20(j), struck out "of this title" after "363".

Pub. L. 112–29, §15(b), substituted "section 112(a) (other than the requirement to disclose the best mode)" for "the first paragraph of section 112 of this title".

Pub. L. 112–29, §3(f), substituted "which names an inventor or joint inventor" for "which is filed by an inventor or inventors named".

1999—Pub. L. 106–113 inserted at end "No application shall be entitled to the benefit of an earlier filed application under this section unless an amendment containing the specific reference to the earlier filed application is submitted at such time during the pendency of the application as required by the Director. The Director may consider the failure to submit such an amendment within that time period as a waiver of any benefit under this section. The Director may establish procedures, including the payment of a surcharge, to accept an unintentionally delayed submission of an amendment under this section."

1984—Pub. L. 98–622 substituted "which is filed by an inventor or inventors named in the previously filed application" for "by the same inventor".

1975—Pub. L. 94–131 inserted ", or as provided by section 363 of this title," after "filed in the United States".

### Effective Date of 2012 Amendment

Amendment by section 102(5) of Pub. L. 112–211 effective on the later of the date that is 1 year after Dec. 18, 2012, or the date that the Geneva Act of the Hague Agreement Concerning the International Registration of Industrial Designs enters into force with respect to the United States, and applicable only to certain applications filed on and after that effective date and patents issuing thereon, see section 103 of Pub. L. 112–211, set out as a note under section 100 of this title.

Amendment by section 202(b)(3) of Pub. L. 112–211 effective on the date that is 1 year after Dec. 18, 2012, applicable to patents issued before, on, or after that effective date and patent applications pending on or filed after that effective date, and not effective with respect to patents in litigation commenced before that effective date, see section 203 of Pub. L. 112–211, set out as an Effective Date note under section 27 of this title.

### Effective Date of 2011 Amendment

Amendment by section 3(f) of Pub. L. 112–29 effective upon the expiration of the 18-month period beginning on Sept. 16, 2011, and applicable to certain applications for patent and any patents issuing thereon, see section 3(n) of Pub. L. 112–29, set out as an Effective Date of 2011 Amendment; Savings Provisions note under section 100 of this title.

Amendment by section 15(b) of Pub. L. 112–29 effective on Sept. 16, 2011, and applicable to proceedings commenced on or after that date, see section 15(c) of Pub. L. 112–29, set out as a note under section 119 of this title.

Amendment by section 20(j) of Pub. L. 112–29 effective upon the expiration of the 1-year period beginning on Sept. 16, 2011, and applicable to proceedings commenced on or after that effective date, see section 20(l) of Pub. L. 112–29, set out as a note under section 2 of this title.

### Effective Date of 1999 Amendment

Amendment by Pub. L. 106–113 effective Nov. 29, 2000, and applicable only to applications (including international applications designating the United States) filed on or after that date, see section 1000(a)(9) [title IV, §4508] of Pub. L. 106–113, as amended, set out as a note under section 10 of this title.

### Effective Date of 1984 Amendment

Amendment by Pub. L. 98–622 applicable to all United States patents granted before, on, or after Nov. 8, 1984, and to all applications for United States patents pending on or filed after that date, except as otherwise provided, see section 106 of Pub. L. 98–622, set out as a note under section 103 of this title.

### Effective Date of 1975 Amendment

Amendment by Pub. L. 94–131 effective Jan. 24, 1978, and applicable on and after that date to patent applications filed in the United States and to international applications, where applicable, see section 11 of Pub. L. 94–131, set out as an Effective Date note under section 351 of this title.

### § 121. Divisional applications

If two or more independent and distinct inventions are claimed in one application, the Director may require the application to be restricted to one of the inventions. If the other invention is made the subject of a divisional application which complies with the requirements of section 120 it shall be entitled to the benefit of the filing date of the original application. A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application. The validity of a patent shall not be questioned for failure of the Director to require the application to be restricted to one invention.

(July 19, 1952, ch. 950, 66 Stat. 800; Pub. L. 93–596, §1, Jan. 2, 1975, 88 Stat. 1949; Pub. L. 106–113, div. B, §1000(a)(9) [title IV, §4732(a)(10)(A)], Nov. 29, 1999, 113 Stat. 1536, 1501A–582; Pub. L. 107–273, div. C, title III, §13206(b)(1)(B), Nov. 2, 2002, 116 Stat. 1906; Pub. L. 112–29, §§4(a)(2), 20(j), Sept. 16, 2011, 125 Stat. 295, 335.)

### Historical and Revision Notes

This section enacts as law existing practice with respect to division, at the same time introducing a number of changes. Division is made discretionary with the Commissioner. The requirements of section 120 are made applicable and neither of the resulting patents can be held invalid over the other merely because of their being divided in several patents. In some cases a divisional application may be filed by the assignee.

AMENDMENTS

2011—Pub. L. 112–29, § 20(j), struck out "of this title" after "120".

Pub. L. 112–29, § 4(a)(2), struck out "If a divisional application is directed solely to subject matter described and claimed in the original application as filed, the Director may dispense with signing and execution by the inventor." before "The validity of a patent".

2002—Pub. L. 107–273 made technical correction to directory language of Pub. L. 106–113. See 1999 Amendment note below.

1999—Pub. L. 106–113, as amended by Pub. L. 107–273, substituted "Director" for "Commissioner" wherever appearing.

1975—Pub. L. 93–596 substituted "Patent and Trademark Office" for "Patent Office".

EFFECTIVE DATE OF 2011 AMENDMENT

Amendment by section 4(a)(2) of Pub. L. 112–29 effective upon the expiration of the 1-year period beginning on Sept. 16, 2011, and applicable to any patent application that is filed on or after that effective date, see section 4(e) of Pub. L. 112–29, set out as a note under section 111 of this title.

Amendment by section 20(j) of Pub. L. 112–29 effective upon the expiration of the 1-year period beginning on Sept. 16, 2011, and applicable to proceedings commenced on or after that effective date, see section 20(l) of Pub. L. 112–29, set out as a note under section 2 of this title.

EFFECTIVE DATE OF 1999 AMENDMENT

Amendment by Pub. L. 106–113 effective 4 months after Nov. 29, 1999, see section 1000(a)(9) [title IV, § 4731] of Pub. L. 106–113, set out as a note under section 1 of this title.

EFFECTIVE DATE OF 1975 AMENDMENT

Amendment by Pub. L. 93–596 effective Jan. 2, 1975, see section 4 of Pub. L. 93–596, set out as a note under section 1111 of Title 15, Commerce and Trade.

§ 122. Confidential status of applications; publication of patent applications

(a) CONFIDENTIALITY.—Except as provided in subsection (b), applications for patents shall be kept in confidence by the Patent and Trademark Office and no information concerning the same given without authority of the applicant or owner unless necessary to carry out the provisions of an Act of Congress or in such special circumstances as may be determined by the Director.

(b) PUBLICATION.—

(1) IN GENERAL.—(A) Subject to paragraph (2), each application for a patent shall be published, in accordance with procedures determined by the Director, promptly after the expiration of a period of 18 months from the earliest filing date for which a benefit is sought under this title. At the request of the applicant, an application may be published earlier than the end of such 18-month period.

(B) No information concerning published patent applications shall be made available to the public except as the Director determines.

(C) Notwithstanding any other provision of law, a determination by the Director to release or not to release information concerning a published patent application shall be final and nonreviewable.

(2) EXCEPTIONS.—(A) An application shall not be published if that application is—

(i) no longer pending;

(ii) subject to a secrecy order under section 181;

(iii) a provisional application filed under section 111(b); or

(iv) an application for a design patent filed under chapter 16.

(B)(i) If an applicant makes a request upon filing, certifying that the invention disclosed in the application has not and will not be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication of applications 18 months after filing, the application shall not be published as provided in paragraph (1).

(ii) An applicant may rescind a request made under clause (i) at any time.

(iii) An applicant who has made a request under clause (i) but who subsequently files, in a foreign country or under a multilateral international agreement specified in clause (i), an application directed to the invention disclosed in the application filed in the Patent and Trademark Office, shall notify the Director of such filing not later than 45 days after the date of the filing of such foreign or international application. A failure of the applicant to provide such notice within the prescribed period shall result in the application being regarded as abandoned, unless it is shown to the satisfaction of the Director that the delay in submitting the notice was unintentional.

(iv) If an applicant rescinds a request made under clause (i) or notifies the Director that an application was filed in a foreign country or under a multilateral international agreement specified in clause (i), the application shall be published in accordance with the provisions of paragraph (1) on or as soon as is practical after the date that is specified in clause (i).

(v) If an applicant has filed applications in one or more foreign countries, directly or through a multilateral international agreement, and such foreign filed applications corresponding to an application filed in the Patent and Trademark Office or the description of the invention in such foreign filed applications is less extensive than the application or description of the invention in the application filed in the Patent and Trademark Office, the applicant may submit a redacted copy of the application filed in the Patent and Trademark Office eliminating any part or description of the invention in such application that is not also contained in any of the corresponding applications filed in a foreign country. The Director may only publish the redacted copy of the application unless the redacted copy of the application is not received within 16 months after the earliest effective filing date for which a benefit is sought under this title. The provisions of section 154(d) shall not apply to a claim if the description of the invention published in the redacted application filed under this clause with respect to the claim does not enable a person skilled in the art to make and use the subject matter of the claim.

(c) PROTEST AND PRE-ISSUANCE OPPOSITION.—The Director shall establish appropriate procedures to ensure that no protest or other form of pre-issuance opposition to the grant of a patent

"Appeal to the Patent Trial and Appeal Board" for "Appeal to the Board of Patent Appeals and Interferences" in item 134 and "Derivation proceedings" for "Interferences" in item 135.

1984—Pub. L. 98–622, title II, §204(b)(2), Nov. 8, 1984, 98 Stat. 3388, substituted "Patent Appeals and Interferences" for "Appeals" in item 134.

## § 131. Examination of application

The Director shall cause an examination to be made of the application and the alleged new invention; and if on such examination it appears that the applicant is entitled to a patent under the law, the Director shall issue a patent therefor.

(July 19, 1952, ch. 950, 66 Stat. 801; Pub. L. 106–113, div. B, §1000(a)(9) [title IV, §4732(a)(10)(A)], Nov. 29, 1999, 113 Stat. 1536, 1501A–582; Pub. L. 107–273, div. C, title III, §13206(b)(1)(B), Nov. 2, 2002, 116 Stat. 1906.)

HISTORICAL AND REVISION NOTES

Based on Title 35, U.S.C., 1946 ed., §36 (R.S. 4893).

The first part is revised in language and clarified. The phrase "and that the invention is sufficiently useful and important" is omitted as unnecessary, the requirements for patentability being stated in sections 101, 102 and 103.

AMENDMENTS

2002—Pub. L. 107–273 made technical correction to directory language of Pub. L. 106–113. See 1999 Amendment note below.

1999—Pub. L. 106–113, as amended by Pub. L. 107–273, substituted "Director" for "Commissioner" in two places.

EFFECTIVE DATE OF 1999 AMENDMENT

Amendment by Pub. L. 106–113 effective 4 months after Nov. 29, 1999, see section 1000(a)(9) [title IV, §4731] of Pub. L. 106–113, set out as a note under section 1 of this title.

## § 132. Notice of rejection; reexamination

(a) Whenever, on examination, any claim for a patent is rejected, or any objection or requirement made, the Director shall notify the applicant thereof, stating the reasons for such rejection, or objection or requirement, together with such information and references as may be useful in judging of the propriety of continuing the prosecution of his application; and if after receiving such notice, the applicant persists in his claim for a patent, with or without amendment, the application shall be reexamined. No amendment shall introduce new matter into the disclosure of the invention.

(b) The Director shall prescribe regulations to provide for the continued examination of applications for patent at the request of the applicant. The Director may establish appropriate fees for such continued examination and shall provide a 50 percent reduction in such fees for small entities that qualify for reduced fees under section 41(h)(1).

(July 19, 1952, ch. 950, 66 Stat. 801; Pub. L. 106–113, div. B, §1000(a)(9) [title IV, §§4403, 4732(a)(10)(A)], Nov. 29, 1999, 113 Stat. 1536, 1501A–560, 1501A–582; Pub. L. 107–273, div. C, title III, §13206(b)(1)(B), Nov. 2, 2002, 116 Stat. 1906; Pub. L. 112–29, §20(j), Sept. 16, 2011, 125 Stat. 335.)

HISTORICAL AND REVISION NOTES

Based on Title 35, U.S.C., 1946 ed., §51 (R.S. 4903, amended Aug. 5, 1939, ch. 452, §1, 53 Stat. 1213).

The first paragraph of the corresponding section of existing statute is revised in language and amplified to incorporate present practice; the second paragraph of the existing statute is placed in section 133.

The last sentence relating to new matter is added but represents no departure from present practice.

AMENDMENTS

2011—Subsec. (b). Pub. L. 112–29 struck out "of this title" after "41(h)(1)".

2002—Pub. L. 107–273 made technical correction to directory language of Pub. L. 106–113, §1000(a)(9) [title IV, §4732(a)(10)(A)]. See 1999 Amendment note below.

1999—Pub. L. 106–113, §1000(a)(9) [title IV, §4732(a)(10)(A)], as amended by Pub. L. 107–273, substituted "Director" for "Commissioner".

Pub. L. 106–113, §1000(a)(9) [title IV, §4403], designated existing provisions as subsec. (a) and added subsec. (b).

EFFECTIVE DATE OF 2011 AMENDMENT

Amendment by Pub. L. 112–29 effective upon the expiration of the 1-year period beginning on Sept. 16, 2011, and applicable to proceedings commenced on or after that effective date, see section 20(l) of Pub. L. 112–29, set out as a note under section 2 of this title.

EFFECTIVE DATE OF 1999 AMENDMENT

Pub. L. 106–113, div. B, §1000(a)(9) [title IV, §4405(b)], Nov. 29, 1999, 113 Stat. 1536, 1501A–560, provided that: "The amendments made by section 4403 [amending this section]—

"(1) shall take effect on the date that is 6 months after the date of the enactment of this Act [Nov. 29, 1999], and shall apply to all applications filed under section 111(a) of title 35, United States Code, on or after June 8, 1995, and all applications complying with section 371 of title 35, United States Code, that resulted from international applications filed on or after June 8, 1995; and

"(2) do not apply to applications for design patents under chapter 16 of title 35, United States Code."

Amendment by section 1000(a)(9) [title IV, §4732(a)(10)(A)] of Pub. L. 106–113 effective 4 months after Nov. 29, 1999, see section 1000(a)(9) [title IV, §4731] of Pub. L. 106–113, set out as a note under section 1 of this title.

## § 133. Time for prosecuting application

Upon failure of the applicant to prosecute the application within six months after any action therein, of which notice has been given or mailed to the applicant, or within such shorter time, not less than thirty days, as fixed by the Director in such action, the application shall be regarded as abandoned by the parties thereto, unless it be shown to the satisfaction of the Director that such delay was unavoidable.

(July 19, 1952, ch. 950, 66 Stat. 801; Pub. L. 106–113, div. B, §1000(a)(9) [title IV, §4732(a)(10)(A)], Nov. 29, 1999, 113 Stat. 1536, 1501A–582; Pub. L. 107–273, div. C, title III, §13206(b)(1)(B), Nov. 2, 2002, 116 Stat. 1906; Pub. L. 112–211, title II, §202(b)(5), Dec. 18, 2012, 126 Stat. 1536.)

AMENDMENT OF SECTION

Pub. L. 112–211, title II, §§202(b)(5), 203, Dec. 18, 2012, 126 Stat. 1536, provided that, effective on the date that is 1 year after Dec. 18, 2012, applicable to patents issued before, on, or after that effective date and patent applications pending on or filed after that effective date, and not effective with respect to patents in litigation commenced before that effective date, this section is amended by striking '', unless it

made, purchased or used as specified, or for the manufacture, use or sale of which substantial preparation was made after the date the application became abandoned or patent lapsed for failure to pay the fee but prior to the grant or restoration of the patent, and it may also provide for the continued practice of any process covered by the patent, practiced, or for the practice of which substantial preparation was made, after the date the application became abandoned or patent lapsed for failure to pay the issue fee but prior to the grant or restoration of the patent, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant or restoration of the patent.''

## § 152. Issue of patent to assignee

Patents may be granted to the assignee of the inventor of record in the Patent and Trademark Office, upon the application made and the specification sworn to by the inventor, except as otherwise provided in this title.

(July 19, 1952, ch. 950, 66 Stat. 804; Pub. L. 93–596, § 1, Jan. 2, 1975, 88 Stat. 1949.)

### HISTORICAL AND REVISION NOTES

Based on Title 35, U.S.C., 1946 ed., § 44 (R.S. 4895).
Language is changed and the reference to reissue is omitted in view of the general provision in section 251.

### AMENDMENTS

1975—Pub. L. 93–596 substituted ''Patent and Trademark Office'' for ''Patent Office''.

### EFFECTIVE DATE OF 1975 AMENDMENT

Amendment by Pub. L. 93–596 effective Jan. 2, 1975, see section 4 of Pub. L. 93–596, set out as a note under section 1111 of Title 15, Commerce and Trade.

## § 153. How issued

Patents shall be issued in the name of the United States of America, under the seal of the Patent and Trademark Office, and shall be signed by the Director or have his signature placed thereon and shall be recorded in the Patent and Trademark Office.

(July 19, 1952, ch. 950, 66 Stat. 804; Pub. L. 93–596, § 1, Jan. 2, 1975, 88 Stat. 1949; Pub. L. 106–113, div. B, § 1000(a)(9) [title IV, § 4732(a)(10)(A)], Nov. 29, 1999, 113 Stat. 1536, 1501A–582; Pub. L. 107–273, div. C, title III, §§ 13203(c), 13206(b)(1)(B), Nov. 2, 2002, 116 Stat. 1902, 1906.)

### HISTORICAL AND REVISION NOTES

Based on Title 35, U.S.C., 1946 ed., § 39 (R.S. 4883, amended (1) Feb. 18, 1888, ch. 15, 25 Stat. 40, (2) April 11, 1903, ch. 417, 32 Stat. 95, (3) Feb. 18, 1922, ch. 58, § 5, 42 Stat. 391).
The phrases referring to the attesting officers and to the recording of the patents are broadened.

### AMENDMENTS

2002—Pub. L. 107–273, § 13206(b)(1)(B), made technical correction to directory language of Pub. L. 106–113. See 1999 Amendment note below.
Pub. L. 107–273, § 13203(c), struck out ''and attested by an officer of the Patent and Trademark Office designated by the Director,'' after ''signature placed thereon''.
1999—Pub. L. 106–113, as amended by Pub. L. 107–273, § 13206(b)(1)(B), substituted ''Director'' for ''Commissioner'' in two places.
1975—Pub. L. 93–596 substituted ''Patent and Trademark Office'' for ''Patent Office'' wherever appearing.

### EFFECTIVE DATE OF 1999 AMENDMENT

Amendment by Pub. L. 106–113 effective 4 months after Nov. 29, 1999, see section 1000(a)(9) [title IV, § 4731]

of Pub. L. 106–113, set out as a note under section 1 of this title.

### EFFECTIVE DATE OF 1975 AMENDMENT

Amendment by Pub. L. 93–596 effective Jan. 2, 1975, see section 4 of Pub. L. 93–596, set out as a note under section 1111 of Title 15, Commerce and Trade.

## § 154. Contents and term of patent; provisional rights

(a) IN GENERAL.—

(1) CONTENTS.—Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States, or importing the invention into the United States, and, if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process, referring to the specification for the particulars thereof.

(2) TERM.—Subject to the payment of fees under this title, such grant shall be for a term beginning on the date on which the patent issues and ending 20 years from the date on which the application for the patent was filed in the United States or, if the application contains a specific reference to an earlier filed application or applications under section 120, 121, or 365(c), from the date on which the earliest such application was filed.

(3) PRIORITY.—Priority under section 119, 365(a), or 365(b) shall not be taken into account in determining the term of a patent.

(4) SPECIFICATION AND DRAWING.—A copy of the specification and drawing shall be annexed to the patent and be a part of such patent.

(b) ADJUSTMENT OF PATENT TERM.—

(1) PATENT TERM GUARANTEES.—

(A) GUARANTEE OF PROMPT PATENT AND TRADEMARK OFFICE RESPONSES.—Subject to the limitations under paragraph (2), if the issue of an original patent is delayed due to the failure of the Patent and Trademark Office to—

(i) provide at least one of the notifications under section 132 or a notice of allowance under section 151 not later than 14 months after—

(I) the date on which an application was filed under section 111(a); or

(II) the date of commencement of the national stage under section 371 in an international application;

(ii) respond to a reply under section 132, or to an appeal taken under section 134, within 4 months after the date on which the reply was filed or the appeal was taken;

(iii) act on an application within 4 months after the date of a decision by the Patent Trial and Appeal Board under section 134 or 135 or a decision by a Federal court under section 141, 145, or 146 in a case in which allowable claims remain in the application; or

(iv) issue a patent within 4 months after the date on which the issue fee was paid

under section 151 and all outstanding requirements were satisfied,

the term of the patent shall be extended 1 day for each day after the end of the period specified in clause (i), (ii), (iii), or (iv), as the case may be, until the action described in such clause is taken.

(B) GUARANTEE OF NO MORE THAN 3-YEAR APPLICATION PENDENCY.—Subject to the limitations under paragraph (2), if the issue of an original patent is delayed due to the failure of the United States Patent and Trademark Office to issue a patent within 3 years after the actual filing date of the application under section 111(a) in the United States or, in the case of an international application, the date of commencement of the national stage under section 371 in the international application, not including—

(i) any time consumed by continued examination of the application requested by the applicant under section 132(b);

(ii) any time consumed by a proceeding under section 135(a), any time consumed by the imposition of an order under section 181, or any time consumed by appellate review by the Patent Trial and Appeal Board or by a Federal court; or

(iii) any delay in the processing of the application by the United States Patent and Trademark Office requested by the applicant except as permitted by paragraph (3)(C),

the term of the patent shall be extended 1 day for each day after the end of that 3-year period until the patent is issued.

(C) GUARANTEE OF ADJUSTMENTS FOR DELAYS DUE TO DERIVATION PROCEEDINGS, SECRECY ORDERS, AND APPEALS.—Subject to the limitations under paragraph (2), if the issue of an original patent is delayed due to—

(i) a proceeding under section 135(a);

(ii) the imposition of an order under section 181; or

(iii) appellate review by the Patent Trial and Appeal Board or by a Federal court in a case in which the patent was issued under a decision in the review reversing an adverse determination of patentability,

the term of the patent shall be extended 1 day for each day of the pendency of the proceeding, order, or review, as the case may be.

(2) LIMITATIONS.—

(A) IN GENERAL.—To the extent that periods of delay attributable to grounds specified in paragraph (1) overlap, the period of any adjustment granted under this subsection shall not exceed the actual number of days the issuance of the patent was delayed.

(B) DISCLAIMED TERM.—No patent the term of which has been disclaimed beyond a specified date may be adjusted under this section beyond the expiration date specified in the disclaimer.

(C) REDUCTION OF PERIOD OF ADJUSTMENT.—

(i) The period of adjustment of the term of a patent under paragraph (1) shall be re-

duced by a period equal to the period of time during which the applicant failed to engage in reasonable efforts to conclude prosecution of the application.

(ii) With respect to adjustments to patent term made under the authority of paragraph (1)(B), an applicant shall be deemed to have failed to engage in reasonable efforts to conclude processing or examination of an application for the cumulative total of any periods of time in excess of 3 months that are taken to respond to a notice from the Office making any rejection, objection, argument, or other request, measuring such 3-month period from the date the notice was given or mailed to the applicant.

(iii) The Director shall prescribe regulations establishing the circumstances that constitute a failure of an applicant to engage in reasonable efforts to conclude processing or examination of an application.

(3) PROCEDURES FOR PATENT TERM ADJUSTMENT DETERMINATION.—

(A) The Director shall prescribe regulations establishing procedures for the application for and determination of patent term adjustments under this subsection.

(B) Under the procedures established under subparagraph (A), the Director shall—

(i) make a determination of the period of any patent term adjustment under this subsection, and shall transmit a notice of that determination no later than the date of issuance of the patent; and

(ii) provide the applicant one opportunity to request reconsideration of any patent term adjustment determination made by the Director.

(C) The Director shall reinstate all or part of the cumulative period of time of an adjustment under paragraph (2)(C) if the applicant, prior to the issuance of the patent, makes a showing that, in spite of all due care, the applicant was unable to respond within the 3-month period, but in no case shall more than three additional months for each such response beyond the original 3-month period be reinstated.

(D) The Director shall proceed to grant the patent after completion of the Director's determination of a patent term adjustment under the procedures established under this subsection, notwithstanding any appeal taken by the applicant of such determination.

(4) APPEAL OF PATENT TERM ADJUSTMENT DETERMINATION.—

(A) An applicant dissatisfied with the Director's decision on the applicant's request for reconsideration under paragraph (3)(B)(ii) shall have exclusive remedy by a civil action against the Director filed in the United States District Court for the Eastern District of Virginia within 180 days after the date of the Director's decision on the applicant's request for reconsideration. Chapter 7 of title 5 shall apply to such action. Any final judgment resulting in a change to the

period of adjustment of the patent term shall be served on the Director, and the Director shall thereafter alter the term of the patent to reflect such change.

(B) The determination of a patent term adjustment under this subsection shall not be subject to appeal or challenge by a third party prior to the grant of the patent.

(c) CONTINUATION.—

(1) DETERMINATION.—The term of a patent that is in force on or that results from an application filed before the date that is 6 months after the date of the enactment of the Uruguay Round Agreements Act shall be the greater of the 20-year term as provided in subsection (a), or 17 years from grant, subject to any terminal disclaimers.

(2) REMEDIES.—The remedies of sections 283, 284, and 285 shall not apply to acts which—

(A) were commenced or for which substantial investment was made before the date that is 6 months after the date of the enactment of the Uruguay Round Agreements Act; and

(B) became infringing by reason of paragraph (1).

(3) REMUNERATION.—The acts referred to in paragraph (2) may be continued only upon the payment of an equitable remuneration to the patentee that is determined in an action brought under chapter 28 and chapter 29 (other than those provisions excluded by paragraph (2)).

(d) PROVISIONAL RIGHTS.—

(1) IN GENERAL.—In addition to other rights provided by this section, a patent shall include the right to obtain a reasonable royalty from any person who, during the period beginning on the date of publication of the application for such patent under section 122(b), or in the case of an international application filed under the treaty defined in section 351(a) designating the United States under Article 21(2)(a) of such treaty, the date of publication of the application, and ending on the date the patent is issued—

(A)(i) makes, uses, offers for sale, or sells in the United States the invention as claimed in the published patent application or imports such an invention into the United States; or

(ii) if the invention as claimed in the published patent application is a process, uses, offers for sale, or sells in the United States or imports into the United States products made by that process as claimed in the published patent application; and

(B) had actual notice of the published patent application and, in a case in which the right arising under this paragraph is based upon an international application designating the United States that is published in a language other than English, had a translation of the international application into the English language.

(2) RIGHT BASED ON SUBSTANTIALLY IDENTICAL INVENTIONS.—The right under paragraph (1) to obtain a reasonable royalty shall not be available under this subsection unless the invention as claimed in the patent is substantially identical to the invention as claimed in the published patent application.

(3) TIME LIMITATION ON OBTAINING A REASONABLE ROYALTY.—The right under paragraph (1) to obtain a reasonable royalty shall be available only in an action brought not later than 6 years after the patent is issued. The right under paragraph (1) to obtain a reasonable royalty shall not be affected by the duration of the period described in paragraph (1).

(4) REQUIREMENTS FOR INTERNATIONAL APPLICATIONS.—

(A) EFFECTIVE DATE.—The right under paragraph (1) to obtain a reasonable royalty based upon the publication under the treaty defined in section 351(a) of an international application designating the United States shall commence on the date of publication under the treaty of the international application, or, if the publication under the treaty of the international application is in a language other than English, on the date on which the Patent and Trademark Office receives a translation of the publication in the English language.

(B) COPIES.—The Director may require the applicant to provide a copy of the international application and a translation thereof.

(July 19, 1952, ch. 950, 66 Stat. 804; Pub. L. 89–83, §5, July 24, 1965, 79 Stat. 261; Pub. L. 96–517, §4, Dec. 12, 1980, 94 Stat. 3018; Pub. L. 100–418, title IX, §9002, Aug. 23, 1988, 102 Stat. 1563; Pub. L. 103–465, title V, §532(a)(1), Dec. 8, 1994, 108 Stat. 4983; Pub. L. 104–295, §20(e)(1), Oct. 11, 1996, 110 Stat. 3529; Pub. L. 106–113, div. B, §1000(a)(9) [title IV, §§4402(a), 4504], Nov. 29, 1999, 113 Stat. 1536, 1501A–557, 1501A–564; Pub. L. 107–273, div. C, title III, §§13204, 13206(a)(8), Nov. 2, 2002, 116 Stat. 1902, 1904; Pub. L. 112–29, §§3(j)(1), (2)(B), 9(a), 20(j), Sept. 16, 2011, 125 Stat. 290, 316, 335; Pub. L. 112–211, title I, §102(6), Dec. 18, 2012, 126 Stat. 1531; Pub. L. 112–274, §1(h), Jan. 14, 2013, 126 Stat. 2457.)

AMENDMENT OF SECTION

*Pub. L. 112–211, title I, §§102(6), 103, Dec. 18, 2012, 126 Stat. 1531, 1532, provided that, effective on the later of the date that is 1 year after Dec. 18, 2012, or the date that the Geneva Act of the Hague Agreement Concerning the International Registration of Industrial Designs enters into force with respect to the United States, and applicable only to certain applications filed on and after that effective date and patents issuing thereon, this section is amended as follows:*

*(1) in subsection (a)(2), by substituting "section 120, 121, 365(c), or 386(c)" for "section 120, 121, or 365(c)";*

*(2) in subsection (a)(3), by substituting "section 119, 365(a), 365(b), 386(a), or 386(b)" for "section 119, 365(a), or 365(b)"; and*

*(3) in subsection (d)(1), by inserting "or an international design application filed under the treaty defined in section 381(a)(1) designating the United States under Article 5 of such treaty" after "Article 21(2)(a) of such treaty".*

*See 2012 Amendment notes below.*

### HISTORICAL AND REVISION NOTES

Based on Title 35, U.S.C., 1946 ed., § 40 (R.S. 4884, amended May 23, 1930, ch. 312, § 1, 46 Stat. 376).

The reference to plants is omitted for inclusion in another section and the reference to the title is shortened since the title is of no legal significance.

The wording of the granting clause is changed to "the right to exclude others from making, using, or selling", following language used by the Supreme Court, to render the meaning clearer.

"United States" is defined in section 100.

### REFERENCES IN TEXT

The date of the enactment of the Uruguay Round Agreements Act, referred to in subsec. (c)(1), (2)(A), is the date of enactment of Pub. L. 103–465, which was approved Dec. 8, 1994.

### AMENDMENTS

2013—Subsec. (b)(1)(A)(i)(II). Pub. L. 112–274, § 1(h)(1)(A), which directed substitution of "of commencement of the national stage under section 371 in an international application" for "on which an international application fulfilled the requirements of section 371 of this title", was executed by making the substitution for "on which an international application fulfilled the requirements of section 371", to reflect the probable intent of Congress and the intervening amendment by Pub. L. 112–29, § 20(j). See 2011 Amendment note below.

Subsec. (b)(1)(B). Pub. L. 112–274, § 1(h)(1)(B), substituted "the application under section 111(a) in the United States or, in the case of an international application, the date of commencement of the national stage under section 371 in the international application" for "the application in the United States" in introductory provisions.

Subsec. (b)(3)(B)(i). Pub. L. 112–274, § 1(h)(2), substituted "no later than the date of issuance of the patent" for "with the written notice of allowance of the application under section 151".

Subsec. (b)(4)(A). Pub. L. 112–274, § 1(h)(3), substituted "the Director's decision on the applicant's request for reconsideration under paragraph (3)(B)(ii) shall have exclusive remedy" for "a determination made by the Director under paragraph (3) shall have remedy" and "the date of the Director's decision on the applicant's request for reconsideration" for "the grant of the patent".

2012—Subsec. (a)(2). Pub. L. 112–211, § 102(6)(A)(i), substituted "section 120, 121, 365(c), or 386(c)" for "section 120, 121, or 365(c)".

Subsec. (a)(3). Pub. L. 112–211, § 102(6)(A)(ii), substituted "section 119, 365(a), 365(b), 386(a), or 386(b)" for "section 119, 365(a), or 365(b)".

Subsec. (d)(1). Pub. L. 112–211, § 102(6)(B), inserted "or an international design application filed under the treaty defined in section 381(a)(1) designating the United States under Article 5 of such treaty" after "Article 21(2)(a) of such treaty" in introductory provisions.

2011—Subsec. (a)(2). Pub. L. 112–29, § 20(j), struck out "of this title" after "365(c)".

Subsec. (a)(3). Pub. L. 112–29, § 20(j), struck out "of this title" after "365(b)".

Subsec. (b)(1)(A)(i). Pub. L. 112–29, § 20(j), in introductory provisions, struck out "of this title" after "132" and after "151".

Subsec. (b)(1)(A)(i)(I). Pub. L. 112–29, § 20(j), struck out "of this title" after "111(a)".

Subsec. (b)(1)(A)(i)(II). Pub. L. 112–29, § 20(j), struck out "of this title" after "371".

Subsec. (b)(1)(A)(iii), (B)(ii). Pub. L. 112–29, § 3(j)(1), substituted "Patent Trial and Appeal Board" for "Board of Patent Appeals and Interferences".

Subsec. (b)(1)(C). Pub. L. 112–29, § 3(j)(2)(B), amended heading generally. Prior to amendment, heading read as follows: "Guarantee or adjustments for delays due to interferences, secrecy orders, and appeals".

Subsec. (b)(1)(C)(iii). Pub. L. 112–29, § 3(j)(1), substituted "Patent Trial and Appeal Board" for "Board of Patent Appeals and Interferences".

Subsec. (b)(4)(A). Pub. L. 112–29, § 9(a), substituted "United States District Court for the Eastern District of Virginia" for "United States District Court for the District of Columbia".

Subsec. (c)(2). Pub. L. 112–29, § 20(j), in introductory provisions, struck out "of this title" after "285".

Subsec. (c)(3). Pub. L. 112–29, § 20(j), struck out "of this title" after "excluded by paragraph (2))".

2002—Subsec. (b)(4)(A). Pub. L. 107–273, § 13206(a)(8), struck out ", United States Code," after "title 5".

Subsec. (d)(4)(A). Pub. L. 107–273, § 13204, amended subsec. (d)(4)(A) as in effect on Nov. 29, 2000, by substituting "the date of" for "the date on which the Patent and Trademark Office receives a copy of the" and "publication in the English language" for "international application in the English language".

1999—Subsec. (b). Pub. L. 106–113, § 1000(a)(9) [title IV, § 4504(1)], inserted "; provisional rights" after "patent" in section catchline.

1999—Subsec. (b). Pub. L. 106–113, § 1000(a)(9) [title IV, § 4402(a)], amended heading and text of subsec. (b) generally. Prior to amendment, text provided for interference delay or secrecy orders, extensions for appellate review, a limitations period, and a maximum period of 5 years duration for all extensions.

Subsec. (d). Pub. L. 106–113, § 1000(a)(9) [title IV, § 4504(2)], added subsec. (d).

1996—Subsec. (c)(2). Pub. L. 104–295 substituted "acts" for "Acts" in introductory provisions.

1994—Pub. L. 103–465 amended section catchline and text generally. Prior to amendment, text read as follows: "Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, for the term of seventeen years, subject to the payment of fees as provided for in this title, of the right to exclude others from making, using, or selling the invention throughout the United States and, if the invention is a process, of the right to exclude others from using or selling throughout the United States, or importing into the United States, products made by that process, referring to the specification for the particulars thereof. A copy of the specification and drawings shall be annexed to the patent and be a part thereof."

1988—Pub. L. 100–418 inserted "and, if the invention is a process, of the right to exclude others from using or selling throughout the United States, or importing into the United States, products made by that process," after "United States".

1980—Pub. L. 96–517 substituted "payment of fees" for "payment of issue fees".

1965—Pub. L. 89–83 added "subject to the payment of issue fees as provided for in this title".

### EFFECTIVE DATE OF 2013 AMENDMENT

Amendment by Pub. L. 112–274 effective Jan. 14, 2013, and applicable to proceedings commenced on or after such date, see section 1(n) of Pub. L. 112–274, set out as a note under section 5 of this title.

### EFFECTIVE DATE OF 2012 AMENDMENT

Amendment by Pub. L. 112–211 effective on the later of the date that is 1 year after Dec. 18, 2012, or the date that the Geneva Act of the Hague Agreement Concerning the International Registration of Industrial Designs enters into force with respect to the United States, and applicable only to certain applications filed on and after that effective date and patents issuing thereon, see section 103 of Pub. L. 112–211, set out as a note under section 100 of this title.

### EFFECTIVE DATE OF 2011 AMENDMENT

Amendment by section 3(j)(1), (2)(B) of Pub. L. 112–29 effective upon the expiration of the 18-month period beginning on Sept. 16, 2011, and applicable to certain applications for patent and any patents issuing thereon, see section 3(n) of Pub. L. 112–29, set out as an Effective Date of 2011 Amendment; Savings Provisions note under section 100 of this title.

Amendment by section 9(a) of Pub. L. 112–29 effective Sept. 16, 2011, and applicable to any civil action commenced on or after that date, see section 9(b) of Pub. L. 112–29, set out as a note under section 1071 of Title 15, Commerce and Trade.

Amendment by section 20(j) of Pub. L. 112–29 effective upon the expiration of the 1-year period beginning on Sept. 16, 2011, and applicable to proceedings commenced on or after that effective date, see section 20(l) of Pub. L. 112–29, set out as a note under section 2 of this title.

### EFFECTIVE DATE OF 1999 AMENDMENT

Pub. L. 106–113, div. B, §1000(a)(9) [title IV, §4405(a)], Nov. 29, 1999, 113 Stat. 1536, 1501A–560, provided that: ''The amendments made by sections 4402 and 4404 [amending this section, sections 156 and 282 of this title, and section 1295 of Title 28, Judiciary and Judicial Procedure] shall take effect on the date that is 6 months after the date of the enactment of this Act [Nov. 29, 1999] and, except for a design patent application filed under chapter 16 of title 35, United States Code, shall apply to any application filed on or after the date that is 6 months after the date of the enactment of this Act.''

Amendment by section 1000(a)(9) [title IV, §4504] of Pub. L. 106–113 effective Nov. 29, 2000, applicable only to applications (including international applications designating the United States) filed on or after that date, and additionally applicable to any pending application filed before Nov. 29, 2000, if such pending application is published pursuant to a request of the applicant under such procedures as may be established by the Director, see section 1000(a)(9) [title IV, §4508] of Pub. L. 106–113, as amended, set out as a note under section 10 of this title.

### EFFECTIVE DATE OF 1994 AMENDMENT

Pub. L. 103–465, title V, §534, Dec. 8, 1994, 108 Stat. 4990, provided that:

''(a) IN GENERAL.—Subject to subsection (b), the amendments made by this subtitle [subtitle C (§§531–534) of title V of Pub. L. 103–465, amending this section and sections 41, 104, 111, 119, 156, 172, 173, 252, 262, 271, 272, 287, 292, 295, 307, 365, and 373 of this title] take effect on the date that is one year after the date on which the WTO Agreement enters into force with respect to the United States [Jan. 1, 1995].

''(b) PATENT APPLICATIONS.—

''(1) IN GENERAL.—Subject to paragraph (2), the amendments made by section 532 [amending this section and sections 41, 111, 119, 156, 172, 173, 365, and 373 of this title] take effect on the date that is 6 months after the date of the enactment of this Act [Dec. 8, 1994] and shall apply to all patent applications filed in the United States on or after the effective date.

''(2) SECTION 154(a)(1).—Section 154(a)(1) of title 35, United States Code, as amended by section 532(a)(1) of this Act, shall take effect on the effective date described in subsection (a).

''(3) EARLIEST FILING.—The term of a patent granted on an application that is filed on or after the effective date described in subsection (a) and that contains a specific reference to an earlier application filed under the provisions of section 120, 121, or 365(c) of title 35, United States Code, shall be measured from the filing date of the earliest filed application.''

### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–418 effective 6 months after Aug. 23, 1988, and, subject to enumerated exceptions, applicable only with respect to products made or imported after such effective date, see section 9006 of Pub. L. 100–418, set out as a note under section 271 of this title.

### EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–517 effective Dec. 12, 1980, see section 8(a) of Pub. L. 96–517, set out as a note under section 41 of this title.

### EFFECTIVE DATE OF 1965 AMENDMENT

Amendment by Pub. L. 89–83 effective three months after July 24, 1965, see section 7(a) of Pub. L. 89–83, set out as a note under section 41 of this title.

### REGULATIONS

Pub. L. 103–465, title V, §532(a)(2), Dec. 8, 1994, 108 Stat. 4985, authorized the Commissioner of Patents and Trademarks to prescribe regulations for further limited reexamination of applications pending 2 years or longer and for examination of more than 1 independent and distinct invention in applications pending 3 years or longer, as of the effective date of section 154(a)(2) of this title, and to establish appropriate related fees.

## [§§ 155, 155A. Repealed. Pub. L. 112–29, § 20(k), Sept. 16, 2011, 125 Stat. 335]

Section 155, added Pub. L. 97–414, §11(a), Jan. 4, 1983, 96 Stat. 2065; amended Pub. L. 106–113, div. B, §1000(a)(9) [title IV, §4732(a)(6), (10)(A)], Nov. 29, 1999, 113 Stat. 1536, 1501A–582; Pub. L. 107–273, div. C, title III, §13206(b)(1)(B), Nov. 2, 2002, 116 Stat. 1906, related to patent term extension.

Section 155A, added Pub. L. 98–127, §4(a), Oct. 13, 1983, 97 Stat. 832; amended Pub. L. 106–113, div. B, §1000(a)(9) [title IV, §4732(a)(7), (10)(A)], Nov. 29, 1999, 113 Stat. 1536, 1501A–582; Pub. L. 107–273, div. C, title III, §13206(b)(1)(B), Nov. 2, 2002, 116 Stat. 1906, related to patent term restoration.

### EFFECTIVE DATE OF REPEAL

Repeal effective upon the expiration of the 1-year period beginning on Sept. 16, 2011, and applicable to proceedings commenced on or after that effective date, see section 20(l) of Pub. L. 112–29, set out as an Effective Date of 2011 Amendment note under section 2 of this title.

## § 156. Extension of patent term

(a) The term of a patent which claims a product, a method of using a product, or a method of manufacturing a product shall be extended in accordance with this section from the original expiration date of the patent, which shall include any patent term adjustment granted under section 154(b), if—

(1) the term of the patent has not expired before an application is submitted under subsection (d)(1) for its extension;

(2) the term of the patent has never been extended under subsection (e)(1) of this section;

(3) an application for extension is submitted by the owner of record of the patent or its agent and in accordance with the requirements of paragraphs (1) through (4) of subsection (d);

(4) the product has been subject to a regulatory review period before its commercial marketing or use;

(5)(A) except as provided in subparagraph (B) or (C), the permission for the commercial marketing or use of the product after such regulatory review period is the first permitted commercial marketing or use of the product under the provision of law under which such regulatory review period occurred;

(B) in the case of a patent which claims a method of manufacturing the product which primarily uses recombinant DNA technology in the manufacture of the product, the permission for the commercial marketing or use of the product after such regulatory review period is the first permitted commercial market-



## CODE OF FEDERAL
## REGULATIONS

# Title 37
Patents, Trademarks, and
Copyrights

Revised as of July 1, 2014

Containing a codification of documents
of general applicability and future effect

As of July 1, 2014

Published by the Office of the Federal Register
National Archives and Records Administration
as a Special Edition of the Federal Register

## U.S. GOVERNMENT OFFICIAL EDITION NOTICE

### Legal Status and Use of Seals and Logos

The seal of the National Archives and Records Administration (NARA) authenticates the Code of Federal Regulations (CFR) as the official codification of Federal regulations established under the Federal Register Act. Under the provisions of 44 U.S.C. 1507, the contents of the CFR, a special edition of the Federal Register, shall be judicially noticed. The CFR is prima facie evidence of the original documents published in the Federal Register (44 U.S.C. 1510).

It is prohibited to use NARA's official seal and the stylized Code of Federal Regulations logo on any republication of this material without the express, written permission of the Archivist of the United States or the Archivist's designee. Any person using NARA's official seals and logos in a manner inconsistent with the provisions of 36 CFR part 1200 is subject to the penalties specified in 18 U.S.C. 506, 701, and 1017.

### Use of ISBN Prefix

This is the Official U.S. Government edition of this publication and is herein identified to certify its authenticity. Use of the 0–16 ISBN prefix is for U.S. Government Printing Office Official Editions only. The Superintendent of Documents of the U.S. Government Printing Office requests that any reprinted edition clearly be labeled as a copy of the authentic work with a new ISBN.

 U.S. GOVERNMENT PRINTING OFFICE

U.S. Superintendent of Documents • Washington, DC 20402-0001

http://bookstore.gpo.gov

Phone: toll-free (866) 512-1800; DC area (202) 512-1800

an Office action. Unless the applicant is notified in writing that a reply is required in less than six months, a maximum period of six months is allowed.

[62 FR 53194, Oct. 10, 1997]

### § 1.135  Abandonment for failure to reply within time period.

(a) If an applicant of a patent application fails to reply within the time period provided under § 1.134 and § 1.136, the application will become abandoned unless an Office action indicates otherwise.

(b) Prosecution of an application to save it from abandonment pursuant to paragraph (a) of this section must include such complete and proper reply as the condition of the application may require. The admission of, or refusal to admit, any amendment after final rejection or any amendment not responsive to the last action, or any related proceedings, will not operate to save the application from abandonment.

(c) When reply by the applicant is a *bona fide* attempt to advance the application to final action, and is substantially a complete reply to the non-final Office action, but consideration of some matter or compliance with some requirement has been inadvertently omitted, applicant may be given a new time period for reply under § 1.134 to supply the omission.

[62 FR 53194, Oct. 10, 1997]

### § 1.136  Extensions of time.

(a)(1) If an applicant is required to reply within a nonstatutory or shortened statutory time period, applicant may extend the time period for reply up to the earlier of the expiration of any maximum period set by statute or five months after the time period set for reply, if a petition for an extension of time and the fee set in § 1.17(a) are filed, unless:

(i) Applicant is notified otherwise in an Office action;

(ii) The reply is a reply brief submitted pursuant to § 41.41 of this title;

(iii) The reply is a request for an oral hearing submitted pursuant to § 41.47(a) of this title;

(iv) The reply is to a decision by the Patent Trial and Appeal Board pursu-

ant to § 41.50 or § 41.52 of this chapter or to § 90.3 of this chapter; or

(v) The application is involved in a contested case (§ 41.101(a) of this title) or a derivation proceeding (§ 42.4(b) of this title).

(2) The date on which the petition and the fee have been filed is the date for purposes of determining the period of extension and the corresponding amount of the fee. The expiration of the time period is determined by the amount of the fee paid. A reply must be filed prior to the expiration of the period of extension to avoid abandonment of the application (§ 1.135), but in no situation may an applicant reply later than the maximum time period set by statute, or be granted an extension of time under paragraph (b) of this section when the provisions of paragraph (a) of this section are available.

(3) A written request may be submitted in an application that is an authorization to treat any concurrent or future reply, requiring a petition for an extension of time under this paragraph for its timely submission, as incorporating a petition for an extension of time for the appropriate length of time. An authorization to charge all required fees, fees under § 1.17, or all required extension of time fees will be treated as a constructive petition for an extension of time in any concurrent or future reply requiring a petition for an extension of time under this paragraph for its timely submission. Submission of the fee set forth in § 1.17(a) will also be treated as a constructive petition for an extension of time in any concurrent reply requiring a petition for an extension of time under this paragraph for its timely submission.

(b) When a reply cannot be filed within the time period set for such reply and the provisions of paragraph (a) of this section are not available, the period for reply will be extended only for sufficient cause and for a reasonable time specified. Any request for an extension of time under this paragraph must be filed on or before the day on which such reply is due, but the mere filing of such a request will not effect any extension under this paragraph. In no situation can any extension carry the date on which reply is due beyond

(iv) The number of days, if any, in the period beginning on the date of notification under §5.3(c) and ending on the date of mailing of the notice of allowance under §1.311.

(3) The period of delay under paragraph (a)(3) of this section is the sum of the number of days, if any, in the period beginning on the date on which an appeal to the Patent Trial and Appeal Board was filed under 35 U.S.C. 134 and ending on the date of a final decision in favor of the applicant by the Patent Trial and Appeal Board or by a Federal court in an appeal under 35 U.S.C. 141 or a civil action under 35 U.S.C. 145.

(d) The period of delay set forth in paragraph (c)(3) shall be reduced by:

(1) Any time during the period of appellate review that occurred before three years from the filing date of the first national application for patent presented for examination; and

(2) Any time during the period of appellate review, as determined by the Director, during which the applicant for patent did not act with due diligence. In determining the due diligence of an applicant, the Director may examine the facts and circumstances of the applicant's actions during the period of appellate review to determine whether the applicant exhibited that degree of timeliness as may reasonably be expected from, and which is ordinarily exercised by, a person during a period of appellate review.

(e) The provisions of this section apply only to original patents, except for design patents, issued on applications filed on or after June 8, 1995, and before May 29, 2000.

[60 FR 20228, Apr. 25, 1995, as amended at 65 FR 56391, Sept. 18, 2000; 69 FR 21710, Apr. 22, 2004; 69 FR 50001, Aug. 12, 2004; 77 FR 46627, Aug. 6, 2012]

### § 1.702  Grounds for adjustment of patent term due to examination delay under the Patent Term Guarantee Act of 1999 (original applications, other than designs, filed on or after May 29, 2000).

(a) *Failure to take certain actions within specified time frames.* Subject to the provisions of 35 U.S.C. 154(b) and this subpart, the term of an original patent shall be adjusted if the issuance of the patent was delayed due to the failure of the Office to:

(1) Mail at least one of a notification under 35 U.S.C. 132 or a notice of allowance under 35 U.S.C. 151 not later than fourteen months after the date on which the application was filed under 35 U.S.C. 111(a) or the date the national stage commenced under 35 U.S.C. 371(b) or (f) in an international application;

(2) Respond to a reply under 35 U.S.C. 132 or to an appeal taken under 35 U.S.C. 134 not later than four months after the date on which the reply was filed or the appeal was taken;

(3) Act on an application not later than four months after the date of a decision by the Patent Trial and Appeal Board under 35 U.S.C. 134 or 135 or a decision by a Federal court under 35 U.S.C. 141, 145, or 146 where at least one allowable claim remains in the application; or

(4) Issue a patent not later than four months after the date on which the issue fee was paid under 35 U.S.C. 151 and all outstanding requirements were satisfied.

(b) *Three-year pendency.* Subject to the provisions of 35 U.S.C. 154(b) and this subpart, the term of an original patent shall be adjusted if the issuance of the patent was delayed due to the failure of the Office to issue a patent within three years after the date on which the application was filed under 35 U.S.C. 111(a) or the national stage commenced under 35 U.S.C. 371(b) or (f) in an international application, but not including:

(1) Any time consumed by continued examination of the application under 35 U.S.C. 132(b);

(2) Any time consumed by an interference or derivation proceeding under 35 U.S.C. 135(a);

(3) Any time consumed by the imposition of a secrecy order under 35 U.S.C. 181;

(4) Any time consumed by review by the Patent Trial and Appeal Board or a Federal court; or

(5) Any delay in the processing of the application by the Office that was requested by the applicant.

(c) *Delays caused by interference and derivation proceedings.* Subject to the provisions of 35 U.S.C. 154(b) and this subpart, the term of an original patent shall be adjusted if the issuance of the patent was delayed due to interference

160

or derivation proceedings under 35 U.S.C. 135(a).

(d) *Delays caused by secrecy order.* Subject to the provisions of 35 U.S.C. 154(b) and this subpart, the term of an original patent shall be adjusted if the issuance of the patent was delayed due to the application being placed under a secrecy order under 35 U.S.C. 181.

(e) *Delays caused by successful appellate review.* Subject to the provisions of 35 U.S.C. 154(b) and this subpart, the term of an original patent shall be adjusted if the issuance of the patent was delayed due to review by the Patent Trial and Appeal Board under 35 U.S.C. 134 or by a Federal court under 35 U.S.C. 141 or 145, if the patent was issued under a decision in the review reversing an adverse determination of patentability. If an application is remanded by a panel of the Patent Trial and Appeal Board and the remand is the last action by a panel of the Patent Trial and Appeal Board prior to the mailing of a notice of allowance under 35 U.S.C. 151 in the application, the remand shall be considered a decision by the Patent Trial and Appeal Board as that phrase is used in 35 U.S.C. 154(b)(1)(A)(iii), a decision in the review reversing an adverse determination of patentability as that phrase is used in 35 U.S.C. 154(b)(1)(C)(iii), and a final decision in favor of the applicant under §1.703(e). A remand by a panel of the Patent Trial and Appeal Board shall not be considered a decision in the review reversing an adverse determination of patentability as provided in this paragraph if there is filed a request for continued examination under 35 U.S.C. 132(b) that was not first preceded by the mailing, after such remand, of at least one of an action under 35 U.S.C. 132 or a notice of allowance under 35 U.S.C. 151.

(f) The provisions of this section and §§1.703 through 1.705 apply only to original applications, except applications for a design patent, filed on or after May 29, 2000, and patents issued on such applications.

[65 FR 56391, Sept. 18, 2000, as amended at 69 FR 21711, Apr. 22, 2004; 77 FR 46627, Aug. 6, 2012; 78 FR 19420, Apr. 1, 2013]

**§ 1.703  Period of adjustment of patent term due to examination delay.**

(a) The period of adjustment under §1.702(a) is the sum of the following periods:

(1) The number of days, if any, in the period beginning on the day after the date that is fourteen months after the date on which the application was filed under 35 U.S.C. 111(a) or the date the national stage commenced under 35 U.S.C. 371(b) or (f) in an international application and ending on the date of mailing of either an action under 35 U.S.C. 132, or a notice of allowance under 35 U.S.C. 151, whichever occurs first;

(2) The number of days, if any, in the period beginning on the day after the date that is four months after the date a reply under §1.111 was filed and ending on the date of mailing of either an action under 35 U.S.C. 132, or a notice of allowance under 35 U.S.C. 151, whichever occurs first;

(3) The number of days, if any, in the period beginning on the day after the date that is four months after the date a reply in compliance with §1.113(c) was filed and ending on the date of mailing of either an action under 35 U.S.C. 132, or a notice of allowance under 35 U.S.C. 151, whichever occurs first;

(4) The number of days, if any, in the period beginning on the day after the date that is four months after the date an appeal brief in compliance with §41.37 of this title was filed and ending on the date of mailing of any of an examiner's answer under §41.39 of this title, an action under 35 U.S.C. 132, or a notice of allowance under 35 U.S.C. 151, whichever occurs first;

(5) The number of days, if any, in the period beginning on the day after the date that is four months after the date of a final decision by the Patent Trial and Appeal Board or by a Federal court in an appeal under 35 U.S.C. 141 or a civil action under 35 U.S.C. 145 or 146 where at least one allowable claim remains in the application and ending on the date of mailing of either an action under 35 U.S.C. 132 or a notice of allowance under 35 U.S.C. 151, whichever occurs first; and

(6) The number of days, if any, in the period beginning on the day after the

161

date that is four months after the date the issue fee was paid and all outstanding requirements were satisfied and ending on the date a patent was issued.

(b) The period of adjustment under §1.702(b) is the number of days, if any, in the period beginning on the day after the date that is three years after the date on which the application was filed under 35 U.S.C. 111(a) or the national stage commenced under 35 U.S.C. 371(b) or (f) in an international application and ending on the date a patent was issued, but not including the sum of the following periods:

(1) The number of days, if any, in the period beginning on the date on which a request for continued examination of the application under 35 U.S.C. 132(b) was filed and ending on the date the patent was issued;

(2)(i) The number of days, if any, in the period beginning on the date an interference or derivation proceeding was instituted to involve the application in the interference or derivation proceeding under 35 U.S.C. 135(a) and ending on the date that the interference or derivation proceeding was terminated with respect to the application; and

(ii) The number of days, if any, in the period beginning on the date prosecution in the application was suspended by the Office due to interference or derivation proceedings under 35 U.S.C. 135(a) not involving the application and ending on the date of the termination of the suspension;

(3)(i) The number of days, if any, the application was maintained in a sealed condition under 35 U.S.C. 181;

(ii) The number of days, if any, in the period beginning on the date of mailing of an examiner's answer under §41.39 of this title in the application under secrecy order and ending on the date the secrecy order was removed;

(iii) The number of days, if any, in the period beginning on the date applicant was notified that an interference or derivation proceeding under 35 U.S.C. 135(a) would be instituted but for the secrecy order and ending on the date the secrecy order was removed; and

(iv) The number of days, if any, in the period beginning on the date of notification under §5.3(c) of this chapter

and ending on the date of mailing of the notice of allowance under 35 U.S.C. 151; and,

(4) The number of days, if any, in the period beginning on the date on which jurisdiction over the application passes to the Patent Trial and Appeal Board under §41.35(a) of this chapter and ending on the date that jurisdiction by the Patent Trial and Appeal Board ends under §41.35(b) of this chapter or the date of the last decision by a Federal court in an appeal under 35 U.S.C. 141 or a civil action under 35 U.S.C. 145, whichever is later.

(c) The period of adjustment under §1.702(c) is the sum of the following periods, to the extent that the periods are not overlapping:

(1) The number of days, if any, in the period beginning on the date an interference or derivation proceeding was instituted to involve the application in the interference or derivation proceeding under 35 U.S.C. 135(a) and ending on the date that the interference or derivation proceeding was terminated with respect to the application; and

(2) The number of days, if any, in the period beginning on the date prosecution in the application was suspended by the Office due to interference or derivation proceedings under 35 U.S.C. 135(a) not involving the application and ending on the date of the termination of the suspension.

(d) The period of adjustment under §1.702(d) is the sum of the following periods, to the extent that the periods are not overlapping:

(1) The number of days, if any, the application was maintained in a sealed condition under 35 U.S.C. 181;

(2) The number of days, if any, in the period beginning on the date of mailing of an examiner's answer under §41.39 of this title in the application under secrecy order and ending on the date the secrecy order was removed;

(3) The number of days, if any, in the period beginning on the date applicant was notified that an interference or derivation proceeding under 35 U.S.C. 135(a) would be instituted but for the secrecy order and ending on the date the secrecy order was removed; and

(4) The number of days, if any, in the period beginning on the date of notification under §5.3(c) of this chapter and

ending on the date of mailing of the notice of allowance under 35 U.S.C. 151.

(e) The period of adjustment under §1.702(e) is the sum of the number of days, if any, in the period beginning on the date on which jurisdiction over the application passes to the Patent Trial and Appeal Board under §41.35(a) of this chapter and ending on the date of a final decision in favor of the applicant by the Patent Trial and Appeal Board or by a Federal court in an appeal under 35 U.S.C. 141 or a civil action under 35 U.S.C. 145.

(f) The adjustment will run from the expiration date of the patent as set forth in 35 U.S.C. 154(a)(2). To the extent that periods of delay attributable to the grounds specified in §1.702 overlap, the period of adjustment granted under this section shall not exceed the actual number of days the issuance of the patent was delayed. The term of a patent entitled to adjustment under §1.702 and this section shall be adjusted for the sum of the periods calculated under paragraphs (a) through (e) of this section, to the extent that such periods are not overlapping, less the sum of the periods calculated under §1.704. The date indicated on any certificate of mailing or transmission under §1.8 shall not be taken into account in this calculation.

(g) No patent, the term of which has been disclaimed beyond a specified date, shall be adjusted under §1.702 and this section beyond the expiration date specified in the disclaimer.

[65 FR 56392, Sept. 18, 2000, as amended at 69 FR 21711, Apr. 22, 2004; 69 FR 50001, Aug. 12, 2004; 77 FR 46628, Aug. 6, 2012; 77 FR 49360, Aug. 16, 2012; 78 FR 19420, Apr. 1, 2013]

**§ 1.704  Reduction of period of adjustment of patent term.**

(a) The period of adjustment of the term of a patent under §§1.703(a) through (e) shall be reduced by a period equal to the period of time during which the applicant failed to engage in reasonable efforts to conclude prosecution (processing or examination) of the application.

(b) With respect to the grounds for adjustment set forth in §§1.702(a) through (e), and in particular the ground of adjustment set forth in §1.702(b), an applicant shall be deemed

to have failed to engage in reasonable efforts to conclude processing or examination of an application for the cumulative total of any periods of time in excess of three months that are taken to reply to any notice or action by the Office making any rejection, objection, argument, or other request, measuring such three-month period from the date the notice or action was mailed or given to the applicant, in which case the period of adjustment set forth in §1.703 shall be reduced by the number of days, if any, beginning on the day after the date that is three months after the date of mailing or transmission of the Office communication notifying the applicant of the rejection, objection, argument, or other request and ending on the date the reply was filed. The period, or shortened statutory period, for reply that is set in the Office action or notice has no effect on the three-month period set forth in this paragraph.

(c) Circumstances that constitute a failure of the applicant to engage in reasonable efforts to conclude processing or examination of an application also include the following circumstances, which will result in the following reduction of the period of adjustment set forth in §1.703 to the extent that the periods are not overlapping:

(1) Suspension of action under §1.103 at the applicant's request, in which case the period of adjustment set forth in §1.703 shall be reduced by the number of days, if any, beginning on the date a request for suspension of action under §1.103 was filed and ending on the date of the termination of the suspension;

(2) Deferral of issuance of a patent under §1.314, in which case the period of adjustment set forth in §1.703 shall be reduced by the number of days, if any, beginning on the date a request for deferral of issuance of a patent under §1.314 was filed and ending on the date the patent was issued;

(3) Abandonment of the application or late payment of the issue fee, in which case the period of adjustment set forth in §1.703 shall be reduced by the number of days, if any, beginning on the date of abandonment or the date

after the date the issue fee was due and ending on the earlier of:

(i) The date of mailing of the decision reviving the application or accepting late payment of the issue fee; or

(ii) The date that is four months after the date the grantable petition to revive the application or accept late payment of the issue fee was filed;

(4) Failure to file a petition to withdraw the holding of abandonment or to revive an application within two months from the mailing date of a notice of abandonment, in which case the period of adjustment set forth in §1.703 shall be reduced by the number of days, if any, beginning on the day after the date two months from the mailing date of a notice of abandonment and ending on the date a petition to withdraw the holding of abandonment or to revive the application was filed;

(5) Conversion of a provisional application under 35 U.S.C. 111(b) to a nonprovisional application under 35 U.S.C. 111(a) pursuant to 35 U.S.C. 111(b)(5), in which case the period of adjustment set forth in §1.703 shall be reduced by the number of days, if any, beginning on the date the application was filed under 35 U.S.C. 111(b) and ending on the date a request in compliance with §1.53(c)(3) to convert the provisional application into a nonprovisional application was filed;

(6) Submission of a preliminary amendment or other preliminary paper less than one month before the mailing of an Office action under 35 U.S.C. 132 or notice of allowance under 35 U.S.C. 151 that requires the mailing of a supplemental Office action or notice of allowance, in which case the period of adjustment set forth in §1.703 shall be reduced by the lesser of:

(i) The number of days, if any, beginning on the day after the mailing date of the original Office action or notice of allowance and ending on the date of mailing of the supplemental Office action or notice of allowance; or

(ii) Four months;

(7) Submission of a reply having an omission (§1.135(c)), in which case the period of adjustment set forth in §1.703 shall be reduced by the number of days, if any, beginning on the day after the date the reply having an omission was filed and ending on the date that the

reply or other paper correcting the omission was filed;

(8) Submission of a supplemental reply or other paper, other than a supplemental reply or other paper expressly requested by the examiner, after a reply has been filed, in which case the period of adjustment set forth in §1.703 shall be reduced by the number of days, if any, beginning on the day after the date the initial reply was filed and ending on the date that the supplemental reply or other such paper was filed;

(9) Submission of an amendment or other paper after a decision by the Patent Trial and Appeal Board, other than a decision designated as containing a new ground of rejection under §41.50 (b) of this title or statement under §41.50(c) of this title, or a decision by a Federal court, less than one month before the mailing of an Office action under 35 U.S.C. 132 or notice of allowance under 35 U.S.C. 151 that requires the mailing of a supplemental Office action or supplemental notice of allowance, in which case the period of adjustment set forth in §1.703 shall be reduced by the lesser of:

(i) The number of days, if any, beginning on the day after the mailing date of the original Office action or notice of allowance and ending on the mailing date of the supplemental Office action or notice of allowance; or

(ii) Four months;

(10) Submission of an amendment under §1.312 or other paper after a notice of allowance has been given or mailed, in which case the period of adjustment set forth in §1.703 shall be reduced by the lesser of:

(i) The number of days, if any, beginning on the date the amendment under §1.312 or other paper was filed and ending on the mailing date of the Office action or notice in response to the amendment under §1.312 or such other paper; or

(ii) Four months;

(11) Failure to file an appeal brief in compliance with §41.37 of this chapter within three months from the date on which a notice of appeal to the Patent Trial and Appeal Board was filed under 35 U.S.C. 134 and §41.31 of this chapter, in which case the period of adjustment set forth in §1.703 shall be reduced by

the number of days, if any, beginning on the day after the date three months from the date on which a notice of appeal to the Patent Trial and Appeal Board was filed under 35 U.S.C. 134 and §41.31 of this chapter, and ending on the date an appeal brief in compliance with §41.37 of this chapter or a request for continued examination in compliance with §1.114 was filed;

(12) Failure to provide an application in condition for examination as defined in paragraph (f) of this section within eight months from either the date on which the application was filed under 35 U.S.C. 111(a) or the date of commencement of the national stage under 35 U.S.C. 371(b) or (f) in an international application, in which case the period of adjustment set forth in §1.703 shall be reduced by the number of days, if any, beginning on the day after the date that is eight months from either the date on which the application was filed under 35 U.S.C. 111(a) or the date of commencement of the national stage under 35 U.S.C. 371(b) or (f) in an international application and ending on the date the application is in condition for examination as defined in paragraph (f) of this section; and

(13) Further prosecution via a continuing application, in which case the period of adjustment set forth in §1.703 shall not include any period that is prior to the actual filing date of the application that resulted in the patent.

(d)(1) A paper containing only an information disclosure statement in compliance with §§1.97 and 1.98 will not be considered a failure to engage in reasonable efforts to conclude prosecution (processing or examination) of the application under paragraphs (c)(6), (c)(8), (c)(9), or (c)(10) of this section if it is accompanied by a statement that each item of information contained in the information disclosure statement:

(i) Was first cited in any communication from a patent office in a counterpart foreign or international application or from the Office, and this communication was not received by any individual designated in §1.56(c) more than thirty days prior to the filing of the information disclosure statement; or

(ii) Is a communication that was issued by a patent office in a counterpart foreign or international application or by the Office, and this communication was not received by any individual designated in §1.56(c) more than thirty days prior to the filing of the information disclosure statement.

(2) The thirty-day period set forth in paragraph (d)(1) of this section is not extendable.

(e) The submission of a request under §1.705(c) for reinstatement of reduced patent term adjustment will not be considered a failure to engage in reasonable efforts to conclude prosecution (processing or examination) of the application under paragraph (c)(10) of this section.

(f) An application filed under 35 U.S.C. 111(a) is in condition for examination when the application includes a specification, including at least one claim and an abstract (§1.72(b)), and has papers in compliance with §1.52, drawings (if any) in compliance with §1.84, any English translation required by §1.52(d) or §1.57(a), a sequence listing in compliance with §1.821 through §1.825 (if applicable), the inventor's oath or declaration or an application data sheet containing the information specified in §1.63(b), the basic filing fee (§1.16(a) or §1.16(c)), the search fee (§1.16(k) or §1.16(m)), the examination fee (§1.16(o) or §1.16(q)), any certified copy of the previously filed application required by §1.57(a), and any application size fee required by the Office under §1.16(s). An international application is in condition for examination when the application has entered the national stage as defined in §1.491(b), and includes a specification, including at least one claim and an abstract (§1.72(b)), and has papers in compliance with §1.52, drawings (if any) in compliance with §1.84, a sequence listing in compliance with §1.821 through §1.825 (if applicable), the inventor's oath or declaration or an application data sheet containing the information specified in §1.63(b), the search fee (§1.492(b)), the examination fee (§1.492(c)), and any application size fee required by the Office under §1.492(j). An application shall be considered as having papers in compliance with §1.52, drawings (if any) in compliance with

§1.84, and a sequence listing in compliance with §1.821 through §1.825 (if applicable) for purposes of this paragraph on the filing date of the latest reply (if any) correcting the papers, drawings, or sequence listing that is prior to the date of mailing of either an action under 35 U.S.C. 132 or a notice of allowance under 35 U.S.C. 151, whichever occurs first.

[65 FR 56393, Sept. 18, 2000, as amended at 69 FR 21711, Apr. 22, 2004; 69 FR 50002, Aug. 12, 2004; 72 FR 46843, Aug. 21, 2007; 74 FR 52691, Oct. 14, 2009; 76 FR 74702, Dec. 1, 2011; 77 FR 46628, Aug. 6, 2012; 77 FR 49360, Aug. 16, 2012; 78 FR 19420, Apr. 1, 2013; 78 FR 62408, Oct. 21, 2013]

§ 1.705  Patent term adjustment determination.

(a) The patent will include notification of any patent term adjustment under 35 U.S.C. 154(b).

(b) Any request for reconsideration of the patent term adjustment indicated on the patent must be by way of an application for patent term adjustment filed no later than two months from the date the patent was granted. This two-month time period may be extended under the provisions of §1.136(a). An application for patent term adjustment under this section must be accompanied by:

(1) The fee set forth in §1.18(e); and

(2) A statement of the facts involved, specifying:

(i) The correct patent term adjustment and the basis or bases under §1.702 for the adjustment;

(ii) The relevant dates as specified in §§1.703(a) through (e) for which an adjustment is sought and the adjustment as specified in §1.703(f) to which the patent is entitled;

(iii) Whether the patent is subject to a terminal disclaimer and any expiration date specified in the terminal disclaimer; and

(iv)(A) Any circumstances during the prosecution of the application resulting in the patent that constitute a failure to engage in reasonable efforts to conclude processing or examination of such application as set forth in §1.704; or

(B) That there were no circumstances constituting a failure to engage in reasonable efforts to conclude processing

or examination of such application as set forth in §1.704.

(c) Any request for reinstatement of all or part of the period of adjustment reduced pursuant to §1.704(b) for failing to reply to a rejection, objection, argument, or other request within three months of the date of mailing of the Office communication notifying the applicant of the rejection, objection, argument, or other request must be filed prior to the issuance of the patent. This time period is not extendable. Any request for reinstatement of all or part of the period of adjustment reduced pursuant to §1.704(b) under this paragraph must also be accompanied by:

(1) The fee set forth in §1.18(f); and

(2) A showing to the satisfaction of the Director that, in spite of all due care, the applicant was unable to reply to the rejection, objection, argument, or other request within three months of the date of mailing of the Office communication notifying the applicant of the rejection, objection, argument, or other request. The Office shall not grant any request for reinstatement for more than three additional months for each reply beyond three months from the date of mailing of the Office communication notifying the applicant of the rejection, objection, argument, or other request.

(d) No submission or petition on behalf of a third party concerning patent term adjustment under 35 U.S.C. 154(b) will be considered by the Office. Any such submission or petition will be returned to the third party, or otherwise disposed of, at the convenience of the Office.

[65 FR 56394, Sept. 18, 2000, as amended at 69 FR 21711, Apr. 22, 2004; 78 FR 19420, Apr. 1, 2013]

EXTENSION OF PATENT TERM DUE TO REGULATORY REVIEW

§ 1.710  Patents subject to extension of the patent term.

(a) A patent is eligible for extension of the patent term if the patent claims a product as defined in paragraph (b) of this section, either alone or in combination with other ingredients that read on a composition that received permission for commercial marketing or use, or a method of using such a

166

# Manual of

# PATENT

# EXAMINING

# PROCEDURE

Original Eighth Edition August 2001

Latest Revision August 2012

U.S. DEPARTMENT OF
COMMERCE

United States Patent and
Trademark Office



Rev. 9, August  2012

The U.S. Patent and Trademark Office does not handle the sale of the Manual, distribution of notices and revisions, or change of address of those on the subscription list. Correspondence relating to existing subscriptions should be sent to the Superintendent of Documents at the following address:

> Superintendent of Documents          Telephone: 202-512-2267
> Mail List Section, Washington, DC 20402

Inquiries relating to purchasing the Manual should be directed to:

> Superintendent of Documents          Telephone: 202-512-1800
> United States Government Printing Office
> Washington, DC 20402,

Orders for reproduced copies of individual replacement pages or of previous revisions of the Manual should be sent to the following address:

> Mail Stop Document Services          Telephone: 1-800-972-6382
> Director of the U.S. Patent and Trademark Office          or 571-272-3150
> P.O. Box 1450
> Alexandria, VA 22313-1450,

Previous editions and revisions of the Manual are available on microfilm in the Patent Search Room.
The Manual is available on CD-ROM from:

> U.S. Patent and Trademark Office          Telephone: 571-272-5600
> Office of Electronic Information Products
> MDW 4C18, P.O. Box 1450
> Alexandria, VA 22313-1450

Pursuant to the Patent and Trademark Office Efficiency Act (PTOEA) (Pub. L. 106-113, 113 Stat. 1501A-572), the head of the United States Patent and Trademark Office (USPTO) is the "Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office." The Director is assisted by the "Deputy Under Secretary of Commerce for Intellectual Property and Deputy Director of the United States Patent and Trademark Office." The patent operations of the USPTO are now headed by the "Commissioner for Patents." The trademark operations of the USPTO are now headed by the "Commissioner for Trademarks." Under section 4741(b) of the PTOEA, any reference to the Commissioner of Patents and Trademarks, the Assistant Commissioner for Patents, or the Assistant Commissioner for Trademarks is deemed to refer to the Director, the Commissioner for Patents, or the Commissioner for Trademarks, respectively. See "Reestablishment of the Patent and Trademark Office as the United States Patent and Trademark Office" published in the *Federal Register* at 65 FR 17858 (Apr. 5, 2000), and in the *Official Gazette of the United States Patent and Trademark Office* at 1234 O.G. 41 (May 9, 2000).

Additions to the text of the Manual are indicated by arrows (><) inserted in the text. Deletions are indicated by a single asterisk (*) where a single word was deleted and by two asterisks (**) where more than one word was deleted. The use of three or five asterisks in the body of the laws, rules, treaties, and administrative instructions indicates a portion of the law, rule, treaty, or administrative instruction which was not reproduced.

> First Edition,  November 1949
> Second Edition,  November 1953
> Third Edition,  November 1961
> Fourth Edition,  June 1979
> Fifth Edition,  August 1983
> Sixth Edition,  January 1995
> Seventh Edition,  July 1998
> Eighth Edition,  August 2001
>> Revision 1, February 2003
>> Revision 2, May 2004
>> Revision 3, August 2005
>> Revision 4, October 2005
>> Revision 5, August 2006
>> Revision 6, September 2007
>> Revision 7, July 2008
>> Revision 8, July 2010
>> Revision 9, August 2012

# Table of Contents

*Chapter*                                                                                                  *Page*

100    **Secrecy, Access, National Security, and Foreign Filing**................................................100-1
200    **Types, Cross-Noting, and Status of Application**................................................200-1
300    **Ownership and Assignment**................................................300-1
400    **Representative of Inventor or Owner**................................................400-1
500    **Receipt and Handling of Mail and Papers**................................................500-1
600    **Parts, Form, and Content of Application**................................................600-1
700    **Examination of Applications**................................................700-1
800    **Restriction in Applications Filed Under 35 U.S.C. 111; Double Patenting**................................................800-1
900    **Prior Art, Classification, and Search**................................................900-1
1000   **Matters Decided by Various U.S. Patent and Trademark Office Officials**................................................1000-1
1100   **Statutory Invention Registration (SIR) and Pre-Grant Publication (PG Pub)**................................................1100-1
1200   **Appeal**................................................1200-1
1300   **Allowance and Issue**................................................1300-1
1400   **Correction of Patents**................................................1400-1
1500   **Design Patents**................................................1500-1
1600   **Plant Patents**................................................1600-1
1700   **Miscellaneous**................................................1700-1
1800   **Patent Cooperation Treaty**................................................1800-1
1900   **Protest**................................................1900-1
2000   **Duty of Disclosure**................................................2000-1
2100   **Patentability**................................................2100-1
2200   **Citation of Prior Art and Ex Parte Reexamination of Patents**................................................2200-1
2300   **Interference Proceedings**................................................2300-1
2400   **Biotechnology**................................................2400-1
2500   **Maintenance Fees**................................................2500-1
2600   **Optional Inter Partes Reexamination**................................................2600-1
2700   **Patent Terms and Extensions**................................................2700-1


Appx I     **Partial List of Trademarks**................................................Appx I-1
Appx II    **List of Decisions Cited**................................................Appx II-1
Appx L     **Patent Laws**................................................Appx L-1
Appx R     **Patent Rules**................................................Appx R-1
Appx T     **Patent Cooperation Treaty**................................................Appx T-1
Appx AI    **Administrative Instructions Under the PCT**................................................Appx AI-1
Appx P     **Paris Convention**................................................Appx P-1
Index      ................................................Index-1

Rev. 9, August   2012

provision is made for an Inauguration Day falling on a Saturday.

When an amendment is filed a day or two later than the expiration of the period fixed by statute, care should be taken to ascertain whether the last day of that period was Saturday, Sunday, or a Federal holiday and if so, whether the amendment was filed or the fee paid on the next succeeding day which is not a Saturday, Sunday, or a Federal holiday.

An amendment received on such succeeding day which was due on Saturday, Sunday, or Federal holiday is endorsed on the file wrapper with the date of receipt. The Saturday, Sunday, or Federal holiday is also indicated.

The period of pendency of a provisional application will be extended to the next succeeding secular or business day which is not a Saturday, Sunday, or a Federal holiday, if the day that is twelve months after the filing date of the provisional application under 35 U.S.C. **111(b)** and 37 CFR **1.53(c)** falls on Saturday, Sunday, or a Federal holiday within the District of Columbia. See 35 U.S.C. **119(e)(3)** and MPEP § **201.04(b)**.

### 710.06 Situations When Reply Period Is Reset or Restarted [R-6]

Where the citation of a reference is incorrect or an Office action contains some other error that affects applicant's ability to reply to the Office action and this error is called to the attention of the Office within 1 month of the mail date of the action, the Office will restart the previously set period for reply to run from the date the error is corrected, if requested to do so by applicant. If the error is brought to the attention of the Office within the period for reply set in the Office action but more than 1 month after the mailing of the Office action, the Office will set a new period for reply, if requested to do so by the applicant, to substantially equal the time remaining in the reply period. For example, if the error is brought to the attention of the Office 5 weeks after mailing the action, then the Office would set a new 2-month period for reply. The new period for reply must be at least 1 month and would run from the date the error is corrected. See **MPEP § 707.05(g)** for the manner of correcting the record where there has been an erroneous citation.

Where for any reason it becomes necessary to remail any action (**MPEP § 707.13**), the action should be correspondingly redated, as it is the remailing date that establishes the beginning of the period for reply. **For Image File Wrapper (IFW) processing, see IFW Manual.

A supplementary action after a rejection explaining the references more explicitly or giving the reasons more fully, even though no further references are cited, establishes a new date from which the statutory period runs.

If the error in citation or other defective Office action is called to the attention of the Office after the expiration of the period for reply, the period will not be restarted and any appropriate extension fee will be required to render a reply timely. The Office letter correcting the error will note that the time period for reply remains as set forth in the previous Office action.

See **MPEP § 505**, **§ 512**, and **§ 513** for U.S. Patent and Trademark Office practice on date stamping documents.

In the event that correspondence from the Office is received late (A) due to delays in the U.S. Postal Service, or (B) because the mail was delayed in leaving the USPTO (the postmark date is later than the mail date printed on the correspondence), applicants may petition to reset the period for reply, which petition shall be evaluated according to the guidelines which follow. Where the Office action involved in the petition was mailed by a Technology Center (TC), the authority to decide such petitions has been delegated to the TC Director. See Notice entitled "Petition to reset a period for response due to late receipt of a PTO action," 1160 O.G. 14 (March 1, 1994).

### I. PETITIONS TO RESET A PERIOD FOR REPLY DUE TO LATE RECEIPT OF AN OFFICE ACTION

The Office will grant a petition to restart the previously set period for reply to an Office action to run from the date of receipt of the Office action at the correspondence address when the following criteria are met:

   (A)  the petition is filed within 2 weeks of the date of receipt of the Office action at the correspondence address;

   (B)  a substantial portion of the set reply period had elapsed on the date of receipt (e.g., at least 1 month of a 2- or 3-month reply period had elapsed); and

   (C)  the petition includes (1) evidence showing the date of receipt of the Office action at the correspondence address (e.g., a copy of the Office action having the date of receipt of the Office action at the correspondence address stamped thereon, a copy of the envelope (which contained the Office action) having the date of receipt of the Office action at the correspondence address stamped thereon, etc.), and (2) a statement setting forth the date of receipt of the Office action at the correspondence address and explaining how the evidence being presented

establishes the date of receipt of the Office action at the correspondence address.

There is no statutory requirement that a shortened statutory period of longer than 30 days to reply to an Office action be reset due to delay in the mail or in the Office. However, when a substantial portion of the set reply period had elapsed on the date of receipt at the correspondence address (e.g., at least 1 month of a 2- or 3-month period had elapsed), the procedures set forth above for late receipt of action are available. Where an Office action was received with less than 2 months remaining in a shortened statutory period of 3 months the period may be restarted from the date of receipt. Where the period remaining is between 2 and 3 months, the period will be reset only in extraordinary situations, e.g., complex Office action suggesting submission of comparative data.

## II. PETITIONS TO RESET A PERIOD FOR REPLY DUE TO A POSTMARK DATE LATER THAN THE MAIL DATE PRINTED ON AN OFFICE ACTION

The Office will grant a petition to restart the previously set period for reply to an Office action to run from the postmark date shown on the Office mailing envelope which contained the Office action when the following criteria are met:

(A)  the petition is filed within 2 weeks of the date of receipt of the Office action at the correspondence address;

(B)  the reply period was for payment of the issue fee, or the reply period set was 1 month or 30 days; and

(C)  the petition includes (1) evidence showing the date of receipt of the Office action at the correspondence address (e.g., copy of the Office action having the date of receipt of the Office action at the correspondence address stamped thereon, etc.), (2) a copy of the envelope which contained the Office action showing the postmark date, and (3) a statement setting forth the date of receipt of the Office action at the correspondence address and stating that the Office action was received in the postmarked envelope.

The provisions of **37 CFR 1.8** and 1.10 apply to the filing of the above-noted petitions with regard to the requirement that the petition be filed within 2 weeks of the date of receipt of the Office action.

The showings outlined above may not be sufficient if there are circumstances that point to a conclusion that the Office action may have been delayed after receipt rather than a conclusion that the Office action was delayed in the mail or in the Office.

## 711  Abandonment of Patent Application [R-9]

*37 CFR 1.135  Abandonment for failure to reply within time period.*

(a)  If an applicant of a patent application fails to reply within the time period provided under **§ 1.134** and **§ 1.136**, the application will become abandoned unless an Office action indicates otherwise.

(b)  Prosecution of an application to save it from abandonment pursuant to paragraph (a) of this section must include such complete and proper reply as the condition of the application may require. The admission of, or refusal to admit, any amendment after final rejection or any amendment not responsive to the last action, or any related proceedings, will not operate to save the application from abandonment.

(c)  When reply by the applicant is a *bona fide* attempt to advance the application to final action, and is substantially a complete reply to the non-final Office action, but consideration of some matter or compliance with some requirement has been inadvertently omitted, applicant may be given a new time period for reply under **§ 1.134** to supply the omission.

*37 CFR 1.138  Express abandonment.*

(a)  An application may be expressly abandoned by filing a written declaration of abandonment identifying the application in the United States Patent and Trademark Office. Express abandonment of the application may not be recognized by the Office before the date of issue or publication unless it is actually received by appropriate officials in time to act.

(b)  A written declaration of abandonment must be signed by a party authorized under § **1.33(b)(1)**, **(b)(3)**, or **(b)(4)** to sign a paper in the application, except as otherwise provided in this paragraph. A registered attorney or agent, not of record, who acts in a representative capacity under the provisions of §  **1.34(a)** when filing a continuing application, may expressly abandon the prior application as of the filing date granted to the continuing application.

(c)  An applicant seeking to abandon an application to avoid publication of the application (see § **1.211(a)(1)**) must submit a declaration of express abandonment by way of a petition under this section including the fee set forth in §  **1.17(h)** in sufficient time to permit the appropriate officials to recognize the abandonment and remove the application from the publication process. Applicant should expect that the petition will not be granted and the application will be published in regular course unless such declaration of express abandonment and petition are received by the appropriate officials more than four weeks prior to the projected date of publication.

thus requires action by the applicant should be handled under the *Ex parte Quayle* practice, using Office Action Summary form PTOL-326.

Should the elected *>invention as claimed< be found allowable in the first action, and an oral traverse was noted, the examiner should include in his or her action a statement under MPEP § 821.01, making the restriction >requirement< final and giving applicant 1 month to either cancel the * claims >drawn to the nonelected invention< or take other appropriate action. (37 CFR 1.144). Failure to take action will be treated as an authorization to cancel the nonelected claims by an examiner's amendment and pass the application to issue. Prosecution of the application is otherwise closed.

In either situation (traverse or no traverse), caution should be exercised to determine if any of the *>allowable< claims are linking or generic claims >, or if any nonelected inventions are eligible for rejoinder (see MPEP § 821.04),< before canceling ** claims >drawn to the nonelected invention<.

Where the respective inventions **>would be examined< in different Technology Centers (TCs), the requirement for restriction should be made only after consultation with and approval by all TCs involved. If an oral election would cause the application to be examined in another TC, the initiating TC should transfer the application with a signed memorandum of the restriction requirement and a record of the interview. The receiving TC will incorporate the substance of this memorandum in its official letter as indicated above. Differences as to restriction should be settled by the existing chain of command, e.g., supervisory patent examiner or TC director.

This practice is limited to use by examiners who have at least negotiation authority. Other examiners must have the prior approval of their supervisory patent examiner.

## 814 Indicate Exactly How Application Is To Be Restricted [R-3]

>The examiner must provide a <u>clear and detailed record</u> of the restriction requirement to provide a clear demarcation between restricted inventions so that it can be determined whether inventions claimed in a continuing application are consonant with the restriction requirement and therefore subject to the prohibition against double patenting rejections under 35

U.S.C. 121. *Geneva Pharms. Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1381, 68 USPQ2d 1865, 1871 (Fed. Cir. 2003). See also MPEP § 804.01.

### I. < SPECIES

The mode of indicating how to require restriction between species is set forth in MPEP § 809.02(a).

**>The< particular limitations in the claims and the reasons why such limitations are considered to *>support restriction of< the claims to a particular disclosed species should be mentioned ** to make the requirement clear.
>

### II. < INVENTIONS OTHER THAN SPECIES

It is necessary to read all of the claims ** to determine what the claims cover. When doing this, the claims directed to each separate *>invention< should be noted along with a statement of the **>invention< to which they are drawn.
**

>In setting forth the restriction requirement,< separate inventions should be identified by a grouping of the claims with a short description of the total extent of the invention claimed in each group, specifying the type or relationship of each group as by stating the group is drawn to a process, or to a subcombination, or to a product, etc., and should indicate the classification or separate status of each group, as for example, by class and subclass. >See MPEP § 817 for additional guidance.<

While every claim should be accounted for, the omission to group a claim, or placing a claim in the wrong group will not affect the propriety of a final requirement where the requirement is otherwise proper and the correct disposition of the omitted or erroneously grouped claim is clear.
>

### III. < LINKING CLAIMS

The generic or other linking claims should not be associated with any one of the linked inventions since such claims must be examined with ** the ** elected ** >invention. See MPEP § 809.<

## 815 Make Requirement Complete [R-3]

When making a >restriction< requirement every effort should be made to have the requirement com-

plete. If some of the claimed inventions are classifi-
able in another art unit and the examiner has any
doubt as to the proper line among the same, the appli-
cation should be referred to the examiner of the other
art unit for information on that point and such exam-
iner should render the necessary assistance.

**

# 817    Outline of Letter for Restriction Requirement [R-5]

The following outline should be used to set forth a
requirement to restrict.

## OUTLINE OF RESTRICTION REQUIRE-MENT

(A) Statement of the requirement to restrict and
that it is being made under 35 U.S.C. 121

(1) Identify each group by Roman numeral.

(2) List claims in each group. Check accuracy
of numbering of the claims; look for same claims in
two groups; and look for omitted claims.

(3) Give short description of total extent of the
subject matter claimed in each group, pointing out
critical claims of different scope and identifying
whether the claims are directed to a combination, sub-
combination, process, apparatus, or product.

(4) Classify each group.

Form paragraphs 8.08-8.11 should be used to group
inventions.

¶ *8.08 Restriction, Two Groupings*
Restriction to one of the following inventions is required under
35 U.S.C. 121:
    I.Claim **[1]**, drawn to    **[2]**, classified in class    **[3]**, subclass
**[4]**.
    II.Claim **[5]**, drawn to **[6]**, classified in class **[7]**, subclass  **[8]**.

¶ *8.09 Restriction, 3rd Grouping*
    III.Claim    **[1]**, drawn to    **[2]**, classified in class **[3]**, subclass
**[4]**.

¶ *8.10 Restriction, 4th Grouping*
    IV.Claim    **[1]**, drawn to    **[2]**, classified in class **[3]**, subclass
**[4]**.

¶ *8.11 Restriction, Additional Groupings*
    **[1]**.Claim**[2]**, drawn to **[3]**, classified in class **[4]**, subclass **[5]**.

**Examiner Note:**
    In bracket 1, insert the appropriate roman numeral, e.g., --V--, --
-VI--, etc.

If restriction is required between species, form
paragraph 8.01 or 8.02 should be used to set forth the
patentably distinct species and reasons for holding the
species are independent or distinct. See MPEP
§ 809.02(a).

(B) Take into account claims not grouped, indi-
cating their disposition.

(1) Linking claims

(i) Identify

(ii) Statement of groups to which linking
claims may be assigned for examination

(2) Other ungrouped claims

(3) Indicate disposition, e.g., improperly
dependent, canceled, etc.

(C) Allegation of independence or distinctness

(1) Point out facts which show independence
or distinctness

(2) Treat the inventions as claimed, don't
merely state the conclusion that inventions in fact are
independent or distinct, e.g.,

(i) Subcombination - Subcombination dis-
closed as usable together

Each usable alone or in other identified com-
bination

Demonstrate by examiner's suggestion

(ii) Combination - Subcombination

Combination as claimed does not require
subcombination

AND

Subcombination usable alone or in other
combination

Demonstrate by examiner's suggestion

(iii) Process - Apparatus

Process can be carried out by hand or by
other apparatus

Demonstrate by examiner's suggestion

OR

Demonstrate apparatus can be used in other
process (rare).

(iv) Process of making and/or Apparatus for
making — Product made

Claimed product can be made by other pro-
cess (or apparatus)

Demonstrate by examiner's suggestion

OR

Demonstrate process of making (or appara-
tus for making) can produce other product (rare)

(D) Provide reasons for insisting upon restriction

(1) Separate status in the art

(2) Different classification

(3) Same classification but recognition of divergent subject matter

(4) Divergent fields of search, or

(5) Search required for one group not required for the other

 (E) Summary statement

(1) Summarize (i) independence or distinctness and (ii) reasons for insisting upon restriction

(2) Include paragraph advising as to reply required

(3) Indicate effect of allowance of linking claims, if any present

(4) Indicate effect of cancellation of evidence claims (see MPEP § 806.05(c))

(5) Indicate effect of allowance of product claims if restriction was required between a product and a process of making and/or using the product.

Form paragraphs 8.14-8.20.02 may be used as appropriate to set forth the reasons for the holding of independence or distinctness. Form paragraph 8.13 may be used as a heading.

*¶ 8.13 Distinctness (Heading)*

The inventions are independent or distinct, each from the other because:

**Examiner Note:**

This form paragraph should be followed by one of form paragraphs 8.14-8.20.02 to show independence or distinctness.

One of form paragraphs 8.21.01 through 8.21.03 must be used at the conclusion of each restriction requirement.

**>

*¶ 8.21.01 Conclusion to All Restriction Requirements: Different Classification*

Because these inventions are independent or distinct for the reasons given above and there would be a serious burden on the examiner if restriction is not required because the inventions have acquired a separate status in the art in view of their different classification, restriction for examination purposes as indicated is proper.

**Examiner Note:**

THIS FORM PARAGRAPH (OR ONE OF FORM PARA-GRAPHS 8.21.02 OR 8.21.03) MUST BE ADDED AS A CON-CLUSION TO ALL RESTRICTION REQUIREMENTS employing any of form paragraphs 8.01, 8.02, or 8.14 to 8.20.03.

*¶ 8.21.02 Conclusion to All Restriction Requirements: Recognized Divergent Subject Matter*

Because these inventions are independent or distinct for the reasons given above and there would be a serious burden on the examiner if restriction is not required because the inventions have acquired a separate status in the art due to their recognized divergent subject matter, restriction for examination purposes as indicated is proper.

**Examiner Note:**

THIS FORM PARAGRAPH (OR ONE OF FORM PARA-GRAPHS 8.21.01 OR 8.21.03) MUST BE ADDED AS A CON-CLUSION TO ALL RESTRICTION REQUIREMENTS employing any of form paragraphs 8.01, 8.02, or 8.14 to 8.20.03.

*¶ 8.21.03 Conclusion to All Restriction Requirements: Different Search*

Because these inventions are independent or distinct for the reasons given above and there would be a serious burden on the examiner if restriction is not required because the inventions require a different field of search (see MPEP § 808.02), restriction for examination purposes as indicated is proper.

**Examiner Note:**

THIS FORM PARAGRAPH (OR ONE OF FORM PARA-GRAPHS 8.21.01 OR 8.21.02) MUST BE ADDED AS A CON-CLUSION TO ALL RESTRICTION REQUIREMENTS employing any of form paragraphs 8.01, 8.02, or 8.14 to 8.20.03.

<

Form paragraph 8.23.02 must be included in all restriction requirements for applications having joint inventors.

*¶ 8.23.02 Joint Inventors, Correction of Inventorship*

Applicant is reminded that upon the cancellation of claims to a non-elected invention, the inventorship must be amended in compliance with 37 CFR 1.48(b) if one or more of the currently named inventors is no longer an inventor of at least one claim remaining in the application. Any amendment of inventorship must be accompanied by a request under 37 CFR 1.48(b) and by the fee required under 37 CFR 1.17(i).

**Examiner Note:**

This form paragraph must be included in all restriction requirements for applications having joint inventors.

# 818     Election and Reply [R-3]

Election is the designation of the particular one of two or more disclosed inventions that will be prosecuted in the application.

A reply should be made to each point raised by the examiner's action, and may include a traverse or compliance.

BY AUTHORITY OF CONGRESS.

THE

# Statutes at Large

AND

## PROCLAMATIONS

OF THE

# UNITED STATES OF AMERICA,

FROM DECEMBER 1869 TO MARCH 1871,

AND

## TREATIES AND POSTAL CONVENTIONS

Arranged in Chronological Order and carefully collated with
the Originals at Washington,

WITH

REFERENCES TO THE MATTER OF EACH ACT AND TO THE SUBSEQUENT
ACTS ON THE SAME SUBJECT.

EDITED BY

## GEORGE P. SANGER,

COUNSELLOR AT LAW.

The rights and interest of the United States in the stereotype plates from which this work is printed are hereby recognized, acknowledged, and declared by the publishers, according to the provisions of the joint resolution of Congress, passed March 3, 1845.

VOL. XVI.

## BOSTON:

### LITTLE, BROWN, AND COMPANY.

1871.

omit to do either, his application shall be held to have been abandoned. **When application held to be abandoned.** Upon the hearing of such renewed applications abandonment shall be considered as a question of fact.

Sec. 36. *And be it further enacted,* That every patent or any interest **Patents, &c. assignable.** therein shall be assignable in law, by an instrument in writing; and the patentee or his assigns or legal representatives may, in like manner, **Exclusive rights.** grant and convey an exclusive right under his patent to the whole or any specified part of the United States; and said assignment, grant, or **Assignment, &c. void against subsequent purchaser, &c. unless, &c.** conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the patent office within three months from the date thereof.

Sec. 37. *And be it further enacted,* That every person who may have **Persons purchasing of inventor, &c. before application for patent, may use, &c. the specific thing purchased without liability.** purchased of the inventor, or with his knowledge and consent may have constructed any newly invented or discovered machine, or other patentable article, prior to the application by the inventor or discoverer for a patent, or sold or used one so constructed, shall have the right to use, and vend to others to be used, the specific thing so made or purchased, without liability therefor.

Sec. 38. *And be it further enacted,* That it shall be the duty of all **The word "patented," &c. to be affixed to each patented article;** patentees, and their assigns and legal representatives, and of all persons making or vending any patented article for or under them, to give sufficient notice to the public that the same is patented, either by fixing thereon the word "patented," together with the day and year the patent **or a label to a package of such articles.** was granted; or when, from the character of the article, this cannot be done, by fixing to it or to the package wherein one or more of them is inclosed, a label containing the like notice; and in any suit for infringe- **If not so marked, no damages unless upon proof of use after prior actual notice.** ment, by the party failing so to mark, no damages shall be recovered by the plaintiff, except on proof that the defendant was duly notified of the infringement, and continued, after such notice, to make, use, or vend the article so patented.

Sec. 39. *And be it further enacted,* That if any person shall, in any **Penalty for wrongly marking as patented any unpatented article, or wrongly affixing the words "patent," &c. and how recovered;** manner, mark upon anything made, used, or sold by him for which he has not obtained a patent, the name or any imitation of the name of any person who has obtained a patent therefor, without the consent of such patentee, or his assigns or legal representatives; or shall in any manner mark upon or affix to any such patented article the word "patent" or "patentee," or the words "letters-patent," or any word of like import, with intent to imitate or counterfeit the mark or device of the patentee, without having the license or consent of such patentee or his assigns or legal representatives; or shall in any manner mark upon or affix to any unpatented article the word "patent," or any word importing that the same is patented, for the purpose of deceiving the public, he shall be liable for every such offense to a penalty of not less than one hundred dollars, with costs; one moiety of said penalty to the person who shall **one half to go to person suing, and the other to the United States.** sue for the same, and the other to the use of the United States, to be recovered by suit in any district court of the United States within whose jurisdiction such offense may have been committed.

Sec. 40. *And be it further enacted,* That any citizen of the United **Caveat;** States, who shall have made any new invention or discovery, and shall desire further time to mature the same, may, on payment of the duty required by law, file in the patent office a caveat setting forth the design thereof, and of its distinguishing characteristics, and praying protection of his right until he shall have matured his invention; and such **where to be filed, and how long operative.** caveat shall be filed in the confidential archives of the office and preserved in secrecy, and shall be operative for the term of one year from the filing thereof; and if application shall be made within the year by **Notice to person filing, of application for a patent with which caveat** any other person for a patent with which such caveat would in any manner interfere, the commissioner shall deposit the description, specification, drawings, and model of such application in like manner in the confi-

204            FORTY–FIRST CONGRESS. Sess. II. Ch. 230. 1870.

would interfere, and subsequent proceedings.

dential archives of the office, and give notice thereof, by mail, to the person filing the caveat, who, if he would avail himself of his caveat, shall file his description, specifications, drawings, and model within three months from the time of placing said notice in the post-office in Washington, with the usual time required for transmitting it to the caveator added thereto, which time shall be indorsed on the notice. And an alien shall have the privilege herein granted, if he shall have resided in the United States one year next preceding the filing of his caveat, and made oath of his intention to become a citizen.

Aliens.

Notice of rejection of claim for patent to be given to applicant with reasons therefor, &c.

SEC. 41. *And be it further enacted,* That whenever, on examination, any claim for a patent is rejected for any reason whatever, the commissioner shall notify the applicant thereof, giving him briefly the reasons for such rejection, together with such information and references as may be useful in judging of the propriety of renewing his application or of altering his specification; and if, after receiving such notice, the applicant shall persist in his claim for a patent, with or without altering his specifications, the commissioner shall order a re-examination of the case.

Case to be re-examined, if, &c.

Interferences, &c.

SEC. 42. *And be it further enacted,* That whenever an application is made for a patent which, in the opinion of the commissioner, would interfere with any pending application, or with any unexpired patent, he shall give notice thereof to the applicants, or applicant and patentee, as the case may be, and shall direct the primary examiner to proceed to determine the question of priority of invention. And the commissioner may issue a patent to the party who shall be adjudged the prior inventor, unless the adverse party shall appeal from the decision of the primary examiner, or of the board of examiners-in-chief, as the case may be, within such time, not less than twenty days, as the commissioner shall prescribe.

Patent to issue to whom.

Affidavits and depositions.

SEC. 43. *And be it further enacted,* That the commissioner may establish rules for taking affidavits and depositions required in cases pending in the patent office, and such affidavits and depositions may be taken before any officer authorized by law to take depositions to be used in the courts of the United States, or of the State where the officer resides.

Subpœnas to witnesses

SEC. 44. *And be it further enacted,* That the clerk of any court of the United States, for any district or Territory wherein testimony is to be taken for use in any contested case pending in the patent office, shall, upon the application of any party thereto, or his agent or attorney, issue [a] subpœna for any witness residing or being within said district or Territory, commanding him to appear and testify before any officer in said district or Territory authorized to take depositions and affidavits, at any time and place in the subpœna stated; and if any witness, after being duly served with such subpœna, shall neglect or refuse to appear, or after appearing shall refuse to testify, the judge of the court whose clerk issued the subpœna, may, on proof of such neglect or refusal, enforce obedience to the process, or punish the disobedience as in other like cases.

Penalty upon witness for refusing to appear as directed.

Witness fees.

SEC. 45. *And be it further enacted,* That every witness duly subpœnaed and in attendance shall be allowed the same fees as are allowed to witnesses attending the courts of the United States, but no witness shall be required to attend at any place more than forty miles from the place where the subpœna is served upon him, nor be deemed guilty of contempt for disobeying such subpœna, unless his fees and travelling expenses in going to, returning from, and one day's attendance at the place of examination, are paid or tendered him at the time of the service of the subpœna; nor for refusing to disclose any secret invention or discovery made or owned by himself.

Witness not compelled to go more than forty miles, &c. unless, &c.;

nor to disclose his own secret invention.

SEC. 46. *And be it further enacted,* That every applicant for a patent

A-031

or the reissue of a patent, any of the claims of which have been twice rejected, and every party to an interference, may appeal from the decision of the primary examiner, or of the examiner in charge of interference[s], in such case to the board of examiners-in-chief, having once paid the fee for such appeal provided by law.    *Appeals from primary examiner;*

Sec. 47. *And be it further enacted,* That if such party is dissatisfied with the decision of the examiners-in-chief, he may, on payment of the duty required by law, appeal to the commissioner in person.    *from examiners-in-chief;*

Sec. 48. *And be it further enacted,* That if such party, except a party to an interference, is dissatisfied with the decision of the commissioner, he may appeal to the supreme court of the District of Columbia, sitting in banc.    *from the commissioner.*

Sec. 49. *And be it further enacted,* That when an appeal is taken to the supreme court of the District of Columbia, the appellant shall give notice thereof to the commissioner, and file in the patent office, within such time as the commissioner shall appoint, his reasons of appeal, specifically set forth in writing.    *Practice in cases of appeals to the supreme court of the District of Columbia.*

Sec. 50. *And be it further enacted,* That it shall be the duty of said court, on petition, to hear and determine such appeal, and to revise the decision appealed from in a summary way, on the evidence produced before the commissioner, at such early and convenient time as the court may appoint, notifying the commissioner of the time and place of hearing; and the revision shall be confined to the points set forth in the reasons of appeal. And after hearing the case, the court shall return to the commissioner a certificate of its proceedings and decision, which shall be entered of record in the patent office, and govern the further proceedings in the case. But no opinion or decision of the court in any such case shall preclude any person interested from the right to contest the validity of such patent in any court wherein the same may be called in question.    *Duty of the court upon such appeals.*

*Its decision not to preclude the right to test validity of patent in any court.*

Sec. 51. *And be it further enacted,* That on receiving notice of the time and place of hearing such appeal, the commissioner shall notify all parties who appear to be interested therein in such manner as the court may prescribe. The party appealing shall lay before the court certified copies of all the original papers and evidence in the case, and the commissioner shall furnish it with the grounds of his decision, fully set forth in writing, touching all the points involved by the reasons of appeal. And at the request of any party interested, or of the court, the commissioner and the examiners may be examined under oath, in explanation of the principles of the machine or other thing for which a patent is demanded.    *Practice in the hearing of appeals by the court.*

Sec. 52. *And be it further enacted,* That whenever a patent on application is refused, for any reason whatever, either by the commissioner or by the supreme court of the District of Columbia upon appeal from the commissioner, the applicant may have remedy by bill in equity; and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof, as the facts in the case may appear. And such adjudication, if it be in favor of the right of the applicant, shall authorize the commissioner to issue such patent, on the applicant filing in the patent office a copy of the adjudication, and otherwise complying with the requisitions of law. And in all cases where there is no opposing party a copy of the bill shall be served on the commissioner, and all the expenses of the proceeding shall be paid by the applicant, whether the final decision is in his favor or not.    *If a patent on application is refused, applicant may bring bill in equity, &c.*

*Patent to issue, if, &c.*

*Copy to be served upon commissioner, if, &c.*

*Expenses.*

Sec. 53. *And be it further enacted,* That whenever any patent is inoperative or invalid, by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery    *Reissues.*

# Calendar No. 1908

| 82D CONGRESS | SENATE | REPORT |
|---|---|---|
| 2d Session | | No. 1979 |

## REVISION OF TITLE 35, UNITED STATES CODE

JUNE 27, 1952.—Ordered to be printed

Mr. WILEY, from the Committee on the Judiciary, submitted the following

## REPORT

[To accompany H. R. 7794]

The Committee on the Judiciary, to which was referred the bill (H. R. 7794) to revise, codify, and enact into law title 35 of the United States Code entitled "Patents," having considered the same, reports favorably thereon, with amendments, and recommends that the bill, as amended, do pass.

#### AMENDMENTS

Amendment No. 1: On page 9, line 3 of subdivision (d), section 102, strike the word "or" and insert in lieu thereof the word "on".

Amendment No. 2: On page 29, subdivision (1) of section 282, strike out the word "or" and insert in lieu thereof a comma.

Amendment No. 3: On page 29, subdivision (1) of section 282, strike out the comma after the word "infringement" and insert in lieu thereof "or unenforceability,".

Amendment No. 4: On page 29, first line of section 284, strike out "Upon adjudging a patent valid and infringed" and insert in lieu thereof the following: "Upon finding for the claimant".

#### PURPOSE

The purpose of the proposed legislation is to revise and codify the laws relating to patents and enact into law title 35 of the United States Code entitled "Patents".

#### STATEMENT

Hearings were held in the House on H. R. 3760, which dealt with the matter of the codification of title 35, and as a result of those hearings the bill was revised and introduced as H. R. 7794.

This bill is part of the comprehensive program of revising and enacting into law all the titles of the United States Code. Up to the present time 9 out of the 50 titles of the code have been revised and enacted into law and consideration or preparation of bills relating to a number of additional titles is in process.

20          REVISION OF TITLE 35, UNITED STATES CODE

### SECTION 118—NEW SECTION

This section is new and provides for the filing of an application by another on behalf of the inventor in certain special hardship situations.

### SECTION 119—SECTION REVISED

Based on title 35, U. S. C., 1946 ed:, § 32, second paragraph (R. S. 4887, second paragraph, amended (1) Mar. 3, 1903, ch. 1019, § 1, 32 Stat. 1225, 1226, (2) June 19, 1936. ch. 594, 49 Stat. 1529, (3) Aug. 5, 1939, ch. 450, § 1, 53 Stat. 1212).

The first paragraph is the same as the present law with changes in language. The references to designs have been removed for inclusion in another section and the opening clause has been modified to accord with actual practice and the requirements of the International Convention for the Protection of Industrial Property.

The second paragraph is new, making an additional procedural requirement for obtaining the right of priority. Copies of the foreign papers on which the right of priority is based are required so that the record of the United States patent will be complete in this country.

### SECTION 120—NEW SECTION

This section represents present law not expressed in the statute, except for the added requirement that the first application must be specifically mentioned in the second.

### SECTION 121—NEW SECTION

This section enacts as law existing practice with respect to division, at the same time introducing a number of changes. Division is made discretionary with the Commissioner. The requirements of section 120 are made applicable and neither of the resulting patents can be held invalid over the other merely because of their being divided in several patents. In some cases a divisional application may be filed by the assignee.

### SECTION 122—NEW SECTION

This section enacts the Patent Office rule of secrecy of applications.

## CHAPTER 12. EXAMINATION OF APPLICATION

Sec.
131. Examination of application.
132. Notice of rejection; reexamination.
133. Time for prosecuting application.
134. Appeal to the Board of Appeals.
135. Interferences.

### SECTION 131—SECTION REVISED

Based on title 35, U. S. C., 1946 ed., § 36 (R. S. 4893).

The first part is revised in language and amplified. The phrase "and that the invention is sufficiently useful and important" is omitted as unnecessary, the requirements for patentability being stated in sections 101, 102 and 103.

**48**

### Section 132—Section Revised

Based on title 35, U. S. C., 1946 ed., § 51 (R. S. 4903, amended Aug. 5, 1939, ch. 452, § 1, 53 Stat. 1213).

The first paragraph of the corresponding section of existing statute is revised in language and amplified to incorporate present practice; the second paragraph of the existing statute is placed in section 135.

The last sentence relating to new matter is added but represents no departure from present practice.

### Section 133—Section Revised

Based on title 35, U. S. C., 1946 ed., § 37 (R. S. 4894, amended (1) Mar. 3, 1897, ch. 391, § 4, 29 Stat. 692, 693, (2) July 6, 1916, ch. 225, § 1, 39 Stat. 345, 347-8, (3) Mar. 2, 1927, ch. 273, § 1, 44 Stat. 1335, (4) Aug. 7, 1939, ch. 568, 53 Stat. 1264).

The opening clause of the corresponding section of existing statute is omitted as having no present day meaning or value and the last two sentences are omitted for inclusion in section 267. The notice is stated as given or mailed. Language is revised.

### Section 134—Section Revised

Based on title 35, U. S. C., 1946 ed., § 57 (R. S. 4909 amended (1) Mar. 2, 1927, ch. 273, § 5, 44 Stat. 1335, 1336, (2) Aug. 5, 1939, ch. 451, § 2, 53 Stat. 1212).

Reference to reissues is omitted in view of the general provision in section 251. Minor changes in language are made.

### Section 135—Section Revised

The first paragraph is based on title 35, U. S. C., 1946 ed., § 52 (R. S. 4904 amended (1) Mar. 2, 1927, ch. 273, § 4, 44 Stat. 1335, 1336, (2) Aug. 5, 1939, ch. 451, § 1, 53 Stat. 1212).

The first paragraph states the existing corresponding statute with a few changes in language. An explicit statement that the Office decision on priority constitutes a final refusal by the Office of the claims involved, is added. The last sentence is new and provides that judgment adverse to a patentee constitutes cancellation of the claims of the patent involved after the judgment has become final, the patentee has a right of appeal (sec. 141) and is given a right of review by civil action (sec. 146).

The second paragraph is based on title 35, U. S. C., 1946 ed., § 51, (R. S. 4903, amended Aug. 5, 1939, ch. 452, § 1, 53 Stat. 1213). Changes in language are made.

**49**

## CHAPTER 13. REVIEW OF PATENT OFFICE DECISIONS

Sec.
141. Appeal to Court of Customs and Patent Appeals.
142. Notice of appeal.
143. Proceedings on appeal.
144. Decision on appeal.
145. Civil action to obtain patent.
146. Civil action in case of interference.

### SECTION 141—SECTION REVISED

Based on title 35, U. S. C., 1946 ed., § 59a (R. S. 4911, amended (1) Mar. 2, 1927, ch. 273, § 8, 44 Stat. 1336, (2) Mar. 2, 1929, ch. 4888, § 2a, 45 Stat. 1476, (3) Aug. 5, 1939, ch. 451, § 3, 53 Stat. 1212).
Changes in language are made.

### SECTION 142—SECTION REVISED

Based on title 35, U. S. C., 1946 ed., § 60 (R. S. 4912 amended (1) Mar. 2, 1927, ch. 273, § 9, 44 Stat. 1336 (2) Mar. 2, 1929, ch. 4888, § 2 (b), 45 Stat. 1476).
Changes in language are made.

### SECTION 143—SECTION REVISED

Based on title 35, U. S. C., 1946 ed., § 61 (R. S. 4913, amended Mar. 2, 1927, ch. 273, § 10, 44 Stat. 1336).
Language is changed. The requirement that the Commissioner notify the parties is omitted and a requirement that the court notify the parties is added. The statement relating to filing the papers and testimony is made more explicit.

### SECTION 144—SECTION REVISED

Based on title 35, U. S. C., 1946 ed., § 62 (R. S. 4914).
Language is changed and the last sentence of the corresponding section of existing statute omitted as superfluous; such a sentence does not appear in the present civil action section, 35 U. S. C. 63 and in either case the validity of the patent may be questioned.

### SECTION 145—SECTION REVISED

Based on title 35, U. S. C., 1946 ed., § 63 (R. S. 4915, amended (1) Mar. 2, 1927, ch. 273, § 11, 44 Stat. 1336, (2) Mar. 2, 1929, ch. 488, § 2 (b), 45 Stat. 1476, (3) Aug. 5, 1939, ch. 451, § 4, 53 Stat. 1212).
Bill in equity is changed to civil action and the section is restricted to exclude interferences which are covered by the next section. The time for filing the action is changed to the same as the time for appeal. The requirement for the applicant to file a copy of the decision in the Patent Office is omitted. Language is changed.

### SECTION 146—SECTION REVISED

The first paragraph and parts of the second paragraph are based on title 35, U. S. C., 1946 ed., § 63 (R. S. 4915, amended (1) Mar. 2, 1927, ch. 273, § 11, 44 Stat. 1336, (2) Mar. 2, 1929, ch. 488, § 2 (b),

**50**

## CERTIFICATE OF SERVICE

On March 25, 2015, the foregoing brief was submitted to the Court through the CM/ECF system.  All parties are represented by CM/ECF users and will be served by the CM/ECF system.

*/s/ Daniel Forchheimer*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 28.1(e)(2).  According to the word processing system used to prepare it, the brief contains 9,028 words.

*/s/ Daniel Forchheimer*